IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

**EMIR DINI**
*Plaintiff,*

v.

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION;**

**CHARLOTTE BURROWS** *in her official capacity as Chair of the Equal Employment Opportunity Commission,*

*Defendants,*

Case No. CV21-00629-PHX-MTL

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

THIS DOCUMENT IS NOT IN PROPER FORM ACCORDING TO FEDERAL AND/OR LOCAL RULES AND PRACTICES AND IS SUBJECT TO REJECTION BY THE COURT.

REFERENCE LRCvP 5.4
(Rule Number/Section)

**NATURE OF ACTION**

1. The Plaintiff files this complaint against the Defendant, the Equal Employment Opportunity Commission ("EEOC"), and against Ms. Charlotte Burrows, Ms. Amy Burkholder, Ms. Patricia Miner, and Mr. Glenn Parker in their official capacities and alleges that agency use of the "Priority Charge Handling Procedures" (or "PCHP") violates the Administrative Procedures Act ("APA") and is unconstitutional as it is an *ultra vires* action with no basis in law;

**THE PARTIES**

2. The Plaintiff is an aggrieved party that filed an EEOC charge on two separate occasion and on both times, the charges were never investigated under a scheme employed by the EEOC known as PCHP;

3. The Defendant is the Equal Employment Opportunity Commission ("EEOC"), a federal agency tasked with enforcing provisions of the Civil Rights Act of 1964 and subsequent

amendments to the law. Ms. Amy Burkholder is the Denver-field Office Director for the Commission, a regional office supervising EEOC enforcement for several states encompassing the Southwest region. Mr. Glenn Parker is an EEOC investigator out of the Denver office. Ms. Patricia Miner is an EEOC investigator out of the Phoenix office. Both Ms. Miner and Mr. Parker are under the supervision of the Denver field office, headed by Ms. Amy Burkholder;

## JURISDICTION & VENUE

4. The jurisdiction of this Court is invoked pursuant to 28 U.S. Code § 1331; 28 U.S. Code § 1346; 28 U.S. Code § 1361 and 5 U.S.C § 551 et seq., and § 701 et seq. (Administrative Procedures Act); and 28 U.S. Code § 2201-2202 among others;

5. The Plaintiff has exhausted all administrative remedies available to them. The Plaintiff has complained numerous times to Defendant and has written at length about the constitutional ramifications of the adopted practices of the EEOC, requesting that they be modified **[EXHIBIT 1]** [Exhibit 2];

6. Venue in this district is proper pursuant to 28 U.S. Code § 1391 (e) because a substantial part of the events giving rise to the Plaintiff's claims against the EEOC occurred in this District (specifically within the EEOC's District Office in Phoenix, Arizona);

## FACTUAL BACKGROUND

7. In 2019, the Plaintiff submitted a civil rights charge against a respondent in Colorado with the Denver field office for the EEOC;

8. A few weeks later, the charge was administratively closed. The notice provided informed the Plaintiff that his charge was closed under the EEOC's priority charge handling procedures ("PCHP");

9. Between the filing of the charge and the issuance of the right-to-sue notice, there was no agency activity that took place into ascertaining the allegations made by the Plaintiff. The Plaintiff notified Ms. Amy Burkholder, the director for the Denver field office that his charge,

as provided, contained a *prima facie* case of discrimination that the EEOC was statutorily obligated to investigate it under Title VII (42 U.S.C 2000e-5. [Section 706] (b)) and under the agencies own PCHP policy [**Exhibit 2**];

10. The Respondent was made aware that a charge had been filed against them; However, the EEOC did not wait to receive a response from the respondent either denying or admitting to the allegations contained in Plaintiff's charge. Rather, the agency closed the charge and issued a notice of right-to-sue letter to the Plaintiff;

11. In 2020, a similar set of recurring events took place, this time with the EEOC's Phoenix office. The Plaintiff submitted two charges against respondents in the state of Arizona. The EEOC closed both charges administratively. As with the Denver respondent, the EEOC did not wait to receive a response from the respondents either denying or admitting to the allegations contained within the Plaintiff's charge as required under 42 U.S.C 2000e-5. [Section 706] (b) [**Exhibit 3**];

12. For both incidents, the Plaintiff conducted his own private investigations. The results of those investigations determined that the respondent in Colorado had indeed discrimination against the Plaintiff by failing to consider him, whilst others similarily situtated were given consideration. However, due to the length of time it took to undertake fact-finding to reach this determination, the Plaintiff had run out the clock on the 90 day window to initiate a lawsuit. More, the Plaintiff did not have at his disposal, the enumerated powers of discovery set aside for the EEOC during the course of a Title VII investigation; For the respondents in Arizona, the Plaintiff determined that the job posting was cancelled as a result of budgetary concerns for one of the respondents. For the other respondent in Arizona, the hired applicant was a highly qualified and former employee, who had come out of retirement to accept the position [**Exhibit 4**].

13. Further the Plaintiff conducted a years long investigation into the EEOC's priority charge handling procedures. The results of that investigation determined that the policy was a scheme to hide severe budgetary stress on the agency and to serve as a policy crutch after decades of neglect by Congress to adequately fund the country's foremost civil rights agency;

## HISTORICAL BACKGROUND OF THE EEOC'S PCHP POLICY (1995 - 2020)

14. Between 1995-1996, under the leadership of former Commissioner Chair Gilbert Casselas, the EEOC instituted a set of policies, collectively known as priority charge handling procedures or PCHP, to organize charges based on merit [**Exhibit 5**] [**Exhibit 5A**]. The impetus for introducing these policies was to address a growing backlog of cases and the agencies decades long stagnant budget;

15. Under the PCHP policy, a civil rights charge would be reviewed by an investigator and based on the facts, the investigator would determine if the case held merit. If so, the charge would be categorized into one of two categories, "A" or "B";

16. If the facts were sufficient enough to establish probable cause and there was belief that the EEOC could obtain relief for the aggrieved party through mediation or litigation, the case was designated as an "A" case, at which time, the EEOC would move to secure relief;

17. If the facts were sufficient but required additional fact-finding to establish probable cause, the case would be designated a "B" case, at which time, the EEOC would conduct an investigation to establish cause for obtaining relief for the aggrieved party;

18. If the facts were construed to be meritless, self-defeating or plainly distinguishable as a falsehood by the investigator, the charge would be designated a "C" case, at which time, no further fact-finding would occur. The aggrieved party would receive a right-to-sue notice and a letter explaining that the EEOC would not be moving forward with the charge;

19. By 1997, under the PHCP policy, the EEOC was able to virtually eliminate its backlog and redirect its resources to systemic patterns of discrimination and harrassment in the labor market;

20. By the year 2000, the EEOC's backlog had returned. At this time, the agencies budget had been stagnant for over 20 years (unchanged from 1980, when accounted for inflation). The stagnant budget had forced the EEOC to downsize, forcing the agency to fire many frontline staff, attorneys and civil rights investigators;

21. Moreover, the U.S labor force had gone through one of its largest economic expansions, greatly increasing the labor force, and by extension, increasing the likelihood that the EEOC would receive additional civil rights charges;

22. During this timeframe, based on the EEOC's own historical materials, the agency had a cyclical backlog of cases from year-to-year;

23. By 2010, the EEOC had entered its 30th year of an unchanged budget and a labor force that had grown by over ~40%. According to figures presented by the Chair of the EEOC during this timeframe, the agency estimated that by the end of 2010, it would have a backlog of over 100,000 cases;

24. In or around this timeframe, the agency began to utilize the PCHP policy as a lifeline to counteract its stagnant budget and pressures to downsize its staff. The EEOC undertook a radical shift in how the PCHP policy would be implemented. Rather than using its resources to investigate prima facie cases of discrimination or harrassment, the EEOC began to select the most promising cases and those that held the most potential for obtaining relief;

25. The cases designated as "C" cases began to grow and were summarily closed prior to any investigation. Many of these cases were in fact not "C" cases, but the agency designated them as such to avoid the costs involved with investigating them and the sad reality, it simply did not have the budget to do so;

26. In time, agency investigators began to complain about the policy [**Exhibit 6**]. Many publicly disclosed that they were closing cases with merit at the direction of EEOC supervisors, despite having a legal obligation to investigate said civil rights charges; Even Rae Vann, the former Vice President and General Counsel for the President's Equal Employment Advisory Council expressed her concerns to members of Congress in 2017 by telling them that she suspected the EEOC was no longer investigating civil rights charges [**Exhibit 6A**];

27. Media reports around this timeframe also memorialized this crisis with journalists writing on the agencies inability to investigate charges and the rapid dismissal of so many claims at breakneck speeds [**Exhibit 7**] [**Exhibit 7A**]; Law Firms, with decades of practice in civil

rights litigation, also began to memorialize the impact of PCHP and the fact that cases they deemed as having merit were being dismissed without any review; often suspecting that the EEOC was violating Title VII and its own administrative rules and regulations [**Exhibit 8**];

28. However, PCHP would be put on steroids under former Commissioner Victoria Lipnic. In the midst of the MeToo movement, Commissioner Lipinic used the policy in an unprecedented way, closing without any investigation over 12,000 cases [**Exhibit 9**]. Many of these were from women who were coming forward for the first time with cases of sexual harassment, however the agency would use an open-and-shut approach, without even waiting to hear a response from abusers; In response, Congress iniated an inquiry scrutinizing the EEOC's use of PCHP under Lipnic, raising concerns over the "due process" rights of aggrieved parties [**Exhibit 9A**];

29. As the agency budget continued to shrink, it has come to rely on PCHP as a lifeline. It now dismissed cases without investigating them. The agency has also politicized enforcement activities;

30. For instance, the Denver field office is currently on a campaign against disability discrimination and in order to free up resources for this campaign; it rejects other types of claims so that it can re-direct resources and staff to focus on these types of claims at the expense of others; The agency has a term for this practice, known as its "National Strategic Enforcement Plan"; While it purports to go after systemic patterns of practice, to do so, it scrafices tens of thousands of charges to carry out this objective;

31. This was the original intent of PCHP. Between 1995-1996, when Casellas was designing the policy, he knew that his agency had to investigate civil rights charges. It was this obligation that had created the back-log and had thrown the agency into crisis. For Casellas, untethering his agency from this obligation was a shortcut to resolving its budgetary crisis. In order to do this, he created PCHP as vehicle evade this constitutional obligation;

32. In heavily redacted transcripts of the commission hearing, taking place between 1995-1996, Casellas, along with Commissioner Tucker, Igasaki, Hart and others discuss the mechanics of the PCHP policy. To evade the fact that the EEOC requires a determination of either probable or no probable cause findings after an investigation pursuant to 42 U.S.C

2000e-5. [Section 706] (b), Commissioner Tucker modified the determination letter, adding a Glomar Response, in which the commission would issue a notice to sue letter with contradictory language stating that it could neither affirm nor deny the allegations contained within a charge. In the hearing, Commissioner Silberman presents a set of questions challenging the change. For instance, she asks if the notice would be issued for charges found to have cause. Commissioner Tucker, Casellas and Igasaki affirm that even if a charge was found to be probable, the EEOC would still issue the letter, despite under 42 U.S.C 2000e-5. [Section 706] (b), the agency being required to take additional enforcement action [**Exhibit 10**];

33. The hearing in which the PCHP was discussed was closed to the public and no notice or comment period was provided. Despite the hearing transcript being heavily redacted, It is the Plaintiff's position, and based on subsequent evidence both from within the agency and outside of it, that the hearings between 1995-1996 in which the PCHP policy was developed, was done in a manner and with the intent to abrogate portions of Title VII. The meetings went beyond a simplistic change in reforming the administrative machinery of the EEOC, but in essence, re-wrote portions of Title VII. It is the Plaintiff's position that the EEOC devised the PCHP policy, under severe budgetary distress, to evade its constitutional obligations under 42 U.S.C 2000e-5. [Section 706] (b) which requires that an investigation take place after a charge is submitted and that if probable cause is found, that "the Commission...endeavor to eliminate any such alleged unlawful employment practice". However, under the PCHP policy, the EEOC can dismiss a probable cause case without any enforcement action and it can by-pass investigations altogether, by issuing notice to sue letter upon review. In doing so, it is able to balance its ever-shrinking budget;

34. Further, the PCHP policy, as applied to the Plaintiff's case goes beyond the failure to apply portions of Title VII. Given that the respondents in this case were government entities (for the Arizona charges), the EEOC was required under Title 29 C.F.R § 1601.28(4)(d) to transfer the case to the Department of Justice, who would then have the authority to issue the right to sue letter to the Plaintiff [**Exhibit 11**]; More, in both *University of Pennsylvania v. EEOC*, 493 U.S. 182 (1990) and *Newsome v. E.E.O.C.*, 301 F.3d 227, 232 (5th Cir. 2002), the Court determined that an investigation, *at a minimum*, involves the (1) receipt of a sworn charge, (2) a copy of its issuance to the respondent and (3) a reply/rebuttal of the allegations contained within the charge by the respondent —— neither of which occurred for all the

charges of the Plaintiff. While the court has noted in that case and in previous cases an overriding discretion into the extent of an EEOC investigation, it did make clear these basic requirements *before agency discretion takes effect*; see *E.E.O.C. v. Keco Industries, Inc.,* 748 F.2d 1097, 1100 (6th Cir.1984); *E.E.O.C. v. St. Anne's Hospital,* 664 F.2d 128 (7th Cir.1981); *E.E.O.C. v. General Electric Co.,* 532 F.2d 359 (4th Cir.1976); *E.E.O.C. v. Chicago Miniature Lamp Works,* 526 F.Supp. 974 (N.D.Ill.1981);

35. Nonetheless, in the subsequent years after the adoption of the PCHP policy, numerous lawsuits against the EEOC were filed. From *Smith v. Casellas,* 119 F.3d 33, 34 (D.C. Cir. 1997); *Terry v. Director, Complaint Adjudication Div.,* 21 F. Supp. 2d 566 (E.D. Va. 1998); *Martin v. U.S. Equal Emp't Opportunity Comm'n,* 19 F. Supp. 3d 291 (D.D.C. 2014); *Campbell v. E.E.O.C,* 296 F. App'x 73 (D.C. Cir. 2008); *Alvey v. Equal Emp't Opportunity Office,* Civil Action No. 1:20-CV-140-GNS (W.D. Ky. Sep. 22, 2020); *Draper v. U.S. Equal Emp't Opportunity Comm'n,* Civil Action No. 1:20-cv-01185 (UNA) (D.D.C. May. 18, 2020); *McMillan v. U.S. Equal Emp't Opportunity Comm'n,* Civil Action No. 19-cv-2041 (TSC) (D.D.C. Aug. 29, 2019); *Jordan v. U.S. Equal Emp't Opportunity Comm'n,* Civil Action No. 18-0956 (UNA) (D.D.C. Apr. 30, 2018); *Hall v. U.S. Equal Emp't Opportunity Comm'n,* Civil Action No. 17-cv-1469 (TSC) (D.D.C. Sep. 15, 2017); *Pugh v. Equal Emp't Opportunity Comm'n,* Civil Action No. DKC 13-2862 (D. Md. Jun. 30, 2014); *Conyers v. Equal Emp't Opportunity Comm'n,* Civil Action No. 11-437 (MAS) (LHG) (D.N.J. May. 9,2013); *Nichols v. Holder,* 938 F. Supp. 2d 97 (D.D.C. 2013); *Adams v. Equal Emp't Opportunity Comm'n,* Civil Action No. 1:12-cv-01201-UNA (D.D.C. Jul. 23, 2012); *Harris v. Equal Employment Opportunity Commission,* No. CIV S-09-2568 FCD GGH PS (E.D. Cal. Mar. 22, 2010); *Peavey v. Holder,* 657 F. Supp. 2d 180 (D.D.C. 2009); *Wilder v. Acting Chairman Ishimaru,* Civil Action No. 09 0545 (D.D.C. Mar. 12, 2009); *Baer v. U.S. Equal Employment Opportunity Commission,* Civil Action No. 08 0824 (D.D.C. Apr. 30, 2008); *McCain v. U.S.,* Civil Action No. 06-1701 (RCL) (D.D.C. Apr. 16, 2007); *Uberoi v. E.E.O.C.,* 180 F. Supp. 2d 42 (D.D.C. 2001); to *Newsome v. E.E.O.C.,* 301 F.3d 227, 232 (5th Cir. 2002);

36. In each case, Defendants alleged *over-and-over again* that the EEOC had not investigated their charges. All of the cases were dismissed for one or a combination of three particular reasons. First, the majority of cases relied on *Gibson v. Missouri Pac. R.R.,* 579 F.2d 890, 891 (5th Cir.1978) which held that a private action against the EEOC did not exist. Second, under *Smith v. Casellas* (1997), the Court adopted an erroneous historical interpretation of the Civil

Rights Act, concluding that Congress intended a private right to action for civil rights infractions. In reality, private right to action had existed for well over a century prior to federal civil rights legislation at the state level and it was an abysmal failure [**Exhibit 12, 12A, 12B, 12C**]. As a matter of fact, it was the failure of private right to action that had galvanized the NAACP to pursue federal legislation in the first place and to provide a legal intervention that relied on government-back advocacy and not on individuals, primarily poor African-Americans, going alone to face well-funded and well-represented respondents on their own [**Exhibit 13**]. Lastly, the Defendants were not aware of the existence of the PCHP policy, which deprived them of any investigation or agency review of their charges under PCHP because the EEOC simply did not have the budget to actually do so;

37. Further, it was an open secret (particularly among members of Congress) that the EEOC had stopped investigating cases as prescribed under Title VII. In a hearing held in 1998, a term had been coined to describe the numerous amounts of charges the EEOC was now rejecting as "case dumping" [**Exhibit 14**]. In a statement on appropriations to increase funding for the EEOC, speaker Newt Gingrich warned that the EEOC should not engage in "case dumping" and that Congress was in the process of increasing funding (*which never happened*).

38. Many years later, Casellas and Igasaki would both speak on the PCHP policy. In 2012, Casellas, testifying before the EEOC alluded and warned the agency from further expanding the policy, warning that it would force the agency to choose "who remains seated at the table of equal opportunity" [**Exhibit 15**]. Igasaki, now a law professor, wrote an article, titled *"Doing the Best with What We Had: Building a More Effective Equal Employment Opportunity Commission during the Clinton-Gore Administration";* an article that was a full confession that the agency had put budgetary needs before those they were meant to serve;

39. Moreover, it is the Plaintiff's position that the PCHP policy, at a conservative estimate, has deprived in excess of 500,000 Americans a fair proceeding before the EEOC (given its 25+ year tenure); Further, that those deprivations of procedural due process has disportionately impacted African-Americans, particularly those in the South, who happen to live in regions without a state-based civil rights commission (AL, AR, MS, GA), and in turn, rely on the EEOC for the enforcement of civil rights statutes; Further, that the PCHP policy has over time created a sociological nightmare for minorities, in that, the primary institution

created to protect them, has in fact relinquished its role and abandoned them altogether; More, that it is impossible under the PCHP scheme, for those with language, intellectual, educational and physical disabilities to fully articulate their injuries with sufficient detail to be recognized as an "A" or "B" charge, and that these limitations, in turn, translate to charges which investigators designate as "C" charges in part due to the limitations of aggrieved parties with such barriers, resulting in these groups also being overwhelmingly impacted disportionately by the PCHP policy;

40. Additionally, the Supreme Court has held that the EEOC is mandated to conciliate cases prior to litigation (*Mach Mining, LLC v. Equal Employment Opportunity Commission*, No. 13-1019 (Apr. 29, 2015)); and the existence of the PCHP policy violates this ruling, given that parties are essentially given an expedited ticket to litigation, without any fact-finding, or any minimal intervention on behalf of the EEOC to mediate cases, prior to respondents being sued in federal court; Often, resulting in costly lawsuits and the clogging of state and federal judiciaries with cases that should not be there;

## STANDING

41. Decades after its creation, the Plaintiff became the victim of the PCHP policy. As designed, it had put budgetary needs before his legal rights under Title VII. Not once, but twice. Future budgetary constraints on the EEOC and its reliance on PCHP to remedy them, means that the Plaintiff will continue to experience similar events, especially as it relates to pending charges before the EEOC, since the PCHP policy will be applied to them;

42. Further, the Plaintiff meets standing to bring this action. He is a person that has suffered a legal wrong and has been adversely affected and aggrieved by an agency action. The PCHP policy took away from the Plaintiff, twice, an investigation of his civil rights claims. He was forced to conduct his own investigation. Under 42 U.S.C 2000e-5. [Section 706] (b) and other provisions of Title VII, the Plaintiff, upon submitting his charge, expected the EEOC to conduct an investigation and review the response from the respondent. That never happened; Further, since the Plaintiff had to conduct his own fact-finding without any of the investigatory powers set aside for the EEOC, he was at a disadvantage and later lost his ability to enforce Title VII trying to make-up for what the EEOC had refused to provide;

43. The direct cause of divergence from the application of 42 U.S.C 2000e-5. [Section 706] (b) is because the PCHP policy instructs EEOC investigators not to follow Title VII or other regulations [**Exhibit 5**] [**Exhibit 5A**] [**Exhibit 6**]. The policy allows the EEOC to evade its constitutional requirements, in order to balance its budget;

44. Under the APA, the Court can redress this wrong by analyzing and determining the legality of the PCHP policy. In doing so, the possibility of relief for the Plaintiff exists;

45. Moreover, this complaint is within a zone of interest, in that, Title VII along with other statues contain language meant to protect people from discrimination, through an investigatory process. Since that investigatory process isn't happening because of PCHP, this requirement is met.

46. For the foregoing reasons, the Plaintiff raises the following causes of action:

## COUNT ONE
### Violation of the Administrative Procedures Act:
### EEOC's Priority Charge Handling Procedures Policy Is Unlawful

47. The allegations in paragraphs 1-46 are reincorporated herein;

48. The EEOC's PCHP policy, which purports to only deal with the processing of civil rights charges, is actually used to balance the agencies budget. The manner which the EEOC does that is by using the policy to dismiss charges it does not have the budget to investigate and to reduce backlogs of cases it does not have the resources to investigate;

49. Since PCHP in practice reintrepets Title VII, to make discretionary the requirement of an investigation and the requirement [that it] endeavor in the eradication of discrimination and harassment for cases of cause findings; such an interpretation of Title VII constitutes as an agency action reviewable by this Court;

50. Further, Section 702 of title 5, United States Code, authorizes the Plaintiff to bring this

action since he has already been adversely affected, twice, and to seek judicial relief and ask the Court to "hold unlawful and set aside" agency action "in excess of statutory jurisdiction, authority, or limitations" 5 U.S.C § 706(2)(C);

51. More, Congress has withheld rulemaking authority from the EEOC, nonetheless, the agency unlawfully circumvented those limits on its power by creating the PCHP policy to substantially re-interpet Title VII, in order to balance its budget and avoid the costs involved with investigating civil rights charges; See, e.g, *American Fed'n of Gov't Emps., AFLC-CIO, Local 3669 v. Shinseki*, 709 F.3d 29 (D.C Cir. 2013); *Emily's list v. Fed. Election Comm'n*, 581 F.3d 1 (D.C Cir. 2009); *Fin. Planning Ass'n v. SEC*, 482 F.3d 481 (D.C. Cir. 2007); *Aid Ass'n for Lutherans v. U.S Postal Serv.*, 321 F.3d 1166 (D.C Cir. 2003); *Michigan v. EPA*, 268 F.3d 1075 (D.C Cir. 2001);

52. Additionally, the EEOC, even if it had rulemaking authority, did provide a notice-and-comment period. It did not publish a notice in the Federal Register. It did not have a meeting open to the public. It did allow for public feedback. All things required under the APA, and since these procedures were not followed, the PCHP policy should be set aside under 5 U.S.C § 706(2)(C);

53. Rather, the agency held a closed meeting in which it conspired to overreach its authority, balance its budget, by inventing the scheme of PCHP in order to untether itself from its legal obligations under the Constitution and its duty to aggrieved individuals seeking its assistance;

54. Lastly, PCHP as put into practice by the agency is invalid as it contrary to the text of Title VII and, in the alternative, it is an unreasonable interpretation of Title VII; Absent declaratory and injunctive relief suspending and vacating PCHP, the Plaintiff will be immediately, continuously, and irreparably harmed by the EEOC's policy;

## COUNT TWO
*Ultra Vires* Agency Action in Violation of Constitutional Separation-of-Powers

55. The allegations in paragraphs 1-46 are reincorporated herein;

56. Article I, Section 1 of the United States Constitution specifies that "[a]ll legislative

Powers herein granted shall be vested in [the] Congress of the United States.";

57. The authority of the executive branch, including executive agencies like the EEOC, to act, "must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S 579, 585 (1952); see also *Clinton v. City of New York*, 524 U.S 417, 438 (1998) ("[No] provision in the Constitution ....authorizes the President [and by extension Executive Agency Heads] to enact, to amend or to repeal statutes.");

58. An executive agency acts *ultra vires* when it acts in excess of its statutory authority conferred by Congress;

59. Given that Congress has witheld rule-making authority from the EEOC, the agency lacks the authority to promulagate substantive rule changes; Further, it lacks the authority to re-write and implement Title VII in a manner in-consistent with statutory language requiring that an investigation take place and that the agency upon a finding of probable cause endeavor to eradicate the corroborated allegations of discrimination and/or harassment;

60. By creating PCHP to serve as a vehicle to circumvent Title VII's requirements, the EEOC engaged in powers reserved by Congress by enacting an interpretation and implementation of the law contrary to Congressional intents, and by extension, usurped Congress's legislative power in violation of the constitutional principle of separation-of-powers; Even more, Congress has already stepped in by conducting an official inquiry into these practices and raising the issue of due process for those filing civil rights complaints [**Exhibit 9A**] [**Exhibit 14**];

61. Absent declaratory and injunctive relief suspending and vacating PCHP, the Plaintiff will be immediately, continuously, and irreparably harmed by the EEOC's policy;

## PRAYER FOR RELIEF

62. **WHEREFORE,** Plaintiff requests that this Court enter judgement in their favor and grant the following relief:

(A). Declare PCHP unlawful within the meaning of the Administrative Procedures Act;

(B). Issue an injunction that permanently enjoins the EEOC and any and all of its officers, employees, and/or agents from applying the PCHP or any versions thereof;

(C). Vacate and set aside the PCHP policy and all versions thereof;

(D). Grant such other and further relief as the Court deems just and proper;


*Respectfully submitted,*

EMIR DINI – Plaintiff
1135 Broadway Blvd NE
Albuquerque, NM 87125-7204
Telephone: (505) 378-8155
Email: emir.dini@joinprivilege.com