*Dini v. EEOC*

**List of Exhibits**

| Exhibit No. | Description |
|:---:|:---:|
| 1. | Feb 2020 Letter to EEOC Inspector General |
| 2. | Jan 2020 Letter Amy Burkholder |
| 3. | Email exchange w/ Patricia Miner |
| 4. | Redacted resume of selected applicant for AZ respondent |
| 5. | Full PCHP w/ agency redactions |
| 5A. | PCHP Training Materials used by the EEOC |
| 6. | EEOC Union 216 Publication |
| 6A. | Letter from VP Rae Vann |
| 7. | Center for Public Integrity Story – Feb 2019 |
| 7A. | Vox Story – June 2019 |
| 8. | Wagner article in Civil Rights Insider |
| 9. | AFGE Case Dumping Story |
| 9A. | Letter from Congress to Chair Lipnic |
| 10. | 1995-1996 Commissioner Hearing Documents |
| 11. | Title 29 C.F.R § 1601.28(a) Print out |
| 12. | Bonfield (1967) |
| 12A. | Rabkin (1964) |

| 12B. | Dyson & Dyson (1965) |
|---|---|
| 12C. | Collins (2003) |
| 13. | Hill (1964) |
| 14. | Hearing on the future of the EEOC |
| 15. | Casellas testimony |

P R I V I L E G E

EEOC
Office of Inspector General
P.O Box 77067
Washington D.C. 20013-7067

Exhibit #1

February 20, 2020

**RE:** Complaint against the Denver Field Office
For the abuse of EEOC's PCHP Guidelines

Dear Sir/Madam of the Inspector General's Office,

I am writing to file a formal complaint against Mr. Glenn Parker and Ms. Amy Burkeholder w/ the EEOC's Denver Field Office.

**General Background:**

On or around August of 2019, I submitted an EEOC charge (⬛⬛⬛⬛⬛⬛) against a respondent in Colorado. The charge was processed by the EEOC's Denver Field Office. On or around September of 2019, I was issued a right-to-sue notice by the assigned investigator (Mr. Parker), notifying me that my charge did not fit into the EEOC's enforcement objectives. I appealed to Ms.Burkeholder, the Field Office Director, who affirmed or either directed the decision to close my charge.

**Historical and Legal Background of the EEOC's PCHP Guidelines:**

In the mid 1990's, the EEOC created the PCHP (piority charge handling procedures) guidelines, along w/ 'strategic enforcement goals', as a necessity in light of a bloated backlog of cases and a stagnant budget. The purpose of the PCHP guidelines, along w/ other strategic and mission-oriented directives, was to make the EEOC efficient and to make the best of a bad fiscal situation. The purpose of the PCHP was never designed to evade the constitutional obligations placed on the EEOC in processing the charges of aggrieved parties. To ensure this, the EEOC created three categories of charge placement. "A" charges, those charges that contained all the elements of a *prima facie* allegation of discrimination or sexaul harassment and the evidence necessary to make a compelling case. "B" charges, those charges that contained all the elements of a *prima facie* allegation of discrimination or sexaul harassment and in which an investigation held the potential of uncovering evidence to make a compelling case. Lastly, "C" charges, those charges that failed to establish a *prima facie* allegation of discrimination or sexual harassment.

## P R I V I L E G E

"C" charges were authorized for closure, as it was seen as a waste of agency resources. However, no one considered or even contemplated of a "C" charge that was filed by a person that is mentally imparied? Lacks the level of education needed to articulate and present a "B" or an "A" charge? Or those with langauage barriers. Nonetheless, what we do know is that the implementation of these policies reduced the backlog of cases and helped the agency improve its performance. In the decades that would follow the implementation of these policies, the EEOC's budget remained the same. However, the pressure to reduce backlogs persisted, despite the fact that agency staffing levels declined and the labor market grew in size and diversity. In a state of fiscal crisis, the EEOC began to contort the original intention of the PCHP guidelines. It began to categorize "A" and "B" charges into "C" charges. It began to reward agency staff and directors into closing as many cases as possible without considering if the cases being closed contained legitimate charges of merit.

**My allegations against the EEOC's Denver Field Office:**

It is my understanding that my charge contained a *prima facie* case of discrimination. (1) I was a member of a protected group, (2) given an adverse employment decision and (3) who identified that he was more qualified than those hired. Under the PCHP guidelines, I had a "B" charge and not a "C" charge. Yet, the Denver field office placed my charge under the "C" cateogry and closed it.....despite, the fact that I brought this to their attention. What I suspect is that the Denver Field Office is doing this to other people. It is my belief that Ms.Burkeholder et al, are doing this to meet internal EEOC metrics. I believe the wrongful placement of charges into the "C" category is on purpose and done so to make their field office look 'good' to headquarters. Such conduct is not only unethical but a brazen violation of people's constitutional rights. I would like your office to look into practices and bring them to a stop. As similiar instances **will be met with immediate legal action** and not a letter to you.

*Signed,*

s/ Emir Dini

**Subject:** RE: PHCP ("Piority Charge Handling Procedures")
**From:** Emir Dini <━━━━━━━━━━━━
**Date:** 1/2/20, 12:41 PM
**To:** amy.burkholder@eeoc.gov

Dear Ms. Burkholder,

This past summer, your agency refused to investigate a prima facie charge that I had filed with your field office. From the letter sent by the investigator, the reason was that my charge failed to align with your agencies overall enforcement objectives. I filed a complaint with Congress and from the documents requested by them, there is concern that your agency is deliberately refusing to investigate charges. Rather, your field office (and the agency as a whole) is refusing to do so, for budgetary reasons. According to the allocation of A, B and C charges, there is a clear pattern of the abrogation of Title VII and the ill-guided cherry-picking of claims that align with transient social movements (i.e #MeToo movement).

The EEOC is not meant to be a political agency. It was not designed to strip away protections from one group in order to provide protections to another (see Casellas testimony). In drafting the PHCP policy, there was never any consideration of its constitutionality. What if an individual is unable to legally articulate their claims as a result of an existing disability? or as a result of limited education? or as result of a language barrier? or simply because they lack familiarity with the EEOC processes? Does that charge automatically become a 'C' charge without no avenue for relief? Do we plunge individuals back into pre-1964 conditions? More, in the words of the architects of the PCHP policy (Casellas, Miller and Igaski), they clearly admit to drafting the policy because of budgetary reasons. Not once did they ever ask themselves the questions I've just asked, but many years later, they do lament their decision and express some regret (see Casellas testimony; Igasaki/Miller in *"Doing the Best with What We Had: Building a More Effective Equal Employment Opportunity Commission during the Clinton-Gore Administration"*).

It is my belief that your current implementation of the PHCP policy is unconstitutional. We both know that your agency is financially strapped for cash, 40+ years and the same budget! That doesn't excuse nor does it make legal for the EEOC to simply abrogate Title VII and the numerous other civil rights laws it was established to enforce. I would recommend having your legal staff look into these concerns, otherwise, the public will eventually be forced to sue your agency for what it is owed.

Respectfully yours,

Exhibit # 2

 Gmail              **Emir Dini** <

---

**RE:** ▮▮▮▮▮▮

PATRICIA MINER <PATRICIA.MINER@eeoc.gov>        Wed, Jun 10, 2020 at 7:28 AM
To: Emir Dini <

A response was not requested from the employer. As previously noted, your rights have been preserved by the filing of your Charge of Discrimination. Once a Notice of Right to Sue is issued, you have the ability to continue the process by filing a lawsuit.

Thank you.

**From:** Emir Dini <▮▮▮▮▮▮▮▮>
**Sent:** Tuesday, June 09, 2020 3:36 PM
**To:** PATRICIA MINER <PATRICIA.MINER@EEOC.GOV>; ▮▮▮▮▮▮▮▮
**Subject:** Re:▮▮▮▮▮

Ms. Miner,

I am awaiting your response.

Thank you,

E. Dini

> On Sat, Jun 6, 2020 at 3:04 AM Emir Dini <▮▮▮▮▮▮▮> wrote:
>
> > Also, how can an investigation be conducted (per the PCHP guidelines) if there is no response from the other aside as to the allegations made in the charge? Please advise. Thank you again.
>
> > On Sat, Jun 6, 2020 at 2:59 AM Emir Dini <▮▮▮▮▮▮wrote:
> >
> > > Thank you. Do you see how this could be a due process issue? The EEOC dismissing a charge without hearing from the otherside (which could admit to everything)?
> >
> > > On Fri, Jun 5, 2020 at 12:00 PM PATRICIA MINER <PATRICIA.MINER@eeoc.gov> wrote:
> > >
> > > > A response was not requested.

*(handwritten, in oval)* Exhibit #3

**From:** Emir Dini <███████████@gmail.com>
**Sent:** Wednesday, June 03, 2020 8:23 PM
**To:** PATRICIA MINER <PATRICIA.MINER@EEOC.GOV>
**Subject:** Re: ███████████

Thank you, and would you be able to see if the respondent has provided a response? Is one being requested? or did the EEOC come to the decision to close the case and hence, no need for a response? Thank you.

On Wed, Jun 3, 2020 at 12:46 PM PATRICIA MINER <PATRICIA.MINER@eeoc.gov> wrote:

As noted below, the Charge has not yet been closed. Due to the COVID-19 pandemic, all Notices of Right to Sue, but for those requested by the Charging Party or their attorney, have been suspended.

Yes, the Respondent was served notice of the charge.

**From:** Emir Dini <███████████
**Sent:** Tuesday, June 02, 2020 6:52 PM
**To:** PATRICIA MINER <PATRICIA.MINER@EEOC.GOV>
**Subject:** Re: ███████████

Ah, I see. Would you be kind enough to check if the respondent had been notified of the charge prior to the charge being closed? Or if it was closed without hearing back from them? Thanks in advance for looking into this.

On Tue, Jun 2, 2020 at 12:29 PM PATRICIA MINER <PATRICIA.MINER@eeoc.gov> wrote:

While the law requires in order for you to perfect your legal rights that you file a Charge of Discrimination, it does not require the EEOC to fully investigate every charge. A variety of factors goes into the decision - to include the Priority Charge Handling Procedures.

**From:** Emir Dini <███████████
**Sent:** Monday, June 01, 2020 1:04 PM
**To:** PATRICIA MINER <PATRICIA.MINER@EEOC.GOV>
**Subject:** Re: ███████████

Are you able to provide the reasons why the EEOC closed the case? Is it due to the PCHP (Piority Charge Handling Procedures)?

On Mon, Jun 1, 2020 at 1:03 PM PATRICIA MINER <PATRICIA.MINER@eeoc.gov> wrote:

Dear Mr. Dini,

The decision was made that the agency will not pursue investigation of this case; however, due to the COVID-19 crisis the EEOC is not issuing any Notices of Right to Sue unless requested by the individual filing the Charge of Discrimination. Accordingly, at this time the case is in suspense pending issuance of the Notice of Right to Sue.

Thank you.

**Patricia Miner**

Patricia Miner

Supervisory Investigator

EEOC/Phoenix District Office

3300 N. Central Ave., Ste. 690

Phoenix, AZ  85012

(602) 661-0040

patricia.miner@eeoc.gov

**From:** Emir Dini <██████████████████
**Sent:** Friday, May 29, 2020 1:10 PM
**To:** PATRICIA MINER <PATRICIA.MINER@EEOC.GOV>
**Subject:** RE: ███████████████

Hi Patricia,

I am writing to get an update on this case.

I look forward to hearing from you.

Many thanks,


E. Dini



**ED**

**EXPERIENCE:**

01/2017 – Current

**Pima County Public Defense Services Tucson, Arizona**
Public Defender's Office, Criminal Investigator Specialist
• Perform work conducting multiple complex and specialized investigations and assisting attorneys with court and trial preparation

04/98 – 01/2016
*Police Sergeant, Retired*

**The University of Arizona Police Department** Tucson, Arizona
• Supervise team of police officers and ancillary personnel assigned to Field Operations Division
• Manage, lead and evaluate team performance
• Collaborate with university departments and outside resources to resolve campus safety and customer service issues
• Investigate, analyze and recommend policy development to administrators; review and analyze officers' use of force and pursuit driving tactics
• Research and resolve external and internal complaints against staff, recommending action to be taken. Impart praise on deserving personnel. Prepare necessary reports
• Plan, manage and direct large-scale public events at football stadium and basketball arena and on campus
• Served as acting commander while managers are absent
• Commissioner, The University of Arizona Commission on the Status of Women
• Member, The University of Arizona Staff Dispute Resolution Committee
• Member, UAPD retirement board, Arizona Public Safety Personnel Retirement System; served as Chair 2004-2015
• Graduate, Southwest Leadership Institute *UA Eller College*
• Recipient, UAPD Unit/Team of the Year 1998, 2006, 2013

03/04–07/08

*Training Director & Supervisor-Traffic Section*
• Supervise and manage police department's training activities
• Collaborate with instructors to meet proficiency and continuous training requirements. Track personnel training courses and hours
• Prepare training files for audit by state certification board
• Facilitate learning opportunities for officers' growth and development
• Organize, manage and responsible for recruit officer's training progression
• Direct and monitor the activities of the police traffic team
• Oversight for university traffic operations and motorcycle/traffic fleet
• Supervise patrol personnel while field supervisors are absent
• Served as acting commander while managers are absent

12/95 – 4/98
*Police Officer*

• Patrol university campus by car, bicycle and foot to deter criminal activity
• Enforce state statutes and university regulations to protect life and property
• Field training officer, employment background investigator, general instructor, use of force instructor, tactical/defensive driver instructor

02/94-12/95  **U.S. House of Representatives, Aide to the Honorable Ed Pastor**
  **Southern** Arizona Office
  - Investigate and resolve constituent inquiries with Federal agencies
  - Prepared and managed case files
  - Established and maintained field offices in Nogales, and Ajo, Arizona
  - Established and nurtured relationships/responsibilities with business, government, education, rural and Hispanic leaders

03/86-12/95  **Pima County Sheriff's Office** Tucson, Arizona
  *Deputy Sheriff*
  - Provide public safety and law enforcement services for unincorporated Pima County
  - Served as training officer, school resource officer, and Reserve Deputy Sheriff, 1994-1995
  - Green Valley District Administrative Deputy. Welcomed visitors to district office needing Sheriff's services, conducted day to day office operations
  - Recipient: Sheriff's Commendation, 1991; Officer of the Month, 03/88

**K-12 Substitute Teaching Certificate**
  - Arizona Department of Education, expires 2021
  - AzDPS Fingerprint Clearance Card, expires 2025

**ACTIVITIES**
*Past and Present*
  - City of Tucson Citizen's Transportation Advisory Committee
  - Executive Board, Broadmoor/Broadway Village Neighborhood Association
  - Elected Precinct Committeeman
  - Maracay CenterPointe Vistoso Homeowner Executive Advisory Committee
  - Town of Oro Valley Board of Adjustment
  - Volunteer Coach: Desert View/Pueblo High Schools baseball; Little League, Bobby Sox, Pop Warner, AYSO, certified Amateur Softball Association (USA Softball) Jr. Olympic Softball; Assistant Varsity/JV Coach, Flowing Wells & Catalina Foothills High Schools Softball
  - USA Softball Umpire
  - Salpointe Catholic High School Alumni Council
  - Fraternal Order of Police Lifetime Member

**Distinguished Community Service Awards**
  - Pima County Board of Supervisors, District 2
  - League of Mexican-American Women
  - Federal Bureau of Investigation/League of United Latin American Citizens, two-time recipient

Additional Skills
  - Extensive experience cultivating positive and productive relationships with others
  - Strong organizational, critical thinking and problem solving skills
  - Thoroughly familiar with government structure, operations and complexities
  - Bilingual and Biliterate in English and Spanish languages

# PRIORITY CHARGE HANDLING PROCEDURES

## INTRODUCTION

In order to more effectively implement the agency's mission of eradicating employment discrimination, and to address the growing backlog of cases, on December 1, 1994, Chairman Gilbert F. Casellas authorized a task force chaired by Vice-Chairman Paul M. Igasaki to conduct a "clean slate" review of the Commission's charge processing procedures.

On April 19, 1995, the Commission adopted a series of motions incorporating key recommendations of the task force. In addition, the Chairman announced a number of action items implementing the new procedures.

The new procedures are based upon the development of a national enforcement plan, which will provide a coordinated approach to achieving the agency's mission through investigation, conciliation, and litigation, in addition to technical assistance and public education. Central to the new approach is a charge prioritization system, the subject of this memorandum, which provides for the classification of charges into three categories: Category A (charges that fall within the national or local enforcement plans as well as other charges in which it also appears "more likely than not" that discrimination has occurred); Category B (charges where further evidence is required to determine whether it is more likely than not that a violation has occurred); and, Category C (charges subject to immediate dismissal). Category A cases will receive priority treatment; Category B cases will be investigated as resources permit; and, Category C cases will be dismissed.

The new standards give field personnel flexible procedures for processing charges, including discretion to decide the appropriate level of resources to be utilized for each charge and permitting settlement in appropriate cases. They place substantial decision-making authority in field offices and with front line investigators and attorneys. These priority charge handling procedures apply to both incoming charges and the charge inventory.

The Commission's actions are fully consistent with the President's National Performance Review which supports "reinvention" based on stakeholder input, greater responsibility for front line staff and reduced levels of administrative review. In addition, broad agreement exists among the agency's stakeholders, including representatives of employers, employees, and labor, civil rights and advocacy organizations, and the bar, as well as the agency's own staff, that such change is needed.

Exhibit #5

# PRIORITY CHARGE HANDLING PROCEDURES

**I.** **BACKGROUND**: The Commission's and Chairman's April 19, 1995, Initiatives

The principal initiatives from the April 19th meeting are as follows:

### 1. National and Local Enforcement Plans.

The Commission will adopt a national enforcement plan to identify priority issues and set out a plan for administrative and litigation enforcement. Each district office will then develop a local enforcement plan to be reviewed by the General Counsel and Director of the Office of Program Operations for consistency with the national plan, and approved by the Chairman. Union and management, and field and headquarters staff, across-the-board, will be involved in the common effort to develop and implement the plans. Moreover, stakeholders' views regarding national and local priorities will be solicited in developing these plans.

### 2. Priority Charge Handling Procedures to Focus Resources on Charges with the Most Law Enforcement Potential.

Consistent with the priority charge handling procedures approved by the Commission, field offices will develop methods for classifying charges into three basic categories. As rapidly as possible, new charges as well as charges in the current inventory will be assigned a category and handled under the new procedures.

### 3. Rescission of the "Full Investigation" Policy.

The "full investigation" policy as well as the December 6, 1983, Commission resolution on which it was based, was rescinded. The investigation to be made in each case should be appropriate to the particular charge, taking into account the EEOC's resources.

### 4. End Use of Substantive "No Cause" LODs.

The Commission ended the use of the substantive "no cause" letters of determination in cases where an appropriate investigation has not established that a violation has occurred. Instead, the parties will be informed in a short-form determination that the investigation failed to disclose a violation. However, communication with CPs regarding the basis for the dismissal of their charges remains essential.

# PRIORITY CHARGE HANDLING PROCEDURES

### 5. Rescission of the "Enforcement Policy;" Authorization of the Exercise of Prosecutorial Discretion in Litigation Decisions.

The Commission rescinded the September 11, 1984 "Statement of Enforcement Policy" that: 1) set forth a cause standard that was commensurate with a finding of litigation worthiness; and 2) required the litigation of all conciliation failures. Offices may now find violations and attempt conciliation in all cases where there is reasonable cause to believe that it is more likely than not that a statute has been violated -- whether or not the case is litigation worthy. In addition, the General Counsel has been delegated substantial prosecutorial discretion in deciding which cases to litigate and is encouraged to redelegate that authority to the Regional Attorneys (RAs) to the maximum extent feasible.

### 6. Rescission of the Remedies Policy; Authorization of More Discretion in Settlement.

The Commission repealed the February 5, 1985 "Policy Statement on Remedies and Relief for Individual Cases of Unlawful Discrimination," which stated that the EEOC would not settle for less than full relief when there was reasonable cause to believe that a violation had occurred. The Commission unanimously approved the following motion:

That settlement efforts be encouraged at all stages of the administrative process and that the Commission may accept settlements providing "substantial relief" when the evidence of record indicates a violation or "appropriate relief" at an earlier stage in the investigation.

### 7. Procedures for Commissioner Charges And Directed Investigations.

The Chairman directed that:

New systemic cases developed in the field offices based on individual or Commissioner charges shall not require prior approval or oversight of the investigation by the Office of Program Operations (OPO); and

Directors are encouraged to increase the use of directed investigations in ADEA and EPA cases. Requests for directed Commissioner charges in Title VII and ADA cases may be submitted directly to the Commission, and if signed by a Commissioner, shall be investigated like other charges, without OPO oversight of the investigation.

# PRIORITY CHARGE HANDLING PROCEDURES

## II.   PRIORITY CHARGE HANDLING PROCEDURES IN PRIVATE AND NON-FEDERAL PUBLIC SECTOR CASES FILED BY CHARGING PARTIES

Set forth below is the framework for priority charge handling procedures in private and non-federal public sector cases filed by charging parties (CPs). It includes standards to be applied, revised charge receipt procedures, suggested investigative procedures to resolve the majority of charges more rapidly, and options for addressing the charge inventory, including the backlog. All priority charge handling procedures must take into account the agency's limited resources. However, this should be construed consistent with giving charging parties a fair opportunity to present their case.

The new procedures are effective as of June 13, 1995 and, where inconsistent with Volume I of the Compliance Manual, supersede the Compliance Manual guidance. Except as inconsistent with this document, Volume I of the Compliance Manual will continue as a guide, useful to the field staff in exercising its discretion.

### A. PRIORITY CATEGORIZATION SYSTEM

Charges are to be classified into one of the three categories described below. Field offices may utilize subcategories within the three categories so long as the essential priority handling scheme is preserved and operates effectively.

#### _Category A: Enforcement Plan/Potential Cause Charges._

The first category includes (1) charges that fall within the national or local enforcement plan and (2) other charges where further investigation will probably result in a cause finding. Cases should also be classified as Category A if irreparable harm will result unless processing is expedited.

For enforcement plan and potential cause cases, the office will conduct an appropriate investigation to obtain the necessary information, as resources permit. Within resource constraints, enforcement plan cases are the highest priority.

#### _Category B: Charges Requiring Additional Information._

Many charges will initially appear to have some merit but will require additional evidence to determine whether continued investigation is likely to result in a cause finding. In addition, in other cases it will simply not be possible to make a judgment regarding the merit of the charge at charge receipt. In these cases, additional investigation will be needed, as resources permit, to determine whether these charges should be moved into Category A and given priority status or moved into Category C and dismissed. In addition to reclassification or settlement, Category B

## PRIORITY CHARGE HANDLING PROCEDURES

charges may be placed in suspense where CP has filed suit based on the issues raised in the charge. See II. G.3.

**_Category C_: _Charges Suitable For Dismissal._**

A charge may be placed in Category C and dismissed when the office has sufficient information from which to conclude that it is not likely that further investigation will result in a cause finding.

An office will have "sufficient information" when it has conducted an investigation appropriate to the particular charge, factoring in resource considerations, and has assured that the CP has been provided a fair opportunity to present his or her case.

Examples of cases that can be resolved under Category C after completion of charge receipt are:

- (b)(7)(E)   10 lines of text redacted and withheld
-
-
-
-

(b)(7)(E)   4 lines of text redacted and withheld

Examples include:

- (b)(7)(E)   5 lines of text redacted and withheld
-

# PRIORITY CHARGE HANDLING PROCEDURES

Office Directors are authorized to give supervisory and line staff discretion to identify charges eligible for dismissal under this standard.

## B. CHARGE RECEIPT: INITIAL CASE CATEGORIZATION

Charge receipt is a critical point under the new procedures since an initial assessment of a charge's priority status will be made at this stage of the investigation. However, it is important to keep in mind that many cases will be provisionally categorized into Category B, with the final categorization dependent on further analysis or investigation.

The charge receipt process, whether conducted in person, by phone or by mail, should include a CP interview conducted by experienced personnel who will counsel the CP and recommend an assessment or disposition of the charge. This interview may be lengthy in certain circumstances, for example, when the case appears to involve systemic discrimination. In other situations a shorter interview may be appropriate,



4. partial/full, lines of text redacted

(b)(7)(E)

The following sets out guidance for the counseling and assessment processes.

### 1. Charge Receipt Counseling

The following are essential elements of charge receipt counseling:

- The individual should be explicitly informed by charge receipt personnel that he or she has a right to file a charge and that filing the charge is necessary to preserve the right to file a private suit under Title VII, ADA, or the ADEA. The office should also explain to the individual that if a formal charge is filed, the EEOC must provide notice of the charge to the respondent. The individual should be informed about the risk of retaliation, that retaliation is itself a violation of federal discrimination law, and that a CP may amend a charge to include an allegation of retaliation.

- To enhance the explanation of our processes, a notice taking into consideration the particular needs of an office and the communities it serves should be given to potential CPs. It should also inform CPs, in an accessible format, of what they may expect during the processing of their charge. We will be working closely with appropriate offices to develop and disseminate model notices as soon as possible. The field will be provided forms in languages other than English to meet the needs of their particular communities. Consideration is also being given to the development of videos and other formats for providing the necessary information.

- Potential CPs should not be discouraged from filing a charge. Where, based on the initial interview, the charge appears to be weak, the CP should be told that and counseled about our process. If the CP wishes to file a charge, he or she should be told that it will be served on the

# PRIORITY CHARGE HANDLING PROCEDURES

respondent and might be dismissed at or shortly after that time. While the number of charges filed will be less critical to our operations than previously, because now the resources devoted to each charge will depend on its merits, staff must remain cognizant that the decision regarding whether to file is very important to the CP and must be made by the CP. Additional guidance will be forthcoming on this issue.

- Charge receipt staff should give CPs their best initial assessment of the evidence. This assessment will assist CPs in making an informed decision about whether and how to proceed. In addition, such assessment will enable CPs to assist more efficiently in the development and investigation of their charge.

- Throughout this process it is vital to convey fairly and honestly to potential CPs the status of their case, how it fits into our new procedures, and what they can expect to happen.

## 2.  *Prompt Charge Assessment*

Efforts should be made to assess as promptly as possible new charges after they are filed (or for mail and telephone charges, during the period the charge is being perfected).

In connection with charge assessment, offices should consider the following guidance:

- Offices may provide literature and questionnaires asking for information relating to statute, basis, and issue to potential CPs as an aid to effective intake interviewing.

- Offices should consider the use of an appointment system for charge receipt.

- Charge receipt staff should assemble intake notes/memoranda to the file, gathering as much information as necessary to facilitate priority charge assessment. Affidavits or declarations may be taken at the discretion of the office when they serve an investigative purpose. For example, obtaining an affidavit or other statement at the charge receipt stage or shortly thereafter, regarding matters within the CP's knowledge, may preserve valuable evidence and save investigative resources later on.

- The inclusion of information on the charge form sufficient to allow Respondents to adequately respond to the charge, or a Request for Information ("RFI") if one is issued, can expedite charge processing.

- Pursuant to 29 CFR § 1601.15(b), the office may require in appropriate cases that the CP provide a statement that includes: each specific harm the person has suffered and the date on which each harm occurred; for each harm, a specification of the act, policy, or practice that is alleged to be unlawful; and for each act, policy, or practice that is alleged to have harmed the person, the facts that lead the person to believe that the act, policy, or practice is discriminatory.

# PRIORITY CHARGE HANDLING PROCEDURES

- In limited cases, calls to respondents or witnesses during charge receipt may be helpful to explore settlement or gather information. While this practice will not always be appropriate, pursuing such opportunities may save resources and/or benefit a party. For example, if contacted during charge receipt, a witness may or may not verify a CP's version of the facts or an employer might have second thoughts about a recently taken adverse action.

- (b)(7)(E) [11 words redacted] CPs should be told how long the additional investigation may take, and when they may obtain a status report from the field office.

- If a charge is eligible for immediate dismissal [2 words redacted] (b)(7)(E), the CP should be informed promptly that the EEOC is unlikely to pursue the claim, and that he or she will have to undertake private enforcement if he or she wants to continue to challenge the alleged discrimination.

- Offices should develop effective attorney referral procedures, including lists of attorneys who can aid those who wish to bring suit. The question of appropriate referrals of CPs to advocacy and civil rights groups will be addressed as part of the communications plan which will be disseminated as soon as it is available. At a minimum, it is important to assure that any group to which a CP is referred is aware of the changes to the charge processing system and has the resources and is otherwise able to assist CPs.

## C. CATEGORIZATION OF EXISTING CHARGE INVENTORY

Field offices should categorize pending charges according to the same priority handling standards set out in this memorandum. As promptly as possible they should (b)(7)(E) [2 words redacted] (b)(7)(E) [10 words redacted]

The staff who have been assigned charges are most familiar with the contents of the file. As a result, supervisors and investigators should normally prioritize the cases in their own inventories. Field managers can support the process by providing staff with definitions and benchmarks based on local conditions and continuing guidance for prioritizing the caseload into categories.

## D. INVESTIGATION AND PROCESSING AFTER INITIAL CATEGORIZATION

### 1. Investigation

The investigation to be made in each case should be appropriate to the particular charge, taking into account the EEOC's resources. In general, an appropriate investigation is one where the field

# PRIORITY CHARGE HANDLING PROCEDURES

office determines that a statute has been violated or that there is sufficient information to conclude that further investigation is not likely to result in a finding that there is reasonable cause to believe that a statute has been violated.

Offices will need to develop a flexible process under which investigators will seek only that amount of evidence needed to make an informed decision as to whether it is more likely than not that a violation of the statute may be found. This will avoid misapplying resources by over-investigating charges that could be resolved with less information, or by pursuing cases that are facially non-meritorious. At the same time, it will have the beneficial effect of shifting the agency's limited resources to cases that are the most likely to fall within the enforcement plans and otherwise result in findings of violations.

As soon as practicable after receipt of a position statement or a response to a RFI, the office should decide whether to take further investigative or settlement action. If no further investigative or settlement action is appropriate, the charge should be dismissed at that time.

While this document is not intended to address in detail the investigation of charges, the following guidance addresses particular issues regarding investigations in the context of charge prioritization.

a. Offices should determine how decisions will be made about the scope and limitations of investigations, including the specific practices and/or policies to be addressed as well as the time period to be covered.

b. A thorough statement of the information provided by the CP should be contained in the file. This information may be in the form of a memorandum to the file, the CP's affidavit, the CP's responses to a questionnaire, and/or intake notes setting out all the relevant CP information.

(b)(7)(E)

17 words redacted from 2 lines

c. Offices should eliminate forms and documents that are unnecessary or duplicative (e.g., detailed "no violation" investigative memoranda (IMs) when a short memo to file will suffice). However, there should be documentation in the file setting out the rationale for the resolution. Revised EEOC Form 291 (Attachment A) may be used for this purpose. The form has been placed on the EEOC Bulletin Board and may be downloaded for your use. Note that the form has also been modified for use when a NRTS is requested and the charge is to be closed.

d. The Chairman has directed that charging parties and respondents should normally be provided with access, upon request, to the positions of the other. This exchange, including documents as appropriate, should permit the parties to narrow the issues, encourage them to resolve disputed facts, and reduce the burden on the office in handling FOIA/§ 83 document requests.

# PRIORITY CHARGE HANDLING PROCEDURES

e. For those cases that have been pending for several months since contact with either party, the office should communicate with the parties, by phone or in writing, a brief report on the status of the case.

f. In appropriate cases, early involvement of legal staff to provide guidance will be extremely helpful.

g. "Boilerplate" Requests for Information (RFIs) should be eliminated. Instead, RFIs tailored to the particular charge should be used.

### 2. Continuing Priority Assessment

Cases that are categorized for further investigation (A and B) should be reviewed as needed during processing to determine whether they should be re-categorized. These procedures will be applied to both new charges and charges currently in the inventory.

## E. SETTLEMENT OF CHARGES

The EEOC's former "full" remedies policy has been rescinded. Now, cases in which the Director has issued, or is prepared to issue, a cause letter of determination may be settled for "substantial" relief; other cases may be settled for "appropriate" relief except that EEOC will not facilitate settlements of Category C cases.

Settlement is an important enforcement option. It should be encouraged by working closely with both charging parties and respondents to explore whether an amicable resolution of their differences is possible. Offices will have discretion in evaluating whether settlements are appropriate in particular cases. As part of the exercise of this discretion, offices should take into careful consideration the interests of the affected parties and not simply impose their view of appropriate relief. At the same time, however, offices should not encourage or facilitate settlements simply to dispose of cases.

The following principles will guide the settlement process:

1. Minimum settlement terms for agreements to which the EEOC is a party are set out in the model agreements in § 15 of Vol. I, and remain in effect.

2. Charges under investigation that do not fall within the national or local enforcement plans and that are in Categories A or B may be settled at any time by the enforcement staff, with or without consultation with legal staff, as appropriate.

10 of 18

# PRIORITY CHARGE HANDLING PROCEDURES

3. Category A charges under investigation that fall within the enforcement plans can be settled at any time in consultation with the Regional Attorney. This will assure that enforcement plans are implemented consistently and appropriately.

4. Category C charges, _____ (b)(7)(E) | 14 words redacted from 2 lines |
_____ However, staff should not stand in the way of parties who are interested in reaching a settlement of their dispute.


## F. DETERMINATIONS

### 1. Elimination Of Substantive "No Cause" LODs

Substantive "no cause" determinations will no longer be used. Instead, the parties will be informed in a short-form determination that the investigation failed to disclose a violation. These determinations will not include particularized factual findings, but rather will use the following uniform language which is included in the dismissal form approved on May 1, 1995, and a copy of which is attached as Attachment B:

Based upon the Commission's investigation, the Commission is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issue that might be construed as having been raised by this charge.


### 2. Determination Counseling

Because of the elimination of substantive "no cause" determinations, it is critical that substantial care be exercised in explaining the disposition and the CP's enforcement options to the CP. Because, under the new procedures, there is an even greater need for effective communications with CPs than before, determination counseling will remain mandatory. However, there is no set formula or method. Offices should develop the best methods for effectively communicating to CPs the reason for the determination, the realities and limitations of our process, and their private enforcement options. Options include the following (offices should feel free to add to or adapt these options as circumstances suggest):

- In-person interview. In appropriate cases, the CP can be invited to visit the office to discuss the matter with the investigator or his or her supervisor. The goal is to fully communicate the reasons underlying the determination as well as the EEOC's resource limitations which may have affected the investigation, and to explain the CP's options to him or her. As needed, the investigator may ask to have a legal unit attorney meet the CP.

# PRIORITY CHARGE HANDLING PROCEDURES

- Telephone or conference call. The investigator could arrange a phone conversation along the lines discussed in the previous paragraph, also involving a supervisor or legal unit attorney if appropriate.

- A written statement. A letter accompanying the LOD could be used to explain the disposition.

- Referrals. The office may refer the CP to a private attorney consistent with its attorney referral procedures. Referrals to civil rights or advocacy organizations should be consistent with the Commission's communication plan and should only be made where the organization has the resources and is otherwise able to assist the CP.

### 3. Requests for Reconsideration

Many parties request reconsideration of the resolutions of their charges. The EEOC has no statutory or regulatory duty to act on these requests, and Directors may decline to review such requests unless the CP presents substantial new and relevant evidence or a persuasive argument that the EEOC's prior decision was contrary to law or the facts. The Commission and headquarters staff are endeavoring to support the field in implementing the new procedures. Consistent with this commitment, offices should reconsider dismissals only when one of the following standards have been met:

- misconduct by an agency official which may have affected the outcome;

- substantial new and material evidence that was not previously considered and which may have affected the outcome; or

- an error in the interpretation of the law, which may have affected the outcome.

## G. SPECIFIC ISSUES

### 1. Expedited Subpoena Issuances

The field can expedite the issuance of subpoenas from Area and Local Offices by using FAX, BBS, or teleconference procedures.

### 2. Title VII/ADA Notice of Right to Sue (NRTS) Issued on Request; ADEA § 7(d) Conciliation on Request

Cases where a Title VII/ADA CP has requested a Notice of Right to Sue (NRTS) prior to 180 days from filing may generally be closed and an NRTS issued if the Director has certified that

# PRIORITY CHARGE HANDLING PROCEDURES

processing cannot be completed within 180 days. All but a handful of district courts recognize jurisdiction over these cases. If a court subsequently dismisses the case because of the early NRTS, however, the case should be reopened. In addition, regulations permit an NRTS to be issued in any case on request after 180 days. In the case of a Category A charge that appears to be within a national or local enforcement plan, staff should issue a Title VII/ADA NRTS on request but should also consult with the Regional Attorney and determine whether the EEOC will continue its investigation.

ADEA charges generally may be closed with the issuance of a notice of dismissal or termination at the request of the CP prior to 60 days from filing after a § 7(d) conciliation attempt. In the case of a Category A charge that appears to be within a national or local enforcement plan, staff should not close the charge until staff has consulted with the Regional Attorney.

### 3.  CP Has Sued on the Same Issue under State Law or on a Different Basis

Occasionally, CPs file suit on the same basis (such as race or age) under State law or challenge the allegedly discriminatory act on a different basis (e.g., as a contract or constitutional violation). Once such a charge has been reviewed (b)(7)(E)   8 words redacted   the CP may be informed that EEOC will take no further action until the pending litigation is resolved and that a NRTS will be issued at the CP's request. If the CP does not ask for a NRTS, the appropriate CDS suspense code can be reported and a decision on whether to take further action can be deferred until the end of the litigation. (b)(7)(E)   9 words redacted   whereupon it should be dismissed. The office should check the status of the pending matter periodically to see if suspense status is still warranted.

### 4.  ADEA Charges Filed More Than 180/300 Days after Date of Violation

Under both the current and the new procedures, when an ADEA CP files a charge more than 180/300 days from the DOV, absent equitable considerations, such charge is untimely for purposes of preserving private suit rights. The CP should be informed that if he or she chooses to file, the charge will be dismissed. CPs should be informed of the timeliness problem if they want to consider pursuing their private suit rights.

### 5.  Bankrupt Respondents

When the office concludes that there is little chance of obtaining meaningful relief because the respondent has filed for bankruptcy, it should consider classifying the charge in Category C. This may be particularly appropriate where the respondent has gone out of business and filed for non-asset Chapter 7 bankruptcy. Nevertheless, the office should be aware that under certain circumstances a successor corporation may be liable for its predecessor's discrimination. See Compliance Manual Vol. II, Sec. 605.17b. If the respondent remains in business and files for

# PRIORITY CHARGE HANDLING PROCEDURES

Chapter 11 bankruptcy and reorganizes, the bankruptcy should generally not affect the investigation. However, in such cases the investigative unit staff should confer with legal staff about meeting requirements for filing a timely proof of claim with the bankruptcy court.

## H. CONTINUED COMMUNICATION WITH STAKEHOLDERS

Currently, EEOC expends substantial resources responding to complaints from parties regarding the handling of their cases. It is reasonable to believe that the number of complaints may temporarily increase with adoption of priority charge handling procedures, since many charges will likely be dismissed within a relatively short period of time after filing. The success of the new procedures will depend on a full understanding by both internal and external stakeholders that the field has the discretion to make a wide variety of processing decisions, why these new procedures were implemented and how they will affect both charging parties and respondents.

To this end, the EEOC will pursue a more active role in stakeholder education. Further guidance on education and outreach will be disseminated shortly. Guidance on the appropriate handling of correspondence is also being developed and will be distributed as soon as it is available.

## I. MANAGEMENT OPTIONS

### 1. *Processing of Pending Inventory, Including Backlog Cases*

It is critical that the agency deal with its charge backlog as expeditiously as possible in order to restore its credibility as a law enforcement agency. Moreover, the backlog requires substantial resources just to maintain the status quo and results in unmanageable burdens on investigators and other staff. It is no longer acceptable to permit the backlog to drive our law enforcement priorities.

Offices are encouraged to develop approaches for handling charges that meet their particular needs. The following are examples of management options that may be considered:

Field offices may, in their discretion, handle older cases as a priority on a temporary basis (although not at the expense of Category A cases). Dedicated teams could be formed, or pending charge assignments could be made to individual employees. Such cases could be assigned to professional staff as appropriate.

Pending charges may be transferred from one office to another, applying procedures similar to those for transferring hearings cases, provided that the receiving field offices can absorb them without substantially interfering with their own enforcement plans.

# PRIORITY CHARGE HANDLING PROCEDURES

Notices could be sent to Category B CPs who have not been contacted recently to determine if they want to proceed. If the CP does not wish to proceed a withdrawal might be appropriate or a NRTS could be issued. In addition, if the CP fails to provide requested necessary information, fails or refuses to appear or be available for interviews, or otherwise fails to cooperate, after due notice and 30 days in which to respond, the office may dismiss the case and issue a NRTS. If the CP wants to go forward, the office should review options with the CP, including settlement as well as a review of evidence which may have been developed.

The office can "troubleshoot" the inventory for cases that can be dismissed either for lack of jurisdiction or on the merits.

The office could conduct expedited fact-finding conferences.

The office could "stand down" for all purposes other than taking charges in order to work on older cases or hold a "settlement week."

Cases could be grouped geographically, by respondent, or by issue, to permit a significant number of cases to be investigated and/or processed at one time. Consolidating cases by respondent would also allow for avoidance of duplicative document requests and, at the same time, permit identification of company patterns and practices.

Offices may inform CPs and respondents of the time it will take to reach a particular charge and that there is no impediment to pursuing voluntary alternate dispute resolution (ADR) or other settlement efforts during that time.

## 2. *Improved Coordination Between Enforcement and Legal Staff*

Legal unit attorneys in the district offices should be involved early in the investigation and classification of Category A charges in order to identify and guide the legal development of cases that might result in EEOC litigation. Offices should consider devising team arrangements and other collaborative approaches to providing that assistance. In order to allow legal unit attorneys to focus greater effort on those priority charges, offices should also consider new ways of providing legal advice to investigators working on Category B and C charges. Offices should keep in mind that the Office of Legal Counsel is available to assist with policy and procedural questions.

## 3. *Potential Additional Options*

We are exploring the possibility of authorizing field offices, within the framework of labor-management partnerships, to elect the following options:

a.  Establish a separate intake unit with qualified personnel.

# PRIORITY CHARGE HANDLING PROCEDURES

b. Establish a rotation system for assigning staff to intake, using either a small team approach (e.g., a member from each team rotates into intake for a prolonged period while other team members are assigned to the team's pending workload), or a long-term assignment (e.g., nine months).

c. Establish a specialized ADA unit to handle intake, assessment, and resolution of ADA cases.

## III. PROCEDURES FOR COMMISSIONER CHARGES AND DIRECTED INVESTIGATIONS

### A. INTRODUCTION

In his April 19, 1995 announcement of steps to implement recommendations of the charge processing task force, the Chairman reasserted the importance of Commissioner charges and directed investigations as part of the EEOC's enforcement mission. In addition, he mandated the development of new, streamlined procedures for the approval of Commissioner charges and the conduct of the resulting investigations. This section provides the information necessary to carry out these directives. As with other sections of this memorandum, it supersedes instructions currently in Volume I of the Compliance Manual regarding headquarters supervision of these charges but should otherwise be read in conjunction with the guidance in the Compliance Manual.

### B. BACKGROUND

Enforcement of Title VII, the ADEA, the EPA and the ADA is not limited to charges filed by individuals. In the absence of an individual charge, a Commissioner may initiate action under Title VII or the ADA through a "Commissioner charge," while field directors and the director of OPO have the authority to initiate "directed investigations" in ADEA and EPA cases. Commissioner charges and directed investigations are integral to EEOC's law enforcement mission and are an important complement to the enforcement of the law through individually initiated charges. They recognize that some types and incidents of illegal discrimination will not be the subject of individual charges but, nonetheless, constitute serious violations of the laws that should be the subject of enforcement action.

For example, discrimination against members of underserved communities may not be reflected in individually filed charges for the precise reason that members of such communities are not aware of their rights and/or of the processes available to pursue those rights. Persons not hired for discriminatory reasons may not be aware of why they were not offered a job, or that discrimination may have been a factor, and therefore fail to file a charge. Other discrimination

# PRIORITY CHARGE HANDLING PROCEDURES

victims may be too frightened to file an individual charge. Or, an individual may be jurisdictionally barred from filing a charge even though the evidence shows that the underlying discriminatory policy or practice persists.

## C. GENERAL PROCEDURES

### 1. Identification of Potential Commissioner Charges and Directed Investigations

The identification and development of Commissioner charges and directed investigations should be consistent with the priorities in the national and local enforcement plans. Such charges and investigations may involve systemic discrimination issues as well as individual discrimination. They may be of broad or limited scope but will typically involve priority and/or novel issues.

### 2. Development of the Charge and/or Investigation

Field offices should determine the scope and limitations of the recommended Commissioner charge or directed investigation, including the practices and policies to be addressed as well as the period to be covered by the charge and investigation.

### 3. Management of Directed Investigations

Directed investigations under the ADEA and EPA will be managed entirely at the field office, in accordance with the same principles applying to individually filed charges.

### 4. Commissioner Charges

#### a. The Charge Proposal

The Commissioner charge proposal should be set out in a memo. The memo's content will depend on the sources of information relied on but should be sufficient for a Commissioner to be satisfied that there is a reasonable basis for the investigation. The Commissioner filing the charge must sign and verify the charge.

The proposal should include the Director's assurance that the district office has the resources to properly investigate the charge and that the charge is consistent with the national and local enforcement plan. In addition, the memo should include a brief general statement of the office's investigative methodology, a description of the basis for the proposed charge, and a brief statement of the potential remedial benefits, and/or impact that may reasonably result from the

# PRIORITY CHARGE HANDLING PROCEDURES

charge. It may also include descriptions of the content of affidavits, if any, or summaries of discussions with contacts; EEOC staff observations of possible discrimination; documentation of relevant matters; a brief summary of relevant current or previous EEOC, FEPA or other agency experience with the respondent; and/or any other pertinent information. If the field wishes to pursue a directed ADEA or EPA directed investigation along with a Title VII/ ADA Commissioner charge, this should be outlined in the Commissioner charge proposal memo.

### b. Submission of the Charge Proposal

Field offices should submit proposed Commissioner charges directly to the Commission, through the Executive Secretariat.

Copies of the charge proposal should be sent to OPO which will assure that offices are not engaging in duplicative investigations. In the event of duplication, or where similar investigations of the same or related respondents are being undertaken, OPO will assure that the offices are coordinating effectively with each other consistent with the need to carry out effective investigations.

### c. Investigation and Disposition of Commissioner Charges

Field Offices should investigate Commissioner charges in the same manner as individually filed charges, without headquarters supervision. Field offices can settle, decide and conciliate these charges in the same manner as other cases. Prior to a determination as to reasonable cause, the Commissioner who filed the charge may withdraw the charge with the consent of the Commission. Commissioners should be notified of the resolution of charges they have filed.

## CONCLUSION

This memorandum on priority charge handling is designed to begin the implementation of the motions adopted by the Commission on April 19, 1995 and the Chairman's action items of the same date. The guidance and procedures it incorporates will assist the agency in more effectively carrying out its mission of eradicating employment discrimination through a coordinated strategy of investigation, conciliation, litigation, technical assistance and public education.