# 3-Step Basic Investigative Plan

The Investigative Plan (IP) is an ever-evolving, fluid document which should contain the bulleted or summarized items that will become the skeleton of the Investigative Memorandum (IM) at the end of the process. As a tool, the IP can provide several benefits for the user. It can serve as a gateway for PCHP application in that it allows the Investigator to synthesize the information contained in a case file into one (or two) page(s). This will facilitate communication with management and Legal in order to receive guidance about steps in the investigative process. Additionally, it will arm the Investigator with the relevant information that should be conveyed to the Charging Party during a PDI.

While an IP may vary in complexity based on the case, 3 simple steps can assist in keeping an investigation on track:

1.  Did CP present a prima facie case?

2.  Did R articulate a legitimate, non-discriminatory reason for the action?

3.  Does the EVIDENCE support the allegation or the defense?



Exhibit #5A

# WITHERSPOON

# PACKET B

# Priority Charge

# Handling Procedures

New Investigator Training 2017
Participant Manual - PCHP

## PRIORITY CHARGE HANDLING PROCEDURES

### TABLE OF CONTENTS

OBJECTIVES OF PRIORITY CHARGE HANDLING PROCEDURES ...........................3

CHARGE PRIORITIZATION ...................................................................................4

INVESTIGATION AFTER INITIAL CATEGORIZATION .......................................14

CLASS AND SIGNIFICANT IMPACT CHARGES ..............................................16

SYSTEMIC PROGRAM .....................................................................................17

EXERCISE: CATEGORIZING A CHARGE...........................................................22

**APPENDIX**

Original 1995 Priority Charge Handling Procedures
PCHP Charge Assessment Form

## PRIORITY CHARGE HANDLING PROCEDURES

**LEARNING OBJECTIVES:**
**Following this session, participants will have the tools necessary to:**

- **Make rational charge priority assessments**
- **Recognize the possibility of expanding charges to include related issues and/or class allegations**


## OBJECTIVES OF PRIORITY CHARGE HANDLING PROCEDURES

All charges do not receive the same level of investigation.  The level of investigation varies based on the categorization of the charge under the agency's Priority Charge Handling Procedures (PCHP) and on strategic enforcement and litigation considerations. The primary purpose of PCHP is to focus investigative resources on developing significant cause cases, with an emphasis on national and local enforcement priority issues. PCHP promotes:

- The appropriate allocation of staff time and resources to charges that will have the greatest impact on EEOC's mission and priorities.

- Early identification and priority treatment of meritorious charges.

- Prompt identification and disposition of charges clearly lacking merit.

- Expeditious management of investigations through prompt reassessment of the charge categorization as new information is received.

- Attorney/investigator collaboration throughout the investigation, and

- Strategic enforcement and litigation focused on priorities and other issues that will have significant impact.


PCHP places substantial decision-making authority in field offices and with front line investigators and attorneys.  Although PCHP must take into

3

account the agency's limited resources, it should not be applied in a way that deprives charging parties of a fair opportunity to present their case.

The Strategic Enforcement Plan (SEP) works directly with PCHP by establishing the agency's issue priorities – the P in PCHP. Clearly defined substantive area priorities allow the agency to consistently allocate resources where government enforcement is needed and impactful. A charge supported by strong evidence that raises an SEP substantive area priority or is likely to have strategic impact should receive priority in charge handling. These charges should receive greater investigatory attention and resources to ensure timely and quality enforcement action. The SEP directs that:

- *Charges shall be screened promptly to determine if an SEP or district priority issue is raised.*
- *Where a preliminary assessment indicates that a priority issue in a charge is likely to have merit, the charge shall be initially designated as the highest category in PCHP.*

## CHARGE PRIORITIZATION

Charge prioritization is the cornerstone of the Commission's Priority Charge Handling Procedures (PCHP).  While the Commission is essentially a charge-driven agency, charge prioritization enables the agency to focus its resources on those charges that are most likely to result in a **cause finding** and will have a significant impact in advancing the EEOC's mission as a national law enforcement agency.

The Commission's charge prioritization system provides for the classification of charges into three categories:

- Category "A" charges will receive priority treatment;

- Category "B" charges will be investigated to determine their relative merit; and

- Category "C" charges will be dismissed without further investigation.



## PRIORITY CATEGORIZATION SYSTEM

Charges are classified into one of the three categories described below.

### *Category A:* Potential Cause Charges

The first category includes charges where further investigation may likely result in a cause finding. These are the charges where it appears "more likely than not" that discrimination has occurred, i.e., the evidence appears credible, the charging party seems credible and you believe it is likely that the events the charging party complained of occurred. These cases are the highest priority.

Cases should also be classified as Category A if the case appears to have merit or irreparable harm will result unless processing is expedited.

An example of a charge raising the issue of irreparable harm would be a disability charge of a credible charging party with terminal cancer who has been discharged, has lost insurance coverage, and is unable to pay for life extending medication.

5

Some factors that support categorizing a charge as "A" include:

- there is strong documentary support, or
- strong witness corroboration, or
- strong comparative evidence;
- the timing of events leads to an inference of discrimination;
- there is a per se violation;
- there is a facially discriminatory policy;
- there is an adverse impact on a protected group.

Category A charges have two **sub-categories**:

**SA:** Charges that are likely to result in cause findings, and Enforcement and Legal have jointly determined that EEOC's enforcement will have **strategic significance.**

**A2:**   Charges where it is likely that discrimination has occurred, but the office has determined it will not or cannot litigate.

An example may be where the case law in the Circuit Court that covers the District Office does not support the finding and a strategic decision has been made not to challenge the precedent.  Also, Title VII, ADA and GINA charges against state and local government respondents may be categorized as **A2** (when the case has merit) because EEOC does not have authority to litigate cases against state and local government employers.  The Department of Justice's Civil Rights Division has authority to litigate such cases, which are referred to DOJ after conciliation failure.

> **Subcategory SA: Cause is Likely _and_ Government Enforcement Has Strategic Significance**

❖ Enforcement and legal will jointly determine whether a charge receives the SA designation based on the following two assessments:

   ✓ Cause is likely, **and**

✓ Government enforcement (conciliation and/or litigation) will have **strategic significance**. "Strategic significance" means the EEOC's enforcement will:

1. broadly deter the conduct (beyond the parties), **or**
2. impact a large number of individuals, **or**
3. impact the development of the law, **or**
4. have a broad impact due to EEOC's leadership role (e.g., geographic presence or as the primary enforcer, such as ADEA state and local enforcement).

❖ **How to Use the SA Subcategory:**

- All charges that are assessed as "A" (cause likely) must be evaluated for strategic significance by application of the above criteria (1 through 4), unless they clearly fall within the A2 designation, e.g., charges against state and local government entities.   This includes charges that raise SEP and/or DCP priorities and other charges that raise potential systemic allegations.
- Charges that do not raise SEP or DCP priorities or potential systemic allegations may be assessed as "SA" if they meet any of the above criteria (1 through 4).
- Charges assessed as "SA" should receive significant attention and resources.
- Charges that are assessed as "SA" and that raise SEP or DCP priority issues take precedence over SA charges that do not raise such priority issues, where the charges are of equal merit, strength, and likely impact.

➢ **A2 Subcategory: Cause is likely but litigation is unlikely**

Use this category for charges where cause is likely but where litigation
by the EEOC is not likely, e.g.:
- When EEOC does not have litigation authority, such as Title VII,
  ADA or GINA charges against state or local governments or public
  educational institutions.
- When the office determines it will not litigate.

*Category B:* **Charges Requiring Additional Information.**

Many charges will initially appear to have some merit but will require
additional evidence to determine whether continued investigation is likely
to result in a cause finding. In other cases, it will simply not be possible to
make a judgment about the merits of the charge at Intake. In these cases,
additional investigation will be needed, as resources permit, to determine
whether these charges should be given priority status or dismissed.

Some factors that support categorizing a charge as "B" include where the
CP has stated a prima facie case, but:

- the comparative evidence needs clarification,
- there is a lack of supporting documents or witnesses, or
- the reason CP was given for the adverse action appears to be a
  legitimate, nondiscriminatory reason.

Moving "B" Charges: Once you have received the additional information
needed take the following actions:

- Promptly reassess the category B designation once you have
  analyzed the additional information and determined if another action
  can be taken in the investigation to accelerate resolution of the
  charge through issuance of a cause finding.

- B charges should be closed as soon as you have sufficient
  information to conclude that further investigation is unlikely to result
  in a cause finding.

8

- If sufficient information is obtained to issue a cause finding on a B charge, the charge should be **immediately** recoded up to category "A."

Do not use subcategories of "B" charges to avoid categorizing charges as "C."

### *Category C:* **Charges Suitable For Dismissal.**

These are charges where the charging party has presented his/her evidence and we conclude that it is unlikely further investigation will result in a cause finding.

**Examples of cases that can be resolved under Category C immediately after completion of charge receipt and intake counseling are:**

- Non-jurisdictional charges, e.g., the employer has fewer than 15/20 employees, or the matter is not covered by the laws EEOC enforces (e.g., employer withheld pay but not because of CP's protected group status – CP should be referred to the Department of Labor, Wage and Hour Division).

- Self-defeating charges, i.e., those in which the charging party provides information that negates an inference of disparate treatment due to a protected basis. For example, a CP who is a Puerto Rican male and has alleged national origin discrimination in promotion asserts that although the individual who received the promotion was Puerto Rican, he believes he was more deserving of the promotion.

- Charges with no supporting direct or circumstantial evidence of discrimination. Charging party is **in a position to know** and has no specific examples of disparate treatment, or the comparator is not similarly situated.

- Charges in which the charging party demonstrates a substantial lack of credibility or is not believable based on prior dealings with the office, including repetitive charge filers.

- ♦ Charges in which the allegations are not credible or believable in light of normal business behavior or experience. (Charging party's story doesn't "ring true" and s/he has nothing to support it.)

- ♦ Charges in which the employment action complained of causes no real harm, e.g., being given a task that charging party doesn't like but that is within the scope of his/her duties and is not significantly more work than his/her colleagues.

- ♦ Charges where the respondent is in bankruptcy, dissolved, or otherwise unable to provide any relief.

- ♦ Charges filed more than 180/300 days after the date of violation (DOV) and there are no allegations of harassment or continuing violations. When a CP files a charge more than 180/300 days from the DOV, absent equitable considerations, such charge is untimely for purposes of preserving private suit rights. The CP should be informed that if s/he chooses to file, the charge will be dismissed. CPs should be informed of the timeliness problem if they want to consider pursuing their private suit rights.

As with all charges that are filed, these charges must be served on the respondent. However, you should not request a position statement or other documents from respondents on the "C" charges described above. Where the CP was counseled during Intake that his/her charge would be dismissed immediately, it is not necessary to conduct a Pre-Determination Interview or a Determination Interview before dismissing a charge for one of the above reasons.

It is important to continue applying PCHP to charges throughout the course of the Commission's investigation to ensure the Agency is utilizing its resources on those charges that are most likely to result in a cause finding and have strategic impact. Investigators will typically reassess the charge after the following:

- • When new information is received
- • Following failed mediation efforts
- • Upon receipt of the position statement/CP's rebuttal
- • Upon receipt of RFI response
- • Completing Onsite or fact finding conference

New Investigator Training 2017
Participant Manual - PCHP

Reassessment of the charge will assist with determining whether the charge category should be upgraded or downgraded, whether investigation should continue or if the charge is suitable for dismissal

## Topics of Interest

Topics of interest are a way for the Commission to track certain emerging or persistent issues.  If a topic of interest is identified in a charge, it does not necessarily mean that a charge should be coded as SA.   Below are explanations of selected topics of interest:

- Arbitration:  Arbitration is a form of alternative dispute resolution that some employers use to address employee complaints including internal complaints of discrimination as well as charges filed with EEOC. Arbitration agreements do not impact EEOC's ability to investigate allegations of discrimination and obtain relief for class members, but they can impact the EEOC's ability to obtain relief for the charging party. During charge counseling, you should explain that absent a mandatory arbitration provision, a charging party can receive a NRTS and have the option to bring their claim in court.  However, if bound by an arbitration clause, an employee may be required to resolve their claim only in arbitration.  Sometimes these provisions are in an application for employment, in onboarding paperwork, or employee handbooks/manuals.  Many employees are unaware that they are bound by such clauses.  Depending on the provisions, arbitration programs can be more or less problematic.  For example, some arbitration programs discourage workers from talking to the EEOC, shorten the statute of limitations, require the complaining party pay all fees if he or she doesn't prevail, or contain other overly broad provisions.  If you learn of an arbitration clause, make sure the charging party understands the implications it has on EEOC's investigation.   If you learn of an arbitration clause that appears overly broad, it may fall within the SEP's Access to Justice priority. You should discuss it with your supervisor.

- Unemployment Status:  Some employers may require that job applicants currently have a job, and bar or discourage the unemployed from applying for a job.

- Leave Policy:  Some employers may have leave policies such as maximum leave policies—either on their books or in practice—that don't

11

provide any flexibility for leave, which can be a violation of the ADA under some circumstances.

## CHARGE RECEIPT:  INITIAL CASE CATEGORIZATION

Charge receipt is a critical point under PCHP since an initial assessment of a charge's priority status will be made at this stage of the investigation. However, it is important to keep in mind a key principle of PCHP is charge reassessment based on the receipt of additional information.

1. **Importance of Charging Party Interview**

The filing of a charge should ideally be preceded by an interview of the charging party (CP) conducted either in person or by phone by experienced staff that will counsel the CP and provide an assessment of the charge. All offices are required to have walk-in hours each work day.  To augment walk-in hours, offices have the option to use an appointment system for charge receipt.

- This interview may be lengthy in certain circumstances, for example, when the case appears to involve systemic discrimination.  In other situations, a shorter interview may be appropriate, for example, where the individual alleges age discrimination, but is 38 years old, and therefore not within the age group protected by the ADEA, and there are no allegations that would suggest a broader pattern or practice of discrimination. The following sets out guidance for counseling of CPs and assessment of charges.

2. **Charge Counseling**

The following are essential elements of charge counseling:

- At Intake, you should expressly inform the potential charging party (PCP) that s/he has a right to file a charge and that filing the charge is necessary to preserve the right to file a law suit in court under Title VII, GINA, ADA, or the ADEA. You should also explain to the individual that if a formal charge is filed, the EEOC must provide notice of the charge to the respondent. You should inform the individual that she/he is protected by law against retaliation, but that

12

there is a risk of retaliation, and that a PCP may file a charge alleging retaliation. If it occurs, refer the PCP to the info on EEOC's website (http://www.eeoc.gov/employees/howtofile.cfm) and provide the Uniform Intake Brochure about essential facts to convey to potential charging parties.

- If the charge appears to be weak, based on the initial interview, you should counsel the PCP about the elements of proof, the lack of merit and about our process. If the PCP still wishes to file a charge, advise him/her that it will be served on the respondent and might be dismissed shortly after that time. Further advise that s/he will have to undertake private enforcement if s/he wants to continue to challenge the alleged discrimination. Document that you informed the PCP about the imminent dismissal. You must, however, recognize that the decision to file is very important to the PCP and must be made by him/her.

- In limited cases, calls to respondents or witnesses during the Intake process may be helpful to explore settlement or gather information. While this practice will not always be appropriate, pursuing such opportunities may save resources or benefit a party. For example, if contacted during charge receipt, a witness may or may not verify a potential CP's version of the facts or an employer might have second thoughts about a recently taken adverse action.

- Provide PCPs with a copy of the Uniform Intake Brochure and/or the link (https://egov.eeoc.gov/eas/) to EEOC's Assessment System on our website. Use the Uniform Intake Checklist as a tickler to cover all important aspects of charge counseling.

## 3.    Prompt Charge Assessment

Assess new charges as promptly as possible after they are filed (including signed Intake Questionnaires and other correspondence with all five indicia of a charge during the period the charge is being perfected).

Consider the following:

- Use the elements of proof to assist in deciding which category is most appropriate for a charge. See "Models of Proof."

- After the charge is filed, offices may use questionnaires to obtain more detailed information from CP relating to statute, basis, and issues to assist in beginning the investigation. Offices are encouraged, however, to obtain this information through a discussion with CP whether in person or on the phone.

- Intake staff should assemble intake notes and memoranda to the file, gathering as much information as necessary to facilitate priority charge assessment. For example, detailed intake notes or a written statement from CP about matters within the CP's knowledge may preserve valuable evidence and save investigative resources later on.

- Including information on the face of the charge sufficient to allow respondents to adequately respond to the charge, or a Request for Information ("RFI") if one is issued, can expedite the investigation. Be specific about allegations of discrimination in "terms and conditions" and of "harassment." Include the names of relevant managers and supervisors only if appropriate (see guidance in section 4 on charge intake and drafting). In other instances, it may be advisable to identify only the positions of the managers or supervisors, not their names, on the face of the charge. Do not include the names of witnesses. Do not include the name of the disability in an ADA case.

- To assist in the assessment of the charge the office may require, in appropriate cases, that the CP provide a statement that includes: each specific harm the person has suffered and the date on which each harm occurred; for each harm, a specification of the act, policy, or practice that is alleged to be unlawful; and for each act, policy, or practice that is alleged to have harmed the person, the facts that lead the person to believe that the act, policy, or practice is discriminatory, pursuant to 29 CFR § 1601.15(b).

## INVESTIGATION AFTER INITIAL CATEGORIZATION

### Investigation

The investigation of each case should be appropriate to the particular charge, taking into account the EEOC's priorities and resources.

14

Investigators must seek *only* that amount of evidence needed to make an informed decision as to whether it is more likely than not that a statute has been violated. Investigators should use the elements of proof to assess the available evidence and decide whether it is sufficient to reach a conclusion.

This avoids misapplying resources by over-investigating charges that could be resolved with less information, or by pursuing cases that are facially non-meritorious. At the same time, it has the beneficial effect of shifting the agency's limited resources to cases that are the most likely to fall within the SEP and DCP enforcement priorities or to have strategic impact and that otherwise result in findings of violations.

As soon as practicable after receipt of a position statement and the charging party's response to the position statement, or a response to a RFI, the office should decide whether to take further investigative or settlement action. If no further investigative or settlement action is appropriate, the charge should be dismissed at that time.

Investigations must be done on a timely basis in light of the nature and complexity of the case, the cooperation of the parties, the size of the workload, and the resources available. Cases should be moved expeditiously. Additional information should be promptly analyzed to determine if another action would accelerate enforcement or resolution of the charge.

Timeliness will be evaluated by considering whether the actions taken were reasonable given the totality of the circumstances, including available resources

The evidence collected should be sufficient to make the proper determination under PCHP. The evidence can be derived from the intake interview, RFI, on-site, witness interviews, data analysis, etc.

Make timely decisions based on the evidence collected. Exercise proper judgments in relation to the evidence collected and the need for further actions depending on the judgment made.

## PRIORITY CHARGE HANDLING PROCEDURES

---

### Objectives of PCHP

- Focus investigative resources on developing cases where cause is likely, with an emphasis on national and local enforcement priority issues.
- Allocate resources to have the greatest impact on mission and priorities.

---

### Strategic Enforcement Plan

- Sets forth the Substantive Priority Areas
- The P in PCHP
- Charges with priority issues receive greater investigatory attention
- If Priority issue likely to have merit, then designated as the highest category in PCHP

1

## Pre-Determination Interviews (PDI's)

- When = Evidence indicates cause is unlikely, but before a determination to dismiss is reached
- If CP has provided a response to the position statement (CP has 20 days to respond) – then review all evidence and explain why cause is unlikely.
- If you have only R's Position Statement: Review the R's position and evidence with CP and provide CP an opportunity to rebut.

10

# New Investigator Training
# August 2017

## PATRICIPANT MANUAL

## TABLE OF CONTENTS

1. Overview of EEOC
2. Jurisdiction/Threshold Issues
3. Overview of the Charge Process
4. Theories of Discrimination
5. Discrimination Based on Religion
6. Investigative Interviewing
7. Discrimination Based on National Origin
8. Americans with Disabilities Act (ADA) and Genetic Information Nondiscrimination Act (GINA)
9. Priority Charge Handling Procedures (PCHP)
10. Fact Finding Conferences
11. Chung Case Study
12. Haverhill Mills Case Study
13. Leslie Reed Case Study
14. Negotiation/Conciliation

## OVERVIEW OF THE CHARGE PROCESS

### Table of Contents

INTRODUCTION TO THE CHARGE ...................................................................................3

DRAFTING THE CHARGE .............................................................................................12

SAMPLE CHARGE...........................................................................................................14

INTAKE .........................................................................................................................16

CHARGE PRIORITIZATION - PCHP...............................................................................20

STRATEGIC ENFORCEMENT PLAN ...............................................................................21

QUALITY ENFORCEMENT PRACTICES (QEP)................................................................23

EXERCISE:......................................................................................................................26

EEOC AND CUSTOMER SERVICE ..................................................................................29

MEDIATION....................................................................................................................31

THE INVESTIGATION......................................................................................................32

INVESTIGATIVE TOOLS AND TECHNIQUES..................................................................37

**APPENDIX**

**Slide Show**

## CHARGE PRIORITIZATION

Charge prioritization is the cornerstone of the Commission's Priority
Charge Handling Procedures (PCHP). The EEOC typically receives about
90,000 charges each year and charge prioritization enables the Agency to
**focus its resources** on those charges that are most likely to result in a
cause finding.

PCHP established three categories for prioritizing charges:

♦ Category "A" - charges where cause is likely. These charges receive
priority treatment;

♦ Category "B" charges need more information to determine their relative
merit; and

♦ Category "C" charges where cause is unlikely. These are dismissed
without further investigation.

PCHP is based on an assessment of the **likely merit** of a charge. The
PCHP categories signify how likely it is that an investigation will result in a
determination of "reasonable cause" to believe discrimination occurred.

Category "A" charges are defined as those in which further investigation
will likely result in a finding of reasonable cause.  Category "A" charges are
further classified based on their strategic significance and litigation
potential:

- "SA" charges are those in which a cause determination is likely **and**
  government enforcement has **strategic significance.**

- "A-2" charges are those in which cause is likely but litigation by the
  EEOC is not likely.

    o A-2 charges include Title VII, ADA and GINA charges that are
      filed against a State or local government. The Department of

20

Justice has the sole authority to litigate those cases. State or local government cases that raise priority issues should be coordinated with DOJ for investigation.

Charge prioritization selections are captured in the IMS database.

The importance of charge prioritization will be discussed further under the Priority Charge Handling Procedures Section.

## STRATEGIC ENFORCEMENT PLAN

The Commission's Strategic Enforcement Plan for FY 2017 - 2021 (SEP) identifies certain **issues** of discrimination or **types of claims** that are priorities for enforcement. Charges are evaluated at intake (and as the investigation progresses) to see if they raise any of these priority issues.

The **SEP priorities** are as follows:

1. **Eliminating Barriers in Recruitment and Hiring.** The EEOC will target class-based recruitment and hiring practices that discriminate against racial, ethnic and religious groups, older workers, women, and people with disabilities. Under this priority, we look for barriers to diversity in hiring in the tech industry, policing, and the temporary workforce. We may analyze how companies are using big data and online job application processes that may pose arbitrary barriers in hiring members of particular groups.

2. **Protecting Immigrant, Migrant and Other Vulnerable Workers.** The EEOC will target disparate pay, job segregation, harassment, trafficking and discriminatory policies affecting vulnerable workers who may be unaware of their rights under the equal employment laws, or reluctant or unable to exercise them. While immigrants and migrants may be vulnerable workers from the national perspective of the Commission, in particular localities, there may be a need to focus on other vulnerable groups or underserved communities. The current SEP allows for that.

3. **Addressing Emerging and Developing Issues.** The EEOC will target emerging issues in equal employment law, including issues associated with significant events, demographic changes, developing theories, new legislation, judicial decisions and administrative interpretations. Current issues include accommodating pregnancy-related limitations that fall

# 216 WO

Exhibit #6

Official Publication
of the National
Council of
EEOC Locals
No. 216
AFGE/AFL-CIO

Volume 18 Number 1

Spring 2019

## What My Years at EEOC Have Taught Me, If the Agency Would Listen

*By Sharon Baker, Council 216, Chief Negotiator*

When I came to work for the Commission, I came with a passion for the mission to eradicate discrimination in the workplace. We did full investigations and wrote Investigative Memoranda to close all cases. That is how you learned to investigate. You could close a case knowing that you considered the information, followed the leads, interviewed witnesses, and conducted onsites before determining cause or no cause. You had a lot of cases, but the passion for the mission motivated you to work through your caseload.

Then came Priority Charge Handling (PCHP), which allowed you to triage your cases. PCHP used to mean that "C" cases were those that were untimely, non-jurisdictional, or had self-defeating bases and issues on the face of the charge.

Now, the agency has expanded the definition to reduce the backlog at the expense of due process for the charging party. By using the expanded definition, the public is deterred from filing a complaint, or the complaint is dismissed while the ink is drying on the paper.

The public does not get the type of quality service we used to provide. The performance standards press employees to meet numeric goals instead of conducting quality investigations.

The new digital charge system assumes that the general public has access and understands the legal terminology.

EEOC is no longer people friendly. Those of you who joined with the EEOC in the past 10 years may not understand what I am saying. Ask yourself



*Baker addressing Louisville shutdown rally*

if you would want someone in your family with a belief that they had been discriminated against to come to the EEOC for assistance, or would you recommend they contact an attorney? Think about it.

The agency employs highly qualified, educated people who want to do their best work and believe in our stated

> **Labor and Management used to work together for the good of all. Today, little collaboration, communication, and compromise is resulting in internal and external suffering and low morale.**

mission. But once you are hired, there is little put into developing you. There is little patience in allowing you to adapt to your new work environment and changing requirements. There is an expectance of a high return with little to no investment in the employee. The turnover rate keeps rising and often there are no backfills.

There is no one in OHR that is for the bargaining unit. What I have been constantly made aware of by OHR is the phrase "management rights." There is little or no consideration of Union and Employee rights. The focus of OHR is to "take back" the few benefits that contribute to a better work-life balance. For instance, OHR shut down the successful Maxi-Flex pilot at the end of its run, rather than improving and expanding it. Vets and prior government employee transferees who were not credited for their service wait months for help. Meanwhile OHR focuses on disciplining employees and misinterpreting the CBA to pull rights from employees.

I have always believed that anything good or bad, when taken to the extreme, is inherently bad. Pushing a "management rights" theme without a proper balance of employee and union rights becomes reckless and bad for all.

The Union always shares with management that we are open to discuss changes that impact the bargaining unit before implementation. Instead, we often get notice "after" management has implemented the plan. Once the buy-in occurs at the management level, it is difficult to get an adjustment based on union input we receive from the bargaining unit doing the work. It should not matter who provides the input that can make the processes more efficient for all.

Labor and Management used to work together for the good of all. Today, little collaboration, communication, and compromise is resulting in internal and external suffering and low morale. My call to management is to stop changing what is working and let's work together to improve what needs improvement — respective of everyone's rights.

# How the Rise and Fall of EEOC's Budget Affects You

**By Rachel Shonfield, Council 216, 1st VP**

Get ready for rough times. The administration has requested a $23 million budget cut for EEOC starting October 1st. Slashing funding for the agency handling #MeToo complaints and training seems ridiculous, but there it is in black and white. EEOC's Congressional Budget Justification (CBJ) paints a bleak picture of how it will absorb the hit — staff losses that will bottleneck help to the public.

EEOC projects losing 50 investigators. Currently we have only approximately 500 investigators — compared to a high of 917 in 2000! If it can take months now to get an appointment, it will only get worse. EEOC also plans not to backfill any GS-5 Information Intake Representatives who leave this high turnover position. If hold times for EEOC's 1-800 line can now be an hour, it will only get worse.

The hurt from next year's budget starts now. EEOC's FY20 budget states that all hiring will "halt" in the middle of FY19. The limited vacancy announcements out now will soon dry up.

However, EEOC's workload will not dry up. With sexual harassment in the news, it has raised the agency's profile. Sexual harassment filings were up 13.6% in FY18. Overall, last year EEOC received 200,000 inquiries, a 30% jump from the year before.

Civil rights allies have already started to push back on this draconian cut. A group of 83 House lawmakers recently signed a letter supporting a $20 million increase instead of a cut.

However, those who support EEOC's cut are already getting what they want. As long as the official request for EEOC hangs out there, EEOC prepares for it by choking off hiring. Then EEOC uses short-staffing as an excuse to shortcut services to the public.

EEOC's budget is already cut to the bone, so most of it goes to staff and rent. When staff retire or get fed up with working conditions and leave, they won't be replaced. This is what the agency calls "separation savings."

Thanks in great part to the Union, for the past two years, EEOC has gotten a $15M increase, despite asking for cuts to funding. Unfortunately, like the fabled grasshopper, the EEOC failed to store up, in this case – hire up, for tough times. Despite the budget bump, EEOC ended FY18 with a net staffing loss, and at 1,968, the smallest workforce since at least 1980.

One consequence of the massive workload and short staffing is a push by EEOC to swiftly close cases without substantive processing by requiring offices to hit "C" at intake quotas. The vast majority of workers coming to EEOC receive a dismissal and 'right to sue' letter and are left to find help on their own. Similar case closure initiatives impact the Federal sector.

EEOC also crows in the budget that investigators closed an average of 163 cases last year. The way it was driven up from the traditional 120 closures was to sacrifice real investigations and mediations for "C" charges.

Reducing charges by discouraging filing, a/k/a "counseling out," seems to be another strategy. EEOC's budget brags that 22,000 people were interviewed but "decided" not to file, up 8,000 over the previous year. This is not a point of pride, but a point of concern.

EEOC has debased its sacred mission by converting civil rights enforcement into numbers- and the wrong numbers- quick closures rather than real help. EEOC should allow frontline staff to apply the inspiration that brought them to this agency in assisting workers whose jobs have been disrupted by unlawful discrimination.

# CHIEF NEGOTIATOR REPORT

**By Sharon Baker, Council 216, Chief Negotiator**

Greetings to my fellow bargaining unit members. A lot has been happening.

The agency continues to change performance standards for our Administrative Law Judges and Mediators, by including bizarre and unattainable numerical requirements, criteria that do not fall in their normal job duties and that the employee has no control over. There is no indication that the agency used the SMART assessment when they changed the performance goals. It is also doubtful that they consulted with the actual doers of the job for feedback. If the goal is to continue to disrupt and lower the level of performance of the well regarded mediation program, then this will probably do that. If the goal is to take away federal employees' right to have a just evaluation of their EEO complaints, then this will also probably do that. The focus of their mission changed from eradicating discrimination to producing closures.

Who knows what other positions have had changes? We only become aware of the changes when our bargaining unit members inform us. The Agency is recognizing only the part of the EEOC Directive 540.008 regarding changes to Performance Standards, which they take out of context, while refusing to recognize the part that supports the Union's role. The part they ignore states, "Consistent with the CBA, discuss any changes that would impact employees with the Union prior to implementation." We also have a disagreement with their failure to comply with the CBA.

The end result is that the Union has filed national grievances regarding the AJ standards and the mediator standards. On the AJ standards, we also filed an RFI to figure out what was relied upon to come up with the very high closure requirements. The Union has also filed a national grievance on the Agency's improper refusal to recognize a designated representative, who happens to be an elected AFGE Local President.

Continued on page 6

**STATEMENT OF**

**RAE T. VANN**
**VICE PRESIDENT AND GENERAL COUNSEL,**
**EQUAL EMPLOYMENT ADVISORY COUNCIL**

**U.S. HOUSE OF REPRESENTATIVES**
**COMMITTEE ON EDUCATION AND THE WORKFORCE**
**SUBCOMMITTEE ON WORKFORCE PROTECTIONS**

**MAY 23, 2017**

## Introduction

Chairman Byrne, Ranking Member Takano, and Members of the Subcommittee, thank you for inviting me to testify today regarding the challenges and potential opportunities facing the U.S. Equal Employment Opportunity Commission (EEOC) as it advances its mission to prevent and eliminate workplace discrimination.  I appear here today as Vice President and General Counsel of the Equal Employment Advisory Council (EEAC).

EEAC is a nationwide association of employers whose mission since 1976 has been to promote sound approaches to promoting equal employment opportunity and compliance with nondiscrimination and other workplace rules.  Its membership comprises over 250 major U.S. corporations, and its directors and officers include many of the nation's leading experts in human resources and equal employment opportunity compliance.  EEAC's members are firmly committed to the principles of nondiscrimination and equal employment opportunity, and thus fully support the EEOC's mission to investigate and correct discriminatory employment practices.

All of EEAC's members are employers subject to the laws enforced by the EEOC.  As potential respondents to EEOC discrimination charges, EEAC member companies have a strong interest in ensuring that the agency's enforcement priorities are consistent with its statutory authority and are pursued in a fair, competent, and effective manner.  To that end, EEAC regularly has testified before, and provided written comments to, the EEOC on a range of regulatory, policy, and administrative matters.  These include, but are not limited to, the agency's development and implementation of its pivotal National Enforcement Plan (NEP) and Priority Charge Handling Procedures (PCHP); the efficacy of EEOC mediation; reorganization of agency operations; development and implementation of its Strategic Enforcement Plan (SEP); and the burdens and utility of various proposed and implemented data collection tools, including the EEO-1 report.

## Recent Emphasis on Systemic Enforcement Has Detracted from EEOC's Core Mission

The EEOC's core mission is, and always has been, to prevent and correct discriminatory employment practices. It does so by conducting proper charge investigations and by attempting to correct alleged violations through informal means of "conference, conciliation, and persuasion." 42 U.S.C. § 2000e-5(b). Although the EEOC has many meaningful tools at its disposal to effectively investigate and resolve workplace discrimination – including a dedicated and hard-working staff of enforcement and policy professionals – regrettably the agency has fallen short of the mark in a few critical areas.

In particular, we believe that the EEOC's past commitment to redressing workplace discrimination through meaningful technical assistance and stakeholder education, top-notch customer service, and quality charge investigation and conciliation has been severely undermined by its strong emphasis in recent years on developing and prosecuting class-based, systemic litigation. In addition, while we appreciate that the EEOC is statutorily authorized to commence litigation where warranted and in the public interest, EEAC member companies are deeply concerned with ensuring that such litigation, when it does occur, is prosecuted competently, responsibly, and fairly.

Moreover, although the EEOC may litigate strategically in the public interest, voluntary resolution of discrimination claims remains "the preferred means for achieving the goal of equality of employment opportunities." *Occidental Life Ins. Co. v. EEOC*, 432 U.S. 355, 368 (1977) (internal quotation omitted). As described below, the agency's self-imposed pressure to "fish" for large, class-based claims has undermined the quality and effectiveness of its overall enforcement efforts and has detracted from ensuring that litigation remains an option of last resort.

By way of background, in early 2005, the EEOC appointed an internal Systemic Discrimination Task Force and charged the group both with evaluating the effectiveness of the agency's existing systemic program and coming up with recommended changes. The result was a 65-page report which recommended a number of significant changes designed to improve the agency's systemic investigations and litigation efforts, including a much more strategic and coordinated approach to identifying and developing systemic cases. The report also called on the EEOC field staff to more aggressively develop systemic discrimination charges and lawsuits, noting that the EEOC field offices had been reluctant to pursue systemic discrimination in the past because of the significant time and resources those cases require.

The emphasis on systemic enforcement was further endorsed in the EEOC's 2013-2016 Strategic Plan and its accompanying Strategic Enforcement Plan (SEP).[1] The initial SEP for Fiscal Years 2012-2016 was approved in December 2012. The SEP for Fiscal Years 2017-2021 was finalized in October 2016. Under the SEP, the EEOC has continued to direct substantial staff time and resources to investigating and prosecuting alleged systemic discrimination claims. The agency's current Strategic Plan goes so far as to require its district offices to achieve numerical quotas as to the minimum number of systemic cases on their litigation dockets. *See* Strategic Plan for Fiscal Years 2012 through 2016 (as modified on February 2, 2015), PERFORMANCE MEASURE 4 ("By FY 2018, 22-24% of the cases on the agency's active litigation docket are systemic cases").[2]

Inherent in the EEOC's systemic enforcement strategy is the assumption that widespread workplace discrimination is present in every district and region – and at every company – across the country. Thus, even where no individual has brought such discrimination to the EEOC's attention by filing a charge, it seems the agency feels it must go out and find it by whatever means necessary. Indeed, the agency has been roundly criticized by stakeholders and the courts alike for focusing more on conducting "fishing expeditions" in search of unasserted violations than on addressing and resolving meritorious, asserted claims. We question whether this approach is an appropriate use of the EEOC's limited resources or, more fundamentally, is consistent with Congressional intent in enacting Title VII.

Rather than focusing on increasing its systemic litigation docket, the EEOC should do more on the front end to ensure that all discrimination charges it receives are properly categorized, investigated, and resolved. We believe that the key to accomplishing the EEOC's statutory mission lies in ensuring that it maximizes investigative resources to more effectively address and resolve the actual claims presented to it, rather than chasing down unasserted and/or hypothetical indicators of potential systemic discrimination. In other words, the EEOC should develop clear standards that can be applied at each stage of the process to determine, as described in the NEP, "whether the strength of the case and the nature of the issue supports the decision to proceed." Section II. F.

---

[1] The Strategic Plan stated that the SEP would replace the EEOC's 1996 National Enforcement Plan (NEP), the main objectives of which were to (1) reduce the substantial discrimination charge backlog that had built up to that point; (2) engage in more focused, strategic enforcement; and (3) better utilize mediation and education and outreach as a means of discrimination prevention.

[2] EEOC, FY 2016 Performance and Accountability Report 23, *available at* https://www.eeoc.gov/eeoc/plan/upload/2016par.pdf.

The EEOC's Priority Charge Handling Procedures (PCHP) system, for instance, contemplates that each filed charge undergoes a thorough and deliberate review at the intake stage of the administrative process. We suspect that does not occur with regularity.

If the EEOC focused more intently on its stated goal of ensuring consistent, nationwide application of the PCHP, it could expedite the resolution of the vast majority of workplace disputes and redirect its resources to other critical program areas, such as education and outreach, as well as mediation, professional staff development, and quality assurance. On the other hand, failure to properly categorize charges can result in precious time wasted on investigating frivolous charges ("C" charges suitable for dismissal), as well as insufficient attention being paid to priority issues ("A" charges warranting prompt attention).

In addition, and further to that end, we urge the elimination of the above-referenced, Strategic Plan-mandated incentives tied to development of systemic investigations and litigation by field offices, which we believe have contributed to prolonged, costly investigations and frivolous court litigation. Requiring that specific systemic litigation goals be met further frustrates discrimination charge processing and informal resolution by incentivizing staff to forgo a proper investigation and find reasonable cause even in marginal cases. That in turn affects the quality of enforcement efforts as a whole, since effective *litigation* of discrimination claims (whether systemic or not) heavily depends on a thorough, complete, and proper *investigation* of the underlying discrimination charge.

## Delegation of Litigation Authority to the General Counsel Should Be Scaled Back in Favor of Greater Commission Oversight of Civil Rights Enforcement

When the NEP was first approved by the EEOC in 1996, it authorized the Office of General Counsel (OGC) to commence or intervene in litigation without first having to obtain Commission approval in most cases.[3] Part of the reason ostensibly was to increase enforcement efficiencies by eliminating time-consuming reviews by the full Commission. Unfortunately, the delegation of litigation authority has made it much more difficult for the agency to establish uniformly applied policies and consistency across regions, which has detracted from meaningful civil rights enforcement. Nevertheless, the Commission has reaffirmed that delegation repeatedly over the years,

---

[3] The General Counsel since has redelegated that authority to Regional Attorneys in claims brought under or implicating Title VII of the Civil Rights Act of 1964 (Title VII), the Age Discrimination in Employment Act (ADEA), and the Equal Pay Act (EPA).

most recently in October 2016 over the dissents of its two Republican members.

Pursuant to his or her delegated litigation authority, the General Counsel wields considerable power in deciding which cases should be pursued in court. The lack of Headquarters oversight has resulted in national employers that appear before multiple EEOC offices often facing vastly different standards, requirements, and expectations from region to region – not only as to litigated matters, but also with respect to the investigations and other activities preceding it.

Consistency and uniformity in investigative standards has been a common concern over the years. Companies operating in multiple jurisdictions often have complained, for instance, that a "garden variety" discrimination charge capable of expeditious resolution in one region might trigger an "expanded" investigation in another, which in turn is much more likely to evolve into a potential systemic claim and threatened EEOC lawsuit.

For charging parties, these inconsistencies likely contribute to a sense of futility and lack of confidence in the process, and could well dissuade aggrieved persons from filing discrimination charges at all. For employers, it creates an unacceptable level of unpredictability that makes it much more difficult to ensure across-the-board compliance.

## Overly Aggressive Litigation Goals Should Yield to Meaningful Efforts to Secure Voluntary Compliance

Title VII authorizes the EEOC to pursue civil action against a respondent believed to have engaged in unlawful discrimination, but only after it has satisfied its statutory duty to "endeavor to eliminate [the] alleged unlawful employment practice by informal methods of conference, conciliation and persuasion" as a precondition to initiating a public enforcement action. 42 U.S.C. § 2000e-5(b). To be sure, there are times when litigation is unavoidable.

In most instances, however, we believe the EEOC's goal of preventing and correcting unlawful discrimination can be achieved quite effectively through voluntary means. For that reason, more emphasis should be placed on facilitating and promoting mutual resolution of charges through settlement, and less on the scorched earth litigation tactics pursued in recent years against all manner of respondents.

Mediation has been an effective charge resolution tool utilized nationally by the EEOC since the early 1990's. Outside evaluations of the

EEOC's mediation program over the years have found a very high level of satisfaction in the program, with over 90% of all employers and employees indicating that they would participate in the program again if given the opportunity to do so.  In addition, the EEOC's mediation program has continued to produce favorable results. In FY 2016, for instance, the agency conducted 10,461 mediations, of which 7,989 (76 percent) were resolved successfully and netted charging parties a total of $163.5 million.

We urge the EEOC to continue to pursue opportunities for informal settlement throughout the charge investigation and resolution process by, among other things, expanding the use of mediation, both at the pre- and the post-cause stages. The EEOC in the past has considered offering mediation at the conciliation stage of the charge resolution process, and we suggest that it do so again.

Once the EEOC has determined that a charge has merit, the dynamics of the situation change significantly, and an employer who may have been disinclined to go to mediation beforehand may now see some value in doing so. The prospect of having an outside party facilitate conciliation is particularly attractive to many EEAC members, some of which in the past have felt pressured by the agency into signing conciliation agreements without being given a meaningful opportunity to negotiate their terms.

The EEOC also could utilize mediation as a viable alternative to litigation upon unsuccessful conciliation efforts. At that stage, an outside neutral with no stake in the outcome of the dispute may greatly assist the parties and the agency in reaching a mutually acceptable resolution that avoids the costs and time involved in federal court litigation.

From an employer's standpoint, the availability of post-conciliation mediation could be extremely valuable.  Not only would it give the employer a chance to resolve a case that appears to be destined for federal court, but it also could provide one final opportunity to help to heal "bad blood" between the parties as a result of the adversarial positions taken during the administrative charge resolution process — or that is inevitable should the case proceed to litigation.  Of course, the employer ultimately would retain the right (as would the charging party) to decline to participate in mediation, depending on the facts and circumstances of the case.

Whether or not the EEOC were to expand its mediation program to the conciliation stage of the charge resolution process, much more needs to be done, in our view, to assure that *all* charges in which reasonable cause has been found are subject to meaningful, good faith conciliation efforts.  In our experience, EEOC investigators have been far too quick to deem conciliation

a failure based merely on a respondent's reasonable inquiries as to the basis of a finding or its efforts to negotiate additional conciliation terms. This cursory treatment of conciliation by some in the field falls short of satisfying the agency's statutory conciliation obligation, and undermines the concept of voluntary settlement as the preferred means of resolving discrimination charges.

We believe that by refocusing its efforts on voluntary compliance, rather than "gotcha" enforcement tactics, the EEOC will be able to achieve its mission-critical strategic aims more efficiently. It also would improve the agency's reputation among the stakeholder community for fairness and even-handedness, and would afford charging parties – many of whom will be unwilling or unable to pursue private litigation – an opportunity to have their claims addressed on terms that are favorable to them.

## The EEOC Should Continue to Prioritize Improving the Quality and Timeliness of Charge Investigations and Conciliations

Over the last few years, the EEOC has taken steps to improve the quality of its stakeholder interactions and administrative charge investigation procedures. We believe that quality assurance and top-notch customer service should remain EEOC management priorities. Establishing and implementing a meaningful quality control system for investigations and conciliations not only is important to ensuring that the agency's enforcement objectives are achieved, but it also can serve as a helpful professional staff development tool.

Also relevant to effective civil rights enforcement is the ability to conduct charge investigation as promptly and efficiently as possible. Although Title VII requires the Commission to "make its determination on reasonable cause as promptly as possible and, as far as practicable, not later than one hundred and twenty days from the filing of the charge...," this statutory standard is routinely disregarded. Because seemingly endless investigation of discrimination charges fails to serve the interests of the charging party or respondent, the EEOC should be encouraged, and provided with the necessary resources, to improve the time it takes to conduct charge investigations.

The EEOC also should continue to strive to improve the quality of its conciliation efforts. The EEOC's failure to provide sufficient information on which to evaluate a settlement offer, its refusal to explain the basis for a monetary demand or to identify specific victims and/or class size, its insistence on unreasonable deadlines, and/or its unwillingness to engage the

respondent in meaningful negotiation of terms all can contribute to unsuccessful conciliation.

In *Mach Mining, LLC v. EEOC,* the Supreme Court clarified that to meet its statutory conciliation obligation the EEOC at a minimum "must tell the employer about the claim – essentially, what practice has harmed which person or class – and must provide the employer with an opportunity to discuss the matter in an effort to achieve voluntary compliance." 135 S. Ct. 1645, 1652 (2015). The EEOC's current Title VII procedural regulations merely require that the agency attempt to achieve a "just resolution of all violations found," however. 29 C.F.R. § 1601.24(a).

We believe that the EEOC should revise its procedural regulations consistent with *Mach Mining* to identify specific factors that should be considered in evaluating the sufficiency of agency conciliation efforts. Such a standard would help improve the quality of conciliations by ensuring that employers are provided with a sufficient factual understanding of the agency's findings, as well as a meaningful opportunity for "voluntary compliance" in every instance.

## The EEO-1 Compensation Data Collection Tool Has No Practical Utility as an Enforcement Tool

Last year, the EEOC proposed, and the Obama Administration subsequently approved, significant and expansive revisions to the EEO-1 Report. The EEO-1 Report is an annual filing requirement that obligates covered employers to report the number of employees, per establishment, by each of seven race and ethnicity categories, two gender categories, and ten job groups.

The revised EEO-1 Report now requires employers report summary employee compensation and hours worked broken down by 12 pay bands within each of the ten EEO-1 job groups. The total number of new data fields to be reported by employers each year under these revisions is between 2.9 billion and 4.5 billion, placing a significant new burden on employers.

But this added burden is unlikely to produce any meaningful benefit from an enforcement standpoint, as the new data collection will be of no real help in identifying unlawful or improper pay practices. First, because the form requires employers to submit summary data in categories that likely do not match the way they actually pay their employees, the data produced is not going to be helpful in identifying true disparities.

Second, because the manner in which compensation is to be reported does not allow for consideration of any of the potential variables that can affect total compensation (such as, for instance, part-time or full-time status), any potential "flag" would be unreliable on its face and would require additional refinement. Apart from enforcement, because compensation systems and practices vary so significantly from company to company, the data collected from the revised report would have no real value to employers from a general benchmarking perspective.

Because its implementation would impose substantial burdens on employers with no meaningful enforcement benefit, the EEOC should remove the compensation data collection component from the EEO-1 form, and explore other possible alternatives to enhancing its ability to detect and correct potential compensation discrimination.

**Conclusion**

Thank you again for the opportunity to testify. I will be pleased to answer any questions you may have.

Case 2:21-cv-00629-MTL   Document 1-8   Filed 04/12/21   Page 35 of 48





Exhibit #7

**INJUSTICE AT WORK**

Published — February 28, 2019

# DESPITE LEGAL PROTECTIONS, MOST WORKERS WHO FACE DISCRIMINATION ARE ON THEIR OWN

↑   Jason Jessup, 39, worked as a driver for United Parcel Service on Long Island for nine years. He and other black drivers sued UPS, saying they received racially discriminatory work assignments and discipline. (Maryam Jameel/Center for Public Integrity)

## Thousands of people report workplace discrimination to the government each year. Employers are rarely held accountable.

 **Maryam Jameel**
Environment and Labor Reporter

 **Joe Yerardi**
Data Reporter

**This story was published in partnership with Vox.**

MOBILE, Alabama — Ron Law walked into the breakroom at work one morning and found a noose hanging from the ceiling.

It was one of eight nooses that black employees reported discovering at the Austal USA shipyard, according to court filings. They were part of a chilling pattern, the workers alleged: Racist graffiti regularly appeared in the men's restrooms — the workers described images of hanging men, threats against specific employees and Ku Klux Klan references scribbled inside stalls and on mirrors and walls.

Sometimes, workers said, slurs were etched into the ships Law and others helped build for the United States Navy. Law said he heard a white supervisor refer to black employees as "monkeys" over his walkie-talkie.

Law and more than a dozen of his fellow black co-workers sought relief through the U.S. Equal Employment Opportunity Commission, the agency created to eradicate job discrimination and investigate workers' complaints. A year later, their case still not resolved, they gave up waiting on the EEOC for help.

That's how it often goes. Each year the EEOC and its state and local partner agencies close more than 100,000 cases. But workers receive some form of assistance, such as money or a change in work conditions, only 18 percent of the time.

John Hendrickson, who spent 36 years as an EEOC attorney in Chicago before retiring in 2017, said too many cases are falling through the cracks. "In some offices it was really amazing how little discrimination they found," said Hendrickson, who was head of litigation for a six-state region. "Many of [the cases] weren't professionally investigated."

```
    A.      I mean, just being treated like
you are nothing, you know, just -- just
treated worse than you would treat an animal,
I would figure, from the way I felt.
    Q.      Okay.  Are there some examples
you could give me?
    A.      Yes.  The way you being talked
to, what you being subjected to every day, on
an everyday basis.
```

Ron Law describing his experience at Austal in his 2009 deposition.

To understand how well the nation protects victims of employment discrimination, the Center for Public Integrity analyzed eight years of complaint data — through fiscal 2017 — from the EEOC as well as its state and local counterparts, reviewed hundreds of court cases and interviewed dozens of people who filed complaints.

Case 3:21-cv-00620-MTT   Document 1-2   Filed 04/12/21   Page 37 of 48

What emerged is a picture of a system that routinely fails workers.

No group of employees alleging discrimination — age, gender, disability or otherwise — fares well. Race claims are among the most commonly filed and have the lowest rate of success, with just fifteen percent receiving some form of relief.

Workers file complaints with the EEOC under penalty of perjury. The agency closes most of them without concluding whether discrimination occurred. Sometimes, workers' lawyers say, an EEOC investigation involves no more than asking the employer for a response.

A key part of the issue, according to experts and former EEOC employees, is that the agency doesn't have the resources for its mammoth task. The EEOC has a smaller budget today than it did in 1980, adjusted for inflation, and 42 percent less staff. At the same time, the country's labor force increased about 50 percent, to 160 million.

## The rising number of U.S. workers to EEOC staff

The U.S. workforce has grown while the number of EEOC staff has dropped. Today there are more than 80,000 U.S. workers for every one EEOC staff member, compared with just over 30,000 workers per staffer in 1980.



Sources: U.S. Bureau of Labor Statistics, U.S. Equal Employment Opportunity Commission



Source: Equal Employment Opportunity Commission, Office of Management and Budget

If the agency had additional staff, former EEOC Chair Jenny Yang said, it would likely confirm more workers' allegations of discrimination. It generally takes more time for investigators to make a finding of discrimination than to close a case based on insufficient evidence, she said.

The system's weaknesses disproportionately hurt black workers. More than a quarter of all EEOC complaints came from black employees alleging racial discrimination.

EEOC Commissioner Charlotte Burrows, appointed by President Barack Obama in 2014, acknowledged that the agency is stretched thin. She said it tries to widen its impact through strategic lawsuits and public outreach. Last fiscal year, the EEOC filed 199 lawsuits against employers and won $505 million for workers.

The EEOC isn't even seeing the full picture, Burrows said. "The people who come and report to us," she said, "are sort of a tip of the iceberg of what the problems are."

What happens to workers the agency doesn't help is shrouded by a lack of data. But many appear to give up. Many workers who sue — generally permitted only after they seek assistance from the EEOC or its partner agencies — file in federal court, where workplace discrimination cases number less than 15 percent of annual EEOC claims. An increasing share of workers are blocked from suing because their

employers require private arbitration, and research suggests flaws in that system have sharply limited the number of claims filed.

The Austal workers, for their part, went to court and found legal barriers they could not overcome. They lost in 2015, nine years after filing their EEOC complaints. Not a single employee was compensated. Most were eventually laid off, workers said.

Austal, which denied in court filings that its employees experienced any illegal treatment, did not respond to multiple interview requests.

The bar is high for discrimination lawsuits, including those alleging racially hostile work environments. The judge on Law's case said the evidence did not show "the conduct — apart from the racially offensive graffiti — was frequent, severe, physically threatening (with the exception of the nooses), humiliating, demeaning and/or unreasonably interfered with his job."

"I don't know what else you have to do to make it hostile," Law, 43, said in a recent interview. For him, the nooses at the shipyard posed a palpable threat: One of the last documented lynchings in the United States took place in Mobile in 1981. "That was a kicker for me — like you know this really could happen," Law said.



In May 2008, several Austal employees found a noose hanging in the breakroom at work. Workers reported seeing eight nooses at Austal on separate occasions. (Courtesy of Wiggins Childs Pantazis Fisher & Goldfarb LLC)

# ACTIONS VERSUS WORDS

The problem of workplace discrimination in the U.S. — treating people unequally because of their race, gender, religion, or other fundamental part of who they are — isn't usually expressed through slurs or physical threats of the sort alleged by the Austal workers. Complaint data shows that it can often manifest in more subtle ways, such as the assignments workers are given, the pay or benefits they receive, and the ways their performance is judged and rewarded.

It can also happen in the hiring process, before an applicant even begins a job. A groundbreaking study published in 2003 found that employers were more likely to consider white candidates with criminal records than black candidates with no such history.

## Tell us your story



INJUSTICE AT WORK

### Have you experienced discrimination at work?

READ →

Though the law places the burden on employees to prove discriminatory intent or impact, when hard evidence of unequal treatment exists, it is often buried in personnel records only the employer can access. And even making an accusation can come at a price: almost 40 percent of people who filed complaints with the EEOC and partner agencies from 2010 through 2017 reported retaliation.

"Over time, the way in which people discriminate, what they acknowledge and admit out loud, has changed," said Chicago lawyer Linda Friedman, who represented 700 workers in a race-discrimination lawsuit against Merrill Lynch that resulted in a $160 million settlement in 2013. "But the ultimate end, which is differential treatment — treating whites more favorably than African Americans — has not changed."

Black workers are 13 percent of the U.S. workforce, but racial discrimination against this group accounts for 26 percent of all claims filed with the EEOC and its partner agencies.

Some of those claims in recent years came from employees of United Parcel Service who went to court after getting nowhere through the EEOC. Their lawsuits alleged discriminatory actions including assignments, discipline, terminations, and promotions — ordinary business practices the workers said were warped to produce unjust results.

Frank Schirripa, a lawyer for one of the UPS workers, said he sees this all the time. "Management will create a fiction to try and make it look like the victim was doing something wrong," he said.

When his client, Jason Jessup, was fired by UPS in 2015, the company pointed to a long list of alleged performance problems. None of them, on the surface, had anything to do with race.

Prior to his termination, Jessup, a black driver based in Uniondale, New York, was regularly disciplined, UPS records show. Among the alleged infractions: failure to take lunch, not wearing UPS socks, making an unsafe turn, absences, tardiness. One time, he said, a manager called him in for breaking a driving rule that didn't exist. "I would have to always look back and double-check and triple-check," Jessup said. "I knew anything I did, if I did anything wrong, they were looking for it."

0:00 / 0:14

Interview with Jason Jessup

Today, as he has all along, Jessup disputes each of the company's allegations, saying they were either false or the result of misunderstandings. For example, he said, UPS would claim it hadn't received his sick-leave notices, even though he'd filed them. He began making copies and saving his fax-machine receipts.

He also started keeping a voice-activated audio recorder in his pocket to have proof of what he and anyone else said. When his dolly was stolen, he said, he was accused of pilfering it himself to resell. According to a federal lawsuit Jessup filed against UPS in 2017, a supervisor told Jessup, "I've seen this before. People like you are hard up for cash." Police later identified a non-employee as the thief.

Four other black drivers who also worked at the Uniondale facility filed suit against UPS in 2016 and 2017, alleging race discrimination. They weren't able to discuss their cases because of confidential settlement agreements or ongoing litigation.

In 2016, UPS settled a discrimination case — similar to Jessup's — brought by a black driver based in Aiken, South Carolina. Brady Kemp, a shop steward and 37-year UPS employee, accused his supervisors of concocting reasons to discipline him and justify his firing after he complained of racial inequality at the company. He alleged, among other things, that they gave him a route so challenging he was virtually guaranteed to make late deliveries.

In an email to the Center for Public Integrity, a UPS spokesperson wrote that while the company couldn't comment on these cases, the workers withheld relevant facts about their situations and the claims aren't representative of UPS' culture or leadership.

"Diversity and inclusion is a core UPS value," the spokesperson wrote. "We do not tolerate hate, bigotry or prejudice. When an allegation of perceived discrimination is reported, UPS completes a thorough investigation and takes appropriate action."

Jessup, however, said he had a different experience.

## Interested in workers' rights?

Sign up for our Watchdog newsletter.

you@example.com                                                    **JOIN**

In 2012, he was appointed assistant union shop steward in Uniondale. One of his duties was to accompany other workers to meetings when they were accused of making mistakes. He and two other former shop stewards said they observed and documented a pattern of black drivers being punished for transgressions that white drivers got away with.

One former steward, Michael Costanza, has worked at three UPS facilities over 17 years. He overlapped with Jessup in Uniondale for seven. "I used to look at him and say, 'How does this guy get out of bed every day knowing what he's going to have to deal with day in and day out?'"

Costanza, who is white, said he hopes to testify in court on Jessup's behalf.

After submitting multiple complaints to the EEOC to no effect, Jessup filed his lawsuit in 2017. In June 2018, UPS asked the judge to dismiss the case, a request that is still pending in the Eastern District of New York.

The company denied Jessup's allegations, saying that even if Jessup had been subjected to racist behavior, his allegations were insufficient to bring in front of a jury: Of "approximately 2,261 working days, plaintiff identifies less than 20 allegedly harassing incidents or statements — or less than .009 percent of the time," the company said in the court filing. "Put another way, this amounts to approximately one incident every 113 working days — or about 2 to 3 instances per year. This is not even close to 'pervasive,' or the requisite 'steady barrage' necessary for a viable claim."

Excerpt from UPS' request to have Jessup's case thrown out.

More than three years after he was fired, Jessup said he hasn't recovered from his time at UPS. He can't afford to see a therapist. "I'm still a wreck," he said. "I'm still depressed. I'm still stressed."

Research has shown that chronic stress caused by discrimination can contribute to mental and physical health problems. Dr. Monnica Williams, a clinical psychologist and an expert in race-based stress and trauma who counsels people grappling with the fallout from mistreatment at work, said the challenges of reporting such behavior often take an additional toll.

"People think that there's a safety net for them, but there isn't," she said, "and that's pretty difficult to understand and accept."

# WEAK BY DESIGN

When the EEOC was created under Title VII of the Civil Rights Act of 1964, it was initially given few tools to enforce the law. It could investigate complaints, try to mediate between companies and employees, and recommend cases to the U.S. attorney general for litigation, but it couldn't sue or issue cease-and-desist orders. If an employer didn't want to follow the law, there was little the agency could do about it.

"We're out to kill an elephant with a fly gun," then-EEOC Chairman Stephen N. Shulman told the Wall Street Journal in 1967.

Its weakness was by design. Many members of Congress were opposed to instituting broad federal protections against workplace discrimination. More than 200 fair-employment measures failed in the two decades before the Civil Rights Act passed.

Reps. George Andrews (D-Ala) and L. Mendel Rivers (D-S.C.) voice support for an amendment to the Civil Rights Act of 1964 prohibiting sex discrimination, citing a need to protect white women. (U.S. Government Publishing Office)

One opponent of the act was Rep. Howard Smith, a Virginia Democrat. Two days before the act passed, he inserted sex discrimination into the protections afforded by Title VII — but not for benevolent reasons. A supportive Democratic colleague, Rep. George Andrews of Alabama, explained the logic. "Unless this amendment is adopted," Andrews said on the House floor, "the white women of this country would be drastically discriminated against in favor of a Negro woman."

Another provision made it a criminal offense for the EEOC to reveal the identities of employers accused of discrimination. That restriction remains to this day.

In 1972, though, the EEOC won the power to litigate against employers. At the same time, schools and state and local governments lost their exemption from Title VII, giving coverage to 10 million more workers. Separate laws granted protections against discrimination based on age or disability.

While the EEOC's responsibilities grew, its staffing dropped. Today, workers must wait two to three months for an appointment to file a complaint. The share of EEOC cases in which workers got relief fell from about 19 percent in 2007 to about 13 percent in 2017.

**RELATED: More than 1 million employment discrimination complaints have been filed with the government since 2010. Here's what happened to them.**

And now, to make matters worse, the EEOC's leadership is in flux. Three of its five commissioner seats are vacant. The Senate has delayed confirming President Donald Trump's nominees for more than a year — prompting one to withdraw — and didn't reconfirm Democratic Commissioner Chai Feldblum when her term expired in December.

That's left the bipartisan commission without the quorum the agency needs to file higher-cost or higher-profile lawsuits against employers. The agency's general counsel nominee is also awaiting confirmation.

Trump's nominee for EEOC chair, lawyer Janet Dhillon, has spent much of her career as a general counsel for corporations. Litigation, she said in her testimony before a Senate committee in September 2017, should be a "last resort."

Civil rights advocates fear that having Dhillon at the helm will further hurt employees' chances at the agency. The NAACP said in a letter of opposition that her record "demonstrates that her priorities lay solely with employers, not with the workers."

# 'THE LAW WAS NOT WRITTEN FOR US'

Case 2:21-cv-00620-MTL   Document 1-1   Filed 04/12/21   Page 45 of 48

(Maryam Jameel/Center for Public Integrity)

In 2005, the first year he worked at the Austal shipyard in Mobile, Ron Law had no intention of speaking up about the written threats he said he found in the bathrooms or the training opportunities he said he was denied.

Growing up, Law's parents had taught him racism was a reality he would have to deal with. The job itself offered a living wage (though Law said he heard of white apprentices earning $17 per hour, while he initially made $15) and health insurance. He had been honing his craft — shipfitting — for a few years before he got to Austal and could read blueprints to piece together ships out of metal sheets. He wanted to stay.

But by 2006, Law, along with welder Tesha Hollis and a few other black workers at Austal, had had enough. They decided to find a lawyer and report their experiences to the EEOC. The risk of retaliation held back some of their colleagues. "It was so many people that didn't want to get on the lawsuit when they had every right to get on it. They were just job-scared," Hollis said.

To this day, Hollis can recite the racist jokes and slurs she said she heard and saw at Austal. At one point, a few workers said they saw a picture of Hollis drawn in the men's restroom with a crude caption. She alleged that a supervisor, a white man, told her about it while pretending to masturbate.

"It just got to be too much," Hollis said. "People were just getting up to go to work to make money to take care of their families, and they had to go and be subjected to that."

Workers documented racist threats and slurs they said appeared in the men's bathrooms at Austal. They also found stick figures with the n-word written on the body and welding wire tied around the neck (right). (Courtesy of Wiggins Childs Pantazis Fisher & Goldfarb LLC)

Soon, 19 workers, including Law and Hollis, had filed EEOC complaints.

The company, in response, denied that it acted illegally in any way. Among its defenses: One-fourth of its workforce was black; the workers hadn't reported the alleged behavior to supervisors; and the company had an equal-employment policy, outlined in a handbook given to all employees. The workers who filed complaints had claimed that there were no black supervisors at Austal, but the company corrected them, saying eight of 111 were black.

About a year after they filed complaints with the EEOC, the initial group of employees asked the agency for permission to go to court. Four of their colleagues joined them in the lawsuit.

Austal asked a federal judge to dismiss the cases without going to trial. "When taken as a whole," the company wrote in a filing about Law's claim, the "allegations lack the frequency, severity, threatening nature, and impact required to maintain an action for hostile environment."

The Austal shipyard in Mobile, Alabama. Austal is a prime contractor for two U.S. Navy shipbuilding programs. (Maryam Jameel/Center for Public Integrity)

U.S. District Judge Kristi DuBose, nominated to the Southern District of Alabama by President George W. Bush in 2005, threw out 13 of the workers' cases, including Law's and Hollis'. The judge said the cases weren't strong enough to meet the legal standard. (The other 10 workers went to trial and lost.)

DuBose supported her decision by citing a 2005 lawsuit that didn't survive the so-called summary judgment stage, when a judge can toss a complaint without a trial. In that older case, she wrote in the Austal ruling, threats to "kick plaintiff's 'black ass'" and the use of racial slurs, including the n-word and "boy," reflected conduct that was "isolated," "sporadic," and "random."

When an appeals court reevaluated the 13 workers' claims in June 2014, it agreed with DuBose's judgment for six of them but decided that what the others said they had endured actually did meet that standard.

In the end, it didn't make a difference. The jury sided with Austal when those seven remaining cases, including Law's and Hollis', went to trial the following year. Not a single employee was compensated. Most were eventually laid off, workers said.

Workers face steep odds when employers in the Southern District of Alabama seek summary judgment like Austal did. In 2016 and 2017, 89 percent of employment-discrimination cases in which employers requested summary judgment in that district were fully or partially dismissed, a Center analysis found.

Interpretations of hostile work environment standards can differ between courts and judges — in 2017, for example, a Third Circuit Court of Appeals judge in Philadelphia wrote that a supervisor calling a subordinate a slur even once could be sufficient.

Birmingham lawyer Heather Leonard, who has represented workers in discrimination cases in Alabama for 20 years, said it's frustrating to compare notes with lawyers in other parts of the country. "Cases that they get tremendous verdicts on, we're like, 'We wouldn't be able to even accept that here because we couldn't get it through summary judgment,'" she said.

For Ron Law's wife, Marsha, the Austal case's outcome was disappointing but not surprising. "I've said it and I'll say it probably till the day I die," she said. "The law was not written for us."

Their case has had damaging ripple effects for other employees. In 2017, for instance, Judge W. Keith Watkins of the Middle District of Alabama, who like DuBose was appointed by former President Bush, cited Austal as he dismissed seven of 12 workers' claims in a hostile work environment case out of Enterprise, Alabama.

Black welders and painters testified to regularly hearing slurs, threats and other derogatory comments over years of employment at a trailer-manufacturing company. Watkins pointed to several Austal employees who had experienced "much worse" but were nonetheless unsuccessful in the appeals court.

What would qualify as hostile? To answer that, he quoted a 1971 appeals court decision: "environments so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers."

*The code and data behind this story's analysis is publicly available on GitHub.*

# Read more in Inequality, Opportunity and Poverty

INJUSTICE AT WORK

## SUPREME COURT RULING ENSURES PROTECTIONS FOR LGBTQ WORKERS

Where you work determined whether you could be fired for being LGBTQ. A 6-3 ruling just changed that.