



Christina Animashaun/Vox

# More and more workplace discrimination cases are being closed before they're even investigated

It's a problem that starts with Congress.

By Maryam Jameel  |  Jun 14, 2019, 9:30am EDT

*Co-published in partnership with the Center for Public Integrity*

 t's a classic Washington catch-22: For years, Congress has chastised the agency that investigates workplace discrimination for its unwieldy backlog of unresolved cases while giving it little to no extra money to address the problem.

In turn, officials at the US Equal Employment Opportunity Commission have found a workaround: Close more cases without investigating them.

Since 2008, the EEOC has doubled the share of complaints involving companies or local government agencies that it places on its lowest-priority track, effectively guaranteeing no probes, mediation, or other substantive efforts on behalf of those workers. About 30

percent of cases were shunted to that category last year, according to internal data obtained by the Center for Public Integrity through a public records request.

The EEOC said it has focused its limited resources "on charges where the government can have the greatest impact on workplace discrimination." But as it cut its backlog by 30 percent in the last decade — much of that in the past two years — the already-low share of workers getting help has dropped. Only 13 percent of all complaints the EEOC closed last year ended with a settlement or other relief for the workers who filed them, down from 18 percent in 2008.

### Workers shut out of their rights

Chicago-based accountant Richard Nelson went to the EEOC's office in March to file a complaint that said he needed help getting his employer to make a few accommodations for disorders including attention-deficit/hyperactivity — all within his right under the Americans with Disabilities Act. His case was shut before the appointment ended.

"I think they're looking for slam dunks," Nelson said. He was told that given the office's small staff and the level of evidence he had in emails with his employer, the EEOC couldn't proceed. Instead of trying to settle or mediate the matter, the agency mailed him a piece of paper telling him he could file a lawsuit, which he would have to do on his own dime.

"I don't want to sue anybody. I just want to be treated fairly," he said.

RELATED

**Workplace discrimination is illegal. But our data shows it's still a huge problem.**

Since 1980, as the US workforce has grown by 50 percent, Congress has kept the EEOC's funding essentially flat — budget increases eaten away by inflation. That's meant more cases without the resources to handle them. Last year the EEOC took in more than twice as many complaints as it did nearly four decades earlier, with about half the staff.

Gabrielle Martin, a 30-year EEOC attorney and president of the National Council of EEOC Locals No. 216, said the agency's decision to send more cases to the "killing fields" — closing them without investigation — is a problematic solution to budget and resources woes.

"If they don't continue to dump cases, Congress will say, 'Well, what did you do with the money we gave you?'" Martin said. But they can't make the case for more funding, she

said, if they appear to be succeeding without it.

The EEOC defended its handling of complaints in a statement, saying it's gathering more information early on so people with stronger evidence can get the assistance they need. Last year, the agency put more cases into its high-priority pool than it has since creating the ranking process in 1996, nearly 26,000 in all.



An archival image of the headquarters of the US Equal Employment Opportunity Commission in Washington, DC.  |  Terry Ashe/The LIFE Images Collection via Getty Images

But the share of workers the EEOC helped get a settlement or other relief — that 13 percent — barely budged from the previous year. And the workers deemed low priority were almost all out of luck: Of about 27,000 cases, less than half a percent got relief.

Attorney Jaz Park assists low-wage workers with discrimination claims through Chicago-Kent College of Law's employment clinic. She said she's noticed an increase in cases closing within a few weeks without any apparent investigation from the EEOC.

In one case, a retail employee with 21 years on the job was fired shortly after being diagnosed with a heart condition. Her employer claimed she was fired for forgetting to give a customer a receipt. "If you take the time, you see it just doesn't add up," Park said.

Stacy Villalobos, an attorney for Legal Aid at Work, a nonprofit that provides legal services for low-income workers, said the EEOC's categorization "oftentimes has nothing to do with the merits of the case." Frequently, she said, information that would prove a worker's allegation is in the hands of the employer.

"There may be merit," she said, "but without an investigation, you may never know."

## An "emotionally draining" process

The EEOC requires an interview with most workers before they can file a complaint. That filters out tens of thousands of potential cases from entering its system in the first place. More than 60 percent of people who inquired about filing last year ultimately didn't — the highest dropout rate in at least 15 years — for reasons such as discrimination laws not covering their situation or the process being daunting. Most of the complaints deemed low priority were filed by workers who continued past this weeding-out step.

To reduce its backlog, the EEOC must close more cases than it receives each year — and with fewer investigators. The agency employs about 570, down roughly 150 from a decade ago. It also handles a separate load of federal employees' complaints; that too has a backlog.

This has been wearing on the agency's workers. In 2018, **almost half of EEOC staff said** in a government survey that they didn't have the resources to do their jobs, higher than average for federal agencies. The agency had the highest percentage of staff strongly disagreeing that their workload is reasonable, as well as the highest percentage strongly agreeing that the work they do is important.

"It's really, really emotionally draining," said former EEOC regional attorney Charles Guerrier, who was based in Birmingham, Alabama, before leaving in 2012. He said he advised staff to make peace with not being able to help every worker. The budget was so tight, he said, that sometimes his office would run out of paper because there wasn't money to buy more.

At the agency's San Diego office, former district director and mediator Tom McCammon said employees regularly went into work on weekends to spend unpaid hours finishing

cases. Even so, he said, sometimes so much time passed before investigators got to a case that they couldn't reach the complainant — the phone number was dead, the home address no longer valid.

"In the meantime, cases are stacking up by the hundreds with no investigation," said McCammon, who left in 2013. "Each one of those files is a person who had a problem."

## Congress's contentious relationship with the EEOC

For years, the EEOC's standing with Congress has fallen into the same category as an increasing number of its cases: low priority.

The agency competes with 11 others in its appropriations subcommittee, including high-profile ones like NASA and the Department of Justice, for funding from a limited pool. Hearings focused on the EEOC's performance and needs are scheduled only once every few years, and they're often dominated by discussions of the backlog and lawsuits against employers that members of Congress object to the agency pursuing.

Eleanor Holmes Norton, who headed the agency from 1977 to 1981, is one of the few members of Congress who have consistently pushed to bolster protections for employment discrimination. But as the representative for Washington, DC, she has no vote.



Eleanor Norton Holmes (center) sits among 45 other women employees of Newsweek magazine as they announce they are suing the publication for discrimination in jobs and hiring on March 16, 1970. | Bettmann via Getty Images

Her perspective: Most lawmakers have little interest in fighting discrimination.

"Failure to pay attention to the EEOC is to leave a lot of people out in the cold," said Norton, a Democrat. "Nothing can overcome a backlog that grows from lack of funding."

There are some signs of a shift. Last fiscal year, after eight years of flat funding that meant the agency's budget was effectively shrinking because of inflation, the then-Republican-controlled Congress approved a $15 million increase for the EEOC. What it took was the #MeToo movement's viral spotlight on sexual harassment. Fifteen senators and 71 representatives, all Democrats, asked the appropriations committees to give the agency more money.

But, with #MeToo attention dimming, Congress approved no increase for this year. Eighty-four members of Congress, all Democrats, have **requested** a $20 million boost for next year. President Donald Trump is proposing a $23.7 million cut instead.

Workplace discrimination costs are being blocked by an investigation - Vox

About 25,000 complaints last year involved sex discrimination, sexual harassment or both. Race and disability discrimination each accounted for virtually the same number, though neither issue has caught Congress's attention.



Protesters gather during the #MeToo Survivors' March outside the CNN building in Los Angeles on November 12, 2017. | David McNew/Getty Images

The leaders of the House and Senate subcommittees that control the EEOC's funding did not respond to interview requests. But these panels that play an outsize role in determining what the agency can do have twice as many men as women. Of their 28 members, only four identify as African American, Hispanic, or Asian American. None identify as Native American.

Together, they take in far more contributions from business interests than groups representing workers — at least 27 times the amount in the latest election cycle, according to data from the **Center for Responsive Politics**.

That creates a challenge for the EEOC. As Victoria Lipnic, then acting chair of the agency, pointed out in her **latest budget justification to Congress**, "our primary stakeholder" is

Case 2:21-cv-00028-MJP   Document 1-5   Filed 04/12/21   Page 8 of 59

"the American workforce."

## A hamstrung agency

Some of the limits imposed on the EEOC by lawmakers have nothing to do with money.

In December, Sen. Mike Lee (R-UT) held the Senate back from confirming three commissioners — a vote that required unanimous consent at that point — over his objection to another term for Chai Feldblum, an Obama appointee and the EEOC's first openly lesbian commissioner.

"The federal government should never be used as a tool to stamp out religious liberty," **he said**, alleging that Feldblum would use her position to do so in the name of LGBTQ rights. (Feldblum wrote last year that she believes this is not a "winner-take-all" game and that the government should look to accommodate religious beliefs while still achieving **"the compelling purpose of the law."**)

Without those three commissioners, the bipartisan agency lacked a quorum, which by rule prevented it from filing higher-cost or higher-profile lawsuits against employers. In May, the Senate finally resolved that problem by confirming Chair Janet Dhillon — two years after she was nominated.



Supporters from the Council on American-Islamic Relations stand outside of the Supreme Court after the court heard oral arguments in *EEOC v. Abercrombie & Fitch* on February 25, 2015. The case was brought on after a woman filed a charge of religious discrimination, saying Abercrombie & Fitch declined to hire her because she wore a head scarf. | Chip Somodevilla/Getty Images

In the past two years, Lee has also introduced legislation that would: strip most of the power from **the National Labor Relations Board**, which enforces workers' right to organize; **repeal the Davis-Bacon Act**, which aims to guarantee prevailing wages for federally funded construction workers; and allow employers to **give time off instead of paying overtime wages.**

Reached for comment, Lee spokesperson Conn Carroll said the senator was not the only elected official who had objections to Feldblum's confirmation and that Democrats could have chosen to vote on the other nominees separately. (Commissioners are commonly approved as a group.) The spokesman said each of the employment-related bills Lee introduced, none of which passed, would "increase the freedom of workers to work." Last election cycle, Lee received $4.5 million in contributions from business interests and $8,000 from labor groups.

Two of Lee's bills were co-sponsored by Sen. Lamar Alexander (R-TN), chair of the Senate committee that reviews labor legislation and a member of the subcommittee that handles EEOC appropriations.

Alexander has been more attentive to the EEOC, and its backlog, than most lawmakers. When the agency proposed collecting wage data by sex, race, and national origin from large employers as part of a cross-agency effort to curb pay discrimination in 2016, for example, he **wrote** to the White House's Office of Management and Budget to request that it squelch the idea. Among his concerns was that collecting pay data from employers — which business associations including the US Chamber of Commerce opposed — would further delay the resolution of EEOC cases.

"The proposal is likely to worsen that backlog as the EEOC will now be sifting through the billions of pieces of new data instead of focusing on its mission of investigating complaints of discrimination in the workplace," he wrote.

However, Ron Edwards, a former EEOC official who led the initiative, said the agency actually planned to use the extra data — which would be collected and analyzed electronically — to resolve complaints more efficiently.

Alexander also introduced the **EEOC Reform Act**, which would have barred the agency from collecting pay data until it reduced its backlog by about 90 percent. Though the bill was unsuccessful, he had more luck with the OMB, which in 2017 stayed the EEOC's collection of the data. That decision was reversed this March following a lawsuit by the **National Women's Law Center** and the **Labor Council for Latin American Advancement**. The Department of Justice has filed an appeal.

Last election cycle, Alexander received more than $7 million in contributions from business interests — 130 times what he received from labor groups. Alexander, who has said he won't seek reelection next year, did not respond to multiple requests for comment.

Edwards, who worked at the EEOC for nearly 40 years, knew the pay information would be a powerful tool to correct discrimination — and that employers didn't want to turn it over.

"The real crux of employment is pay," said Edwards, who retired in 2017. "If you collect the pay data, you get a better sense of how people are being treated."

In recent months, Democrats have introduced bills, in some cases co-sponsored by a handful of Republicans, to strengthen discrimination law enforcement, including measures to address the **gender pay gap**, improve protections for **LGBTQ workers** and **prohibit nondisclosure agreements in workplace harassment cases.**

None have passed.

Labor economist William Spriggs isn't surprised by that or the funding constraints that affect workers' chances of help at the EEOC. Congress's treatment of employment discrimination and workers' rights, he said, is par for the course in the U.S.

"There is a tendency in society to think of labor law as littering or something," he said. "They don't think of it as an actual violation." ∎

*Have you experienced discrimination at work? The Center for Public Integrity wants to hear from you.*

*Maryam Jameel is a journalist at the **Center for Public Integrity**, a nonprofit, nonpartisan investigative newsroom in Washington, DC.*

Vox's mission has never been more vital than it is in this moment: to empower through understanding. Financial contributions from our readers are a critical part of supporting our resource-intensive work and help us keep our journalism free for all. **Please consider making a contribution to Vox today from as little as $3**.

IDENTITIES

The massive Republican push to ban trans athletes, explained

# CIVIL RIGHTS INSIDER

## Federal Bar Association Civil Rights Law Section's Newsletter

**Fall 2017**

## From the Desk of the Chairperson

"No one is born hating another person because of the color of his skin or his background or his religion. People must learn to hate, and if they can learn to hate, they can be taught to love, for love comes more naturally to the human heart than its opposite." Nelson Mandela

This sentiment, recently tweeted by President Obama, has been widely shared in the past few weeks as the country has become more divided by differing notions of what is good and what is evil. The tragic events in Charlottesville, Virginia highlighted this division while invigorating those of us involved in the Federal Bar Association's Civil Rights Law Section more than ever.

Civil Rights lawyers around the country have had busy years indeed. Our nation faces bigger challenges than most of us have seen within our lifetime, and some believe that we are living through historical moments while revisiting some of the worst moments of our past. With great change has come enormous hurdles, and it has been a privilege to watch civil rights attorneys across the country come out in full force. For the Section's part, we have enjoyed hosting panels, educating attorneys, and connecting and building relationships with lawyers in firms across the country. We also gathered in New Orleans in April to host our first, national CLE, the Civil Rights Etouffee, where we heard from speakers on topics that run the gamut of current civil rights issues.

For all our hard work this year, I am proud to say that we are being honored with the Federal Bar Association's Recognition Award! This will be the first time the civil rights section will be recognized with this annual award. Our success would not have been possible without all the hard work from our board, our officers, our committee chairs, our national liaisons and our general membership. I will proudly accept this award at the national convention in Atlanta, Georgia in September on behalf of all of us.

I would like to take this opportunity to welcome and thank our

*Chair continued on page 5*

## OFFICERS

**CHAIR**
Wylie Stecklow
New York, NY
Wylie@sctlaw.nyc

**TREASURER**
Jared Kosoglad
Chicago, IL
jared@jaredlaw.com

**MEMBERSHIP**
Robert Sinsheimer
Boston, MA
rsinsheimer@sinsheimerlaw.com

**AMICUS BRIEFING**
Kevin Golembiewski
Tampa, FL
kgolembiewski10@gmail.com

**DISCRIMINATION IN EMPLOYMENT,
HOUSING AND/OR PUBLIC
ACCOMMODATIONS**
Marilyn Tobocman
Cleveland, OH
marilyn.tobocman@ohioattorneygeneral.gov

Stephen Dane
Washington, DC
sdane@relmanlaw.com

**STUDENT CO-CHAIRS**
Keegan Stephan
New York, NY
contact@Keegan.nyc

Lindsey Rubinstein
New York, NY
lerubins@law.cardozo.yu.edu

**CHAIR-ELECT**
Stephen Haedicke
New Orleans, LA
haedickelaw@gmail.com

**SECRETARY**
Robin Wagner
Ann Arbor, MI
RWagner@Pittlawpc.com

**IMMEDIATE PAST CHAIR**
Eileen Rosen
Chicago, IL
ERosen@rfclaw.com

**EDUCATION**
Caryl Andrea Oberman
Willow Grove, PA
caryl@caryloberman.com

**FEDERAL PROHIBITION AGAINST
MARIJUANA**
Bonnie Kift
Ligonier, PA
bonniekiftesq@aol.com

**DEFENSE OF GOVERNMENTAL ENTITIES**
Theresa Powell
Springfield, IL
tpowell@heylroyster.com

**CIVIL RIGHTS ETOUFFEE CLE**
Darpana Sheth
Arlington, VA
dsheth@ij.org

Stephen Haedicke
New Orleans, LA
haedickelaw@gmail.com

Wylie Stecklow

**NEWSLETTER**
Stephen Dane

Marilyn Tobocman

### In this Issue

Supreme Court Previews ...........................................................
Exclusionary Zoning in the Spotlight................................
Member Highlight.........................................................................
The EEOC'S "Strategic Enforcement" Means Fewer Inves...
Human Trafficking Report Released in Ohio ..........................9

*Exhibit #8*

*Civil Rights Insider* is published by the Federal Bar Association Civil Rights Law Section, © 2017 The Federal Bar Association. All rights reserved. The opinions expressed herein are solely those of the authors unless otherwise specified.

# The EEOC'S "Strategic Enforcement" Means Fewer Investigations

## by Robin B. Wagner, Pitt McGehee Palmer & Rivers, PC, Royal Oak, MI

If your docket includes employment-discrimination cases, then perhaps you have begun to notice some curious changes at the EEOC—namely Right-to-Sue letters are being issued without any substantive investigation. At my law firm outside Detroit, Michigan, we have been receiving these letters within days of submitting a signed charge, when in the past, months were the norm.

Plaintiff-side attorneys place great value on the employer's position paper that the EEOC solicits as part of its investigation into a charge. We use it immediately to evaluate a case—does the employer have colorable defenses or not? Are there non-discriminatory reasons for the adverse action, and if so, are these reasons legitimate or pretext? But far more than that, the position statement is essential to achieving workplace justice for victims of discrimination. It is an admission by the defendant as to the circumstances surrounding the claimant's termination. And it is a powerful tool in litigation, as it commits a defendant early to a "reason" for the termination or other adverse employment action. We use it to craft pre-litigation approaches to settlement, and we rely on the position statement if needed to call out an employer whose reasons shift during litigation.

But even defense attorneys and corporate counsel have told us that they appreciate the opportunity to answer an EEOC charge. Many a potential lawsuit can be nipped in the bud—or at least contained in terms of damage and future risk—through an employer's early investigation.

So when we began to receive Right-to-Sue letters that were issued summarily upon receipt of an executed charge, we were deeply concerned. These letters point the finger at the Commission's "Priority Charge Handling Procedures" ('PCHP') for the reason why our charge received a summary dismissal. Would you believe the source of this disturbing trend is this 1995 unpublished Commission document, the PCHP?[1]

No? Neither did we.

So we looked for clues in the Commission's Strategic Enforcement Plan for Fiscal Years 2017-2021 ("SEP"), which was promulgated towards the end of the Obama Administration.[2] This document sets forth the guiding principles for EEOC enforcement efforts and establishes six "substantive area priorities" for enforcement through Fiscal Year 2021:

- **Eliminating Barriers in Recruitment and Hiring**: the "EEOC will focus on class-based recruitment and hiring practices" that are discriminatory. This category includes background screens, steering, exclusionary policies or practices, restrictive application procedures, screening tools, pre-employment tests. (Based on all of the protected classes: race, sex, religion, national origin, age, disability, genetic information).
- **Protecting Vulnerable Workers**: the focus here is on "job segregation, harassment, trafficking, and policies targeting immigrant and migrant workers, as well as individuals from underserved communities.
- **Addressing Selected Emerging and Developing Issues**: this allows the EEOC to develop cases and precedent in areas such as LGBT rights,[3] ADA qualification standards and inflexible leave policies, violations of the Pregnancy Discrimination Act, complex employment relationships

such as staffing agencies and on-demand economy (e.g. Uber drivers) workers, and discrimination against people of Middle Eastern descent.
- **Equal Pay Act Violations**: The EEOC is not only closely examining gender based compensation discrimination under the Equal Pay Act, but is also looking at Title VII wage discrimination based on race, sex and national origin.
- **Access to the Legal System**: including overly broad waivers, arbitration provisions, significant retaliatory practices, and other trends that discourage access to the legal system
- **Preventing Systemic Harassment**: the SEP describes this in terms of a "policy, practice, or pattern of harassment," but the screening focus is on targeting issues that the Commission can remedy through holistic prevention efforts, such as training mandates for big employers. Class-based harassment under all of the statutes the Commission enforces. The EEOC is less likely to put resources into an individual harassment charge when the person is represented by competent counsel, but even in that case, if there are other harmed individuals the Commission may look deeper because of the broader public interest or because of the existence of class members.

But even this guidance document, which spells out the types of cases that will get a priority ranking under the PCHP, doesn't explain why we have been receiving Right-to-Sue letters with no investigation on cases that we believed fit into one of these priority areas.

Seeking more clarity, we spoke with an EEOC Field Office Director and learned that the reason is a confluence of three factors: the SEP, the PCHP, and a new directive from the Commission's headquarters.

Our source explained that her office is under immense pressure to reduce their inventory of charges by 12%. Roughly half of the thousands of inquiries received by a field office will result in charges being filed. And percentage of charges for which a field office is finding cause is not changing significantly despite the imposition of new pressures on the field offices to apply the priority guidance. Applying the PCHP more strictly, roughly 20 to 25 percent of charges are designated as "A" cases that are given priority attention and the highest level of investigative resources. And the "A" cases are determined by evaluating them in relationship to the six Strategic Enforcement Priorities ("SEP"). Of course, just because a charge is labeled an "A" case does not mean that it will yield a finding of cause.

The real change comes from pressure on the field offices to dust off and more strictly adhere to that 1995 PCHP. EEOC field offices have received a directive from EEOC HQ in Washington, D.C. to vigorously enforce the PCHP. Vigorous enforcement of the PCHP translates into a goal that 30% to 40% of filed charges be summarily dismissed. This directive has resulted in more early determinations that a charge on its face is self-defeating or insufficiently supported by direct or indirect evidence of discrimination.

The PCHP specifies that such charges be classified as a "C" case and then summarily dismissed. But field offices have tended in the past to restrict use of the "C" categorization for only cases that utterly fail to make out a claim on their face. Now this categorization has been expanded to claims that might yield colorable claims if investigated and otherwise facially valid claims that are not within the priorities, so as

to meet the new goals for summary dismissals.

Another practical implication of the new emphasis on vigorous enforcement of the PCHA is that the "B" cases, which under the PCHP require more investigation as resources allow, are not benefiting from investigation because of staffing shortages throughout the Commission.

Of course, a certain number of charges can always be dismissed summarily if they are untimely or otherwise facially deficient. However, what we are witnessing is the impact of this new summary-dismissal directive and the EEOC Strategic Enforcement Plan on the field offices' work. The SEP dictates specific priorities that guide the EEOC's efforts, leading to lower priority rankings being assigned to claims that are otherwise not facially deficient.

It is not clear that this triple cocktail of the directive to increase summary dismissals, combined with the SEP and stricter adherence to the 1995 PCHP, is even permissible under the laws and regulations governing the EEOC's work.

First of all, the EEOC has an unequivocal mandate to investigate sworn charges. Just this past April, the Supreme Court reiterated the Commission's mandate to investigate in no uncertain terms:

> The EEOC's responsibilities "are triggered by the filing of a specific sworn charge of discrimination," University of Pa. v. EEOC, 493 U.S. 182, 190, 110 S. Ct. 577, 107 L.Ed.2d 571 (1990), which can be filed either by the person alleging discrimination or by the EEOC itself, see § 2000e–5(b). When it receives a charge, the EEOC must first notify the employer, ibid., and must then investigate "to determine whether there is reasonable cause to believe that the charge is true," University of Pa., 493 U.S., at 190, 110 S.Ct. 577 (internal quotation marks omitted).[4]

And Title VII itself describes the EEOC investigation in mandatory language: "Whenever a charge is filed . . . the Commission shall serve a notice of the charge . . . within ten days, and shall make an investigation thereof."[5]

One somewhat useful case appears to set the "floor" for what constitutes a satisfactory investigation. This case, Newsome v. E.E.O.C., involved the denial of a writ of mandamus in the case of a woman who found the Commission's investigation unsatisfactory.[6] In Newsome, the EEOC sent a letter to the employer asking it to respond to the charge, which the employer did, and that was the extent of the investigation.[7] The Court reasoned that the EEOC was required to make an investigation, but that Title VII "does not prescribe the manner for doing so."[8] It held that since the "nature and extent of the investigation are discretionary," the charge-filer did not have a "clear right" to a mandamus.[9] In reaching this holding, the Court further reasoned that the petitioner had another remedy available—filing a federal lawsuit.[10]

The takeaway from these cases could be that seeking a response from the employer is something of a "floor" for the Commission's mandate to investigate—at least, it would be difficult to imagine the Court still holding that the EEOC had fulfilled its obligation if it hadn't done at least that minimal amount.

This inference is further supported by the regulations governing the Commission's investigations:

> The investigation of a charge **shall be made** by the Commission, its investigators, or any other representative designated by the Commission. During the course of such investigation, the Commission may utilize the services of State and local agencies which are charged with the administration of fair employment practice laws or appropriate Federal agencies, and may utilize the information gathered by such authorities or agencies. As part of each investigation, the Commission will accept any statement of position or evidence with respect to the allegations of the charge which the person claiming to be aggrieved, the person making the charge on behalf of such person, if any, or the respondent wishes to submit.[11]

Admittedly, this regulation is permissive in terms of what the agency may do in the course of its investigation, but the overwhelming emphasis on the scope of the agency's investigative powers only underscores the fact that its core job is to investigate.

Particularly when a charge facially states a claim, it appears that the EEOC must not dismiss without something more than a review of the charge. The regulation governing dismissal of charges states:

> Where a charge on its face, or as amplified by the statements of the person claiming to be aggrieved discloses, or where after investigation the Commission determines, that the charge and every portion thereof is not timely filed, or otherwise fails to state a claim under title VII, the ADA, or GINA, the Commission shall dismiss the charge.[12]

This statement can be understood to require an investigation, unless there is no facial charge of discrimination under one of the EEOC's statutes or the charge is otherwise facially deficient. Moreover, a "no cause" determination may only be made after an investigation is completed:

> Where the Commission completes its investigation of a charge and finds that there is not reasonable cause to believe that an unlawful employment practice has occurred or is occurring as to all issues addressed in the determination, the Commission shall issue a letter of determination to all parties to the charge indicating the finding.[13]

Even though the regulations and caselaw strongly suggest that an investigation of some sort must take place, it appears that currently, if the charge does not allow the investigator to immediately zero-in on one of the above priorities, the EEOC is simply notifying the employer of the charge and issuing a right-to-sue letter. Indeed, EEOC headquarters have instructed field offices, pursuant to the PCHP, not to seek position statements for claims they assess to be "C" cases.

Crafting a challenge to the Commission's current policies regarding its mandate to investigate may be a move to consider. But it is also important to keep in mind that the SEP, an Obama-era invention, combined with concerns under the current administration of government shut-downs, hiring freezes and defunding, are forcing the

field offices to take these approaches.

A few suggestions on how to effectively represent clients before the EEOC.

- First, draft charges with a sharp eye towards the SEP to ensure that the charge will survive the initial screen.
- Second the Commission's most serious focus, as explained in the SEP, is on the so-called "systemic" cases; therefore, it is important to highlight for the Commission cases that have a potential class of similarly situated claimants.
- Also, in light of the short-staffed EEOC investigative teams, it is beneficial to file a supplemental sheet with the charge to provide richer details on the relationship to that priority, such as known comparatives and the identity of witnesses and decision makers. This EEOC Intake Questionnaire collects beneficial information, even when the claimant is represented by counsel.
- Check with your field office director, who may be open to discussing a particular case with you before the Right-to-Sue letter is issued.

Additionally, the Commission is looking closely at cases that have strategic impact, that is: cases involving facially discriminatory policy, multiple charges against the same respondent on the same issues, charges with plausible class impact and charges that develop the law.

*Robin Wagner is an associate at Pitt McGehee Palmer & Rivers, PC, in Royal Oak, MI. She is Secretary of the Civil Rights Section and welcomes comments at rwagner@pittlawpc.com. Rachael E. Kohl, also contributed research to this article.*

## Endnotes

[1]According to the 1995 PCHP, which we obtained from the EEOC Detroit Field Office, the procedures laid out in this document were adopted in April of 1995 to address a growing backlog of cases. The EEOC developed a three-tiered priority system to classify all charges. "A" charges receive priority treatment because they are charges in which it appears "more likely than not" that discrimination occurs; "B" charges require more information and are to be investigated as resources permit; and "C" charges are summarily dismissed for a facial failure to state a claim.

[2]Available at https://www.eeoc.gov/eeoc/plan/sep-2017.cfm.

[3]At the time this article was written, the Department of Justice had just filed an amicus brief in a Second Circuit case to reverse the DOJ and EEOC's prior stance on LGBT employment discrimination and instead argue that Title VII does not cover discrimination on the basis of sexual orientation. (available at https://www.nytimes.com/interactive/2017/07/27/nyregion/gay-rights-justice-department.html). The EEOC has not at this point changed its stance on the topic.

[4]*McLane Co. v. E.E.O.C.*, 137 S. Ct. 1159, 1164, 197 L. Ed. 2d 500 (2017), *as revised* (Apr. 3, 2017) (emphasis added).

[5]42 U.S.C. § 2000e-5(b) (emphasis added).

[6]*Newsome v. E.E.O.C.*, 301 F.3d 227 (5th Cir. 2002).

[7]*Id.* at 229-30.

[8]*Id.* at 231.

[9]*Id.* (quoting *E.E.O.C. v. Keco Industries, Inc.*, 748 F.2d 1097, 1100 (6th Cir.1984)).

[10]*Id.*

[11]29 C.F.R. § 1601.15(a) (emphasis added).

[12]29 C.F.R. § 1601.18(a).

[13]29 C.F.R. § 1601.19(a).

---

*Zoning continued from page 4*

ments LLC et al. v. City of Yuma, Arizona, 818 F.3d 493, (9th Cir. Ariz. 2016), on remand, denial of city's motion for summary judgment, 2:09-cv-00297 JWS (May 1, 2017)

[6]Texas Department of Housing and Community Affairs et al. v. Inclusive Communities Project Inc. et al., 576 U.S. ___, 135 S.Ct. 2507 (2015).

[7]MHANY Mgmt. Inc. v. City of Nassau et al., 819 F.3d 581 (2d Cir. 2016).

[8]Pacific Shores Properties v. City of Newport Beach, 730 F.3d 1142 (9th Cir. 2013), cert den. ____ U.S. ____ (Nov. 3, 2014).

[9]Gilead Community Services, Inc. et al. v. Town of Cromwell et al., No. 3:17-cv-627 (filed April 17, 2017).

[10]Joint Statement of the Department of Housing and Urban Development and the Department of Justice, "State and Local Land Use Laws and Practices and the Application of the Fair Housing Act," (November 16, 2016) available at https://www.justice.gov/crt/page/file/909956/download.

[11]Pratt, Sara and Allen, Michael, Addressing Community Opposition to Affordable Housing: A Fair Housing Toolkit, available at www.fhcsp.com/Links/toolkit.pdf; PolicyLink, Equity Resources Affordable Housing Toolkit, available at http://www.policylink.org/equity-tools/equitable-development-toolkit/affordable-housing, Metropolitan Area Planning Council, Fair Housing Toolkit available at http://www.mapc.org/fair-housing-toolkit. Allen, Michael, Why Not in Our Backyard? Planning Commissioners Journal No. 45.

http://www.fairhousing.com/include/media/pdf/Why-Not-In-Our-Back-Yard.pdf.



FOR IMMEDIATE RELEASE
**November 14, 2017**

**Contact:**
Tim Kauffman
202-639-6405/202-374-6491
**tim.kauffman@afge.org (mailto:tim.kauffman@afge.org?subject=Press%20Release)**

# Labor union warns justice denied by EEOC's great case dump

## *Agency slashes case backlog by 16%, raising concerns of rush job*

**WASHINGTON –** The union representing career civil service employees at the Equal Employment Opportunity Commission says the agency has set off alarm bells by announcing that it has slashed a decades-long backlog in discrimination cases.

"Realistically, justice could not have been served for 12,000 Americans complaining of workplace discrimination who got moved off of EEOC's books this year," said Gabrielle Martin, president of the American Federation of Government Employees' National Council of EEOC Locals No. 216.



The sudden drop in cases is inconsistent with long-running statistics on EEOC's workload challenges, Martin said. EEOC's backlog typically has gotten bigger from year to year. An exception was when the backlog improved slightly from 2011-2012, as some new front-line staffing backfills came on board. But overall, EEOC's backlog of discrimination charges has stubbornly stood at over 70,000 cases for a

decade.

Just last year, EEOC still had 73,508 cases piled up, even after a modest 3.8 percent improvement over the previous year. But now, EEOC has announced that as of September 30, the backlog **miraculously shrunk (https://www.eeoc.gov/eeoc/newsroom/release/11-9-17.cfm)** to 61,621 cases – a 16 percent reduction.

"Each case in the backlog represents a worker waiting for EEOC for help with a claim of discrimination," Martin said. "Justice delayed is a problem, but it is still better than justice denied."

The agency is attributing the jolting drop in the backlog to several factors: prioritizing the problem, sharing strategies between offices, and a new digital charge system. But Martin is not buying these explanations. "The backlog has always been a priority, interoffice communications is not new, and the digital charge system should eliminate paper – not cases."

Martin believes the EEOC's controversial new performance management system is the real culprit. For the first time, EEOC included case processing quotas in EEOC's new performance plans, which rate professional employees on arbitrary numerical requirements.

"To get a passing grade, EEOC is relentlessly pressing staff to reduce cases over a certain number of days old to below an arbitrary percentile of their caseload," Martin said.

"EEOC is trying to solve its backlog problem by taking a page from an 'I Love Lucy' episode and speeding up the conveyor belt. But discrimination cases are not widgets – each complaint is a different set of facts. Workers filing discrimination complaints want both a fair and timely process, not just a quick closure."

A straight line can be drawn from the percentile requirements in the EEOC's new rating system and the drastic shift in the backlog numbers.

"The civil rights community and all those who care about justice should get EEOC to push the pause button on the new rating system until its impact on appropriate charge processing can be determined."

Recent headlines underscore the importance of EEOC as the agency that enforces laws preventing sexual harassment and other discrimination in the workplace.

"Unquestionably, discrimination is alive and well in our times. Unfortunately, EEOC has been hobbled by budget constraints that have not allowed for adequate frontline-staffing to keep up with new filings and the backlog. But EEOC's answer to short-staffing should not simply be a rush to dump old cases," Martin said.

### 

The American Federation of Government Employees (AFGE) is the largest federal employee union,

MAJORITY MEMBERS:

ROBERT C. "BOBBY" SCOTT, VIRGINIA,
  *Chairman*

SUSAN A. DAVIS, CALIFORNIA
RAUL M. GRIJALVA, ARIZONA
JOE COURTNEY, CONNECTICUT
MARCIA L. FUDGE, OHIO
GREGORIO KILILI CAMACHO SABLAN,
  NORTHERN MARIANA ISLANDS
FREDERICA S. WILSON, FLORIDA
SUZANNE BONAMICI, OREGON
MARK TAKANO, CALIFORNIA
ALMA S. ADAMS, NORTH CAROLINA
MARK DESAULNIER, CALIFORNIA
DONALD NORCROSS, NEW JERSEY
PRAMILA JAYAPAL, WASHINGTON
JOSEPH D. MORELLE, NEW YORK
SUSAN WILD, PENNSYLVANIA
JOSH HARDER, CALIFORNIA
LUCY MCBATH, GEORGIA
KIM SCHRIER, WASHINGTON
LAUREN UNDERWOOD, ILLINOIS
JAHANA HAYES, CONNECTICUT
DONNA E. SHALALA, FLORIDA
ANDY LEVIN, MICHIGAN
ILHAN OMAR, MINNESOTA
DAVID J. TRONE, MARYLAND
HALEY M. STEVENS, MICHIGAN
SUSIE LEE, NEVADA
LORI TRAHAN, MASSACHUSETTS
JOAQUIN CASTRO, TEXAS

MINORITY MEMBERS:

VIRGINIA FOXX, NORTH CAROLINA,
  *Ranking Member*

DAVID P. ROE, TENNESSEE
GLENN THOMPSON, PENNSYLVANIA
TIM WALBERG, MICHIGAN
BRETT GUTHRIE, KENTUCKY
BRADLEY BYRNE, ALABAMA
GLENN GROTHMAN, WISCONSIN
ELISE M. STEFANIK, NEW YORK
RICK W. ALLEN, GEORGIA
FRANCIS ROONEY, FLORIDA
LLOYD SMUCKER, PENNSYLVANIA
JIM BANKS, INDIANA
MARK WALKER, NORTH CAROLINA
JAMES COMER, KENTUCKY
BEN CLINE, VIRGINIA
RUSS FULCHER, IDAHO
VAN TAYLOR, TEXAS
STEVE WATKINS, KANSAS
RON WRIGHT, TEXAS
DANIEL MEUSER, PENNSYLVANIA
WILLIAM R. TIMMONS, IV, SOUTH CAROLINA
DUSTY JOHNSON, SOUTH DAKOTA



## COMMITTEE ON
## EDUCATION AND LABOR
U.S. HOUSE OF REPRESENTATIVES
2176 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515–6100

August 30, 2019

The Honorable Janet Dhillon
Chair
U.S. Equal Employment Opportunity Commission
131 M St., NE
Washington, D.C. 20002

Exhibit #9A

Dear Chairwoman Dhillon:

We write to request information regarding the U.S. Equal Employment Opportunity Commission's (EEOC) current practice and procedure for intakes, investigating, mediating, and adjudicating charges and claims.  Specifically, the decrease in the agency's staffing levels, coupled with decreases in the charge inventory, raises questions about whether the EEOC has developed policies that elevate expedience over due process.  Accordingly, we have concerns about the EEOC's ability to carry out its mission and request that the EEOC produce the following information and documents:

Please provide the following documentation:

1) In July 2017, the EEOC held a meeting with senior leadership and field staff to discuss "sustainable responses to charge processing challenges"[1]; during that time, then Acting Chair Lipnic distributed a discussion memo on how to substantially reduce the private sector charge inventory.[2]
   a. Please provide the July 2017 memo.
   b. Please provide emails, memos, meeting notes, and other internal documentation pertaining to the planning and outcome of the July 2017 meeting.

2) All documentation of initiatives the EEOC implemented beginning in Fiscal Year 2017 through the current fiscal year to change the percentage of charges designated as A, B, or

---

[1] U.S Equal Employment Opportunity Commission, Fiscal Year 2020 Congressional Budget Justification 6 (March 2019), https://www.eeoc.gov/eeoc/plan/2020budget.cfm.
[2] U.S. Equal Employment Opportunity Commission, *Performance and Accountability Report, FY 2018* (2018).

The Honorable Janet Dhillon
August 30, 2019
Page 2

C under the Priority Charge Handling Procedures (PCHP).[3] The scope of this document request includes but is not limited to:

    a. Any memoranda, or other communication, from Office of Field Programs to District Directors, and from District Directors to their managers, that discuss increasing the percentage of C charges;

    b. Any EEOC pilot program to increase charge closures; and

    c. The performance standards for the District Director position for each of the past 5 years.

3) All documentation showing the EEOC's official policy and procedure for intake interviews of individuals who walk into a district office without an appointment to file a charge.

4) All reports, or informal analysis, documenting the impact of the government shutdown between Dec. 22, 2018, and Jan. 25, 2019, on operations, including the intake process for private and federal sector complainants.

5) Documentation of changes to the interview process, or effective pre-charge counseling, that the EEOC credits with the decrease in charge receipts filed after completion of the interview.[4]

6) The Administrative Judge Performance Plan for the past 5 years and internal documentation, emails, and memos discussing case closure requirements.

Please provide the following data:

1) The number of full-time equivalents (FTE) employed by the EEOC for each of the past 10 years disaggregated by position type. Please ensure that, for each year, this data at minimum indicates the number of FTEs in each of the following positions:

    a. Information Intake Representatives staffing the Information Intake Group;

    b. EEOC investigators; and

    c. Administrative Judges.

2) The following information for the past five years disaggregated by: (1) the total number received, (2) the number in the EEOC's pending inventory (backlog), and (3) the total number as of August 1, 2019:

    a. The number of charges in the EEOC's inventory of private sector charges, and

---

[3] "A charges include charges which fall within the national or local enforcement plan and other charges where further investigation will probably result in a cause finding; B charges include charges that initially appear to have some merit but will require additional evidence to determine whether continued investigation is likely to result in a cause finding and charges where it is not possible to make a judgment regarding the merits; and C charges are those in which the office has sufficient information to conclude that it is not likely that further investigation will result in a cause finding. A charges will receive priority treatment; B charges will be investigated as resources permit; and C charges will be dismissed." Introduction to Commission Policies, REGIONAL ATTORNEYS' MANUAL, https://www.eeoc.gov/eeoc/litigation/manual/1-3-a_intro.html (last visited Aug 10, 2019).

[4] EEOC, *FY 2018 Performance and Accountability Report*, p, 31 (2018).

The Honorable Janet Dhillon
August 30, 2019
Page 3

     b.  The number of pending hearing requests from federal complainants.

3) The number of A, B, and C, charges as designated by the PCHP for each of the past 5 years.

4) Beginning with January 2001, provide the number of charge filings dismissed with a notice of right to sue within:
     a.  Two weeks;
     b.  One month; and
     c.  Six months.

5) The number of private sector charges assigned to the EEOC's mediation program for each of the past 5 years.

6) The number of onsite investigations that took place annually for each of the past 5 years.

7) The number of the EEOC requests made annually for each of the past 5 years for position statements from employers responding to charges of discrimination.

8) Disaggregated annually and by the EEOC's 53 field offices for each of the past 5 years, the number of:
     a.  Initial inquiries; and
     b.  Charge receipts.

9) The average hold time for an individual calling the EEOC's charge filing hotline for each of the past 5 years (1-800-669-4000).

Please provide answers to the following questions:

1) Has the EEOC indicated to district offices that there is any form of quota on the percent of charges that should be categorized as A, B, or C under the PCHP?  If such a quota exists, please provide documentation sufficient to show this.

2) Are there case closure requirements in the Administrative Judge Performance Plan?
     a.  If so, what is the EEOC's rationale for including the requirements?

3) Are the Digital Charge and Appointment Systems currently available in any language other than English?
     a.  If so, which languages are they available in, and are there plans to add additional languages?
     b.  If not, does the EEOC have any plans to make online charging and appointment systems available in any language other than English?

The Honorable Janet Dhillon
August 30, 2019
Page 4

4) Do the Digital Charge and Appointment Systems currently meet 508 compliance standards that require federal agencies to make their information and communication accessible to, and usable by, individuals with disabilities?[5]
   a. If not, does the EEOC have any plans to make them 508 compliant?

5) The EEOC's approved staffing ceiling is 2,347 FTE.  However, the EEOC ended Fiscal Year 2017 with 2,082 FTEs and Fiscal Year 2018 with 1,968 FTEs.[6]  Further, Congress appropriated a $15 million increase in the EEOC's Fiscal Year 2017 budget, an increase that was maintained in Fiscal Year 2018.
   a. What accounts for the EEOC's FTE levels falling almost 20% below approved staffing levels despite increases in congressional funding?

Please provide the EEOC's response to the above requests by September 13th, 2019. Please also provide the EEOC's response to each of the above requests as it becomes available rather than waiting to provide all responses at once.  If you have any questions, please contact Janice Nsor at Janice.Nsor@mail.house.gov.  Please direct all official correspondence to the Committee's Chief Clerk at Tylease.Alli@mail.house.gov.  Thank you for your attention to this matter, and we look forward to your response.

Sincerely,

ROBERT C. "BOBBY" SCOTT
Chair

SUZANNE BONAMICI
Chair
Subcommittee on Civil Rights and Human
  Services

---

[5] https://www.section508.gov/about-us.
[6] https://www.eeoc.gov/eeoc/plan/budgetandstaffing.cfm.

# REQUEST TO CLOSE COMMISSION MEETING
## GOVERNMENT IN THE SUNSHINE ACT

ITEM TO BE DISCUSSED

## GENERAL COUNSEL RECOMMENDATIONS: LITIGATION AUTHORIZATIONS

| REASON(S) FOR THIS REQUEST *(See EEOC Order 155, Appendix A)* - FILL IN THE BOX(ES) WITH THE APPROPRIATE EXEMPTION NUMBER(S), ATTACH AN EXPLANATION OF HOW THE SUBJECT MATTER COMES WITHIN THE EXEMPTION(S). □ □ □ | NAME AND AFFILIATION OF PERSONS WHO ATTENDED CLOSED MEETING *(Please attach)* |
|---|---|

| PART I – EXECUTIVE SECRETARIAT | | | | PART II |
|---|---|---|---|---|

| REQUEST NO. | DATES | | | LEGAL COUNSEL CERTIFICATION *(Please attach)* |
|---|---|---|---|---|
| | RECEIVED BY EXECUTIVE SECRETARIAT | FORWARDED TO OLC | SCHEDULED FOR AGENDA | DATE: |

### PART III – COMMISSION ACTION

| OPEN | CLOSED | MEETING | NAME | | DATE |
|---|---|---|---|---|---|
| □ | □ | □ | Gilbert F. Casellas | CHAIRMAN | _____ |
| □ | □ | □ | Paul M. Igasaki | VICE CHAIRMAN | _____ |
| □ | □ | □ | Paul Steven Miller | COMMISSIONER | _____ |
| □ | □ | □ | Reginald E. Jones | COMMISSIONER | _____ |
| □ | □ | □ | _____ | COMMISSIONER | _____ |

### PART IV – EXECUTIVE SECRETARIAT

| DATE INFORMATION MADE PUBLICLY AVAILABLE | NAME AND AFFILIATION OF ALL PERSONS EXPECTED TO ATTEND CLOSED MEETING *(Please attach)* |
|---|---|

EXPLANATION OF COMMISSION ACTION CLOSING MEETING

Having determined that the public interest would not be served by considering this matter in open session, a majority of the entire membership of the Commission voted as indicated in Part III, that this portion of the meeting of October 22, 1996 be closed in accordance with Exemption 10 of the Government in the Sunshine Act, 5 U.S.C., Section 552b (c) (10), and Commission regulations at 29 C.F.R., Section 1612.4(j) and 1612(a) (3).

Frances M. Hart
Executive Officer
Executive Secretariat

### PART V – LITIGATION *(Attach additional sheets if necessary)*

Exhibit # 10

Memo withheld in full (4 pages)

Page 063 of 124

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Withheld in full

Page 064 of 124

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 065 of 124

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page withheld in full

Page 066 of 124

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
Washington, DC 20507

July 3, 1995

Office of
the Commissioner

MEMORANDUM

TO:        Gilbert F. Casellas
           Chairman

FROM:      Joyce E. Tucker
           Commissioner

SUBJECT:   Priority Charge Handling Procedures – Dismissal and
           Notice of Rights

Please be advised that I have reviewed the recently prepared
document on Priority Charge Handling Procedures and commend your
staff for their diligent effort toward implementing the
Commission's policy in this area.  However, I would like to bring
to your attention the fact that the directive on p.11 of this
document appears to be inconsistent with the motion approved by
the Commission on April 19, 1995, concerning the elimination of
substantive "no cause" Letters of Determination (LODs).

It is my understanding that on April 19, 1995, a majority of the
Commission voted that substantive dismissals would be required to
be either "cause" or "no cause", but that it would no longer be
necessary to provide a written rationale for that finding in a
letter of determination.  In contrast the language in the
directive states: "Based upon the Commission's investigation, the
Commission is unable to conclude that the information obtained
establishes violations of the statutes. This does not certify
that the respondent is in compliance with the statutes."

As you may recall, prior to the vote on the motion to eliminate
the requirement for substantive no cause letters, there was an
extended discussion on the meaning and intent of the language in
the motion pertaining to not making particularized findings.
(Relevant portions of the transcript are attached for your
convenience).

At that time, I raised a concern about the effect that not issuing a determinative finding would have on the Fair Employment Practices Agencies (FEPAs) in Pennsylvania, and possibly on other FEPAs. I indicated that the motion would not be problematic, if we intended to continue to make a finding of either "cause" or "no cause" even if a rationale for the finding were not provided. However, I believe that it is crucial that EEOC make a determination concerning whether, on the evidence before us, there is or is not a violation of the statutes.

During the course of the conversation on this issue, I specifically discussed whether the motion would allow District Directors to say that there was "not enough evidence here to make a finding so we're not going to make a call at all." I raised this concern because such a result was recommended in the Charge Processing Task Force Report. (Transcript of Commission Meeting of April 19, 1995 at p. 65). Commissioner Silberman stated that that was not what this resolution was and Vice Chairman Igasaki indicated that that was not necessarily what was intended by this resolution and that a finding or determination under law would have to be made.

Later in the discussion, I requested further clarification since it appeared to me that the motion was at variance with the recommendation in the report itself. I asked whether the resolution was about adopting the recommendation in the report that no finding be made. The Vice Chairman noted that that was not what this resolution was about. (Transcript at pp.66-67).

The discussion closed with a statement by Commissioner Silberman to clarify the intent of the motion before us. She stated, "[w]hat we are voting on is that it is not necessary to have a rationale." Both the Vice Chairman and myself agreed, on the record, that this was also our understanding of the meaning of the motion. Thus, though I opposed the motion, it was and continues to be my understanding that the issue before the Commission was not a vote to eliminate a "no cause" finding, but simply a vote to eliminate the necessity of articulating a rationale for such a finding.

Again, please note that contrary to the above discussion and vote by the Commission, the newly issued document provides a sample "Dismissal and Notice of Rights" form that states, among other things, "The Commission issues the following determination: Based upon the Commission's investigation, the Commission is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by the charge." (Priority Charge Handling Procedures, Attachment B, emphasis added). As indicated at p. 11 of the document, this language is uniform and mandatory in dismissal notices.

2

In comparison, the pertinent language provided in Volume I of the Compliance Manual for no cause Letters of Determination clearly indicates that the Commission has reached a substantive determination on the merits of the evidence presented and states: "I have determined that the evidence obtained during the investigation <u>does not establish a violation of the statute</u>." (EEOC Compliance Manual Volume I, Exhibit 4-F(1), emphasis added).

Because the new language, by its terms, clearly indicates that the Commission has reached no conclusion as to whether there has been a  violation of the statutes, it does not appear to me that it satisfies the Commission's vote that a "no cause" finding is required.

I have noted that the Priority Charge Handling Procedures does provide at Attachment A, a sample "Memorandum and Recommendation for Dismissal/Closure"  which includes a "Not Cause" box that the investigator can check off as the reason for the dismissal. However, Attachment A is an internal document for the signature of the Unit Supervisor and is not a document provided to the parties "on behalf of the Commission." Attachment A, thus, would not appear to satisfy the Commission's resolution to provide a finding indicating whether the statutes have been violated.

Based upon the above, it would appear to me that the Commission should either withdraw and revise the relevant sections of the Priority Charge Processing Manual or vote to modify its initial position. Please note, as well, that the Commission's procedural regulations, while not requiring a rationale, do appear to require a finding.  The regulations state:

> Where the Commission completes its investigation of a charge and finds that there is not reasonable cause to believe that an unlawful employment practice has occurred or is occurring as to all issues addressed in the determination, the Commission shall issue a letter of determination to all parties to the charge indicating the finding. The Commission's letter of determination shall be the final determination of the Commission.

29 C.F.R. Sec. 1601.19a (in pertinent part)


Dismissals without a cause or no cause determination are limited, under the regulations, to cases that are untimely filed, fail to state a claim or where there are other procedural bases for dismissal.  29 C.F.R. Sec. 1601.18

Your observations and conclusions as to the above matter are requested.

copy:      Paul M. Igasaki
            Vice Chairman

            R. Gaull Silberman
            Commissioner

            Paul Steven Miller
            Commissioner

Attachments (3):     Priority Charge Handling Procedures,
                 page 11 and Attachments A and B

                 Compliance Manual Volume I, Exhibit 4-F(1)

                 April 19, 1995, Transcript pages 60-68

of their differences is possible. Offices will have discretion in evaluating whether settlements are appropriate in particular cases. As part of the exercise of this discretion, offices should take into careful consideration the interests of the affected parties and not simply impose their view of appropriate relief. At the same time, however, offices should not encourage or facilitate settlements simply to dispose of cases.

The following principles will guide the settlement process:

1. Minimum settlement terms for agreements to which the EEOC is a party are set out in the model agreements in § 15 of Vol. I, and remain in effect.

2. Charges under investigation that do not fall within the national or local enforcement plans and that are in Categories A or B may be settled at any time by the enforcement staff, with or without consultation with legal staff, as appropriate.

3. Category A charges under investigation that fall within the enforcement plans can be settled at any time in consultation with the Regional Attorney. This will assure that enforcement plans are implemented consistently and appropriately.

4. Category C charges, which are appropriate for dismissal, will not be the subject of EEOC settlement efforts. However, staff should not stand in the way of parties who are interested in reaching a settlement of their dispute.

## F.   DETERMINATIONS

### 1. Elimination Of Substantive "No Cause" LODs

Substantive "no cause" determinations will no longer be used. Instead, the parties will be informed in a short-form determination that the investigation failed to disclose a violation. These determinations will not include particularized factual findings, but rather will use the following uniform language which is included in the dismissal form approved on May 1, 1995, and a copy of which is attached as Attachment B:

> Based upon the Commission's investigation, the Commission is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issue that might be construed as having been raised by this charge.

(revised - 6/20/95)                                11

<u>Attachment A</u>

| MEMORANDUM | RECOMMENDATION FOR DISMISSAL/CLOSURE |
|---|---|

**TO** : _____    **CHARGE NO.** _____

**FROM** : _____

**SUBJECT** : _____    **V.** _____
*Charging Party*                                                      *Respondent*

1. I recommend dismissal/closure of the subject charge based on the following:

☐ a. No Jurisdiction                        ☐ f. Not Cause
  ☐ Lack of Standing
  ☐ Other _____
        *Specify*

☐ b. Untimely

☐ c. Failure to Cooperate

☐ d. Unable to Locate                       ☐ g. Right to Sue (Issued on Request)

☐ e. Refusal to Accept Full Relief            ☐ Director has certified that the investigation will not likely
                                              be completed within 180 days (Title VII/ADA)
                                              of charge filing.

2. Specific information in support of recommendation:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

| | **DATE** |
|---|---|

ECOMMENDATION APPROVED

**Equal Employment Opportunity Commission**                    <u>Attachment B</u>

## DISMISSAL AND NOTICE OF RIGHTS

**To:**                                      **From:**

[  ]   *On behalf of a person aggrieved whose identity is*
       *CONFIDENTIAL (29 CFR § 1601.7(a))*

| Charge No. | EEOC Representative | Telephone No. |
|---|---|---|

*(See the additional information attached to this form.)*

### YOUR CHARGE IS DISMISSED FOR THE FOLLOWING REASON:

[  ]   The facts you allege fail to state a claim under any of the statutes enforced by the Commission.

[  ]   Respondent employs less than the required number of employees.

[  ]   Your charge was not timely filed with the Commission, *i.e.*, you waited too long after the date(s) of the discrimination you alleged to file your charge. Because it was filed outside the time limit prescribed by law, the Commission cannot investigate your allegations.

[  ]   You failed to provide requested information, failed or refused to appear or to be available for necessary interviews/conferences, or otherwise refused to cooperate to the extent that the Commission has been unable to resolve your charge. You have had more than 30 days in which to respond to our final written request.

[  ]   The Commission has made reasonable efforts to locate you and has been unable to do so. You have had at least 30 days in which to respond to a notice sent to your last know address.

[  ]   The respondent has made a reasonable settlement offer which affords full relief for the harm you alleged. At least 30 days have expired since you received actual notice of this settlement offer.

[  ]   The Commission issues the following determination: Based upon the Commission's investigation, the Commission is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[  ]   Other *(briefly state)* _____

### – NOTICE OF SUIT RIGHTS –

[  ]   **Title VII and/or the Americans with Disabilities Act:** This is your NOTICE OF RIGHT TO SUE, which terminates the Commission's processing of your charge. If you want to pursue your charge further, you have the right to sue the respondent(s) named in your charge in U.S. District Court. If you decide to sue, you must sue <u>WITHIN 90 DAYS</u> from your receipt of this Notice; otherwise your right to sue is lost.

[  ]   **Age Discrimination in Employment Act:** This is your NOTICE OF DISMISSAL OR TERMINATION, which terminates processing of your charge. If you want to pursue your charge further, you have the right to sue the respondent(s) named in your charge in U.S. District Court. If you decide to sue, you must sue <u>WITHIN 90 DAYS</u> from your receipt of this Notice; otherwise, your right to sue is lost.

[  ]   **Equal Pay Act (EPA):** EPA suits must be brought within 2 years (3 years for willful violations) of the alleged EPA underpayment.

I certify that this notice was mailed on the date set out below.

                              **On behalf of the Commission**

_____          _____
*(Date Mailed)*

**Enclosures**
   Information Sheet
   Copy of Charge

cc:     Respondent(s)

Draft correspondence withheld in full (pages 12-30)

Page 074 of 124

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 075 of 124

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 076 of 124

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 077 of 124

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 078 of 124

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 079 of 124

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 080 of 124

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 081 of 124

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 082 of 124

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 083 of 124

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 084 of 124

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 085 of 124

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 086 of 124

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 087 of 124

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 088 of 124

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 089 of 124

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 090 of 124

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 091 of 124

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 092 of 124

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

60

1          CHAIRMAN CASELLAS:   The motion carries

2     unanimously.

3          VICE CHAIRMAN IGASAKI:  Thank you.

4          Number four, that the Commission eliminates

5     the substantive no cause letter of determination in

6     cases where the appropriate investigation of the charge

7     has not established reasonable cause to believe that

8     discrimination has occurred.  Such charges should be

9     dismissed without particularized findings.  However,

10    field offices are encouraged to share with charging

11    parties the basis for EEOC's determination through such

12    means as predetermination interviews.

13         CHAIRMAN CASELLAS:  Second?

14         COMMISSIONER MILLER:  Second.

15         CHAIRMAN CASELLAS:  Any discussion?

16         COMMISSIONER SILBERMAN:  Mr. Chairman, do

17    I understand that we are voting only on the no cause?

18    I did not realize, per your conversation with

19    Commissioner Tucker, that you were contemplating that we

20    would do the same thing with cause determinations.

21         VICE CHAIRMAN IGASAKI:  Well, that was, I

22    believe, the-- that's not what the resolution states

61

1    right here.  That was, I believe, part of our task force

2    recommendation.

3             COMMISSIONER SILBERMAN: Well, with that in

4    mind, I mean, as far as I'm concerned I would be willing

5    to vote for this resolution, but I want in no way for

6    that to implicate that I am supporting that that be seen

7    as supporting the conversation that you and Commissioner

8    Tucker had because I would have very serious doubts

9    about the wisdom of doing that.

10           COMMISSIONER TUCKER:   I do have another

11    comment.  I would also be concerned about the wisdom of

12    doing one and not the other.  But since that's not the

13    issue that we're dealing with, let me just add this,

14    that in terms of the impact of this action, Commission

15    action on the FEPAs, there are certain FEPAs who cannot

16    dismiss their cases based on a no determination finding

17    of the Commission.

18           I think Philadelphia has 2,000 cases that

19    if we make a determination those are dual file cases

20    that will activate.  They will have to investigate those

21    cases even though under the dual filing relationship

22    EEOC investigates what it gets, the FEPAs investigate

1  what they get.  If we vote on this, Philadelphia or

2  Pennsylvania gets those 2,000 cases if we make that kind

3  of decision.  And we don't know what impact it has on

4  other FEPAs, but despite that fact I still have problems

5  with it.

6          CHAIRMAN CASELLAS: Any further discussion?

7          COMMISSIONER SILBERMAN:   Mr. Chairman,

8  could we postpone this particular resolution and await

9  Commissioner Tucker's report and look further into what

10  the implications of it may be?  Because, it seems to me

11  that it is not pivotal enough to what we want to do

12  today to put our feet in stone, as it were, on an issue

13  that might have further implications.

14          COMMISSIONER TUCKER:   That's not in my

15  report, but that's information that has been brought to

16  my attention and I would think that postponing would be

17  a good idea in light of the fact that we don't know what

18  this is going to do to our sister state and local

19  agencies.

20          COMMISSIONER SILBERMAN:  I think that that

21  would be a preferable way to handle it, given the fact

22  that, as I say, this is a -- it's not a major part of

1    the report.

2                    CHAIRMAN CASELLAS:  Let me just -- can I

3    ask a question about that?  As it stands currently

4    without this motion that's pending, if a no cause -- if

5    the current substantive no cause letter of determination

6    goes out in those situations where FEPAs are -- we have

7    these dual file relationships, you're saying that the

8    FEPA --

9                    COMMISSIONER TUCKER:  Okay.  What I'm

10   saying is I know this is the case for Pennsylvania.  If

11   the charge is dismissed without a particularized

12   finding, if we don't make a finding, then they have to

13   investigate those charges.  So, if we don't make a no

14   cause finding or cause finding, if we do something that

15   doesn't say what we do, and this is the -- the motion

16   says such charges should be dismissed without

17   particularized findings -- if we don't make a

18   determination, I know from Pennsylvania they have 2,000

19   cases now that will be reactivated.  Now they'll be here

20   on Monday.  You might want to ask them that question,

21   but that's what they advised me.

22                    CHAIRMAN CASELLAS:  So I guess what I'm not

1  stated was correct.  So we have to give -- and I guess

2  the confusion is particularized finding, me reading this

3  and interpreting it as -- and let me say where that

4  comes from, because in the report itself we discuss not

5  making findings.  We suggest that the district directors

6  may be able to say there's not enough evidence here to

7  make a finding so we're not going to make a call at all.

8  Now that's contained in the report.

9          COMMISSIONER SILBERMAN:  That's not what

10  this resolution is --

11          COMMISSIONER TUCKER:  We're not saying --

12  let me ask the Vice Chairman.

13          That's not what this -- or is that a part

14  of --

15          VICE CHAIRMAN IGASAKI:  No, that's not

16  necessarily what we're intending here.  We have

17  consulted fully with legal counsel on this and I'm not

18  familiar with exactly what the Pennsylvania situation

19  is.

20          What I do know is that, as I understand it,

21  we're required to make some finding or some

22  determination under law.

NEAL R. GROSS
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVENUE, N.W.
(202) 234-4433          WASHINGTON, D.C. 20005          (202) 234-4433

66

1          MS. VARGYAS:  That is correct and I think

2     the question here is the explanation for the finding,

3     but this does maintain the--

4          COMMISSIONER TUCKER:  So we would be --

5     right --

6          MS. VARGYAS:  -- statutory and regulatory

7     requirements of a --

8          COMMISSIONER TUCKER:  We'll be making a

9     finding which is contrary to one of the recommendations

10    in the report itself that we don't make a finding.

11         VICE CHAIRMAN IGASAKI:  Well, I think that

12    there was -- we had some extensive discussions about

13    this in the task force and that is why we tried to be as

14    clear as we could in this resolution.  The idea is that

15    the law requires some form of determination and we

16    believe that's been satisfied here.

17         COMMISSIONER TUCKER:  Okay.  But let me

18    just go back here.  We have a recommendation in the

19    report itself which suggests that we don't -- that one

20    of the things that we can do is not to make a finding at

21    all, and my understanding that we're not -- we're not

22    adopting that part of -- we're not going to be doing

1          CHAIRMAN CASELLAS:  Okay.  I wasn't sure if

2   you were requesting that be postponed.

3          Okay.  I guess we're prepared to vote.  All

4   in favor of the motion, signify by saying aye.

5          (Ayes.)

6          CHAIRMAN CASELLAS:  Any opposed?

7          COMMISSIONER TUCKER:  Opposed.

8          CHAIRMAN CASELLAS:  Okay.  Thank you.

9          VICE  CHAIRMAN  IGASAKI:    Number  5,  that

10  settlement  efforts  be  encouraged  at  all  stages  of  the

11  administrative  process  and  that  the  Commission  may

12  accept  settlements  providing  substantial  relief  when

13  evidence  of  record  indicates  a  violation  or  appropriate

14  relief  at  an  earlier  stage  in  the  investigation.

15          CHAIRMAN CASELLAS:  Do I hear a second?

16          COMMISSIONER MILLER:  Second.

17          CHAIRMAN CASELLAS:  Any discussion?

18          COMMISSIONER SILBERMAN:  Yes.  I'd like to

19  ask a question.

20          Vice  Chairman,  how  do  you  weigh  the

21  dichotomy  that  seems  to  be  implied  in  this  between

22  substantial  and  appropriate?  When  is  each  one  used  and