Exhibit # 71

## § 1601.26

R. 65308, Oct. 14, 1977, as amended at 47 FR 46091, Aug. 2, 1982; 74 FR 63982, May 56 FR...

The Commission may bring a civil action against any respondent named in a charge not a government, governmental agency or political subdivision, after thirty (30) days from the date of the filing of a charge with the Commission unless a conciliation agreement acceptable to the Commission has been secured: *Provided, however,* That the

... endeavors.

... one dur- ... ate un- ... infor- ... ncilia- ... made a ... by the ... ployees, ... equent ... onsent ... provi- ... esures ... State ... priate ... res will ... ctive ... e VII. ... fuse to ... agency ... confi- ... accord ... ny cir- ... res will ... any of ... of the ... ADA, ... owever, ... ve the ... atory process.

§ 1601.27 Civil actions by the Commission.

(a) *Issuance of notice of right to sue upon request.* (1) When a person claiming to be aggrieved requests in writing, that a notice of right to sue be issued, and the charge to which the request relates is filed against a respondent other than a government, governmental agency or political subdivision, the Commission shall promptly issue such notice as described in § 1601.28(e) to all parties, at any time after the expiration of one hundred eighty (180) days from the date of filing of the charge with the Commission, or in the case of a Commissioner charge 180 days after the filing of the charge or 180 days after the expiration of any period of reference under section 706(d) of title VII as appropriate.

(2) When a person claiming to be aggrieved requests, in writing, that a notice of right to sue be issued, and the charge to which the request relates is filed against a respondent other than a government, governmental agency or political subdivision, the Commission may issue such notice as described in § 1601.28(e) with copies to all parties, at any time prior to the expiration of 180 days from the date of filing of the charge with the Commission, provided that the District Director, the Field Director, the Area Director, the Local Director, the Director of the Office of Field Programs or upon delegation, the Director of Field Management Programs has determined that it is not able to complete its administrative processing of the charge within the 180 days from the filing of the charge and has attached a written certificate to that effect.

(3) Issuance of a notice of right to sue shall terminate further proceeding of any charge that is not a Commissioner charge unless the District Director, Area Director, ... Director, Director of the Office of Field Programs or upon delegation, the Director of Field Management Programs or ...

[65308, Oct. 14, 1977, as amended at 56 FR ... 8, Mar. 7, 1991; 74 FR 63982, Dec. 7, 2009]

**PROCEDURE CONCERNING THE CONSTITUTION OF CIVIL ACTIONS**

## 29 CFR Ch. XIV (7–1–17 Edition)

Commission may seek preliminary or temporary relief pursuant to section 706(f)(2) of title VII, according to the procedures set forth in § 1601.23 of this part, at any time.

§ 1601.28 Notice of right to sue: Procedure and authority.

(a) *Issuance of notice of right to sue upon request.* (1) When a person claiming to be aggrieved requests in writing, that a notice of right to sue be issued and the charge to which the request relates is filed against a respondent other than a government, governmental agency or political subdivision, the Commission shall promptly issue such notice as described in § 1601.28(e) to all parties, at any time after the expiration of one hundred eighty (180) days from the date of filing of the charge with the Commission, or in the case of a Commissioner charge 180 days after the filing of the charge or 180 days after the expiration of any period of reference under section 706(d) of title VII, as appropriate.

(2) When a person claiming to be aggrieved requests, in writing, that a notice of right to sue be issued, and the charge to which the request relates is filed against a respondent other than a government, governmental agency or political subdivision, the Commission may issue such notice as described in § 1601.28(e) with copies to all parties, at any time prior to the expiration of 180 days from the date of filing of the charge with the Commission...

## Equal Employment Opportunity Comm. § 1601.28

or the General Counsel, determines that time or at a later time that it will would effectuate the purpose of title VII, the ADA, or GINA to further process the charge. Issuance of a notice of right to sue shall not terminate the processing of a Commissioner charge.

(4) The issuance of a notice of right to sue does not preclude the Commission from offering such assistance to the person issued such notice as the Commission deems necessary or appropriate.

(b) *Issuance of notice of right to sue following Commission disposition of charge.* (1) Where the Commission has found reasonable cause to believe that title VII, the ADA, or GINA has been violated, has been unable to obtain voluntary compliance with title VII, the ADA or GINA, and where the Commission has decided not to bring a civil action against the respondent, it will issue a notice of right to sue under § 1601.28(e) to:

(i) The person claiming to be aggrieved, or,

(2) Where the Commission has entered into a conciliation agreement in which the person claiming to be aggrieved is not a party, the Commission shall issue a notice of right to sue on the charge to the person claiming to be aggrieved.

(3) Where the Commission has dismissed a charge pursuant to § 1601.19, it shall issue a notice of right to sue, as described in § 1601.28(e) to:

(i) In the case of a Commissioner charge, to any member of the class who is named in the charge, identified by the Commissioner in the charge, or otherwise identified by the Commission as a member of the class, and provide a copy thereof to all parties.

(4) The person claiming to be aggrieved, or,

(ii) In the case of a Commissioner charge, to any member of the class who is named in the charge, identified by the Commissioner in the charge, or otherwise identified by the Commission as a member of the class, and provide a copy thereof to all parties.

person issued such notice as the Commission deems necessary or appropriate.

(c) (i) The Commission hereby delegates authority to District Directors, Field Directors, Area Directors, Local Directors, the Director of the Office of Field Programs, or Director of Field Management Programs or their designees, to issue notices of right to sue, in accordance with this section, on behalf of the Commission. Where a charge has been filed on behalf of a person claiming to be aggrieved, the notice of right to sue shall be issued in the name of the person or organization who filed the charge.

(d) *Notices of right-of-sue for charges against Governmental respondents.* In all cases where the respondent is a government, governmental agency, or political subdivision, the Attorney General will issue the notice of right to sue, including the following cases:

(1) When there has been a finding of reasonable cause by the Commission, there has been a failure of conciliation, and the Attorney General has decided not to file a civil action, and where a charging party has requested a notice of right to sue pursuant to § 1601.28(a)(1) or (2). In cases where a finding of discrimination results in a finding of cause in part and no cause in part, the case will be treated as a "cause" determination to be referred to the Attorney General.

(2) Where a charging party has requested a notice of right to sue pursuant to § 1601.28(a)(1) or (2).

(e) *Content of notice of right to sue.* The notice of right to sue shall include:

(1) Authorization to the aggrieved person to bring a civil action under title VII, the ADA, or GINA pursuant to section 706(f)(1) of title VII, section 107 of the ADA, or section 207 of GINA.

[`Formal Ratification–Notice is hereby given that the EEOC at a Commission meeting in ... 1974, formally ratified the acts of the District Directors of EEOC District Offices in issuing notices of right to sue pursuant to Commission action instituted on October 15, 1969, and continued through March 18, 1974, 39 FR 10378 (March 18, 1974).]




DATE DOWNLOADED: Tue Oct 13 23:18:58 2020
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
Arthur Earl Bonfield, The Origin and Development of American Fair Employment
Legislation, 52 IOWA L. REV. 1043 (1967).

ALWD 6th ed.
Bonfield, A. ., The origin and development of american fair employment legislation,
52(6) Iowa L. Rev. 1043 (1967).

APA 7th ed.
Bonfield, A. (1967). The origin and development of american fair employment
legislation. Iowa Law Review, 52(6), 1043-1092.

Chicago 7th ed.
Arthur Earl Bonfield, "The Origin and Development of American Fair Employment
Legislation," Iowa Law Review 52, no. 6 (June 1967): 1043-1092

McGill Guide 9th ed.
Arthur Earl Bonfield, "The Origin and Development of American Fair Employment
Legislation" (1967) 52:6 Iowa L Rev 1043.

MLA 8th ed.
Bonfield, Arthur Earl. "The Origin and Development of American Fair Employment
Legislation." Iowa Law Review, vol. 52, no. 6, June 1967, p. 1043-1092. HeinOnline.

OSCOLA 4th ed.
Arthur Earl Bonfield, 'The Origin and Development of American Fair Employment
Legislation' (1967) 52 Iowa L Rev 1043

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from uncorrected OCR text.
-- To obtain permission to use this article beyond the scope of your license, please use:
   *Copyright Information*



Exhibit #12

# Iowa Law Review

VOLUME 52  JUNE 1967  NUMBER 6

## THE ORIGIN AND DEVELOPMENT OF AMERICAN FAIR EMPLOYMENT LEGISLATION

Arthur Earl Bonfield*

*Historically, fair employment legislation proved to be inadequate and ineffective because its coverage was ad hoc and the means provided for its enforcement were unrealistic. This experience demonstrated the need for broad scope, comprehensive, and administratively enforceable legislation in this field. It also proved that effective application of these particular kinds of laws demanded an independent, single-purpose agency whose sole reason for existence was the enforcement of fair employment laws. In this article Professor Bonfield presents an exhaustive analysis of the development of American fair employment laws and describes the historical bases for those practices and approaches considered most desirable in such legislation today. Specifically, he demonstrates the complete failure of piecemeal legislation in this area and the intuility of the usual criminal and civil enforcement processes and agencies for these kinds of civil rights statutes.*

### I. Introduction

Broad scope, comprehensive, and fully enforceable laws whose sole purpose[1] is the elimination of employment discrimination on the basis

---

* Professor of Law, University of Iowa College of Law. B.A., Brooklyn College; LL.B., LL.M., Yale Law School.

[1] Other statutes, not considered in this study, bar such discrimination only indirectly or incidentally. *See, e.g.,* National Labor Relations Act, ch. 120, 61 Stat. 136 (1947), *as amended,* 29 U.S.C. §§ 151-68 (1964), *amending* Act of July 5, 1935, ch. 372, 49 Stat. 449, and the Railway Labor Act, ch. 8, 44 Stat. 2105 (1926), *as amended,* 45 U.S.C. §§ 151-62 (1964). While primarily concerned with problems of labor organization and collective bargaining both these statutes indirectly or incidentally offer important help in dealing with discrimination by unions on the basis of race, religion, and ethnic background. Under these acts a union selected by a majority of the employees in a unit appropriate for collective bargaining becomes the exclusive representative of all the employees and not just those who want to be represented by that union. Because of this both

of race, religion, or national origin[2] are today a well-entrenched part
of our legal system.   These modern fair employment laws are of broad
scope in that they apply to all, or a substantial portion of all, employ-
ment generally rather than just to a very limited class of employment
such as government employment or employment by government con-
tractors.   Statutes of this sort are comprehensive insofar as they deal
with discrimination in employment by regulating the conduct of all
those whose activities intimately affect, or are related to, the employ-
ment process.   The conduct of unions and employment agencies as
well as employers, therefore, is subject to these acts.   Current fair
employment laws are described as fully enforceable because they rely
on a single-purpose government agency, utilizing a relatively success-
ful administrative process backed by compulsion, to obtain compliance
with the policy sought to be advanced.

Despite the fact that these kinds of fair employment laws are now
common, they are a relatively recent addition to our societal fabric.
Their development is worthy of study because it demonstrates not only
the ad hoc and haphazard way in which legislatures frequently attempt
to solve complex problems, but also the ability of a willing and moti-
vated legislature to go beyond such immature efforts and devise new
and imaginative means with which to deal with these problems.   The
growth of fair employment legislation also deserves examination be-
cause it illustrates Justice Holmes' maxim that "The life of the law
has not been logic: it has been experience.   The felt necessities of the
time, the prevalent moral and political theories . . . have had a good
deal more to do than the syllogism in determining the rules by which

---

statutes have been construed to require the union in such a situation to fairly,
impartially, in good faith, and without discrimination represent all those persons
in the bargaining unit.   A union violates this duty whenever on the basis of
race, religion, or national origin it causes an employer to discriminate, it dis-
criminatorily handles grievances, it accepts a discriminatory contract, and so on.
*See generally* M. SOVERN, LEGAL RESTRAINTS ON RACIAL DISCRIMINATION IN EM-
PLOYMENT ch. 6 (1966) [hereinafter cited as SOVERN].

[2] Additionally, many states and the federal government have also prohibited
discrimination on the basis of sex and age.   *See* 6 BNA LABOR POLICY AND
PRACTICE 451:25-:27 (March 17, 1966).   However, the main concern of fair em-
ployment practices legislation has been the protection of minority group interests
against arbitrary discrimination.   Age and sex are usually not aspects of minority
group existence as such; and the statutory elimination of employment discrimina-
tion on those bases raises problems of policy and statutory application quite
different from the statutory elimination of discrimination on the basis of race,
religion, or national origin.   Consequently, this study will focus on the develop-
ment and constitutionality of fair employment legislation only in terms of those
minority group criteria upon which discrimination has been traditionally pro-
hibited — race, religion, national origin, and the related factors of creed and
ancestry.

men should be governed."[3]   In this area experience has been a far more persuasive teacher than logic and has been responsible for most of the relevant legislative progress.  Lastly, the evolution of laws dealing with this subject is specially significant because it illustrates the extent to which law may gradually be erected as a bulwark against society's failure to practice what it preaches in a situation where practice inconsistent with preachment inflicts serious injury on many individuals as well as on our society as a whole.[4]

An important part of the American tradition is our conscious acceptance of the basic moral principle embedded in the Declaration of Independence that "all men are created equal" as well as free.   This society has, as a matter of philosophical commitment, long accepted the notion that "the only aristocracy that is consistent with the free way of life is an aristocracy of talent and achievement."   Stemming from this is an assumed "obligation to build social institutions that will guarantee equality of opportunity to all men."   In this way it is hoped that we will realize our long standing national goal that "the aspirations and achievements of each member of our society [will be] limited only by the skills and energies he brings to the opportunities equally offered to all Americans."[5]   Unfortunately, prior to the end of World War II, there was a great discrepancy between these national ideals and our efforts as a society to build an order ensuring this kind of equal opportunity for all people.   An examination of the severely limited employment possibilities available to Negro Americans because of their race, and the paucity of our legislative efforts to correct that situation until recent times, cannot help but illustrate the tremendous extent of that gap.

Towards the end of the nineteenth century the industrialization of our society intensified and was accompanied by an ever-increasing migration from the farms to the cities for employment in the manufacturing industries of the country.   This movement enabled the average American to preserve or enhance his standard of living while the profitability of agricultural pursuits was drastically declining.   All

---

[3] O.W. HOLMES, THE COMMON LAW 5 (M. Howe ed. 1963).

[4] On the injury suffered by society at large as well as by the members of the group discriminated against, *see generally* G. BECKER, THE ECONOMICS OF DISCRIMINATION (1957); T. KAHN, THE ECONOMICS OF EQUALITY (1964); G. MYRDAL, AN AMERICAN DILEMMA (2d ed. 1962); H. NORTHRUP & R. ROWAN, THE NEGRO AND EMPLOYMENT OPPORTUNITY (1965); *Hearings on S. 773, S. 1210, S. 1211 and S. 1937 Before the Subcomm. on Employment and Manpower of the Senate Committee on Labor and Public Welfare,* 88th Cong., 1st Sess. 325 (1963); U.S. COMMISSION ON CIVIL RIGHTS REPORT, EMPLOYMENT (1961) [hereinafter cited as U.S. EMPLOYMENT REPORT]; Bonfield, *State Civil Rights Statutes: Some Proposals,* 49 IOWA L. REV. 1067–80 (1964).

[5] U.S. PRESIDENT'S COMM. ON CIVIL RIGHTS, TO SECURE THESE RIGHTS 4 (1947).

Americans, however, were not accorded equality of opportunity in this respect.

Between 1890 and 1910 Negroes entered industry in increasing numbers so that by 1910 approximately twenty per cent of all Negro Americans were engaged in nonagricultural and nonservice occupations, compared with ten per cent in 1890.[6] But during the same period the total number of white male workers in nonagricultural pursuits almost doubled while the total of such Negro workers increased by only two-thirds.[7] During World War I Negroes made substantial employment gains in industry; however, these advances proved to be only temporary.[8] Although it was true in 1930 that fourteen per cent more Negroes were employed in manufacturing than ten years before,[9]

> The economic depression of the thirties gave impetus to the already established trend of removing Negroes from jobs which had become desirable either as a result of technical improvement or the raising of wage scales through unionization. Negroes lost heavily on railroads as firemen and in the building trades, while continuing their downward trend in employment as boilermakers and machinists. Unemployed whites took over the traditional "Negro jobs" of waiters, bell-men, porters and truck drivers and, with the loss of these service jobs, the Negro was literally pushed off the bottom rung of the occupational ladder.
>
> The depression seriously curtailed occupational gains which Negroes had made in such industries as iron, steel, meat packing, ship-building, and automobile manufacturing during World War I and the decade thereafter. In 1940, colored workers constituted even a smaller proportion of the workers in mining, manufacturing, trade, and transportation than they had in 1910. The greatest relative and absolute loss occurred in manufacturing, a decline from 6.1 per cent of the total in 1910 to 4.9 per cent of the total in 1940.[10]

As Gunnar Myrdal noted in his now classic work, *An American Dilemma*, "Negroes ha[d] been driven out from one kind of a job after another" as whites decided it was desirable or necessary for them to compete with Negroes for those jobs.[11] Whites became interested in many previously undesirable jobs when technical innovations made them less strenuous, less dirty, and thereby more attractive.[12] A large number of previously undesirable jobs also became attractive to whites because of the widespread increase in their unemployment during the 1930's.[13] Furthermore,

> If we look over the whole period of the Civil War up to 1940, the general picture is that, while the Negroes in the South have been gradually losing out in most lines of work where they had been firmly entrenched at the

[6] FAIR EMPLOYMENT PRACTICE COMMITTEE, FIRST REPORT, July 1943–December 1944, 85–86 (1945) [hereinafter cited as FIRST FEPC REPORT].

[7] G. MYRDAL, *supra* note 4, at 285.

[8] FIRST FEPC REPORT 87–88.

[9] *Id.* at 88.

[10] *Id.* at 88–89.

[11] G. MYRDAL, *supra* note 4, at 281.

[12] *Id.* at 282.

[13] *Id.* at 289.

time of slavery and have been allowed to get a favorable position in but a few of the new industries, Negroes in the North have made some fairly significant gains in some occupations which are new or where few if any Negroes were allowed to work before. Still, Negroes are completely or almost completely, kept out of many manufacturing lines in the North.[14]

Other observers were not quite so kind as Myrdal in respect to the employment opportunities of Negroes in the North during this period. They insisted that,

> The Negro in the North can be a waiter in a hotel and restaurant (in some); he can be a butler or footman in club or household (in some); or the haircutter or bootblack in the barber shop (in some); and I say "in some" because even the more menial offices of industry are being slowly but gradually denied to him.[15]

In any event, employment discrimination against Negroes was widespread and not limited to any particular area of the country, field of occupation, or class of employment.

Employers were not the only participants in this kind of pervasive, open, and notorious conduct. Unions and employment agencies were also especially active in discriminatory schemes of this sort. And the general national complacency on the matter prior to the 1940's suggests that the public at large usually acquiesced, if not condoned, employment discrimination on the basis of race. It should be noted that although true to a slightly lesser degree, similar employment discrimination was also widely practiced during this period on the grounds of religion and national origin.[16]

In the early days before the belief that civil rights were for all persons, some influential sectors of our society protested this kind of discriminatory conduct and attempted to do something about it. The N.A.A.C.P. and the National Urban League were formed early in this century specifically to combat this sort of discrimination.[17] The success of these organizations, and of other small but vocal groups, in pressing for legal solutions to this kind of exclusion was, however, sporadic and unimpressive in the period prior to the end of World War II.

The failure to evolve any broad scope and effective legislative approach to this problem before 1945 was primarily due to popular as well as legislative indifference, if not hostility, to such a program. To some small extent it may also have been partially attributable to a fear that laws barring employment discrimination on the basis

---

[14] *Id.* at 292-93.

[15] MURPHY, PROBLEMS OF THE PRESENT SOUTH 186-87 (1909).

[16] *See* E. BALTZELL, THE PROTESTANT ESTABLISHMENT: ARISTOCRACY & CASTES IN AMERICA (1964); RAUSHENBUSH, JOBS WITHOUT CREED OR COLOR (1945); FAIR EMPLOYMENT PRACTICE COMMITTEE, Final Report, 38-40 (1946) [hereinafter cited as FINAL FEPC REPORT].

[17] U.S. COMM'N ON CIVIL RIGHTS, FREEDOM TO THE FREE 80-82 (1963).

of race, religion, or national origin were beyond the authority of our several governments. This last fear was substantially dispelled after the United States Supreme Court in 1937 held valid a federal act barring employment discrimination against employees or potential employees on the basis of their anti- or pro-union proclivities.[18] The combination of this judicial decision and the heightened degree and extent of employment discrimination practiced against minority group members because of the depression led to a growing legislative willingness to act with respect to at least parts of this problem in the period before the outbreak of World War II. However, as the following discussion will illustrate, virtually all of the legislation enacted prior to the end of World War II that was aimed at eliminating such discrimination was at best ad hoc, unimaginative, unduly limited, and relatively ineffective.

## II. Early Fair Employment Legislation

### A. *Enforcement Procedures Generally*

Before the nature and development of the pre-1945 federal and state fair employment statutes are examined in any detail, some general introductory comments are appropriate in respect to their enforcement. Almost all of these early fair employment laws were enforceable only by criminal prosecution or by civil suit at the instance of the injured party. Frequently, no specific means of enforcement were provided — the assumed but unclear availability of a civil suit for redress being predicated merely upon the bare existence of the general statutory prohibition. On the whole it can be fairly concluded that the criminal and civil means provided for enforcing these early laws were largely responsible for their failure. They did not seem to affect discriminatory employment practices significantly, nor did they result in any substantial effort to use the law to do so.[19] The reasons that the usual criminal and civil processes did not effectively ensure either

---

[18] NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 49 (1937).

[19] *See* New York State Temporary Commission on the Condition of the Urban Colored Population, Report, N.Y. Leg. Doc. No. 63, at 27, 38, 40-41 (1938) [hereinafter cited as 1938 N.Y. Report]; New York State Temporary Commission on the Condition of the Colored Urban Population, Second Report, N.Y. Leg. Doc. No. 69, at 61, 62-63, 156 (1939) [hereinafter cited as 1939 N.Y. Report]; Maslow, *The Law and Race Relations*, 244 Annals 75, 77 n.12 (1946); Tuttle, *The New Law Against Discrimination*, 17 N.Y.S. Bar Ass'n Bull. 76, 79 (1945); Note, *Legislative Attempts to Eliminate Racial and Religious Discrimination*, 39 Colum. L. Rev. 986, 1002 (1939) [hereinafter cited as Colum. Note]; Note, *The Right to Equal Treatment: Administrative Enforcement of Antidiscrimination Legislation*, 74 Harv. L. Rev. 526 (1961) [hereinafter cited as Harv. Note]; Note, *Race Equality by Statute*, 84 U. Pa. L. Rev. 75, 78-79 (1935) [hereinafter cited as Pa. Note]; Note, *The New*

the enforcement of these statutes or general public adherence to their mandate are not particularly obscure.

A standard criminal or penal approach to the enforcement of fair employment laws has inherent shortcomings. In the first place, proof in a criminal case must be beyond a reasonable doubt. This burden makes conviction under these particular kinds of statutes extremely difficult.[20] The precise motivation of any defendant's refusal to employ a Negro is unusually hard to prove beyond a reasonable doubt. Further, trial by jury is always available in a criminal prosecution. This permits the defendant to avail himself of a body that may be as prejudiced as he is, or that may be out of sympathy with the objectives or approach of civil rights legislation.

Another defect suffered by criminal statutes of the kind under discussion is that they must be unusually specific and will be construed narrowly. This is because due process demands that criminal statutes must accord clear and specific notice of their exact proscriptions.[21] Consequently, people who would discriminate are left with great latitude for evasive conduct outside the precise letter of the particular criminal law involved.

A further problem with the criminal approach to law enforcement in this area is that the prosecutor must be persuaded to act. As a result, prosecutions have been very few or nonexistent.[22] This may partly be due to preoccupation among prosecutors with the more traditional crimes against person or property and to a lack of available enforcement resources. It also may be a product of the prosecutors' lack of sympathy for these kinds of statutes, their objectives, or the penalties they impose on the proscribed conduct.

It should also be noted that the aim of the law in this area should be to eliminate discrimination of the kind prohibited. The law should, therefore, be completely satisfied when the evil at which it is directed is terminated. A criminal or penal approach does not effectively secure this objective. The imposition of a fine upon one who violates this kind of law makes the right to equal opportunity conditional upon the size of the fine and the violator's willingness to pay it. As a result, members of a minority group may still be denied a right that others of the general public share because offenders may be willing to pay this price for a continued ability to discriminate. The fact that imprisonment may be made an alternate criminal sanction does not

---

*York State Commission against Discrimination: A New Technique for an Old Problem,* 56 YALE L.J. 837, 840-41 (1947) [hereinafter cited as YALE Note].

[20] SOVERN 56.

[21] Lanzetta v. New Jersey, 306 U.S. 451, 453 (1939).

[22] *See* 1938 N.Y. Report 27, 38; 1939 N.Y. Report 63; COLUM. Note 1002; HARV. Note 526; YALE Note 840-41.

substantially change this picture. It has little effect as a deterrent because violators are usually well able to pay the fine and avoid the alternative of going to jail. Further, there is likely to be great reluctance on the part of judges to imprison people in cases involving violations of the kinds of legislation under discussion here.

Enforcement of these kinds of statutes by a civil action for damages prosecuted by the injured party has certain advantages over the criminal approach. Unlike criminal prosecutions, civil actions can be instituted by the injured parties themselves to vindicate their legal rights. The incentive of possible economic gain may also increase the likelihood that they will do so. Also, in civil suits for damages proof need only be by the preponderance of the evidence. Further, if substantial exemplary damages are awarded, the pecuniary detriment to the defendant will be greater than the nominal fines normally imposed under criminal civil rights statutes. A greater deterrent effect may thereby be achieved.

However, civil suits for damages prosecuted by the injured party possess severe defects which render them an undesirable and ineffective primary mode of enforcing antidiscrimination acts. Like criminal prosecutions, they usually give the defendant a right to jury trial. As previously noted, this permits the defendant to avail himself of a body that may be as prejudiced as he is or that may be out of sympathy with the objectives or approach of antidiscrimination legislation. Additionally, private damage suits involve the expense of engaging counsel by persons who usually cannot afford to do so and attorney's fees are unlikely to be recompensed by the relatively small amount of damages awarded, even if they are won. Further, the burden of going forward in such suits rests upon the members of our minority groups who may be reticent about doing anything to vindicate their rights.[23] Privately initiated suits for injunction may avoid the jury aspects of a damage action, but otherwise suffer the same infirmities of civil suits for damages.

Private damage suits are also a relatively ineffective means of enforcing antidiscrimination statutes because, like criminal fines, payment of the usually insubstantial or token damages may not operate as a deterrent to prosperous individuals who are strongly committed to a discriminatory course of conduct. The most significant weakness of damage actions, therefore, is that they may not accomplish the real purpose of the statutes in question. Just like the situation where the remedy is a fine, the lawbreaker has the option of recognizing the right of the minority group or continually denying it and paying money. This means that the minority group members may be forced

---

[23] *See* 1938 N.Y. Report 63.

to accept a substitute for a right which they are entitled to share with other members of the public.

In summation, it should be noted that neither criminal prosecutions nor private civil actions have appreciably decreased the incidence of discrimination or given its victims an adequate legal remedy.[24]   Experience with the early fair employment laws, which were enforceable almost exclusively by these means, demonstrated that:

> Prosecuting attorneys are reluctant to bring actions under the criminal statutes, and, even when actions are brought, juries are often unwilling to indict or convict.  Individuals are often hesitant to make use of civil-action statutes because of the expense, effort, and threat of community opprobrium their use may entail; the difficulty of calculating damages and their inadequacy as a remedy for one whose primary interest is in finding a . . . job indicate that broad reliance upon civil remedies would be misplaced.[25]

For this reason it is not too suprising that no reported cases have been found under any of the state fair employment laws enacted before the last days of World War II.[26]   Almost every one of those laws, if enforceable at all, was enforceable solely by usual criminal prosecution or private civil action.

## B. *Early Discrimination Laws and Government Employment*

With these general comments about the effectiveness of ordinary criminal and private civil remedies as a background, the precise nature and extent of the early state and federal fair employment laws can be fruitfully examined.  Although these statutes were heterogeneous, they can be subjected to a certain systemization that is conducive to a satisfactory analysis.  Prior to 1945, twenty-two states and the United States specifically prohibited certain kinds of discrimination on the basis of race, religion, or national origin, or some of them, in the state civil service or state employment generally; sixteen states prohibited certain kinds of such discrimination in the hiring of public school teachers; two states prohibited such discrimination in some or all public utilities; four states prohibited certain kinds of such discrimination by labor unions; twelve states and the United States prohibited certain kinds of such discrimination by public works contractors; and four states and the United States prohibited certain kinds of such discrimination by defense and war contractors.

As previously noted, statutes attempting to eliminate discrimination

---

[24] 1938 N.Y. Report 27, 38, 40–41; 1939 N.Y. Report 61, 63, 156; COLUM. Note 1002; PA. Note 78–79.

[25] HARV. Note 526 (footnote omitted).  On the ineffective nature of the normal criminal and civil remedies provided in these early statutes, *see also* YALE Note 840–41; sources cited note 24 *supra.*

[26] *See* Maslow, *supra* note 19; Tuttle, *supra* note 19.

in government employment were the most common kind of legislation in this area prior to the culmination of World War II. In the beginning, most states had a general constitutional provision specifically barring any religious test for public officers.[27] In 1918 New York also enacted a general law prohibiting the exclusion of any state citizen "by reason of race, color, creed or previous condition of servitude, from any public employment." Any individual who aided or incited another "to deny to any other person because of race, creed or color, public employment" was also specifically subject to punishment.[28] Two years later, Massachusetts joined New York with a provision stating that "the application of a citizen of the commonwealth for employment in any department of the commonwealth or any political division thereof . . . shall not be affected by the applicant's national origin, race or color."[29] These two statutes were somewhat unusual in that all the other early state laws dealing with discrimination in government employment were enacted as part of civil service schemes or were directed at particular kinds of government employment, such as the employment of public school teachers.

Massachusetts was the first state to specifically bar discrimination in the state civil service as such. Its 1884 provision was representative of the narrow approach taken by these kinds of civil service laws. That provision provided that "No question in any examination . . . [conducted under the auspices of the civil service system] shall relate to . . . religious opinions or affiliations, and no appointment or selection to an office . . . [covered by that system] shall be in any manner affected or influenced by such opinions or affiliations."[30] Most of the twenty-two pre-1945 state laws specifically barring discrimination in the civil service were substantially similar to this act.[31] About half

---

[27] See W. GRAVES, FAIR EMPLOYMENT PRACTICE LEGISLATION IN THE UNITED STATES, FEDERAL-STATE-MUNICIPAL, Library of Congress Legislative Reference Service, Public Affairs Bulletin No. 93, at 121-23 (1951).

[28] Ch. 380, [1918] N.Y. Laws 1201. The penalty for the violation of this provision was a fine of not less than $50 nor more than $500.

[29] Ch. 376, [1920] Mass. Acts & Resolves 383.

[30] Ch. 320, § 16, [1884] Mass. Acts & Resolves 350. The main purpose of this act was to replace the political patronage system with a merit system for hiring and therefore the proscription against such discrimination on the basis of political affiliation which it contained was primary in the minds of the provision's drafters. Note also that this provision seemed only to bar religious discrimination *in hiring* but not afterwards.

[31] Ch. 243, [1941] Cal. Stat. 1308; ch. 117, §§ 13, 16, [1907] Colo. Laws 266; ch. 20, § 4, [1919] Colo. Laws 144; ch. 105a, § 480(d), [Supp. 1937] Conn. Gen. Stat. 235; ch. 105(a), § 426(g), [Supp. 1943] Conn. Gen. Stat. 166; Act of May 11, 1905, §§ 6, 12, [1905] Ill. Laws 115; ch. 139, §§ 16, 36, [1941] Ind. Acts 400; ch. 156, §§ 7, 17, [1915] Kan. Laws 181; ch. 358, §§ 17, 25(1), [1941] Kan. Laws 585; no. 172, §§ 20, 42, [1940] La. Acts 748; ch. 221, § 13, [1937] Me. Laws 256; ch. 41, § 15, [1920]

of these states added race to religious opinions or affiliations as an additional prohibited criterion.[32] No state except Massachusetts,[33] however, specifically included discrimination on the basis of national origin within the scope of the protection afforded by its act.

The state civil service antidiscrimination laws were typically enforced in one of several ways: either the officer discriminating was deemed to forfeit his office,[34] such discriminations being treated as a misdemeanor,[35] or it gave rise to a civil cause of action for damages, injunction, or perhaps specific performance at the behest of the injured

---

Md. Laws 84; ch. 320, § 16, [1884] Mass. Acts & Resolves 350; ch. 376, [1920] Mass. Acts & Resolves 383; no. 346, § 22, [1937] Mich. Acts 842; ch. 441, §§ 15, 24, [1939] Minn. Laws 1009; Act of April 24, 1946, § 20, [1945] Mo. Laws 1168; ch. 238, §§ 12, 27, [1945] Neb. Laws 711; ch. 156, §§ 18, 19(5), 24, [1908] N.J. Laws 245; ch. 176, § 38, [1930] N.J. Laws 629; ch. 380, [1918] N.Y. Laws 1201; ch. 811, [1939] N.Y. Laws 2042; Act of May 5, 1913, §§ 11, 17, [1913] Ohio Laws 703; Act of May 28, 1915, §§ 486-10, -17, [1915] Ohio Laws 406; ch. 400, §§ 14(3), 23, [1945] Ore. Laws 670; no. 286, §§ 502, 706, 807, [1941] Pa. Laws 765; ch. 661, § 21, [1939] R.I. Acts & Resolves 117; ch. 221, §§ 16, 34, 40, [1939] Tenn. Pub. Acts 856; ch. 363, §§ 22, 26, [1905] Wis. Laws 582.

[32] No. 182, § 30(a), [1939] Ala. Acts 328 (county); ch. 243, [1941] Cal. Stat. 1308; ch. 105a, § 426(g), [Supp. 1943] Conn. Gen. Stat. 166; ch. 139, §§ 16, 36, [1941] Ind. Acts 400; ch. 358, §§ 17, 25(1), [1941] Kan. Laws 585; ch. 376, [1920] Mass. Acts & Resolves 383; no. 346, § 22, [1937] Mich. Acts 842; ch. 208, § 61, [1917] Neb. Laws 514 (city); ch. 380, [1918] N.Y. Laws 1201; ch. 811, [1939] N.Y. Laws 2042; ch. 400, §§ 14(3), 23, [1945] Ore. Laws 670; No. 286, §§ 502, 706, 807, [1941] Pa. Laws 765; ch. 661, § 21, [1939] R.I. Acts & Resolves 117. All of these states also barred such discrimination on the grounds of political party affiliation and the like because the primary purpose of these laws was to replace the political patronage system with the merit system for hiring.

[33] Ch. 376, [1920] Mass. Acts and Resolves 383.

[34] No. 182, § 30(f), [1939] Ala. Acts 328 (county); ch. 117, § 22, [1907] Colo. Laws 268; Act of May 11, 1905, § 34, [1905] Ill. Laws 122; ch. 156, § 24, [1915] Kan. Laws 186; ch. 358, § 34, [1941] Kan. Laws 591; no. 172, § 45(b), [1940] La. Acts 767; ch. 221, § 24, [1937] Me. Laws 259; ch. 441, § 28, [1939] Minn. Laws 1016; Act of April 24, 1946, § 47, [1945] Mo. Laws 1182; Act of May 5, 1913, § 28, [1913] Ohio Laws 712; Act of May 28, 1915, § 1(486-30), [1915] Ohio Laws 418; ch. 400, § 31(2), [1945] Ore. Laws 680; no. 286, § 906, [1941] Pa. Laws 777; ch. 661, § 28, [1939] R.I. Acts & Resolves 121; ch. 363, § 30, [1905] Wis. Laws 587.

[35] No. 61, § 18, [1941] Ark. Acts 131 (cities); ch. 753, § 204, [1937] Cal. Stat. 2110; ch. 117, § 23, [1907] Colo. Laws 268; ch. 20, § 7, [1919] Colo. Laws 145; Act of May 11, 1905, § 33, [1905] Ill. Laws 121; ch. 139, § 43, [1941] Ind. Acts 415; ch. 358, § 33, [1941] Kan. Laws 591; no. 172, § 45(a), [1940] La. Acts 767; ch. 221, § 24, [1937] Me. Laws 259; ch. 41, § 24, [1920] Md. Laws 88; ch. 441, § 28(7), [1939] Minn. Laws 1017; ch. 176, § 43, [1930] N.J. Laws 631; ch. 380, [1918] N.Y. Laws 1201; Act of May 5, 1913, § 28, [1913] Ohio Laws 712; Act of May 28, 1915, § 1 (486-30), [1915] Ohio Laws 418; ch. 162, § 29, [1929] Ore. Laws 152 (county); ch. 400, § 31(1), [1945] Ore. Laws 679; no. 167, §§ 25, 26, [1907] Pa. Laws 218 (city); no. 274, art. XIX, § 22, [1919] Pa. Laws 621 (city); no. 286, § 903, [1941] Pa. Laws 775; ch. 661, § 28, [1939] R.I. Acts & Resolves 121; ch. 363, § 30, [1905] Wis. Laws 587; ch. 259, § 772-14, [1917] Wis. Laws 432 (county).

party.[36]  In many cases complaining parties were specifically entitled
to an administrative remedy with the state civil service board.[37]  New
York went further than most jurisdictions and authorized any person
denied appointment or promotion in the classified civil service because
of the prohibited factors to petition the civil service commission for
appropriate relief.  The commission could hold hearings to determine
whether such discrimination occurred and could order any appropriate
corrective action.  If it was determined that a less qualified person of
a different race or religion was preferred over the complaining party,
a presumption arose that the plaintiff was discriminated against.[38]  To
invoke the aid of this presumption, however, the complaining party
had to prove his superior qualifications.  As a result, where the ap-
pointment was from an eligibility list, the availability of the presump-
tion had more potential than otherwise.  In the first situation the proof
required was easier to gather than in cases where hiring or promotion
were not from any list.

The federal government's activity in the area of governmental em-
ployment paralleled that of the states just noted.  Like most state
constitutions the United States Constitution has always contained a
provision specifically proscribing a religious test of any sort as a re-
quirement for any office or trust under the United States.[39]  Like the
state laws just discussed, one of the first regulations issued under the
Federal Civil Service Act of 1883 particularized that general constitu-
tional provision by specifically outlawing religious discrimination in

---

[36] These were possible remedies where no specific means of enforcement were
provided in the statute.  Statutes without any specific means of enforcement men-
tioned were ch. 376, [1920] Mass. Acts & Resolves 383 and ch. 238, [1945] Neb.
Laws 707.

[37] Ch. 105a, § 427(g), [Supp. 1943] Conn. Gen. Stat. 166; ch. 139, § 36, [1941]
Ind. Acts 412; ch. 156, § 17, [1915] Kan. Laws 184; ch. 358, § 25(2), [1941] Kan.
Laws 589; no. 172, § 42(8), [1940] La. Acts 766; ch. 221, § 16, [1937] Me. Laws
257; no. 346, § 17, [1937] Mich. Acts 839; ch. 441, § 24, [1939] Minn. Laws 1014;
ch. 208, § 62, [1917] Neb. Laws 514 (city); ch. 156, § 24, [1908] N.J. Laws 250;
ch. 176, § 34, [1930] N.J. Laws 626; ch. 811, [1939] N.Y. Laws 2042; Act of May
5, 1913, § 17, [1913] Ohio Laws 707; Act of May 28, 1915, § 1(486-17), [1915]
Ohio Laws 411; ch. 162, § 21(b), [1929] Ore. Laws 146 (county); ch. 400, § 23,
[1945] Ore. Laws 677; no. 167, § 20, [1907] Pa. Laws 216 (city); no. 274, art. XIX,
§ 18, [1919] Pa. Laws 620 (city); no. 286, §§ 706, 807, [1941] Pa. Laws 771; ch.
661, § 16(3), [1939] R.I. Acts & Resolves 112; ch. 221, § 34, [1939] Tenn. Pub.
Acts 867; ch. 363, § 22, [1905] Wis. Laws 582.

[38] Ch. 811, [1939] N.Y. Laws 2042.

[39] U.S. CONST. art. VI.  "The Senators and Representatives before mentioned,
and the Members of the several State Legislatures, and all executive and judicial
Officers, both of the United States and of the several States, shall be bound by
Oath or Affirmation, to support this Constitution; but no religious Test shall ever
be required as a Qualification to any Office or public Trust under the United
States."

the federal civil service.[40]   Violation of this regulation was made a misdemeanor.[41]   In 1940 an executive order added race as a prohibited ground of discrimination,[42] only to be followed shortly by a more general statute barring any discrimination in the federal civil service "against any person, or with respect to the position held by any person, on account of race, creed, or color."[43] These latter provisions relied for enforcement on the same criminal penalties as those levied against violation of the earlier civil service regulation.[44]

During the period prior to the termination of World War II, many states also specifically barred discrimination on the basis of race, religion, or national origin in the hiring, firing, or advancement of public school teachers. Most states followed Colorado (1876), Montana (1889), and Wyoming (1890) by specifically prohibiting only religious discrimination against teachers and prospective teachers.[45] Other jurisdictions such as Wisconsin (1933) and California (1943) also barred discrimination of this sort on the basis of race.[46] Except for the Wisconsin law of 1933, these statutes did not mention national origin. Furthermore, some of these public school teacher provisions were so limited that they only prohibited differentials in compensation because of a teacher's race[47] or dismissal from employment on the basis of race or religion

[40] See Pendleton Act, ch. 27, 22 Stat. 403 (1883), as amended, 5 U.S.C. § 633 (1964); 5 C.F.R. § 1.2 (1938).

[41] See Pendleton Act, ch. 27, 22 Stat. 403 (1883), as amended, 5 U.S.C. § 633 (1964).  The act provided a fine of not less than $100 or more than $1,000 or a term not less than ten days or more than one year or both.

[42] Exec. Order No. 8587, 3 C.F.R. 303 (Supp. 1940).

[43] Ch. 919, § 3(e), 54 Stat. 1214 (1940).  "[T]he President is authorized . . . to cover into the classified civil service any offices or positions in or under an executive department, independent establishment, or other agency of the Government."  Ch. 919, 54 Stat. 1211 (1940).

[44] See note 41 supra.

[45] Act of Jan. 30, 1889, § 5, [1889] Idaho Laws 18; Act of Jan. 27, 1893, § 17, [1893] Idaho Laws 10; Act of March 11, 1901, § 14, [1901] Idaho Laws 21; Act of Feb. 16, 1903, § 18, [1903] Idaho Laws 16; Act of April 7, 1933, [1933] Ill. Laws 1022; Act of May 1, 1945, § 22-4, [1945] Ill. Laws 1456; ch. 140, § 2, [1934] Iowa Acts Extra. Sess. 262; ch. 78, subdiv. XIII, § 9, [1881] Neb. Laws 374; ch. 180, § 1, [1937] Neb. Laws 710; ch. 179, § 1, [1920] N.J. Laws 365; ch. 234, § 1, [1932] N.Y. Laws 617; Act of May 18, 1911, § 2801, [1911] Pa. Laws 433; ch. 52, § 1, [1937] Wash. Laws 135.  The Constitutional provisions are: Ariz. Const. art. XI, § 7; Colo. Const. art. IX, § 8; Idaho Const. art. IX, § 6; Mont. Const. art. XI, § 9; N.M. Const. art. XII, § 9.

[46] Mo. Const. art. IX, § 3(c); ch. 618, § 1 (5.798), [1935] Cal. Stat. 1748; ch. 71, § 14123, [1943] Cal. Stat. 587; Act of July 22, 1941, § 1(36a), [1941] Ill. Laws 399; ch. 12, § 1(1), [1933] Wis. Laws 170.

[47] Ch. 156, § 1, [1927] Del. Laws 495; ch. 515, [1941] Md. Laws 872; ch. 35, § 67(a), [1929] W. Va. Acts 167; ch. 21, [1890] Wyo. Laws 132. The statute of West Virginia was the only one containing any specific means of enforcement. It allowed a writ of mandamus to compel equality in pay.

when the teaching staff was reduced.[48]

In 1932 New York added a variant to these public school teacher acts. First, it prohibited any official or employee of the public schools from inquiring about, or transmitting information about, the religious affiliation of any person seeking a position in such schools. Second, that act also specifically barred any person or agency, employed or maintained to obtain positions for teachers, from inquiring about, or transmitting such information in respect to, applicants for public school teaching jobs.[49] Wisconsin (1933), Texas (1933), Iowa (1934), and Washington (1937) all adopted similar provisions covering both public school officials and employment agencies dealing in teacher placement.[50] Most of these acts were penal laws,[51] although some also specifically provided an additional money penalty for the benefit of the aggrieved party.[52]

In addition to the above types of provisions barring discrimination on the grounds of race, religion, or national origin in government employment generally, or against teachers or prospective teachers specifically, many states enacted laws prohibiting such discrimination in various other particular classes of government employment. For example, some states enacted laws specifically barring religious discrimination in employment by fire departments, police departments, and state parole board employees.[53] Other states enacted specific provi-

---

[48] Ch. 243, § 3, [1909] N.J. Laws 399.

[49] Ch. 234, [1932] N.Y. Laws 617.

[50] Ch. 140, § 2, [1934] Iowa Acts 262; ch. 15, § 1, [1933] Tex. Laws 48; ch. 52, § 1, [1937] Wash. Laws 135; ch. 12, § 1(1), [1933] Wis. Laws 170.

[51] Ch. 618, § 1(5.799b), [1935] Cal. Stat. 1751; ch. 71, § 14142, [1943] Cal. Stat. 589; Act of April 7, 1933, § 1(273a), [1933] Ill. Laws 1022; Act of July 22, 1941, § 36, [1941] Ill. Laws 398; Act of May 1, 1945, § 22-4, [1945] Ill. Laws 1456; ch. 140, §§ 1, 3, [1934] Iowa Acts 262; ch. 180, § 2, [1937] Neb. Laws 710; ch. 179, § 3, [1920] N.J. Laws 365; ch. 234, § 2, [1932] N.Y. Laws 617; ch. 15, § 2, [1933] Tex. Laws 49; ch. 52, § 2, [1937] Wash. Laws 136; ch. 12, § 1(2), [1933] Wis. Laws 170.

[52] Act of April 7, 1933, § 1(273a), [1933] Ill. Laws 1022; Act of May 1, 1945, § 22-4, [1945] Ill. Laws 1456; ch. 234, § 2, [1932] N.Y. Laws 617; ch. 15, § 2, [1933] Tex. Laws 49. Only Idaho provides no enforcement provision. Its statutes deal with each school individually: Act of Jan. 30, 1889, [1889] Idaho Laws 17 (U. of Idaho); Act of Jan. 27, 1893, [1893] Idaho Laws 6 (Lewiston Normal School); Act of March 11, 1901, [1901] Idaho Laws 17 (Idaho State); Act of Feb. 16, 1903, [1903] Idaho Laws 12 (Idaho Industrial Reform School).

[53] No. 120, § 6(a), [1935] Ark. Acts 328 (State Rangers); no. 231, § 6(a), [1945] Ark. Acts 534 (State Police); Act of July 24, 1939, § 7, [1939] Ill. Laws 432 (Park Police Annuity and Benefit Funds Employees); ch. 57, § 11, [1929] Minn. Laws 57 (firemen); ch. 299, § 9, [1929] Minn. Laws 380 (police); ch. 29, § 8, [1943] Neb. Laws 132 (firemen); no. 45, §§ 20, 23, [1941] Pa. Laws 90 (police); no. 323, § 13, [1941] Pa. Laws 865 (parole board); ch. 181, § 9(2), [1935] Tex. Laws 447 (state

sions prohibiting any state government department or state political subdivision from discriminating on account of race, color, or creed in hiring persons for work relief projects.[54]  The federal government followed suit.  During the New Deal period, beginning with 1933, many of the federal laws enacted for relief of the unemployed provided that in employing persons under those acts, the federal department or agency involved could not discriminate on account of race, color, or creed.[55]  Most of these laws contained no specific means of enforcement and in fact, they were frequently ignored.[56]

Statutes proscribing racial, religious, or ethnic discrimination in only one aspect of government employment are further testimony to the absurd limits that a piecemeal approach to a broad problem of this type can go.  Furthermore, even the broadest scoped laws of the type described above only barred such discrimination in all *government* employment.  The whole vast field of private employment remained untouched.  With one minor exception, the states and the federal government did not even begin to concern themselves with any part of that remainder until the 1930's.

## C. *Early Discrimination Laws and Private Employment*

In 1920 Massachusetts prohibited discrimination on the basis of race, color, or national origin "in any department of a street railway company, operated, owned, controlled or *financially aided in any way* by the commonwealth, or by any political subdivision thereof."[57]  New York followed with a somewhat broader provision in 1933, generally barring all public utility companies from refusing to employ persons on the grounds of their race, color, or religion.[58]  This latter act may have applied only to positions in the operation and maintenance of the

---

police); ch. 13, § 9, [1937] Wash. Laws 30 (police); ch. 60, § 14, [1933] W. Va. Acts 192 (firemen); ch. 49, § 11, [1933] Wyo. Laws 59 (firemen); ch. 69, § 13, [1937] Wyo. Laws 107 (police).

[54] Act of June 27, 1935, [1935] Ill. Laws 708; ch. 170, [1941] Mass. Acts & Resolves 131.  Both provide violation constitutes a misdemeanor.  Illinois, in addition, provides for discharge of the responsible official.

[55] National Industrial Recovery Act, ch. 17, § 1, 48 Stat. 22 (1933); Civilian Conservation Corps Act, ch. 383, § 8, 50 Stat. 320 (1937); National Youth Administration, ch. 428, ¶ 20, 54 Stat. 593 (1940); training defense workers, ch. 780, 54 Stat. 1035 (1940); employment under U.S. Housing Authority, 24 C.F.R. § 603.6 (1938).

[56] Only the National Youth Administration statute contained any enforcement provision.  It termed discrimination a felony punishable by a fine not to exceed $2,000 and/or a term not to exceed two years.

[57] Ch. 376, [1920] Mass. Acts & Resolves 383 (emphasis added).

[58] Ch. 511, [1933] N.Y. Laws 1110.

public service and not to those in management.[59]   Neither the Massa-
chusetts nor the New York laws contained any express enforcement
provision and were therefore enforceable, if at all, solely by civil suit
at the behest of the injured party.   These laws were a dismal failure
and in no way accomplished their purpose.[60]

In 1939 several efforts were made to strengthen the New York act
prohibiting discrimination by public utilities.   A number of legislative
bills would have specifically imposed severe criminal or civil sanctions
for breach of the law, expanded the provision's application to include a
prohibition on discriminatory promotion, dismissal, and hiring by such
companies, and rendered it unlawful for any officer or agent of these
enterprises to ask for, indicate, or transmit data as to an applicant's
race or religion.   A more sweeping proposal attempted to eliminate
such discrimination by requiring every public utility to adopt formal
employment procedures similar to a civil service merit system with
penalties recoverable by aggrieved persons.[61]   However, none of these
proposed additions to the New York public utilities law were enacted.

The first state act seeking to deal with employment discrimination
by regulating union practices was a 1937 Pennsylvania law.   That
provision excluded from the protection of Pennsylvania's labor rela-
tions act all labor organizations that denied persons membership on
account of race, creed, or color.[62]   The removal of such organizations
from the protection of the state labor relations act meant that unless
covered by the federal act they were at the mercy of employer inter-
ference: employees were not protected against employers who pres-
sured them to abstain from associating with such organizations, and
employers could not be forced to bargain with such organizations.[63]
In 1939 the *Columbia Law Review* commented that,

> The possibility that this provision could be abused by employers, to whose
> benefit its application operates, was recognized by the proponents of a

---

[59] *Id.*

[60] 1938 N.Y. Report 41.

> Responsible executives of some of the principal utilities of the City of
> New York have not even paid to this law the nominal recognition in-
> volved in bringing it to the attention of those of their subordinates who
> are charged with the selection of employees.   Indeed some subordinate
> officers having control of the employment of large classes of employees
> were even wholly unaware of the existence of the law, until it was
> brought to their attention in connection with the hearings of this Com-
> mission.
>       The responsible officers of one of the largest utilities of the State, the
> one which has unequivocally stated that it has always excluded Negroes
> from employment and has made no change in its practices since the
> enactment of the statute, have announced that they regard such practices
> as lawful and intend to make no change therein.   *Id.*

[61] *See* COLUM. Note, *supra* note 19, at 992-93.

[62] No. 294, § 3(f), [1937] Pa. Laws 1170.

[63] *See id.* § 6, at 1172.

similar measure for New York who inserted a clause authorizing the Labor Board to exclude a union from the benefits of the act only upon the petition of a person who claims to have been discriminated against. Even this addition does not sufficiently guard against abuse since employers can utilize agents to charge union discrimination. The Governor, recognizing the possibility of this bill being used to destroy the essential rights of organized labor, vetoed it.[64]

In 1940, the New York State Legislature adopted a statute directly proscribing discrimination by labor organizations against potential and existing members on the grounds of their race, color, or creed.[65] For purposes of this law a labor organization was defined as "any organization which exists and is constituted for the purpose, in whole or in part, of collective bargaining, or of dealing with employers concerning grievances, terms or conditions of employment, or of other mutual aid or protection."[66] Such organizations were forbidden, on the basis of the enumerated grounds, to discriminate in membership by constitutional or by-law prescriptions, tacit agreements among their members, or by other means. They were also specifically prohibited from engaging in any discriminatory designation of members to an employer for hiring, promotion, or dismissal.[67] The New York provision specifically provided for a civil remedy on behalf of the injured party of not less than one hundred dollars nor more than five hundred dollars, plus a punishment consisting of a fine, imprisonment, or both.[68] Kansas and Nebraska enacted similar laws barring discrimination by labor organizations in 1941, but they only proscribed such discrimination on the grounds of race or color.[69]

In 1933 Illinois, Indiana, and New Jersey enacted laws requiring the insertion of a clause in every public works contract prohibiting the contractor from discriminating on the grounds of race or color in the selection or treatment of employees used in fulfilling that contract.[70] The New Jersey act also barred discrimination of this sort on the grounds of creed. New York, Ohio, and Pennsylvania followed suit in 1935. The New York statute dealt only with discrimination on the basis of race or color while the latter two state statutes covered creed as well.[71] In the next few years Kansas (1937), California (1939), Massachusetts (1941), and Minnesota (1941) also enacted similar laws

---

[64] COLUM. Note, *supra* note 19, at 996 (footnotes omitted).

[65] Ch. 9, [1940] N.Y. Laws 19.

[66] *Id.* § 1.

[67] *Id.*

[68] *Id.* § 2.

[69] Ch. 265, [1941] Kan. Laws 428; ch. 96, [1941] Neb. Laws 406.

[70] Act of July 8, 1933, [1933] Ill. Laws 296; ch. 270, [1933] Ind. Acts 1228; ch. 277, [1933] N.J. Laws 747.

[71] Ch. 158, [1935] N.Y. Laws 588; Act of April 23, 1935, [1935] Ohio Laws 151; no. 382, [1935] Pa. Laws 1173.

proscribing discrimination by government contractors in any employment related to the performance of their public works contracts.[72] The Massachusetts statute was the first to add nationality as a specified ground upon which such discrimination was barred.

Typically, these government contractor provisions provided that a deduction be made from the contract price of an amount equal to five dollars per person for each day such person was discriminated against.[73] Under most of these statutes a second violation of the nondiscrimination clause, mandatorily inserted in all public works contracts, also meant termination of the contract and forfeiture of any monies due.[74] The New Jersey law provided that the state Labor Commissioner could hold formal hearings to enforce these penalties on receipt of a complaint from an aggrieved person.[75] A similar provision was unsuccessfully proposed in New York.[76] This procedure was advantageous because it removed the enforcement of these contractual provisions from the exclusive domain of the agency that made the contract and placed it in the hands of an uninvolved commissioner. The contracting departments were neither equipped to discover such discrimination or to investigate charges alleging such discrimination, nor as interested in ending this kind of discrimination as having the contract completed.[77]

While a few of these government contractor provisions were enforceable only by way of the criminal process,[78] the Illinois statute

---

[72] Ch. 643, [1939] Cal. Stat. 2068 (race, color, religion); ch. 257, [1937] Kan. Laws 385 (race or color); ch. 170, [1941] Mass. Acts & Resolves 131 (race, color, religion, national origin); ch. 238, [1941] Minn. Laws 460 (race, creed, color).

[73] Act of July 8, 1933, § 4, [1933] Ill. Laws 296; ch. 270, § 1(c), [1933] Ind. Acts 1229; ch. 277, § 1(c), [1933] N.J. Laws 747; ch. 158, § 1(c), [1935] N.Y. Laws 589; Act of April 23, 1935, § 2(a), [1935] Ohio Laws 152 ($25).

[74] Ch. 270, § 1(d), [1933] Ind. Acts 1229; ch. 238, § 1(d), [1941] Minn. Laws 461; ch. 277, § 1(d), [1933] N.J. Laws 748; ch. 158, § 1(d), [1935] N.Y. Laws 589; Act of April 23, 1935, § 2(b), [1935] Ohio Laws 152; no. 382, § 1(d), [1935] Pa. Laws 1173.

[75] Ch. 277, § 2, [1933] N.J. Laws 748.

[76] *See* Colum. Note, *supra* note 19, at 991.

[77] *See* 1938 N.Y. Report 27-28.

It is our belief that the duty of the investigating and passing upon complaints of discrimination should be vested by the statute in some officer wholly removed from any responsibility for the completion of the work. The Industrial Commissioner seems to us the most suitable officer for the purpose . . . . Provision is also made in the legislation proposed for the enforcement of the cancellation and forfeiture provisions of the contract. *Id.* at 28.

[78] Ch. 788, § 16, [1933] Cal. Stat. 2115 and ch. 643, [1939] Cal. Stat. 2068 provide not less than one year in prison nor more than five. Ch. 257, § 3, [1937] Kan. Laws 385 sets a fine not less than $50 nor more than $1,000 and/or a prison term not to exceed six months. Ch. 170, [1941] Mass. Acts & Resolves 131 gives a fine of not more than $100.

expressly provided a civil penalty for the benefit of injured parties, a civil contractual penalty for the state, and a criminal penalty.[79]   The civil penalty on behalf of the aggrieved person was seen as a desirable way to increase the probability that the contractors' obligations of non-discrimination would be honored.   It was assumed that if the most interested and directly concerned party could enforce the act by recovering damages for his own benefit, there would be a greater likelihood that the government contractors would be forced to follow the policy of equal employment opportunity.[80]   In practice, however, this route seems to have been little more successful in inducing compliance with the law than the other unsuccessful means utilized to enforce these contractor provisions.

### III. Fair Employment Laws and World War II

#### A. State Developments

As World War II grew imminent, a movement developed to outlaw employment discrimination by defense contractors on the basis of race, color, and creed.   New York and Illinois enacted laws dealing with that subject in 1941,[81] only to be followed in 1942 by New Jersey[82] and in 1943 by Nebraska.[83]   All of these laws were similar to the New York act, which made it a misdemeanor for any person or firm engaged in the production or distribution of military equipment for New York State or the United States to "refuse to employ any person in any capacity on account of the race, color or creed of such person."[84] The Nebraska act of 1943 followed a 1942 amendment to the original New York law[85] and barred employment discrimination by industries engaged in defense contracts on the grounds of race, color, creed, religion, or national origin.

Another 1942 amendment to the New York law empowered the New York Industrial Commissioner to enforce the defense contracts provision.

> For this purpose he [could] use the powers of administration, investigation, inquiry, subpoena, and hearing vested in him by the labor law; he [could] require submission at regular intervals or otherwise of information, records and reports pertinent to discriminatory practices in [defense] industries.[86]

[79] Act of July 8, 1933, §§ 5, 6, [1933] Ill. Laws 297.  Section 5 grants not less than $100 nor more than $500 to the aggrieved parties.

[80] A similar provision was proposed in New York. 1938 N.Y. Report 28.

[81] Act of July 21, 1941, § 1, [1941] Ill. Laws 557; ch. 478, § 1, [1941] N.Y. Laws 1195.

[82] Ch. 114, [1942] N.J. Laws 386.

[83] Ch. 114, [1943] Neb. Laws 400.

[84] Ch. 478, § 1, [1941] N.Y. Laws 1195.

[85] Ch. 676, [1942] N.Y. Laws 1557.

[86] Ch. 677, [1942] N.Y. Laws 1558.

However, in the last analysis all the Industrial Commissioner could do with recalcitrants was to recommend to the appropriate authorities criminal prosecution for a misdemeanor. Most of these defense contractor acts were expressly enforceable solely by the usual penal process.[87] They were, therefore, ineffective for the same reasons that other criminal laws barring employment discrimination had proved to be unsuccessful. Even less helpful in this respect were the efforts of Kansas and California. In 1941 the legislatures of those two states merely indicated their disapproval of racial discrimination in the defense program without attempting to prohibit it and urged the President of the United States to curb such abuses.[88] It did not take long for the President to respond.

### B. Federal Developments

Starting in 1941 the federal government actively sought to eliminate employment discrimination in the defense industry. On June 25, 1941, President Roosevelt issued Executive Order 8802, which declared it to be national policy "that there shall be no discrimination in the employment of workers in defense industries or government because of race, creed, color or national origin."[89] The order was a product of his "firm belief that the democratic way of life within the Nation can be defended successfully only with the help and support of all groups within its borders." It seemingly applied to all hiring done pursuant to defense contracts, governmental employment, and vocational training programs administered by federal agencies. All contracting agencies of the federal government were specifically directed to include in defense contracts "a provision obligating the contractor not to discriminate against any worker because of race, creed, color or national origin."

The 1941 presidential executive order set up a five man Fair Employment Practices Committee which was to "receive and investigate complaints of discrimination in violation of the provisions of th[e] order [and take] appropriate steps" to redress valid grievances. The Committee was also charged with the duty of recommending such further measures to the government and President as it deemed necessary to carry out the order.

The substance of the Committee's work was to engage in informal negotiations with the parties covered by the order to secure voluntary compliance with the nondiscrimination principle and to hold hearings in areas where widespread discrimination was reported. When em-

---

[87] Act of July 21, 1941, § 5, [1941] Ill. Laws 557; ch. 114, § 2, [1943] Neb. Laws 400; ch. 114, [1942] N.J. Laws 386; ch. 478, § 2, [1941] N.Y. Laws 1196.

[88] Ch. 19, [1943] Cal. Stat. 1st Extra Sess. 58; ch. 408, [1941] Kan. Laws 732.

[89] Exec. Order No. 8802, 3 C.F.R. 234 (Supp. 1941).

ployment bias was found, orders were issued instructing the party charged to take specific steps to comply with the President's order. But the Committee was severely limited in its power to bring sanctions to bear if the offending party refused to comply with the "cease and desist" order. Judicial enforcement was not available to the Committee; it could, at best, call upon national war contracting and regulatory agencies to punish the violator by various intermediate sanctions, such as cancellation of government contracts or denial of manpower and material priorities, or could, ultimately, refer the case to the President for final disposition.[90]

The first President's Committee was not conspicuously successful. It suffered from the disabilities of numerous administrative frictions, inadequate authority, financing, and personnel. It also lacked any distinct, clear organizational position and was shifted several times from one federal agency to another.[91] As a result, pressure mounted for a clarification and strengthening of the wartime federal FEPC.

In early 1943 the President issued another executive order dealing with fair employment practices.[92] The new order established a second Fair Employment Practices Committee in place of the earlier one. This Committee was to be an autonomous agency in the Executive Office of the President, headed by a full-time chairman, with six part-time members selected from labor, industry, and the public. The 1943 order went beyond the 1941 effort because it required that all government contracts, whatever their nature, contain a specific clause obligating the contractors to refrain from any discrimination on the basis of race, creed, color, or national origin in employment pursuant to such contracts. The required contractual clause also demanded that government contractors insert the same nondiscrimination clause into any subcontracting arrangements they made to fulfill their prime government contract.

Like the 1941 executive order, the 1943 order barred such discrimination in all employment by the federal government and in all recruitment and training for war production. In addition, the second executive order also prohibited discrimination in membership and all matters relating to employment by labor organizations affecting the policy that there be no discrimination "in the employment of any person in the war industries or in government by reason of race, creed, color or national origin." In summation, the second federal FEPC was empowered to receive, investigate, and appropriately dispose of the following types of complaints alleging "discrimination in regard to hire, tenure, terms or conditions of employment, or union membership":

---

[90] L. KESSELMAN, THE SOCIAL POLITICS OF FEPC 16 (1948) [hereinafter cited as KESSELMAN].

[91] Id.

[92] Exec. Order No. 9346, 3 C.F.R. 1280 (Cum. Supp. 1943).

> 1. Complaints against all departments, agencies, and independent establishments of the Federal Government over whose employment relationships the President is authorized by the Constitution or the statutes of Congress, made pursuant thereto, to exercise directly or indirectly general supervision and control.
> 2. Complaints against all employers, and the unions of their employees, having contractual relations with the Federal Government which contain a nondiscrimination clause regardless of whether such contracts pertain to the war effort, and
> 3. Complaints against all employers, and the unions of their employees, engaged in the production of war materials or in activities necessary for the maintenance of such production or for the utilization of war materials, whether or not these employers have contractual relations with the Government.[93]

Although the second executive order applied to a much larger number of employers than the first, it was still a relatively narrow proscription. It made no attempt to cover the vast bulk of employers or unions on the basis of any relation they may have had to interstate or foreign commerce. Under federal law, private firms not holding government contracts or subcontracts and not engaged in activities essential to the war effort were, therefore, free to discriminate in employment on any basis they chose.[94]

The second executive order emulated the earlier one by empowering the Fair Employment Practices Committee only to "conduct hearings, make findings of fact, and take appropriate steps to obtain elimination of such discrimination" as contravened the executive order. The procedural rules of the Committee provided for

> bona fide complaints, informal investigation, the weighing by the Committee itself of complaints not adjustable in the field, and the conduct of a public hearing by the Committee in exceptionally stubborn cases. Parties requested to appear at a hearing were given adequate notice and afforded full opportunity to produce witnesses and to cross-examine. In the relatively rare cases where directives were issued, ordering an employer or a union to cease discrimination, a summary of findings of fact was presented as a basis for the Committee's conclusions.
>
> Within this rigid procedural framework FEPC constantly applied persuasion as its best working tool. The issuance of a "Directive" was merely the most rigorous method of persuasion and not an act of compulsion.[95]

Consequently, the second Committee was limited in the same way as the first and had to rely on the uncertain, unclear, and inadequate remedies — especially in wartime — of inducing the several government contracting agencies to sanction recalcitrant violators by cancelling their government contract or by denying them manpower or resource priorities. "The last recourse was citation of a recalcitrant to the President."[96]

Companies and unions subject to the executive order took full

---

[93] First FEPC Report 7.
[94] *Id.*
[95] Final FEPC Report 8.
[96] *Id.; First FEPC Report 21-22.*

*FAIR EMPLOYMENT LEGISLATION* 1065

advantage of the Committee's inability to enforce judicially the orders of nondiscrimination it issued after hearing, and frequently just ignored them. Through the end of 1945 employers disregarded twenty-six of the total of thirty-five compliance orders issued against them and unions ignored nine of the ten compliance orders directed against them.[97] "The enforcement system [finally] broke down when the President and the agencies cooperating with the Committee failed to back up the executive orders consistently by cutting off priorities and invoking other sanctions because they feared interference with war production."[98] This severely impaired the prestige, effectiveness, and value of the Committee as well as the policy promulgated by the order under which it operated.

In many ways, however, the wartime presidential executive orders proved to be relatively successful.[99] A major portion of this achievement was due to the creation of an agency whose sole and exclusive purpose was the advancement of equal employment opportunity through law. As the Committee said in its Final Report, "everybody's business is nobody's business, and [so] there . . . was required an independent arm of Government with the duty to deal with discrimination directly and not as a subordinate phase of other . . . activities."[100] This was a reflection of the lessons learned under the various kinds of prewar state fair employment laws.

Prewar experience had indicated that law enforcement officers charged with the application of laws generally were not particularly dedicated to the policy of equal employment opportunity and were already overburdened with more traditional kinds of illegal conduct. Additionally, among the multitudinous law enforcement problems they faced, this particular one seemed relatively unimportant and of low priority. Past experience had also indicated that there was often a direct conflict between the prime loyalties, obligations, or missions of multipurpose agencies charged with the duty of assuring equal employment opportunity and the policy of equal employment oportunity. This conflict was particularly acute in the situation where government contracting agencies who wanted their contracts completed as speedily and efficiently as possible, were charged with the exclusive responsibility of enforcing equal employment opportunity among their contractors. This conflict also existed in the situation where government agencies whose employees resisted the employment of Negroes were the only bodies empowered to enforce equal opportunity in their hiring.

---

[97] KESSELMAN 23 n.47.
[98] *Id.*
[99] FINAL FEPC REPORT xiv-xvi, 7-11.
[100] *Id.* at 8-9.

The separate Committee created by the President to enforce the policy of equal employment opportunity mandated by his wartime executive orders was bound, therefore, to be a greater success than the prior and more traditional efforts in this field. Because it was a separate, single-purpose agency, it became an official special interest group dedicated to advancing the policy of fair employment through all the means available to it. Complaints of violations were considered by that body to be much more important and serious than they had been by the general law enforcement agencies. Furthermore, as a single purpose agency it was motivated to — and did — look for and attempt to eliminate such discrimination even in absence of formal complaints by aggrieved parties. The fact that the Committee would itself bear the cost of investigating alleged violations and attempts to vindicate the rights of aggrieved persons was also very helpful. For all of these reasons, and with due regard to the peculiar weaknesses of the Presidential wartime orders, the Fair Employment Practices Committee had a substantially beneficial impact. One commentator has summarized the work of the Committee in this way:

> Its success was impeded by lack of cooperation on the part of other government agencies, especially where it appeared that the immediate interests of winning the war conflicted with the Committee's recommendations; by a lack of funds; and, most importantly, by a lack of power to enforce its decisions. Nonetheless, "a picture emerges of an organization committed to the aim of eliminating discrimination in employment, fighting against tremendous odds to accomplish its tasks, and, finally, despite every conceivable obstacle, achieving a noteworthy and imposing record of successes."[101]

The record achieved by the FEPC deserves some brief mention. During the course of its existence the FEPC handled over 10,000 complaints, including almost 1900 alleging discrimination by government agencies.[102] Of these, nearly 5000 cases were satisfactorily settled by negotiation, conciliation, and persuasion.[103] This latter figure included about forty strikes caused by racial differences.[104] During its most active two years, the second Committee "satisfactorily adjusted" about one hundred cases per month. "Government and industry were persuaded to advance many minority workers to their established skills . . . . A number of newspapers were persuaded to discontinue discriminatory want ads. Many worker groups withdrew their objections to working side by side with minority group members."[105]

---

[101] 2 T. EMERSON & D. HABER, POLITICAL AND CIVIL RIGHTS IN THE UNITED STATES 1443-44 (2d ed. 1958) [hereinafter cited as EMERSON & HABER]. See also L. RUCHAMES, RACE, JOBS AND POLITICS, THE STORY OF THE FEPC 164 (1945).

[102] Id. at 1443.

[103] FINAL FEPC REPORT viii.

[104] Id.

[105] Id. at 9.

The opportunities for conciliation and mediation provided in the administrative process proved particularly helpful. It was clear that "the bulk of FEPC's useful work was accomplished by the quiet persuasion of its regional representatives assigned to 15 regional and sub-regional offices located in major industrial centers."[106] And although most people did not realize it, "hundreds of FEPC charges were satisfactorily adjusted to every one which reached the public hearing stage."[107] Only when cases could not be satisfactorily adjusted by persuasion or other informal means did the agency call the parties to formal public hearing. After that hearing, the Committee would issue a compliance order if appropriate.[108]

In the end, however, without reliable and clearly defined enforcement powers, such as Committee authority to enforce judicially any compliance order it issued after formal hearing, the policy of nondiscrimination became ineffective.[109] The greater the successful disregard of the Committee's compliance orders due to that body's ultimate inability to enforce them by a certain and consistent sanction of easy availability, the less success it had in obtaining voluntary adherence to the executive order's general policy.[110] The Federal Fair Employment Committee automatically expired in June 1946 pursuant to an act of Congress providing that no appropriation could be allotted to any agency established by executive order and in existence for more than one year, "if the Congress has not appropriated any money specifically for such agency . . . or specifically authorized the expenditure of funds by it."[111] However, the remainder of the presidential executive order, including the portion commanding the insertion of nondiscrimination clauses in all government contracts, remained in effect.

## IV. The Birth of Modern Fair Employment Legislation

While Negroes as a group made substantial employment gains during World War II both because of the shortage of white workers and

---

[106] *Id.* at viii.

[107] *Id.* at 10.

[108] On procedures of the Committee generally, *see* First FEPC Report 18–22.

[109] Final FEPC Report 11–23.

[110] Kesselman 23; Final FEPC Report 11–23.

[111] Ch. 286, § 213, 58 Stat. 387 (1944). On July 7, 1945, the FEPC received a final appropriation of $250,000 to liquidate its affairs. Ch. 319, 59 Stat. 473 (1945). *See also* Final FEPC Report ix–x. On the work of the Commission, *see* (in addition to its two reports previously cited) Kesselman, supra note 90; Ruchames, *supra* note 101; *Discrimination in Employment—the FEPC*, 3 Law. Guild Rev. 32 (1943).

the efforts of the Fair Employment Practices Committee,[112] employment discrimination against them and to a lesser extent against other minority groups was still rampant and widespread throughout the country.[113] As the war ended and peace reappeared, there was generally a noticeable, vigorous return to older and more deeply ingrained discriminatory hiring practices in those areas where progress toward equal employment opportunity had been made.[114] Negroes employed during the war in previously "white jobs" tended after its termination to be either completely displaced by whites, or downgraded in pay and position. All of this occurred at the same time that public opinion was gradually shifting toward a somewhat more hospitable view of laws securing equal employment opportunity for members of minority groups. This changing atmosphere was due partly to the large contribution made to the war effort by Negroes, both in the armed forces and on the home front, and partly to the idealism generated by the war. In addition, returning Negro veterans who had fought side-by-side with whites were not as willing as their elders had been to sit still while they were excluded solely because of their race from an equal chance to make something of themselves.

For all of these reasons, pressure for a bolder, more imaginative, and broader scale legislative assault on the problem of employment discrimination increased as the end of World War II approached.[115] By 1945 the state legislatures of this country were flooded with proposals on this subject. At least twenty state legislatures and Congress considered some form of equal employment opportunity statute during the spring of 1945 alone.[116]

---

[112] FINAL FEPC REPORT 4, 33–37. "In every area studied, Negroes made important industrial gains, both as to industries and occupations entered." *Id.* at 42.

[113] *Id.* at 11–40.

[114] *Id.* at 41–89.

[115] As early as the 1930's broad scope statutes barring employment discrimination generally were proposed to several legislatures. For example, a 1932 New York bill provided "that it shall be unlawful for any person, firm or corporation or for any officer, agent or employee thereof, to refuse to employ any person in any capacity in the business of such person, firm or corporation, on account of race, creed or color of such person seeking such employment." Note, 6 ST. JOHN'S L. REV. 422, 424 (1932). And in 1939 bills introduced into the New York Legislature would have barred discrimination on account of race, creed, or color by all employers and also punished any employment agency for furnishing employees to any employer who makes race or religion a condition of employment. *See* COLUM. Note, *supra* note 19, at 994. None of these proposals were adopted.

[116] Murray, *The Right to Equal Opportunity in Employment*, 33 CALIF. L. REV. 388, 420–21, n.125 (1945) (states); *see* Maslow & Robison, *Civil Rights Legislation and the Fight for Equality, 1862–1952*, 20 U. CHI. L. REV. 363, 394–95 nn.167 & 168 (1953) (federal).

A number of these proposed laws were, in light of prior legislation in this field, unusually imaginative and ambitious. They were of broad scope in the sense that they prohibited discrimination in all or the major portion of all employment generally rather than in just certain narrowly-defined classes of employment, like government employment or employment pursuant to government contracts. The more forward-looking proposed laws were also comprehensive, in the sense that they usually attempted to deal with the whole subject of employment discrimination, in all its phases, by one piece of legislation. As a result, measures like these covered the activities of unions and employment agencies as well as employers. Lastly, the more imaginative proposals were intended to be fully enforceable, in both fact and theory. To that end, these measures sought to create an independent administrative agency whose exclusive purpose would be the enforcement of equal employment opportunity through the flexible administrative processes utilized by the wartime federal FEPC.[117] However, in order to cure the obvious deficiencies of the FEPC, the proposed agency was to be authorized to deal with recalcitrants by issuing, on its own motion and after due process administrative hearings, judicially enforceable compliance orders.

Enthusiasm for the creation of an independent single-purpose administrative agency charged with the application of these laws and empowered to issue judicially enforceable cease-and-desist orders rested upon the conviction that, in light of prior experience, this approach would be most advantageous and have a variety of distinct benefits. Under this type of scheme the expense of the investigation and proceeding would be borne by the government. No jury would be required anywhere in the enforcement process. Orders of the commission charged with the enforcement of these statutes would be upheld by the courts if they were supported by substantial evidence. Moreover, an administrative agency could be authorized to seek out prohibited discrimination on its own and would also be in a position to keep a constant check on recalcitrant individuals. The complete independence of the enforcement agency would minimize or eliminate any possibility that a conflict might develop between its duty to enforce these laws and other interests or goals of a larger or parent department or agency under whose jurisdiction the enforcement agency might be placed. Because it would be a single-purpose agency, it

---

[117] "The Temporary Commission which reported the basic proposals for SCAD to the New York Legislature almost unanimously recommended a strong, separate, new administrative agency. It reported that discrimination in employment involved matters 'extremely subtle and complex. The matter of enforcement cannot be left to routine officials.'" YALE Note, *supra* note 19, at 841.

would also likely develop as a self-generating, dedicated force willing to press forward vigorously with the full enforcement of fair employment laws.

In addition to the above, the administrative approach offered an opportunity to employ law in unusual ways. Conciliation and mediation could be integral features of this kind of enforcement. Broad educational campaigns could also be conducted by such anti-discrimination commissions as ancillary responsibilities to their prime function of law enforcement.

Another point should be noted about the enthusiasm for administrative enforcement of fair employment statutes. Because such a commission could be empowered to issue judicially enforceable cease-and-desist orders and other flexible remedies, it could more readily assure the achievement of the legislation's real objective. As previously noted, the real purpose of these kinds of laws is to terminate discriminatory practices of the kind prohibited and not to work retribution upon offenders. Criminal prosecutions and private civil actions proved to be relatively incapable of achieving this objective. The use of flexible cease-and-desist orders issued by vigilant administrative commissions seemed more hopeful.

Several other advantages to this kind of administrative enforcement seemed apparent to its advocates. In administrative proceedings proof would be satisfied by the preponderance of the evidence, thus avoiding the insuperable burden of proof required in criminal cases. The truth might also be easier to find in commission proceedings because the strict, overly technical rules of evidence would not apply and the agency could become expert in discerning bias. Finally, statutes enforced by such administrative agencies could be made sufficiently general to catch novel attempts at evasion or subterfuge; because such provisions were not penal, they could be construed broadly to effectuate their purpose.

However, many of the fair employment bills introduced into state legislatures toward the end of World War II and in the period soon thereafter were not as imaginative or ambitious as the type just described. Proposals adopted by the Indiana and Wisconsin legislatures in 1945, for example, created commissions empowered only to study employment discrimination on the grounds of race, creed, color, national origin, or ancestry. Despite their express authority to hold hearings in individual cases, these agencies could only "make recommendations to the parties."[118] Statutes of this sort were wholly inadequate and ineffective because the agencies they created had no en-

---

[118] Ch. 325, § 3(2), [1945] Ind. Acts 1501; ch. 490, § 3, [1945] Wis. Laws 861.

forcement powers and discriminatory conduct was not made clearly unlawful.

Against this background New York adopted the first statute that according to current conceptions would constitute a modern fair employment act.[119]  On March 12, 1945, this law became the first broad scope, comprehensive, and fully enforceable American statute prohibiting racial, religious, and ethnic discrimination in employment.

> Before the passage of the law the executive committee of the New York State Bar Association opposed its enactment on the ground that it was an unconstitutional infringement of freedom of contract; it would cause business firms to leave the state; it tried to legislate morality; it could not be enforced; and it would actually intensify group hostility and cause riots.  Even Assemblyman Ives, who sponsored the bill and served as chairman of the Temporary Commission which proposed it, doubted that the problem of employment discrimination could be solved by legislation. It was only after a study of the subject that he became convinced that the law was an appropriate means in this area of group relations.[120]

The New York statute was to become the model for most subsequent state laws in this area.  For this reason the precise nature and scope of its provisions are especially important.  The 1945 New York act specifically made it unlawful for:  (1) an employer to refuse to hire a person or otherwise discriminate against any person in the terms or conditions of employment on the grounds of his race, creed, color, or national origin; (2) a labor union to exclude any person, or discriminate against any of its members, or against any employer or employees on such grounds; (3) an employer or employment agency to advertise, use any application form, or elicit any information from prospective employees in such a manner as to indicate employment discrimination because of race, creed, color, or national origin; (4) an employer, labor union, or employment agency to discharge or otherwise discriminate against a person who has opposed these unlawful

---

[119] Ch. 118, [1945] N.Y. Laws 457.  *See* M. BERGER, EQUALITY BY STATUTE ch. 4 (1952). Eight years of official investigations preceded the New York statute. *See* ch. 858, [1937] N.Y. Laws 1847 (creating the Temporary Commission on the Condition of the Urban Colored Population) and 1938 N.Y. Report; ch. 677, [1938] N.Y. Laws 1756 (extending Commission for a year) and 1939 N.Y. Report; ch. 692, [1944] N.Y. Laws 1492 (creating commission to investigate discrimination and report with recommendations for legislation) and Report of the New York State Temporary Comm'n Against Discrimination, Leg. Doc. No. 6 (1945).  For summary of pre-1945 legislative commissions directed to investigate this subject, *see* Maslow & Robison, *supra* note 116, at 397 n.178 and Note, *Legislation Outlawing Racial Discrimination in Employment*, 5 LAW. GUILD REV. 101, 104 n.42 (1945). *See also* J. HIGBEE, DEVELOPMENT AND ADMINISTRATION OF THE NEW YORK LAW AGAINST DISCRIMINATION chs. I, II (1967).

[120] M. BERGER, *supra* note 119, at 114-15 (footnotes omitted).  On the proper role of law in combating racial discrimination and an answer to the objections of the New York State Bar Association, *see* Bonfield, *State Civil Rights Statutes: Some Proposals*, 49 IOWA L. REV. 1067, 1080-95 (1964).

practices or filed a complaint with or otherwise aided the authorities charged with the statute's enforcement; and (5) any person to aid, abet, incite, or compel the doing of any act forbidden by the statute.[121]

In cases where a discrimination based on race, creed, color, or national origin was within the broad terms of the provisions just noted but was justifiable as a "bona fide occupational qualification," the act was declared inapplicable.[122] The law also completely excluded various classes of employers from its coverage, including social and fraternal clubs, charitable, educational, and religious non-profit associations, and establishments with less than six employees.[123] Otherwise, it seemed to apply to all government as well as private employment. The statute specifically provided that its provisions were to be construed liberally "for the accomplishment of the purposes thereof."[124]

To execute the general policy of this landmark New York statute, an independent, official, single-purpose state agency was created "with power to eliminate and prevent discrimination in employment because of race, creed, color or national origin, either by employers, labor organizations, employment agencies or other persons."[125] Because it was felt that the fair employment law would most likely be obeyed if people were sympathetic to its aims and understood its scope, the State Commission Against Discrimination was charged with a general educational function in this regard. In addition, the five member Commission was specifically empowered to receive complaints alleging statutory violations from aggrieved persons, the state Attorney General, or the State Industrial Commissioner.[126] If probable cause for crediting the allegations of such a complaint was found, efforts at persuasion and conciliation were in order.

If these informal efforts to eliminate the unlawful practice failed, the Commission was empowered to hold a formal hearing. In the hearing before the Commission, procedure conforming with due process was assured, but the usual rules of evidence were not controlling. After the hearing the Commission could, if appropriate, issue a judicially enforceable order commanding the respondent to cease and desist from his unlawful discriminatory practice and to take such other action as the Commission deemed equitable in the circumstances. Among the affirmative orders that the Commission could issue against

---

[121] Ch. 118, § 131, [1945] N.Y. Laws 460.
[122] *Id.* Although badly worded so as literally to permit such a bona fide occupational qualification exemption only for advertising and the like, the exemption was in practice deemed applicable to all otherwise unlawful practices.
[123] *Id.* § 127, at 458.
[124] *Id.* § 135, at 464.
[125] *Id.* § 125, at 458.
[126] *Id.* § 132, at 461.

offending employers, for example, were those demanding that they hire, reinstate, or upgrade an employee who was unlawfully discriminated against, or pay lost wages to him.

Under the New York scheme all parties were assured full rights of judicial review.[127]   However, judicial review of the Commission's orders was limited to questions of law and a finding that they were based on substantial evidence in the administrative record.[128]   Any person willfully impeding the Commission's work, or willfully violating an order lawfully issued by the Commission, was also subject to a criminal sanction consisting of a maximum jail sentence of one year and a maximum fine of 500 dollars.[129]

## V. POST WAR LEGISLATIVE DEVELOPMENTS 1945-1963

### A. *State Developments*

The importance of the 1945 New York fair employment statute as a precedent and general model for future legislation in this area cannot be overstated.   About one month after that statute became law, New Jersey enacted a provision substantially similar in basic scope, comprehensiveness, and enforcement machinery.[130]   In 1946 Massachusetts followed the example of the prior two states.[131]   Within the next three years Connecticut (1947), New Mexico (1949), Oregon (1949), Rhode Island (1949), and Washington (1949) joined the ranks of those jurisdictions with broad scope, comprehensive, and fully enforceable fair employment practices legislation substantially modeled on the New York act.[132]   The Territory of Alaska adopted a similar law in 1953.[133]   In 1955 Pennsylvania, Minnesota, and Michigan were added to the growing group of states with this general type of modern equal employment opportunity statute and were followed by Wisconsin and Colorado in 1957 and Ohio and California in 1959.[134]   By the end of 1959 sixteen states had fair employment laws substantially modeled on the 1945 New York act.

---

[127] *Id.* §§ 132, 133.

[128] *Id.*

[129] *Id.* § 134, at 463.

[130] Ch. 169, [1945] N.J. Laws 589.

[131] Ch. 368, [1946] Mass. Acts & Resolves 372.

[132] Ch. 279, §§ 1360i-66i, [Supp. 1947] Conn. Gen. Stat. 685; ch. 161, [1949] N.M. Laws 366; ch. 221, [1949] Ore. Laws 314; ch. 2181, [1949] R.I. Acts & Resolves 157; ch. 183, [1949] Wash. Laws 506.

[133] Ch. 18, [1953] Alas. Laws 64.

[134] Ch. 121, [1959] Cal. Stat. 1999; ch. 176, [1957] Colo. Laws 492; no. 251, [1955] Mich. Pub. Acts 411; ch. 516, [1955] Minn. Laws 802; Act of April 29, 1959, [1959] Ohio Laws 12; no. 222, [1955–56] Pa. Laws 744; ch. 266, [1957] Wis. Laws 411.

In 1960 Delaware passed a law prohibiting racial, religious, and ethnic discrimination in employment that was enforceable only by the criminal process.[135] A year later, Illinois, Kansas, and Missouri enacted broad scope, comprehensive, and fully enforceable fair employment laws of the New York type as their initial effort to deal with this problem in a general fashion.[136] The action of Missouri in this regard was particularly significant because it was the first border state to enact a general law barring racial, religious, and ethnic discrimination in employment. Idaho also adopted a fair employment law in 1961, but its provisions were enforceable solely by the usual penal process and were not comprehensive in the way that state laws similar to the New York act were.[137] Hawaii and Indiana joined those states with modern fair employment laws in 1963[138] while in the same year Iowa and Vermont adopted as their initial effort in this area short laws enforceable only through the normal criminal process.[139]

During the period between the 1945 New York enactment of the first modern fair employment law and the end of 1963 twenty states passed laws substantially similar in general approach and design to that first act. They were all fully enforceable, comprehensive, and of relatively broad scope. However, while the first modern statutes enacted by each of these states were basically of the New York type, they differed from each other in many ways. As time progressed, these divergences either widened or narrowed, depending on the particular state's propensity to amend its fair employment laws frequently.[140] Nevertheless, the differences between these modern statutes

---

[135] Ch. 337, [1959] Del. Laws 795.

[136] Act of July 21, 1961, [1961] Ill. Laws 1845; ch. 248, [1961] Kan. Laws 542; Act of Aug. 1, 1961, [1961] Mo. Laws 439.

[137] Ch. 309, [1961] Idaho Laws 573.

[138] No. 180, [1963] Hawaii Laws 223; ch. 173, [1963] Ind. Acts 216.

[139] Ch. 330, [1963] Iowa Acts 513; no. 196, [1963] Vt. Laws 209.

[140] *See* American Jewish Congress, Commission on Law and Social Action, Summary of 1958 and 1959 State Anti-Discrimination Laws 3–5; Summary of 1960 and 1961, at 3–10; Summary of 1962 and 1963, at 3–8.

*See, e.g.,* the following amendments to the New Jersey, New York, and Massachusetts laws:

New Jersey:  ch. 169, [1945] N.J. Laws 589, *as amended,* ch. 155, [1947] N.J. Laws 690; ch. 11, [1949] 37; ch. 64, [1951] 418; ch. 18, §§ 41–44, [1953] 322; ch. 66, [1957] 128; ch. 59, [1960] 489; ch. 106, [1961] 682; ch. 37, [1962] 158; ch. 40, [1963] 122; ch. 254, [1966] ——.

New York:  ch. 118, [1945] N.Y. Laws 457, *as amended,* ch. 891, § 29, [1953] N.Y. Laws 2461; ch. 738, [1958] 1591; ch. 978, [1960] 2415; ch. 609, [1961] 1867; chs. 164, 529, [1962] 914, 2480; ch. 480, [1963] 1913; chs. 239, 948, [1964] 1034, 2475; chs. 4, 506, 516, 851, [1965] 26, 1412, 1419, 2037.

Massachusetts:  ch. 368, [1946] Mass. Acts & Resolves 372, *as amended,* ch. 424, [1947] Mass. Acts & Resolves 407; chs. 479, 697, [1950] 323, 590; ch. 681, [1954] 700; ch. 426, [1957] 299; ch. 163 [1960] 86; ch. 570, [1961] 482; ch. 627, [1962] 446; chs. 469, 613, [1963] 290, 464; ch. 397 [1965] 215; chs. 22, 361, 410, [1966] ——, ——, ——.

usually concerned only matters of degree and detail rather than matters of basic approach, scope, or comprehensiveness. Some examples of these numerous differences in respect to matters of degree and detail follow.[140a]

In its original 1945 form the New York statute applied, with only a few exceptions, to all employers of six or more employees.[141] The first laws of this type enacted by other states varied on this score. The original Illinois law only applied to employers of one hundred or more persons,[142] but Illinois was very unusual in this respect. The Kansas and Washington acts applied to employers of eight or more persons[143] and the New Mexico and Rhode Island acts, to employers of four or more.[144] Most of the acts used the numbers four, six, or eight, and exempted all employers with less than the required number of employees. In addition, these statutes varied in the degree to which they exempted from their proscriptions other particular classes of employers.[145]

There were also numerous differences in respect to the details of the administrative enforcement schemes provided by these several laws. For example, in their initial acts most states allowed the enforcing commission itself to initiate formal proceedings under the act by filing complaints.[146] New York, as previously noted, did not initially permit this, but later amended its act to do so.[147] Also unlike New York, several of these acts insisted on a de novo hearing[148] and in some cases even a trial by jury in any suit to enforce the commission's orders.[149] While many states followed the lead of New York by creating a completely independent administrative agency to enforce these laws and foster their policy, others either created a separate department in an existing governmental unit or charged an existing admin-

---

[140a] For a detailed analysis of these numerous differences in matters of degree and detail, *see* Bonfield, *The Substance of American Fair Employment Legislation I: Employers,* 61 Nw. U.L. Rev. 907 (1967); Bonfield, *The Substance of American Fair Employment Legislation II: Employment Agencies, Labor Organizations and Others,* 62 Nw. U.L. Rev. 19 (1967).

[141] Ch. 118, § 127(5), [1945] N.Y. Laws 458.

[142] Act of July 21, 1961, § 2(d), [1961] Ill. Laws 1846.

[143] Ch. 248, § 2, [1961] Kan. Laws 542; ch. 183, § 3(b), [1949] Wash. Laws 507.

[144] Ch. 161, § 3(d), [1949] N.M. Laws 367; ch. 2181, § 3(B), [1949] R.I. Acts & Resolves 158.

[145] *See* ch. 121, § 1413(d), [1959] Cal. Stat. 2000.

[146] *See, e.g.,* ch. 279, § 1365i, [Supp. 1947] Conn. Stat. 688; Act of April 29, 1959, § 4112.05(B), [1959] Ohio Laws 16; ch. 2181, § 8(B), [1949] R.I. Acts & Resolves 166; ch. 183, § 8, [1949] Wash. Laws 513.

[147] Ch. 118, § 132, [1945] N.Y. Laws 461, *as amended,* ch. 4, [1965] N.Y. Laws 26.

[148] *See* ch. 18, § 9, [1953] Alas. Laws 69; ch. 161, § 11(a), [1949] N.M. Laws 375; ch. 221, § 10, [1949] Ore. Laws 317.

[149] *See* Act of Aug. 1, 1961, § 5(1), [1961] Mo. Laws 443.

istrative official with enforcing this law in addition to his other duties.[150] These and many other variations of both substance and procedure were common among the twenty-one comprehensive, broad scope, and fully enforceable state fair employment laws enacted prior to 1964. In addition, it should be recalled that during the period between 1945 and 1963 four states enacted general laws, usually much less comprehensive than the New York type acts, that were enforceable solely by the normal penal process.[151]

Although for purposes of this developmental analysis of fair employment laws it is not essential to evaluate in any substantial detail the success of the New York type fair employment statutes in the 1945-1963 period, some general comments on that subject seem relevant to what followed on the national level. These laws did not prove to be panaceas. Large scale evasion of their mandate was common, and prior open discrimination often went underground.[152] Nevertheless, New York style fair employment statutes proved to be the most effective and workable laws yet devised to eradicate racial, religious, and ethnic discrimination in employment. There is little doubt that they were responsible for some substantial employment gains by minority group members during this period and for the eradication of significant amounts of discrimination by employers, labor organizations, and employment agencies.[153]

The comprehensiveness of these modern laws in covering the activities of labor organizations and employment agencies as well as employers successfully permitted the first coordinated efforts to deal with a complicated and diffuse problem. Because they were of broad scope in the sense that they applied to most employers generally rather than just to narrow classes of them, like government contractors, these

---

[150] *See* no. 180, § 2, [1963] Hawaii Laws 224 (State Dept. of Labor and Industrial Relations); ch. 221, § 2, [1949] Ore. Laws 314 (Bureau of Labor); ch. 490, § 111.33, [1945] Wis. Laws (Industrial Commission).

[151] Delaware (1960), Idaho (1961), Vermont (1963), and Iowa (1963).

[152] P. NORGREN & S. HILL, TOWARD FAIR EMPLOYMENT 130-35, 142-43 (1964); SOVERN, *supra* note 1, at 185-86, 188; Note, *Administrative Law — Human Relations Commission — Pennsylvania Law and Discriminatory Employment Practice,* 36 TEMP. L.Q. 515, 540-42 (1963). For attempts to mask discrimination which failed, *see* Sutin, *The Experience of State Fair Employment Commissions: A Comparative Study,* 18 VAND. L. REV. 965, 1000-02 (advertisements), 1003-04 (applications), 1005-11 (qualifications) (1965).

[153] M. BERGER, *supra* note 119, at 115-45; EMERSON & HABER 1443-44, 1483; P. NORGREN & S. HILL, *supra* note 152, at 115-30, 136-41; Berger, *Fair Employment Practices Legislation,* 275 ANNALS 37 (1951); Carter, *Practical Considerations of Anti-Discrimination Legislation — Experience Under the New York Law Against Discrimination,* 40 CORNELL L.Q. 40, 58-59 (1954); Witherspoon, *Civil Rights Policy in the Federal System: Proposals For A Better Use of Administrative Process,* 74 YALE L.J. 1171, 1180-84 (1965).

laws enabled the first substantial steps to be made toward opening the mass of employment opportunities in our society to qualified members of minority groups. The fact that statutes of this sort were fully enforceable through usually independent, single-purpose agencies empowered to use on their own motion the flexible tools of education, persuasion, and legal compulsion also permitted the first significantly successful efforts to assure conformity to governmentally declared policies on this matter.[154]

In short, the New York type fair employment laws enacted between 1945 and 1963 unquestionably proved themselves to be more successful than all prior types of legal solutions attempted in this area and, in absolute terms, advanced substantially the cause of equal employment opportunity. Furthermore, there was a concerted effort to amend these acts as experience proved alterations or additions desirable.[155] Nevertheless, these kinds of laws were no cure-all, because even in those jurisdictions where they were in force, statutes of this sort did not completely eradicate the problem. But the experience with these

---

"As the table (House Education and Labor Committee Survey) indicates, 99.7 per cent of the complaints received by the various State agencies were settled by mediation and conciliation without being scheduled for formal hearings."

*Comparative complaint experience under State fair employment practice laws*
[From date of law until Dec. 31, 1961]

| State | Cases | Hearings | Cease and desist orders | Court actions |
|---|---|---|---|---|
| California | 1,014 | 2 | 2 | 2 |
| Colorado | 251 | 4 | 3 | 1 |
| Connecticut | 900 | 4 | 3 | 0 |
| Massachusetts | 3,559 | 2 | 2 | 4 |
| Michigan | 1,459 | 8 | 6 | 1 |
| Minnesota [1] | 184 | 1 | 1 | 0 |
| Missouri [1] | 45 | 0 | 0 | 2 |
| New Jersey | 1,735 | 2 | 2 | 2 |
| New York | 7,497 | 18 | [3] 6 | 5 |
| Ohio | 985 | 2 | 1 | 0 |
| Oregon | 286 | 0 | 0 | 0 |
| Pennsylvania | 1,238 | 19 | 0 | 0 |
| Rhode Island | 286 | 0 | 0 | 0 |
| Total | 19,439 | 62 | 26 | 18 |

[1] The Minnesota figures do not cover cases arising in Duluth, Minneapolis, or St. Paul, where local anti-discrimination laws apply.
[2] The Missouri law became effective on Oct. 13, 1961. Of the 45 complaints received by July 23, 1963, 26 have been settled informally and 19 are still under investigation.
[3] The figure given is that of the House committee survey. Testimony of the general counsel of the New York State Commission for Human Rights suggests that only 4 complaints have resulted in the issuance of cease and desist orders. See statement of Henry Spitz before Subcommittee on Employment and Manpower, Senate Committee on Labor and Public Welfare July 29, 1963.
*Hearings on S.773, supra* note 4, at 133–34.

[154] *See* note 153 *supra.*

[155] *See* note 140 *supra.*

statutes was sufficiently successful to justify and demand their enactment by all American jurisdictions without them.[156]

## B. *Federal Developments*

Advocates of modern fair employment laws had less success on the federal level between 1945 and 1963 than they had on the state level. In every session of Congress during that period bills were introduced to create a fair employment practices commission with broad powers to eliminate discrimination in employment on the basis of race, religion, or national origin.[157] All of these attempts to enact a New York style statute on the national level failed. However, during this same period, 1945-1963, several significant efforts were made to revitalize by executive order the federal government's policy of nondiscrimination in employment by government agencies and contractors.

President Truman's 1947 Committee on Civil Rights recommended an executive order against discrimination in government and the establishment of adequate enforcement machinery to ensure compliance with it.[158] The President issued such an order almost immediately.[159] This 1948 order reasserted the "long established policy . . . [of] fair employment throughout the Federal establishment, without discrimination because of race, color, religion, or national origin." It created a special Fair Employment Board as a separate unit within the Civil Service Commission and empowered that Board to carry out this policy with respect to all civilian employment in the executive branch. The new unit was specifically empowered to review decisions of department heads dealing with complaints alleging discrimination. If a department refused to follow the recommendations of the Board in a given case, the Board could request the President to intervene. This 1948 executive order had only limited success.[160]

President Truman also promulgated another relevant executive order in 1948. The Selective Service Act of 1940[161] had outlawed racial discrimination in the armed forces; however, "separate but equal" treatment was not considered within the scope of that prohibition. Consequently, racial segregation in our military establishment was commonplace. In 1948 the President commanded "equality of treatment and opportunity for all persons in the armed services without re-

---

[156] On the arguments demanding such legislation and its proper role and function, *see* Bonfield, *supra* note 120, at 1078-86.

[157] *See* EMERSON & HABER 1444.

[158] U.S. PRESIDENT'S COMM. ON CIVIL RIGHTS, TO SECURE THESE RIGHTS 168 (1947).

[159] Exec. Order No. 9980, 3 C.F.R. 720 (Comp. 1943-48).

[160] For some data relating to its accomplishments, *see* EMERSON & HABER 1447-48.

[161] Selective Service Act, ch. 720, § 4(a), 54 Stat. 885 (1940).

gard to race, color, religion, or national origin," and created a special investigatory committee to report to him on that subject.[162] The report of this committee recommending the elimination of all segregation in the armed forces was fully implemented in respect to active duty units by 1955.[163]

After the outbreak of the Korean War, efforts were made to revitalize the federal policy barring employment discrimination by contractors in the performance of their government contracts. Between February and November 1951, President Truman issued a number of executive orders specifically requiring certain government contracting agencies to include provisions in their procurement contracts requiring nondiscrimination in all employment related to those undertakings.[164] Although these orders applied only to particular federal agencies, provisions requiring government contractors to refrain from racial, religious, and ethnic discrimination in employment associated with such contracts had been included in almost all contracts of this sort since 1943. This was done pursuant to the mandate of the second wartime presidential executive order whose substantive proscriptions had not expired with the Fair Employment Practices Committee charged to enforce it.[165]

In December 1951 the President issued an order creating the Committee on Government Contract Compliance,[166] with instructions to study the problem of discrimination by federal contractors. The Committee reported that people were unaware that these government contract provisions existed and, therefore, did not file any complaints. The report further suggested that the existing machinery for dealing with these complaints and enforcing this policy on contractors was wholly inadequate. Sole reliance on the individual contracting agencies for enforcement was especially thought to be a failure.[167]

In 1953 President Eisenhower responded to the report of President Truman's 1951 Committee on Government Contract Compliance by issuing an executive order establishing the Government Contract Com-

---

[162] Exec. Order No. 9981, 3 C.F.R. 722 (Comp. 1943–48). Committee on Equality of Treatment and Opportunity in the Armed Services.

[163] EMERSON & HABER 1449–50; U.S. EMPLOYMENT REPORT, supra note 4, at 47.

[164] Exec. Order No. 10227, 3 C.F.R. 739 (Comp. 1949–53) (General Services Administration); Exec. Order No. 10231, 3 C.F.R. 741 (Comp. 1949–53) (Tennessee Valley Authority); Exec. Order No. 10243, 3 C.F.R. 752 (Comp. 1949–53) (Civil Defense Administration); Exec. Order No. 10298, 3 C.F.R. 828 (Comp. 1949–53) (Department of Interior).

[165] See note 111 supra.

[166] Exec. Order No. 10308, 3 C.F.R. 837 (Comp. 1949–53).

[167] U.S. PRESIDENT'S COMMITTEE ON GOVERNMENT CONTRACT COMPLIANCE, EQUAL ECONOMIC OPPORTUNITY 28–35 (1953). See also EMERSON & HABER 1444–45; U.S. EMPLOYMENT REPORT, supra note 4, at 14.

mittee.[168]  This agency was authorized to receive complaints alleging violations by government contractors of the nondiscrimination provision.  However, like prior orders, the main responsibility for enforcing this policy continued to rest with the contracting agency itself, the new committee functioning primarily in an advisory capacity and as a prod to action by the directly affected governmental department. Nevertheless, the Committee was partially successful.[169]  It suggested several important standards upon which compliance procedures of the various government contracting agencies should be based, revised the nondiscrimination provision for insertion in all government contracts, and received a fair number of complaints, many of which it helped settle.[170]  The new contract provision recommended by the Government Contract Committee was subsequently instituted by executive order and provided that:

> In connection with the performance of work under this contract, the contractor agrees not to discriminate against any employee or applicant for employment because of race, religion, color or national origin.  The aforesaid provision shall include, but not be limited to, the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship.  The contractor agrees to post hereafter in conspicuous places, available for employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of the nondiscrimination clause.
> The contractor further agrees to insert the foregoing provision in all subcontracts hereunder, except subcontracts for standard commercial supplies or raw materials.[171]

In 1955 President Eisenhower issued another executive order dealing with fair employment, this one applying solely to discrimination in government service.[172]  It replaced the Fair Employment Board of the Civil Service Commission established in 1948 by President Truman with the President's Committee on Government Employment Policy, an interdepartmental agency outside the Civil Service Commission. The order provided that each agency within the executive branch appoint a special official, solely responsible to the agency head, who would receive and investigate complaints of discrimination and ensure compliance by that agency with the policy of equal employment opportunity.  Decisions of this officer could be appealed to the Government Employment Policy Committee.  However, that Committee could

---

[168] Exec. Order No. 10479, 3 C.F.R. 961 (Comp. 1949–53).

[169] *But see* EMERSON & HABER 1446, citing the New York Times to the effect that widespread discrimination by government contractors continued.

[170] *See* EMERSON & HABER 1445–46; U.S. EMPLOYMENT REPORT, *supra* note 4, at 57–71.

[171] Exec. Order No. 10557, 3 C.F.R. 203 (Comp. 1954–58).

[172] Exec. Order No. 10590, 3 C.F.R. 237 (Comp. 1954–58).  *See also* EMERSON & HABER 1448–49; U.S. EMPLOYMENT REPORT, *supra* note 4, at 15–16.

only give advisory opinions to the respective agency heads. "Despite the quasi-autonomous status of the new Committee, it suffered from the same infirmities as its predecessor: It had no enforcement power and the basic responsibility for securing compliance rested with the heads of the executive agencies."[173] Nevertheless, the Committee had some accomplishments to its credit, reviewing a sizable number of complaints and engaging in important educational programs.[174]

In 1961 President Kennedy abolished both the President's Committee on Government Employment Policy and the Government Contracts Committee, substituting for them the President's Committee on Equal Employment Opportunity.[175] This new agency was charged with the duty of effectuating equal employment opportunity both in government employment and in employment pursuant to government contracts.[176] The Kennedy order specifically transferred all the existing duties of the pre-existing Government Employment Policy Committee to the new President's Committee and continued in force the 1955 Eisenhower order dealing with discrimination in federal government service. Additionally, the 1961 order commanded that new and broader provisions be inserted in all government contracts prohibiting contractors from discriminating in any way, during the course of their contract, against any employee or applicant for employment on the basis of race, creed, color, or national origin.[177] These provisions also required contractors to bind their subcontractors in the same way. The 1961 executive order went further than prior orders of this type by specifically requiring contractors to take certain affirmative actions, such as indicating in all advertisements for employees their nondiscrimination policy, advising unions of their policy, and filing compliance reports with the new Committee.[178]

The new order followed prior executive orders in placing primary responsibility for obtaining contractor compliance with each government contracting agency. However, the Kennedy order went further by empowering the Committee on Equal Employment Opportunity to recommend to the Justice Department suits to compel contractor compliance and criminal actions for furnishing false information in their compliance reports.[179] Most significantly, the order empowered this Committee to terminate by itself, in whole or in part, the contract of a noncomplying employer. Before it decreed such termination, reason-

---

[173] U.S. EMPLOYMENT REPORT, *supra* note 4, at 15.

[174] *Id.* at 15-16, 21-30.

[175] Exec. Order No. 10925, 3 C.F.R. 448 (Comp. 1959-63).

[176] *See* U.S. EMPLOYMENT REPORT, *supra* note 4, at 16.

[177] Exec. Order No. 10925, § 301, 3 C.F.R. 449 (Comp. 1959-63).

[178] *Id.*

[179] *Id.* § 312(b), at 452.

able efforts had to be made to secure compliance by conference and conciliation.[180]  The Committee was also authorized to forbid contracting agencies to enter into any new contracts with noncomplying contractors unless the latter demonstrated that they would thereafter adhere to the policy of equal employment opportunity set out in those contracts.[181] The scope of the Kennedy executive order was broadened in 1963 to include federally assisted construction contracts.[182]

The Kennedy executive orders on this subject were obviously a major advance and had some success.  For the first time an independent agency dedicated solely to nondiscrimination in employment pursuant to government contracts had authority of its own to enforce the relevant contract provisions. However, the scheme was still totally inadequate.  First, the remedies available to the Committee were insufficient because in most cases the actual termination of the contract or blacklisting of the offending contractor would not be realistically feasible. Second, absent a significant staff of its own and more extensive authority, the Committee had to depend primarily on the goodwill of both the contracting agencies for the discovery of violations and the Justice Department for specific judicial enforcement proceedings.

Of course, the largest defect of all federal efforts to secure equal employment opportunity by law between 1946 and 1963 was their very narrow and limited applicability.  The executive orders issued during the period only dealt with government employment, employment by government contractors, and employment pursuant to federally assisted construction contracts.  No body of federal law had yet attempted to eliminate racial, religious, or ethnic discrimination in employment by the vast bulk of employers generally, labor organizations, employment agencies, or others.  Furthermore, in providing for the enforcement of the limited and narrow scope legal prohibitions of employment discrimination that it had created, the national government ignored a large portion of the experience of those states with New York style acts concerning the most effective means of securing compliance with proscriptions of this type.

## VI. The Federal Civil Rights Act of 1964 and Thereafter

The intense and broad scale activity of the civil rights movement during the early 1960's had a major impact on the position of the federal government with respect to equal employment opportunity.

---

[180] *Id.* § 312(f), at 453.
[181] *Id.* § 312(d), at 452.
[182] Exec. Order No. 11114, 3 C.F.R. 774 (Comp. 1959-63).

That movement successfully swayed popular sentiment to the point where a relatively broad scope, comprehensive, and enforceable national fair employment law, modeled in basic design and approach on the New York experience, seemed feasible. After heated wrangling over the details of such a national law and a large number of compromises respecting its terms, Congress enacted the Civil Rights Act of 1964.[183] Title VII of that statute constituted the first and only general, comprehensive federal fair employment practices law.

The national statute was generally similar to the previously enacted New York type state laws in terms of the practices it prohibited. The federal act made it unlawful for covered (1) employers to discriminate in any way against employees or prospective employees on the basis of race, color, religion, or national origin; (2) employment agencies to fail or refuse to refer for employment or otherwise discriminate against a person on those grounds; (3) labor organizations to exclude or expel from membership or otherwise discriminate against, or cause an employer to discriminate against, any person on those grounds; (4) employers or labor organizations to discriminate against any person on those grounds in the admission to apprenticeship or other training programs; (5) employers, employment agencies, or labor organizations to publish any advertisement or the like indicating any preference, limitation, or discrimination on those bases; and (6) employers, employment agencies, or labor organizations to discriminate against people because they oppose practices made unlawful by the act, make a charge under the act, or assist in its enforcement.[184] The law provided a specific exception in most cases where the discrimination is based on a "bona fide occupational qualification."[185]

The definition of the employers, employment agencies, and labor organizations to which the federal act applied was far narrower and more limited than that of any previously enacted state statute of the New York type.[186] A covered employer was defined to include any person engaged in an industry affecting interstate or foreign commerce and having a required number of employees for a certain period

---

[183] Civil Rights Act of 1964, 42 U.S.C. § 2000(a) (1964). Title VII dealing with fair employment practices commences at 42 U.S.C. § 2000(e) (1964). For a detailed analysis of the substantive coverage of the Federal Act, *see* note 140a *supra*.

[184] *Id.* §§ 703(a), (d), 704(a), (b), 42 U.S.C. 2000e-2(a) to (d), 2000e-3(a), (b) (1964). Such discrimination on the basis of sex is also covered under the Federal act and the acts of almost a dozen states. *See* 6 BNA LABOR POLICY AND PRACTICE 451:26-:27 (March 17, 1966).

[185] Civil Rights Act of 1964, § 703(e), 42 U.S.C. 2000e-2(e) (1964).

[186] But note Illinois had a sliding scale of 100 employees downward. ILL. REV. STAT. ch. 48, § 852(d) (1965).

in the current or preceding calendar year. Before July 1, 1966, covered employers had to have a minimum of one hundred employees; between July 2, 1966, and July 1, 1967, the act applied to employers of at least seventy-five employees; from July 2, 1967, to July 1, 1968, covered employers need to have only a minimum of fifty employees, and after July 2, 1968, twenty-five employees.[187] Employment agencies subject to the federal act included only those undertaking to procure either employees for a covered employer or opportunities to work for a covered employer.[188]

Labor organizations subjected to the federal act because they were engaged in an "industry affecting commerce" had to have the same minimum number of members on a sliding scale as employers covered under the federal act had to have employees. In addition, to come under the act a labor organization had to be either (1) certified under the National Labor Relations Act or Railway Labor Acts, or (2) recognized by an employer covered under the federal fair employment act, or (3) related to a covered labor organization in one of a variety of ways. In the alternative a labor organization was subjected to the federal act, regardless of the number of its members or whether it qualified under the three classifications above, if it maintained or operated a hiring hall which procured employees for a covered employer or employment opportunities for an employee to work for a covered employer.[189] The United States and its agencies, Indian tribes, the states and their political subdivisions, bona fide private membership clubs,[190] and, in some cases, educational institutions[191] were all specifically exempted from the national law.

In terms of the scope of its coverage the Civil Rights Act of 1964 was much narrower than, and consequently inferior to, most of the previously enacted modern state laws. Three factors caused this narrowness: the act applied only to employers, unions, and employment agencies in some relation to interstate commerce; it provided at its broadest for application only to employers of more than twenty-five employees and to most unions only if they had more than twenty-five members; and it completely exempted all employment by the states and their subdivisions.

The procedure for enforcing the federal act was also grossly inferior to the process normally provided by the previously enacted New York style laws. The Federal Equal Employment Opportunity Commission

---

[187] Civil Rights Act of 1964, § 701(a), (b), 42 U.S.C. 2000e(a), (b) (1964).
[188] Id. § 701(c), 42 U.S.C. 2000e(c) (1964).
[189] Id. § 701(d), (e), 42 U.S.C. 2000e(d), (e) (1964).
[190] Id. § 701(b), 42 U.S.C. 2000e(a) (1964).
[191] Id. § 702, 42 U.S.C. 2000e-1 (1964).

created by the 1964 act[192] was an independent, single-purpose agency empowered to receive formal complaints respecting violations of the law from either one of its five members or a person claiming to be aggrieved. After a finding that there was reasonable cause to believe the allegations made in a complaint, the Commission had to attempt to eliminate the unlawful practice by conciliation and persuasion.[193] If such efforts failed, its only recourse in most cases was to notify the person aggrieved by the alleged violation. The aggrieved person could then bring a civil action on his own behalf to secure compliance with the law.[194] If the court found a violation, it was authorized to enjoin the unlawful conduct and order the offending party to take such affirmative remedial action as would be appropriate, including reinstatement or hiring of an employee with or without back pay, his promotion or admission to a union, or the like.[195] The Attorney General of the United States was also authorized to initiate and prosecute civil suits on his own behalf for the enforcement of the act, but only in those cases where he certified that he believed there was a "pattern or practice" of resistance to the full enjoyment" of equal employment opportunity rights guaranteed by the law.[196]

The enforcement provisions of the 1964 federal act ignored much of the prior state experience in this field. Successful enforcement of state fair employment legislation seemed to require an independent single-purpose agency. That body had to have full authority to secure compliance with these laws through an administrative process backed by coercion, if necessary, and authority to act either on its own motion or on the complaint of an aggrieved party who would thereby be relieved of any responsibility for the costs of such enforcement proceedings.[197] Past experience also seemed to suggest that even conciliation and persuasion would be relatively ineffective tools in the hands of a body without direct authority of its own to coerce compliance with the law.[198] Nevertheless, the Equal Employment Opportunity Commission was not empowered to issue, where necessary, judicially enforceable

---

[192] *Id.* § 705, 42 U.S.C. 2000e-4 (1964).

[193] *Id.* § 706(a), 42 U.S.C. 2000e-5(a) (1964).

[194] *Id.* § 706(e), 42 U.S.C. 2000e-5(e) (1964).

[195] *Id.* § 706(g), 42 U.S.C. 2000e-5(g) (1964).

[196] *Id.* § 707(a), 42 U.S.C. 2000e-6(a) (1964). On enforcement of the federal act, *see generally* 6 BNA LABOR POLICY AND PRACTICE 431; SOVERN, *supra* note 1, at 73-98.

[197] *See* SOVERN, *supra* note 1, at 31-34; Bonfield, *State Civil Rights Statutes: Some Proposals,* 49 IOWA L. REV. 1067, 1117 (1964); Sutin, *supra* note 152, at 1019-21; Witherspoon, *supra* note 153, at 1191-93, 1201-03; HARV. Note, *supra* note 19, at 526, 530-31.

[198] *See* source cited notes 97 & 98 *supra* and accompanying text. *See also*

orders, nor could it even enforce the act on its own motion through ordinary civil suits. The Commission had to rely on private civil suits brought by aggrieved parties, who in most cases would probably have to bear the burden and expense of such actions personally.[199] Furthermore, the Commission could not even obtain the assistance of the United States Attorney General to enforce the law, except in a limited class of cases and then only if the Attorney General agreed to cooperate.

The new national civil rights statute did not dissolve the scheme of federal executive orders whose purpose was to assure equal opportunity in employment by the executive departments and agencies of the federal government and by federal contractors. That body of law continued to exist side by side with the 1964 act. In 1965, President Johnson issued an executive order superseding all the Eisenhower and Kennedy executive orders on this subject.[199a] It abolished the 1961 President's Committee on Equal Employment Opportunity and transferred all of its functions with respect to assuring equal opportunity in federal government employment to the U.S. Civil Service Commission. The Commission was to provide procedures for processing complaints of alleged employment discrimination in government executive departments or agencies that would assure at least one impartial review within the department or agency involved. It also had to provide an appeal from that intradepartmental or intra-agency review to the Civil Service Commission itself. Heads of affected

---

EMERSON & HABER, *supra* note 101, at 1443-44; P. NORGREN & S. HILL, *supra* note 152, at 158, 176; U.S. EMPLOYMENT REPORT, *supra* note 4, at 10-11.

    In the years after World War II, some thought that employment discrimination would yield to persuasion and education without compulsion. Even today a number of commissions, almost all of them municipal, have no enforcement powers. But the illusion of "voluntarism" no longer bemuses any serious student of the problem. While an impotent commission can, on occasion, function effectively as mediator or educator, an administrative agency, to be truly effective, must possess the power to compel offenders to mend their ways. [See, *e.g.*, U.S. Department of Labor, *Growth of Labor Law in the United States*, 1962, pp. 261-67; 1962 Kansas Comm'n on Civil Rights Ann. Rep., p. 14 (of 89 complaints processed under the toothless FEP Act from 1953 to 1962, 23 supported by probable cause went unsatisfied because of the "uncooperativeness" of the respondent). The subsequent history of the Kansas commission under an amended, enforceable act dramatizes the point. 1963 Kansas Comm'n on Civil Rights Ann. Rep., p. 14.] SOVERN, *supra* note 1, at 56.

[199] Note that if the court considers it "just," it may appoint an attorney for such a plaintiff and relieve him of usual court fees. But this provision is rarely likely to relieve aggrieved parties of the cost of proceeding. SOVERN, *supra* note 1, at 76.

[199a] Exec. Order No. 11246, 3 C.F.R. 567 (1966). Section 403(a) of the order specifically states that it supersedes the executive orders on this subject of 1955, 1957, 1961, and 1963. On the federal executive orders, *see generally* SOVERN, *supra* note 1, at 103-42, 262.

government units were commanded to comply with any orders of the Commission pursuant to this scheme. The Johnson order also transferred from the Kennedy President's Committee all of its functions and powers respecting equal opportunity in employment by government contractors to the Office of Contract Compliance of the Department of Labor. The rules, regulations, requirements, and sanctions provided in the Kennedy executive orders concerning equal opportunity by government contractors were otherwise largely repromulgated in the same form by this 1965 order.

The Civil Rights Act of 1964 also did not supersede or invalidate state legislation barring discrimination on the basis of race, religion, or national origin by employers, unions, and employment agencies. The federal statute specifically provided that it would not "relieve any person from any liability, duty, penalty, or punishment provided by any present or future law of any State or political subdivision of a State, other than any such law which purports to require or permit the doing of any act which would be an unlawful employment practice under th[at] title."[200] Indeed, the federal act went further and provided that:

> In the case of an alleged unlawful employment practice occurring in a State, or political subdivision of a State, which has a State or local law prohibiting the unlawful employment practice alleged and establishing or authorizing a State or local authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, no charge may be filed . . . by the person aggrieved . . . [under the federal act] before the expiration of sixty days after proceedings have been commenced under the State or local law, unless such proceedings have been earlier terminated.[201]

Mandatory federal deference to state statutory remedies in this area,[202] inadequacy of the coverage[203] and enforcement procedures[204] provided in the federal act, and increasing popular receptivity to the insistent demands for this kind of legislation led to the enactment in 1964 and 1965 of broad scope, comprehensive, and fully enforceable fair employment laws in nine additional states and the District of Columbia.[205] During those two years alone, sixteen other states also

---

[200] Civil Rights Act of 1964, § 708, 42 U.S.C. 2000e-7 (1964).
[201] *Id.* § 706(b), 42 U.S.C. 2000e-5(b) (1964).
[202] *See* text accompanying note 201 *supra.*
[203] *See* text accompanying notes 186-91 *supra.*
[204] *See* text accompanying notes 192-99 *supra.*
[205] Ch. 117, [1965] Alas. Laws; ch. 27, [1965] Ariz. Laws 36; D.C. Board of Comm. Order 65-768 (1965); ch. 121, [1965] Iowa Laws 195; ch. 717, [1965] Md. Laws 1043; ch. 276, [1965] Neb. Laws 782; ch. 332, [1965] Nev. Stat. 689; ch. 297, [1965] N.H. Laws 575; ch. 66, [1965] Utah Laws 173; ch. 170, [1965] Wyo. Laws 445.

strengthened, recast, or expanded their existing statutes in this field.[206] Finally, in 1966 Kentucky joined the ranks of those states with modern fair employment laws, becoming the second slave state to do so.[207] Between 1965 and 1967 efforts were also made in Congress to amend the federal Civil Rights Act of 1964 to broaden its coverage and strengthen its enforcement machinery by authorizing the Equal Employment Opportunity Commission to issue judicially enforceable cease and desist orders in the same manner and for the same purposes as the successful state commissions.[207a] Thus far, these efforts have not been fruitful.

## VII. CONCLUSION

Today, thirty-one states and the District of Columbia have administratively enforceable general statutes prohibiting employment discrimination on the basis of race, religion, and national origin by employers, labor organizations, employment agencies, and others.[208] Although varying greatly in respect to specific details, these laws are almost all of the general New York type in terms of their comparatively broad scope, comprehensiveness, and scheme of enforcement. When one adds to this impressive figure the federal act, the laws of

[206] Robinson & Flicker, *Summary of 1964 and 1965 State Anti-Discrimination Laws,* 3 LAW IN TRANS. Q. 94, 101-02 (1966). They list the states and give the relevant citations.

[207] Ch. 2, [1966] Ky. Acts. Missouri was the first such state to do so. *See* note 149 *supra.*

[207a] *See* tit. VI, S. 2923 (H.R. 12845), 89th Cong., 2d Sess. (1966); H.R. 10065, 89th Cong., 2d Sess. (1966); tit. III, S. 1026, 90th Cong., 1st Sess. (1967). H.R. 10065 was passed by the House in 1966, but failed in the Senate. *See* 112 Cong. Rec. 8691-725 (daily ed. April 27, 1966).

[208] ALAS. STAT. §§ 18.80.010, - .300, § 23.10.192 (Supp. 1966); ARIZ. REV. STAT. ANN. §§ 41-1401,-1485 (Supp. 1965); CAL. LABOR CODE ANN. §§ 1410-32 (1964); COLO. REV. STAT. §§ 80-21-1,-8 (1963); CONN. GEN. STAT. ANN. §§ 31-126,-128 (1960); D.C. Police Regs. art. 47 (1965); HAWAII REV. LAWS §§ 90A-1,-9 (Supp. 1965); ILL. REV. STAT. ch. 48, §§ 851-66 (1963); IND. STAT. ANN. §§ 40-2307, - 2317 (1965); ch. 121, [1965] Iowa Laws 195; KAN. GEN. STAT. ANN. §§ 44-1001, - 1014 (Supp. 1961); ch. 2, [1966] Ky. Acts; MD. ANN. CODE art. 49B, §§ 1-19 (Supp. 1965); MASS. ANN. LAWS ch. 6, § 56 (Supp. 1966), ch. 151B (1966); MICH. STAT. ANN. § 17.458 (1960); MINN. STAT. ANN. §§ 363.01, .13 (1966); MO. REV. STAT. §§ 296.010, .070 (Supp. 1965); ch. 276, [1965] Neb. Laws 782; N.H. REV. STAT. ANN. §§ 354A:1, :14 (1966); N.J. REV. STAT. 1937, § 18:25-1, - 28 (Supp. 1966); N.M. STAT. ANN. §§ 59-4-1, - 14 (1960); N.Y. EXEC. LAW §§ 290-301 (McKinney Supp. 1966); OHIO REV. CODE ANN. §§ 4112.01, .99 (Page 1965); ORE. REV. STAT. §§ 659.010, .115, § 659.990 (1965); PA. STAT. ANN. tit. 43, §§ 951-63 (1964); R.I. GEN. LAWS §§ 28-5-1,-39 (1956); ch. 6, [1965] Utah Laws 173; WASH. REV. CODE §§ 49.60.010, .320 (1962); W. VA. CODE ch. 5, art. 11; WIS. STAT. ANN. §§ 111.31, .37 (Supp. 1967); ch. 170, [1965] Wyo. Laws 445.

five other states with usually less comprehensive fair employment statutes enforceable solely by the normal criminal processes,[209] and the numerous cities with general fair employment laws,[210] it is apparent that this kind of legislation has come into its own as an accepted part of our jurisprudence and societal fabric.[211]

It is also apparent that although all American jurisdictions originally entered the employment discrimination area with legislation of an ad hoc, unimaginative, and overly simplistic style, most of them learned from their own experience, and the experience of others, and ultimately transferred much of that learning into positive law. Of course, this does not in any way deny the fact that legislatures still have much to learn in this area and even more to do. The laws as they presently exist are only way-stations on the road to new and better legal techniques for dealing with this problem.

In this connection the recent work of the National Conference of Commissioners on Uniform State Laws should be noted. Toward the end of 1963 that body appointed a Special Committee on Civil Rights

---

[209] DEL. CODE ANN. tit. 19, §§ 710-13 (Supp. 1964); IDAHO CODE §§ 18-7301,-7303 (Supp. 1965); ME. REV. STAT. ANN. tit. 26, §§ 851-54 (Supp. 1965); ch. 201, [1965] Mont. Laws 676; VT. STAT. ANN. tit. 21, §§ 495-95(c) (Supp. 1965).

[210] For some of the city ordinances, see Gary, Ind., 1950, 30 L.R.R.M. 3008 (1952); Louisville, Ky., 1965, 6 BNA LABOR POLICY AND PRACTICE 451:2451; River Rouge, Mich., 1952, 31 L.R.R.M. 3035 (1953); Ecorse & Hamtramck, Mich., 1954, 35 L.R.R.M. 137 (1955); Duluth, Minn., 1953, 33 L.R.R.M. 3012 (1954); Kansas City, Mo., 1965, 10 RACE REL. L. REP. 926 (1965); Newark, N.J., 1952, 33 L.R.R.M. 3009 (1954); Warren, Ohio, 1951, 31 L.R.R.M. 3015 (1953); Monessen, Pa., 1950, 31 L.R.R.M. 3019 (1953); Sharon, Pa., 1951, 31 L.R.R.M. 3025 (1953); Farrell, Pa., 1951, 31 L.R.R.M. 3032 (1953); Pittsburgh, Pa., 1953, 31 L.R.R.M. 3021 (1953); RHYNE & RHYNE, CIVIL RIGHTS ORDINANCES N.I.M.L.O., Rep. No. 148 (1963); Elson & Schanfield, *Local Regulation of Discriminatory Employment Practices*, 56 YALE L.J. 431 (1947); Note, *The New Pittsburgh Fair Employment Practices Ordinance*, 14 U. PITT. L. REV. 604 (1953). The early "difficulty of obtaining federal and state legislation, and local agitation . . . for immediate progress . . . combined to stimulate municipal action. In August, 1945, Chicago became the first city to enact an ordinance on th[is] subject; with Milwaukee [1946] and . . . Minneapolis [1947] following suit." Elson & Schanfield, *supra* at 435.

[211] Of course it is true that the states outside the old confederacy have a monopoly on modern fair employment legislation. But note that Tennessee has an unenforceable executive order declaring that the public policy of the state is against discrimination in public and private employment. CCH Fair Employment Practices ¶ 27,900. Note also that the following states that were outside the Confederate States of America do not have fair employment laws: North Dakota, South Dakota, and Oklahoma. Oklahoma does, however, have a state civil rights commission—but it has no authority to combate employment discrimination save by mediation, conciliation, education, or recommendations to other government agencies. *Id.* ¶ 26,803. It also outlaws discrimination of this sort in public employment. *Id.* ¶ 26,804.

Legislation.[212] After three years of research, comment, and discussion, and four tentative drafts which were circulated and criticized by appropriate state and federal administrative officials, civil rights groups, law professors, and lawyers associations, the Conference adopted the final Special Committee product as a Model Anti-Discrimination Act.[213] The Comprehensive Act version of this statute

> attempts to provide a complete and strong law against discrimination based on the more than 20 years of experience with human rights commissions in more than 30 states. The Comprehensive Act contains chapters prohibiting discrimination in employment, public accommodations, educational institutions and real property transactions, and additional chapters on enforcement and local commissions. It embodies

---

Over 71% of the total population of the United States live in states having some form of fair employment legislation. More significantly about 40% of all Negroes, 87% of all other non-white Americans, and 94% of all Jewish Americans live in states with enforceable fair employment laws. Commission on Law and Social Action of the American Jewish Congress, Summary of 1964 and 1965 State Anti-Discrimination Laws 41 (Jan. 1966). Since this study Kentucky has been added to the fair employment states so the current figures will be slightly higher. What appears to be a rather low percentage of Negroes living in such states is explained by the fact that a large part of the Negro population in this country lives in the eleven southern states that have no fair employment statutes. *See* U.S. DEP'T OF COMMERCE, STATISTICAL ABSTRACT 27-28 (1964). The spread of state fair employment laws is very significant since although the Federal Civil Rights Act of 1964 applies to persons throughout the United States, its coverage is narrower than that of almost all state fair employment laws, and its enforcement machinery leaves much to be desired. *See* Bonfield, *The Substance of American Fair Employment Legislation I: Employers*, 61 NW. U.L. REV. 907, 918-55 (1967); notes 186-99 *supra* and accompanying text.

It should also be noted that in addition to the modern type of fair employment acts and the general penal provisions of the several states as noted above, many of the ad hoc, narrow scope laws of the pre-World War II type have never been repealed. Some narrow scope state statutes or executive orders dealing only with equal opportunity in employment by state government agencies have even been added to the legal arsenals of the several fair employment states during the period since World War II. For a compilation of most of the existing state statutes or executive orders dealing specifically and solely with state government agencies and contractors see 6 BNA LABOR POLICY AND PRACTICE § 451. Since the advent of the modern fair employment laws in these states, the narrow scope laws of this type have become of relatively little consequence. They do, however, offer the potential of extra remedial devices. Some of the state contractor provisions may also help assure equal employment opportunity among out-of-state government contractors who are located in and perform their contracts in states without fair employment laws, and among in-state contractors who are for one reason or another not subject to the contracting state's fair employment act.

[212] Professor Norman Dorsen of the New York University School of Law acted as Reporter-Draftsman on the preparation of the act and also prepared a preliminary report in 1964 for the Committee entitled "The Prospects for a Model or Uniform Civil Rights Act."

[213] UNIFORM LAW COMMISSIONERS' MODEL ANTI-DISCRIMINATION ACT 2, 6 (1966). Two versions of the Act were adopted by the Commissioners as "Model" acts.

Case 2:21-cv-00629-MTL    Document 1-4    Filed 04/12/21    Page 50 of 67

what were thought to be the best features of existing laws against discrimination as well as several new provisions that are designed to facilitate efficient and effective state action. The Act also is drafted to mesh with the enforcement provisions of Title VII of the [federal] CRA. Taken as a whole, the Comprehensive Act is designed for states wishing to enact, either initially or by amendment of existing laws, a complete and modern state law against discrimination.[214]

The Model Act was an achievement of superior technical competence and a substantial advance in technical detail over all existing fair employment legislation.[215] It should encourage uniformity of the substantive and remedial provisions of American fair employment statutes because it is the product of the prestigious and influential National Conference of Commissioners on Uniform State Laws. Uniformity is desirable because diversity in the laws of this kind in our several jurisdictions "will tend to . . . prejudice, inconvenience or otherwise adversely affect the citizens of the states in their activities or dealings in other states or . . . in moving from state to state."[216] Furthermore, uniformity of fair employment laws is especially important because the rights protected are so fundamental, valuable, and essential to a successful life in this society, and so much a part of the fabric of its system of higher and overriding national values, that they should not measurably vary from state to state. The fundamental human rights which fair employment laws seek to protect should be equally and congruently secure no matter what part of our country a person finds himself. Therefore, every effort ought to be made "to translate what common attitudes exist throughout the United States [on this subject] into legislation that will establish uniform civil rights in the states."[217]

The Model Act will also induce and foster the enactment of fair employment statutes whose drafting and detail will be more technically perfect than prior statutes in the field because it will make available

---

They were a comprehensive version whose scope and purpose is explained in the text accompanying note 214 *supra* and a basic version which was "designed for states merely wishing to accept responsibility pursuant to . . . [the Federal Civil Rights Act of 1964] for enforcement of laws prohibiting discrimination in public accommodations and employment." *Id.* at 6. Only the comprehensive version is a "Model" act in the sense of being an ideal proposed act. *See also* Dorsen, *The Model Anti-Discrimination Act: Introduction*, 4 HARV. J. LEGIS. 212 (1967).

[214] *Id.* at 6.

[215] For a discussion and evaluation of the substantive provisions of the Model Act's comprehensive version in the light of present state and federal legislation, *see* Bonfield, *The Substance of American Fair Employment Legislation I: Employers*, 61 NW. U.L. REV. 907 (1967); Bonfield, *The Substance of American Fair Employment Legislation II: Employment Agencies, Labor Organizations and Others*, 62 NW. U.L. REV. 19 (1967).

[216] 1963 HANDBOOK OF THE NATIONAL CONFERENCE OF COMMISSIONERS ON UNIFORM STATE LAWS 223.

[217] "The Prospects for a Model or Uniform Civil Rights Act," *supra* note 212, at 27.

to legislatures the superior drafting skills devoted by the National Commissioners to this project and also the substantive conclusions reached by their impartial study of all the experience under prior fair employment legislation.  In this regard, it is interesting to note that the last state to enact a fair employment law, Kentucky, relied upon one of the earlier drafts of the Model Act.[218]  This development seems entirely beneficial. Although the Model Act, like any human endeavor, is not perfect,[219] it will nevertheless render great service in the effort to improve the quality of American fair employment legislation.

---

[218] UNIFORM LAW COMMISSIONERS' MODEL ANTI-DISCRIMINATION ACT, *supra* note 213, at 6.

[219] *See* authorities cited note 215 *supra* for criticism of some of the act's substantive provisions.




DATE DOWNLOADED: Wed Oct 14 00:02:30 2020
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
Sol Rabkin, Enforcement of Laws against Discrimination in Employment, 14 BUFF. L.
REV.  100 (1964).

ALWD 6th ed.
Rabkin, S. ., Enforcement of laws against discrimination in employment, 14(1) Buff.
L. Rev.  100 (1964).

APA 7th ed.
Rabkin, S. (1964). Enforcement of laws against discrimination in employment. Buffalo
Law Review, 14(1), 100-113.

Chicago 7th ed.
Sol Rabkin, "Enforcement of Laws against Discrimination in Employment," Buffalo Law
Review 14, no. 1 (Fall 1964): 100-113

McGill Guide 9th ed.
Sol Rabkin, "Enforcement of Laws against Discrimination in Employment" (1964) 14:1
Buff L Rev 100.

MLA 8th ed.
Rabkin, Sol. "Enforcement of Laws against Discrimination in Employment." Buffalo Law
Review, vol. 14, no. 1, Fall 1964, p. 100-113. HeinOnline.

OSCOLA 4th ed.
Sol Rabkin, 'Enforcement of Laws against Discrimination in Employment' (1964) 14 Buff
L Rev  100

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.
-- To obtain permission to use this article beyond the scope of your  license, please use:
   *Copyright Information*

Exhibit #12A

# ENFORCEMENT OF LAWS AGAINST DISCRIMINATION IN EMPLOYMENT

### Sol Rabkin*

L AWS against discrimination in employment are now a well-established aspect of our American legal scene. They have been in effect and in operation for a large part of the 20th century. Were it not for some of the discussions now going on, on and off the floor of the United States Senate, concerning the fair employment practice provision of the pending civil rights bill, one could safely have assumed that the principles upon which such legislation are based are now beyond question.

A reasonable man might well doubt the validity of any claims that the adoption of a federal fair employment practices law by Congress calls for the imposition of any pattern of "due deliberate speed" aimed at cushioning the impact of such a law on established customs. One would never think, from reading about these discussions, that fair employment practice laws have been in operation in New York and a few other states for almost nineteen years with none of the horrendous effects which were cited as imminent dangers which must be guarded against.

But we are not here to convince the doubting Thomases or, should I say, Senators. Rather, we are here to discuss the experience accumulated under those laws—and there are now twenty-five such state laws in operation—to see how their effectiveness can be improved. This paper will deal with one aspect of that problem, techniques of possible improvement of enforcement of such laws. It will not undertake to deal with even all aspects of that subdivision of the problem. Rather, it shall be confined to a consideration of methods of reducing delays in the handling of complaints, methods of insuring compliance with the law and methods of strengthening existing sanctions for use against violators of laws against discrimination in employment.

Discussion of easing the initiation of complaints of violation of the laws, of liberalizing formal requirements for such complaints, altering and lowering the established standards for finding of probable cause are all to be dealt with in another paper to be presented to this conference. That other paper will also deal with the wisdom of separating the enforcement and adjudication functions of executive agencies enforcing such laws. We shall endeavor in this paper to observe the limitations described above. Occasionally, however, it may be necessary in connection with the subject matter of this paper to make mention of some of the proposals which are outside the scope of this paper. If that happens, we beg your forgiveness and the forgiveness of the author of the paper dealing primarily with those aspects of the problem.

Even though this paper deals with a limited aspect of possible changes in

---

\* ·National Law Director, Anti-Defamation League of B'nai B'rith.

enforcement of laws against discrimination in employment, it is impossible to deal with even such a limited phase of the problem without some consideration of the background of FEPC statutes and their purposes. The first such law was the statute adopted here in New York in 1945. This pioneering law really embodied a recognition that the government of the state has a special interest in vindication of the right to equality of employment opportunity; that the state's countenancing of existing patterns of racial and religious discrimination in employment resulted in the imposition of economic disabilities on the groups thus discriminated against which created hazards to the health, welfare and peace of the entire community.

Implicit in the adoption of this law were several things. First, there was an abandonment of the patterns used in prior laws against discrimination, the state's civil rights law, which barred racial and religious discrimination in places of public accommodation, depending for its effectiveness on the imposition of criminal or civil remedies. It was recognized that such remedies had been of little effect. Another assumption implicit in the New York state fair employment practices act[1] was a recognition of the inequality of resources available to an employer, union or employment agency engaging in racial or religious discrimination and the applicant for work who was the victim of such discrimination.

It was the recognition of these facts that led to the use of a pattern originally established in the first National Labor Relations Act. That Act sought to avoid the delays implicit in any court proceeding. In addition, it was, on its face, a one-sided act intended to lend the aid of the government to one of the parties in an unequal struggle, the struggle between laborers seeking to organize into unions for the purpose of collective bargaining and employers opposing such efforts in order to maintain their existing superiority of bargaining power.

The Act was adopted in 1935 as our country was struggling to recover from the deep economic depression in which it had been. One aspect of that recovery was aimed at increasing the income of the ordinary American consumer, employees in factories, fields and offices. This could be done only if the economic bargaining power of these employees was strengthened by means of collective bargaining between employers and labor organizations created by the employees. In the depression, the workers' organizations for collective bargaining—the trade unions—had suffered severely. Some employers used labor spy agencies to undermine the trade unions and to gain greater economic advantage over their employees.

Hence, the Wagner Act set up an administrative agency which was empowered to help unorganized employees, who sought to organize themselves into trade unions, to achieve recognition by their employers and to engage in collective bargaining with their employers through those trade unions. The administrative agency permitted the processing of complaints of employer interference with trade union organization and other processes of collective bargaining with

---

1. Law Against Discrimination, N.Y. Executive Law, art. 15.

101

speed and with the insight which was the result of the specialized function of the agency. The agency could dispense with the delays attendant on court procedures and could also speed up the processes of certification of majority unions for collective bargaining. It could put a speedy end to unfair employment practices by issuing a cease and desist order which was enforceable not in the district federal courts but in the federal courts of appeal if the record before the administrative agency contained evidence to sustain its findings.

The administrative agency, even though it had quasi-judicial functions arising from its responsibility to make findings as to the existence of unfair labor practices and as to which of several competing trade unions represented a majority of the workers, was still essentially an agency enforcing the right of workers to engage in collective bargaining. It was primarily an agency which was enforcing a law aimed at insuring that all workers engaged in interstate commerce would have the right to collective bargaining.

The administrative agency established under the New York state fair employment practices act was set up in order to insure vindication of the right established by the statute of an applicant for employment or a person already working to be free from discrimination based on race or creed in obtaining a job or in obtaining promotions or other benefits attached to the job. The primary purpose of the agency is to eliminate discrimination based on race or creed in employment. Even though the New York statute requires as a condition of a formal complaint the filing of a verified complaint, we would respectfully submit that the commission, as a law enforcement agency, has a duty not to close its eyes to obvious violations, even in the absence of the receipt of a verified complaint.

Similarly, even though the commission does have an adjudicatory function in connection with its hearings and in connection with its findings of probable cause to credit the allegations of the complaint, we would respectfully submit that this element of adjudication should not be permitted to obscure the basic fact, which is that the primary responsibility of a commission enforcing a state law against discrimination is to bring about the cessation of discrimination in employment wherever it finds it.

When state fair employment practices laws were in their infancy, commissions charged with enforcement of such laws tended to operate on the theory that there was a need to demonstrate to those regulated by the law, employers, employment agencies and unions, that the law would not unduly interfere with their operations nor subject them to the expense and trouble of having to defend complaints by all applicants for employment who were members of minority groups and whom the employer refused to hire. When the laws were originally being considered by the state legislatures which enacted them, there was much talk on the part of employer groups and employment agencies that the result would be witch hunts directed against innocent employers and employment agencies and unions by disgruntled rejected applicants for employment. Most of the agencies charged with enforcement of fair employment laws took

cognizance of such talk and tended to insist on airtight complaints and cases before they were willing to press ahead to public hearings in cases where the process of conciliation and persuasion proved unsatisfactory. Furthermore, the agencies sometimes were unwilling to insist on speedy answers by respondents during the process of adjustment by conciliation and persuasion.

The fact is that the experience up to this point, primarily with the labor act, has demonstrated that lawmakers are quick to alter such one-sided laws if it develops that the aid given by government to the victims of discrimination or of interference with the right to organize for purposes of collective bargaining has tipped the scales so as to give such people undue advantage over the employers. The Taft-Hartley law was a reflection of the lawmakers' readiness to adjust any such imbalances which developed.

The technique of administrative agency enforcement of such laws has demonstrated its usefulness. The sanctions available to such agencies, consisting essentially of the right to apply to a court for an order to compel compliance with their determinations, violation of which is punishable by a contempt procedure, have proved more than effective. It is a rare employer or employment agency or labor union officer who is willing to risk imprisonment for even a day in order to give free rein to his racial or religious prejudices. Hence, the sanctions devised in such laws may well have effect far beyond what one would expect. In addition, the virtue of the type of law discussed herein is that almost every such law has a declaration that the policy of the state is opposed to discrimination in employment based on race or creed.

The final virtue of the administrative device for enforcement of laws against discrimination in employment is that these laws are completely consistent with the established customs and mores of the community. Despite the fears of witch hunts expressed by employers and others policed by such laws, there is no danger of popular defiance of such laws such as developed in connection with the prohibition amendment to the federal constitution. Clearly, the vast majority of the people are benefited by such laws and support them. Clearly, defiance of such a law would result in popular disapproval, unlike prohibition.

### Enforcement—Reducing Delay

As has been indicated, a most important novel aspect of most of the fair employment practice laws adopted by states, beginning in 1945, was the device of enforcement by an administrative agency set up specifically for that purpose, to which the person believing himself the victim of a violation of the law, of discrimination in employment, could apply for redress. Thus, the complainant could find in one agency an investigator, a conciliator, and finally, if needed, an adjudicator and enforcer.[2]

After a verified complaint had been filed charging a violation of the law—in the preparation of which the complainant could obtain aid from the same

---

2. See for example New York State Law Against Discrimination § 297.

agency—the task of moving ahead with the process of investigation and further steps shifted from the complainant to the enforcing commission. No longer need the complainant obtain his own attorney and undertake at his own expense the onerous and often costly and slow task of accumulating evidence to sustain his charge. Instead, ". . . the chairman of the commission [designates] one of the commissioners to make, with the assistance of the commission's staff, prompt investigation in connection therewith. . . ."[3] It is axiomatic that justice delayed is justice denied.

When the first FEPC statute specifies that the investigation shall be "prompt," it is in recognition not only of this axiom but also of the fact that the person believing himself the victim of racial or religious discrimination is also highly likely to be one whose prior dealings with state officialdom have been such as to cause him, out of ignorance or feelings of inferiority or a distrust of the organs of law enforcement, to view the machinery of the state with suspicion and skepticism.

Viewed against this background, it is surprising that inspection of the annual reports of the various agencies charged with enforcement of the existing twenty-one state enforcement laws, which provide for an administrative enforcement agency, fails to disclose any which includes a report on the length of time consumed in investigation of complaints, or devoted to any conciliation and persuasion which may ensue. No indication is given of how soon after receiving a verified complaint the investigation is begun, how much time is allowed for completion of the investigation, whether the staff member or members assigned to the investigation is pressed to move with all possible speed, whether time limits are applied to the various steps in the investigation.

Manuals of investigation which may have been developed in agencies enforcing laws against employment discrimination are not available to outsiders. Hence, it is impossible to determine whether the established investigatory procedures include an acknowledgment of the statutory injunction of promptness in the investigation. Although, as has been noted by one of the best studies of the administrative enforcement of such laws, "Investigation is not normally governed by rigid procedures, and may serve a variety of formal and informal functions,"[4] it would appear that at the very least, such investigations must be policed to insure speed and avoidance of unnecessary delay. And the annual reports on the activities of enforcing agencies should reflect the machinery set up to insure the required promptness of investigation and information to allow some determination of the effectiveness of such machinery.

Establishment of employment discrimination is often a complex problem. The employment pattern of the respondent is often a major aspect of the investigation. Hence, the investigator may have to look into the racial or religious composition of the respondent's personnel. He must also examine the qualifica-

---

3. *Ibid.*
4. Note, 74 Harv. L. Rev. 526, 533 (1961).

tions of the complainant as contrasted with those of other applicants for the same position or incumbents of similar positions. This would require him to examine the respondent's records and to meet respondent's employees and other applicants to respondent for employment so he can obtain data on their race, religion or ancestry and on their qualifications. Obviously, the respondent is in a position to impose delay, if he so wishes. Equally obviously, there is no basis in the reports of most commissions to enable a member of the public to evaluate the diligence shown in pressing forward with such an investigation.[5]

### RELATION OF INVESTIGATION TO CONCILIATION

Section 297 of the New York Law Against Discrimination provides that if the investigating commissioner determines after investigation that probable cause exists for crediting the allegations of the complaint, ". . . he shall immediately endeavor to eliminate the unlawful discriminatory practice complained of by conference, conciliation and persuasion." The word "immediately" calls for comment, for it, like the word "prompt," which qualifies the direction to investigate in the preceding portion of this sentence of the statute, reflects the legislative recognition of the need for speed in ending any discrimination found to exist.

Of course, the statutory direction to confer, conciliate and persuade necessarily places the power to impose some delay in the hands of the respondent. Conference, conciliation and persuasion, with their implications of palaver and talk and appeal to reason, bar any possibility of "prompt" or "immediate" progress to a public hearing. This process offers to respondents in complaints of employment discrimination the opportunity to extend unduly processing under the statute. If there is to be conciliation and persuasion, it is absolutely necessary for the agency negotiator to avoid any appearance of arbitrariness or impatience. These attitudes are hardly consistent with the appearance of reasonableness and willingness to negotiate which is an essential prerequisite of successful conciliation.

Other sources of delay may arise at this stage of the handling of the complaint from the fact that the greater resources of the respondent can here be involved. He may bring into the conciliation discussions his legal counsel, his personnel specialists and all the other resources which his economic reserves make available to him. Furthermore, by indicating a willingness to go to public hearings and to resort to court action, if necessary, the respondent may inject an additional element of delay by causing the enforcing agency to lean over backwards to establish a record of reasonableness in conciliation intended to strengthen its hand with possibly unfriendly courts. This might well occur even though the statute provides that what goes on in the process of conciliation may not be disclosed by members of the commission and its staff.[6] While no

5. *Id.* at 534.
6. New York State Law Against Discrimination § 297.

Case 2:21-cv-00629-MTL   Document 1-4   Filed 04/12/21   Page 60 of 67

disclosure may be made as to what transpired in the course of such endeavors, the time between the date of the complaint and the noticing of the matter for public hearing is easily calculable from the bare dates shown in the administrative record of the case.

The language of most state fair employment practice laws clearly distinguishes between the process of investigation which leads to a determination as to whether probable cause exists to credit the allegations of the complaint, and the ensuing process of conference, conciliation and persuasion called for if there is a finding of probable cause. Yet, there is no indication in the reports of the various enforcing agencies that the investigation does not often, in fact, merge into the efforts of the enforcing agency to resolve the matter by conciliation.

Such a development is hardly unexpected, since what is more normal than for the respondent to ask the investigator as to the reason for his inquiry and, on being told, to protest his innocence and his eagerness to do the right thing, if it be shown that he, the respondent, has erred. But an equally inevitable concomitant of such a development is the merging of the process of investigation and the process of conciliation, the delaying and possible frustration of a finding of probable cause, and the creation of a possibility of substantial delay.

It may well be that the procedures followed by agencies enforcing laws against discrimination in employment are framed to avoid this danger. But since this issue is not discussed in reports of such agencies, and what occurs in the conciliation process must be kept secret by them, it cannot be known whether this potential source of delay is avoided or minimized. It would seem desirable to formally separate the process of investigation aimed at establishing whether probable cause exists to credit the allegations of the complaint from the ensuing process of conciliation. Such a separation would also allow the maintenance of a time check to make it clear even to the most skeptical complainant that his charge of discrimination is receiving the prompt investigation required by statute, whether or not this has resulted in a finding of probable cause, and, finally, whether it is being moved immediately thereafter to conciliation.

Mention has been made of the danger of delay inherent in the process of conference, conciliation and persuasion. While this cannot be wholly avoided, its effect as a source of distrust for members of those racial and religious groups which may be more subject to discrimination than others may be minimized if agency procedures set time limits on this process as well as on the process of investigation. If such limits are set—and, of course, they may be varied where the chairman of the enforcing agency makes a finding that such a variance is proper—the annual reports of the agency should include sections on the time needed for successful handling of complaints, with indications of cases in which the time limits were waived and those in which the handling was even faster than the established limits. In establishing good faith and dedication to those

whose rights the statute is intended to protect, such time reports would be most helpful.

And that this is important is clear from the unwillingness of members of many civil rights groups to accept the delays in dealing with employment discrimination which are all too often characteristic of agencies enforcing such laws. While such delays are by no means the sole cause of such reluctance, it may safely be assumed that they are a contributing factor to the picketing and chain-ins, which have occurred at many construction sites, aimed at alleged job discrimination in the building trades in a number of FEPC states.

Where sufficient progress is being made in the process of conference, conciliation and persuasion to justify its further extension, it is suggested that the person carrying through the process for the enforcing agency seek to condition such extension on a commitment by the respondent to keep open the job vacancy in question pending the completion of the conciliation and to make up for the complainant any loss in pay he may suffer as a result of the delay. Such requirement would serve to demonstrate to the complainant the zeal and good faith of the enforcing agency in carrying out its responsibility to prevent discrimination in employment. It would make clear to the complainant, and others in like situation, that the enforcing agency is committed to protection of members of his group against employment discrimination, to make his right to equality of employment opportunity a present and immediate right, not a distant goal.

Finally, it is suggested that consideration be given to amending the statute to make it follow more completely the pattern established by the Wagner Act. The enforcing agency should be allowed to seek court enforcement of its cease and desist orders issued after hearing, not in the trial courts of its state but rather in the appellate courts thereof, with the appellate court's review of the findings of fact being limited to determining whether such findings are based on evidence. Similarly, if a respondent resorts to the courts to estop the enforcing agency from proceeding with a complaint against it, such action should be removable to the appellate courts, if the suit is brought after hearing.[7]

What is essential is that the enforcing agency adopt a philosophy consistent with the major role assigned to it by the statute it is enforcing. Such statutes are enacted under the police power of the state. Many of the statutes specifically provide that they are to be interpreted liberally to effectuate thier purpose, which is to eliminate discrimination in employment based on race or creed.[8] They are remedial statutes enacted to meet a danger to the public peace and welfare found to exist by the legislature. Hence, even though the enforcing agency may be given quasi-judicial powers in connection with its authority to hold hearings and its responsibility to determine if probable cause exists to credit the allegations of the complaint, it does not follow that the agency should

---

7. N.Y. Civ. Prac. Law & Rules § 7804.
8. See for example New York State Law Against Discrimination §§ 290, 300.

conduct itself like a court of law seeking merely to adjudicate disputes between complainants and respondents. Rather, the enforcing agency should, it is submitted, regard itself as a means set up by the state to combat discrimination whenever and wherever it has reason to believe it exists and is amenable to its powers.

Thus, where there are rumors that in a certain area of employment a policy exists of excluding members of one racial group, the enforcing agency should look into the matter on its own, informally if necessary. If it finds reason to believe that the rumors are well based, it should seek to invoke whatever power the state may have to bring the matter to public light in order to remedy the situation. For example, in New York, where the statute requires a verified complaint as a basis for a formal investigation, such problems might well have brought into use paragraph 9 of Section 63 of the Executive law which authorizes the state's enforcing commission to request the Attorney General to bring any civil action necessary for effective enforcement of the state's laws against discrimination. The State Commission For Human Rights is to be commended for its recent ruling against the Sheet Metal Workers Union in such a situation, but one might wonder why it took so many years for it to move into the matter when the pattern of exclusion was one well known to anyone acquainted with the employment pattern in this field.

INSURING COMPLIANCE

Examination of the statistics contained in the reports of the various agencies enforcing laws against discrimination shows that very nearly all of the cases which involve findings of probable cause are ultimately settled by means of conciliation agreements. As has been indicated, the process of conciliation is required by statute to be shrouded in secrecy. Of course, the conciliation agreement itself need not be kept secret though, possibly in an excess of zeal, some agencies enforcing laws against discrimination in employment maintained a policy of secrecy with respect to conciliation agreements for a while. It is suggested that any consent order entered into through conciliation proceedings should be made a matter of public record.

Many of the statutes give the investigating commissioner free rein in seeking to adjust a complaint by conciliation. Of course, if the commissioner views his job as being primarily one of eliminating discrimination and only secondly one involving exercise of quasi-judicial powers, he will insist on conciliation agreements which advance the goal of the law, the elimination of discrimination in employment. On the other hand, it is understandable that the investigating commissioner, when entering into the process of conciliation, may well seek to achieve the speediest possible compromise by splitting the case down the middle. This may result in the denial to the victim of discrimination of complete redress of his grievances. It is suggested that every conciliation agreement, before being finally accepted and approved by the commissioner, should be submitted to an

108

automatic review by the entire commission. In other words, every enforcing agency should set up a procedure for auditing proposed conciliation agreements to make sure that the agreement does the maximum job for advancing the goal of the law, the elimination of discrimination in employment.

Within the past few years, some enforcing agencies have sought to embody in conciliation agreements consent orders under which the respondent not only agrees to take such action as is necessary to implement the law, but also consents to the issuance of a court order against him if he should fail to carry out his responsibilities under the conciliation agreement. It is suggested that this means of proceeding be expanded by administrative means and, where necessary, by statutory means.

A number of the agencies enforcing such laws include in most conciliation agreements a provision calling for reinspection of the respondent's working staff and hiring practices at specified periods after the completion of the conciliation agreement. It is suggested that one aspect of such reinspection should be an examination of the sources and techniques of staff recruitment employed by the respondent. This would insure that respondents could not adversely affect a proposed pattern of nondiscriminatory hiring by stressing sources of recruitment which are in themselves selective in terms of race or religion. Where such re-inspections leave the commission in doubt as to whether the conciliation agreement is being implemented with the best possible speed, the commission might well refer the question of this implementation to the Attorney General so that the resources of his office can be brought to bear on the complex fact problem involved.

In such reinspections, the enforcing agency might properly undertake, through its research division, to make an independent survey of the respondent's working staff if the respondent is an employer, of its employment seeking clients if the respondent is an employment agency, or of its membership if the respondent is a union, in order to determine whether the groups examined are reflecting in terms of their racial or religious composition progress in manifesting a pattern of nondiscrimination. Such research surveys might also look into the matter of promotions within a respondent-employer's working staff. Naturally, the data on race or creed accumulated by the enforcing agency's research division would be obtained on the basis of a promise of confidence and would under no circumstances be made available to the respondent in such terms as to enable him to identify particular employees in terms of their race or creed.

The enforcing agency should also establish a policy of speedy publicity in cases where it finds that respondents have breached conciliation agreements. In addition, they should establish procedures under which, where such breaches are found to have occurred, the enforcing agency should be able to revive the original complaint and proceed with the greatest possible speed to public hearings on it. In this connection, the enforcing agency should explore means of setting up close lines of contact with minority group agencies concerned with

109

problems of equality of opportunity. Through these contacts, it should call to the attention of such agencies the breach of previous conciliation agreements and the fact that certain respondents, under such a conciliation agreement, are now more likely to welcome applicants from the minority groups which might formerly have been the objects of discriminatory treatment.

Finally, in this regard, it is suggested that the enforcing agencies adopt a policy of allowing only one conciliation to a respondent. Where, if a conciliation agreement has been reached and supposedly implemented, the enforcing agency receives a complaint on which it finds probable cause, it should then advise the respondent that unless he immediately settles the complaint satisfactorily to the enforcing agency, or produces strong proof to rebut the finding of probable cause, it will notice the case for public hearing and bypass the conciliation process as demonstratively an unnecessary waste of time.

### POSSIBLE ADDITIONAL SANCTIONS

It has been noted above that the technique of enforcement by exercise of the contempt power of the courts is generally a most effective technique. The threat of imprisonment to a respondent, even brief imprisonment, serves to make most people eager to comply with orders enforceable by the courts. Unfortunately, however, this ultimate power of enforcement by court order, violation of which is punishable by exercise of the contempt power, cannot be invoked until far too many hurdles have been crossed and far too much time has passed. Furthermore, the enforcing agency charged with administration of laws against discrimination in employment has often tended to avoid resorting to the courts for fear that courts will react with hostility to new-fangled administrative agencies whose quasi-judicial activities necessarily diminish the court's jurisdiction. Hence, enforcing agencies have generally shown an unwillingness to proceed with cases where the preponderance of truth was not so strong as to greatly minimize the likelihood of court reversal.

In the early days of FEPC laws, this attitude may well have served a purpose. It may have tended to make otherwise reluctant courts more willing to exercise their powers to enforce cease and desist orders aimed at employment discrimination. Those enforcing agencies which have had to resort to the courts or which have been brought into the courts by respondents have maintained an excellent record. The proportion of victories is overwhelming. It is submitted that most courts in states with laws against discrimination in employment are long past the attitude of distrusting administrative agencies charged with combating discrimination in employment.

It is not surprising that Mr. Justice Hofstadter of the New York Supreme Court, in *Bachrach v. 1001 Tenants Corporation,* 245 N.Y.S.2d 912 (1963), has said, "Public policy in this direction has continued to date as is evidenced by the recent report of the New York County Lawyers Association Civil Rights

*ENFORCEMENT OF LAWS*

Committee which called for 'a shift in emphasis from persuasion and conciliation to vigorous law enforcement.' "

Mention has been made of the fact that the technique of enforcing by administrative agencies in discrimination complaints was developed because of severe defects in the techniques of enforcement by penal provisions or by private civil suits. The defects of use of the ordinary procedures of criminal law enforcement still make it unwise to authorize penal sanctions, except in the limited cases where a person interferes wilfully with the employees of the enforcement agency carrying out their duty, or deliberately and wilfully prevents the carrying out of a conciliation agreement or a cease and desist order. An example of such limited use of penal sanctions appears in Section 299 of the New York State Law Against Discrimination.

Mention has also been made of the difficulties normally faced in using the device of enforcement by civil suit. However, since the climate of public opinion has changed substantially with respect to such laws and since there has been an increasing general concern with the existence of racial or religious discrimination in such fundamentally important fields of community life as employment, it may well be that juries faced with civil suits in such issues would be less reluctant to find for the complainant. Furthermore, it may well be that complainants in such matters, because of a possible distrust of the dedication of the enforcing agency, might prefer to seek redress in the courts by means of their own civil suit. Such procedures should certainly be allowed and, if the statute bars such alternative remedies, the statute should be amended.

Another reason for permitting such an election of remedies is that it may well be that complainants in some instances may have sufficient financial and legal resources to make them prefer to deal with the respondent in the neutral forum of the courts. After all, as has been pointed out above, state laws against discrimination in employment setting up administrative agencies were enacted on the assumption that most victims of employment discrimination are not able to deal on a basis of equality with those responsible for such discrimination. If, in fact, they are so able, there is no reason why they should not be allowed to elect to handle the case themselves with their own counsel in the courts as a neutral forum.

### The Sanction of Publicity

Throughout the discussion of the development of statutes against discrimination in employment, notice has been taken of the fact that publicity with respect to complaints of such discrimination might well entail substantial dangers. Premature publicity based on a complaint which is founded on probable cause might severely damage the innocent respondent. The result might be rumors of hostility toward the group of which the claimed victim is a member, and this, in turn, might result in baseless boycotts. Furthermore, the complainant in such matters is often a victim. First, he may become in the eyes of members

111

of the public a troublemaker and someone who has been branded as undesirable and, therefore, subjected to discrimination. Secondly, other employers may be unwilling to hire him because he has acquired a reputation as a troublemaker. Finally, premature publicity might well tend to harden the position of the respondent and make him less amenable to speedy adjustment of the complaint by conciliation. It was some of these considerations which may have impelled the legislature to impose a gag on the enforcing agency with respect to what occurs in the conciliation process. At the same time, the limitations of publicity have made more difficult the job of the enforcing agency because it imposed clogs on the agency program of educating the general public to the existence of a statutory right against discrimination in employment. Of course, here in New York, as long ago as 1951, the enforcing agency has followed a policy of releasing selected conciliation agreements without first obtaining the consent of the respondent.[9]

It is suggested that an important aid in implementing the findings of the enforcing agency and its decisions would be a substantial expansion in its efforts to obtain publicity for its reported successes. Furthermore, the agency should develop a pattern of making awards for cooperation to employers, unions and employment agencies which demonstrate their dedication to the principles of the laws against discrimination in employment.

The terms of conciliation agreements should be made public. Such a practice will serve to demonstrate to respondents that their fears of adverse repercussions are baseless. Furthermore, it would serve to prevent rumors of discriminatory policies from circulating among the groups which are generally the victims of employment discrimination and thus would serve to prevent improper boycott developments.

Such publicity would make known to the public the existence of a statutory right to be free from discrimination in employment. It would encourage members of minorities which have in the past been the subjects of discrimination to make application to employers who, by conciliation agreements, have demonstrated their desire to comply with the ban on employment discrimination. Such publicity would also alert the recruitment sources of respondents to the fact that their major client is committed to fair employment practices.

Consideration should also be given to giving publicity to complaints where the investigating commissioner has found probable cause to credit the allegations of the complaints. Such publicity might well prove helpful in speeding up the process of conciliation. Furthermore, there is nothing in existing statutes which bars such publicity since the imposition of a secrecy requirement is applicable only to endeavors to eliminate the unlawful discriminatory practice complained of by conference, conciliation and persuasion. Such early publicity on the filing of complaints would also serve to demonstrate to the skeptics

---

9. Spitz, *Patterns of Conciliation under the New York State Law Against Discrimination*, 125 N.Y.L.J. 1246 (April 6, 1951).

*ENFORCEMENT OF LAWS*

among the groups which are normally victims of discrimination that the enforcing agency is fully committed to carrying out the law and to seeking the elimination of discrimination in employment wherever it can be found.

Finally, it would be helpful if enforcing agencies announce programs of research in fields where it is rumored that discrimination exists. For example, much furor has developed leading to picket lines and chain-ins and lie-downs on the major building projects because it is charged that there is widespread racial discrimination in the building trades. Before the situation reached its present heat, rumors had long been rife of the existence of such discrimination. It is suggested that an aggressive program of research by enforcing agencies might have headed off such demonstrations leading to violence both by showing to the claimed victims that the enforcing agency is concerned with and seeking to deal with the problem and by demonstrating to the employers and unions in the field that unless they could show compliance with the ban on discrimination, they would soon be the subjects of complaints of employment discrimination.

So, too, programs of research into the population mix of the executive suites in major companies operating in states with fair employment practice laws would do much to insure equality of opportunity at this higher employment level. There is no reason why such research projects should have to be initiated by private defense agencies such as that from which I come, the Anti-Defamation League of B'nai B'rith.

### CONCLUSION

What has been said above, while critical in tone, is in no way intended as destructive. It is our hope that those of us who are concerned with this problem will be able to work constructively with the enforcing agencies to achieve the speediest possible elimination of discrimination in employment everywhere in this country. Certainly, the problem of such discrimination should have been substantially solved at all levels in states such as New York where we are in our 19th year of living under such a law. Let us work together to make equal opportunity in employment a present and immediate right.

113