


DATE DOWNLOADED: Wed Oct 14 00:02:15 2020
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
Richard B. Dyson & Elizabeth D. Dyson, Commission Enforcement of State Laws against
Discrimination: A Comparative Analysis of the Kansas Act, 14 U. KAN. L. REV. 29
(1965).

ALWD 6th ed.
Dyson, R. B.; Dyson, E. D., Commission enforcement of state laws against
discrimination: A comparative analysis of the kansas act, 14(1) U. Kan. L. Rev. 29
(1965).

APA 7th ed.
Dyson, R. B., & Dyson, E. D. (1965). Commission enforcement of state laws against
discrimination: comparative analysis of the kansas act. University of Kansas Law
Review, 14(1), 29-58.

Chicago 7th ed.
Richard B. Dyson; Elizabeth D. Dyson, "Commission Enforcement of State Laws against
Discrimination: A Comparative Analysis of the Kansas Act," University of Kansas Law
Review 14, no. 1 (October 1965): 29-58

McGill Guide 9th ed.
Richard B Dyson & Elizabeth D Dyson, "Commission Enforcement of State Laws against
Discrimination: A Comparative Analysis of the Kansas Act" (1965) 14:1 U Kan L Rev 29.

MLA 8th ed.
Dyson, Richard B., and Elizabeth D. Dyson. "Commission Enforcement of State Laws
against Discrimination: A Comparative Analysis of the Kansas Act." University of
Kansas Law Review, vol. 14, no. 1, October 1965, p. 29-58. HeinOnline.

OSCOLA 4th ed.
Richard B Dyson and Elizabeth D Dyson, 'Commission Enforcement of State Laws against
Discrimination: A Comparative Analysis of the Kansas Act' (1965) 14 U Kan L Rev 29

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from uncorrected OCR text.
-- To obtain permission to use this article beyond the scope of your license, please use:
   *Copyright Information*



Exhibit #12B

# COMMISSION ENFORCEMENT OF STATE LAWS AGAINST DISCRIMINATION: A COMPARATIVE ANALYSIS OF THE KANSAS ACT

*Richard B. Dyson**
*Elizabeth D. Dyson***

It is not a new idea that the racial and religious caste system should be eliminated from our country's economic life. Neither is it a new idea that this change should be facilitated by legislation. As early as 1874, Kansas became the third state in the nation to pass a law making it a crime for the owners of licensed inns, hotels, or places of public amusement or entertainment to "make any distinction on account of race, color or previous condition of servitude . . . ."[1] Following the United States Supreme Court's vitiation of federal antidiscrimination legislation in 1883,[2] many state legislatures acted on the Court's suggestion that discriminatory acts by individuals were within the domain of state legislation, and passed public accommodations statutes modeled on the federal act.[3] Legislative vetoes on discrimination next spread to the field of employment, with New York passing the first state statute proscribing employment discrimination in 1945.[4] Kansas first expressed its official state policy against employment discrimination in 1953.[5]

Early state laws attempting to eliminate discrimination in public accommodations by imposing civil or criminal penalties failed to make significant changes in discriminatory patterns. One reason for this failure was that the economic burden of bringing civil suit rested on the victims of the discrimination, who quite generally belonged to an economic class that could not afford the luxury of hiring lawyers. Even if the economic hurdle could be passed, civil suits were of limited usefulness because of the delay inherent in civil litigation and the inadequacy of damages as a remedy. Criminal laws were equally ineffective since the decision to prosecute customarily rested with local county attorneys, who more often than not were apathetic or hostile to the idea of charging local businessmen with crimes based on behavior that had long been viewed as normal, if not entirely desirable.[6] Moreover, the strict construction most judges gave to these penal statutes sharply limited the range of businesses

---

* Associate Professor of Law, Boston University. A.B., Boston University, 1955; LL.B., Harvard, 1962.
** Massachusetts Attorney. A.B., Radcliffe, 1961; LL.B., University of Kansas, 1964.

[1] Kan. Sess. Laws 1874, ch. 49, § 1. This statute, somewhat amended, is still on the books. One who violates this law may be convicted of a misdemeanor and fined not more than $1,000. KAN. STAT. ANN. § 21-2424 (1964). Other Kansas statutes pertaining to civil rights but not within the jurisdiction of the Kansas Commission on Civil Rights (KCCR) are KAN. STAT. ANN. § 21-2461 (employment in public works), 21-2462 to -2463 (public contracts), 44-801 (labor union bargaining units), and 12-713 (planning and zoning) (1964).

[2] Civil Rights Cases, 109 U.S. 3 (1883).

[3] For a general account of the development of state laws outlawing discrimination see KONVITZ & LESKES, A CENTURY OF CIVIL RIGHTS 155-251 (1961).

[4] N.Y. Sess. Laws 1945, ch. 118, §§ 1-3.

[5] Kan. Sess. Laws 1953, ch. 249, § 1.

[6] For a revealing survey of attitudes of local prosecutors, see Goostree, *The Iowa Civil Rights Statute: A Problem of Enforcement*, 37 IOWA L. REV. 242, 245-47 (1952).

covered. In Kansas, for example, the supreme court ruled in 1923 that a mere eating place was not an inn, hotel, or boarding house within the meaning of the Kansas public accommodations law,[7] and in 1939 that an ice cream parlor was not a place of entertainment or amusement covered by the law.[8]

Discouraged by the inefficacy of their civil and criminal laws, many states looked to other ways of enforcing a public policy against discrimination. The New York fair employment law of 1945 was a landmark in state legislation, departing for the first time from older enforcement patterns to establish an official state agency responsible for implementation and enforcement of the law.[9] The New York State Commission Against Discrimination set the pattern for similar boards in other states, by carrying the burden of establishing facts and issuing enforceable orders, as well as fighting contested cases through the courts. The administrative method of enforcing state civil rights laws has become the prevailing one today.[10]

Kansas established an "Anti-Discrimination Commission" in 1953 to deal with employment discrimination, although its function was purely advisory and educative since it had no enforcement powers.[11] In 1961, however, the agency, renamed the Kansas Commission on Civil Rights, was given some enforcement powers,[12] and in 1963 its jurisdiction was extended to cover a limited number of public accommodations.[13] In 1965 further changes were made in its methods of enforcement and new public accommodations establishments were brought within its scope.[14]

[7] State v. Brown, 112 Kan. 814, 212 Pac. 663 (1923).

[8] Brown v. Sanitary Milk Co., 150 Kan. 931, 96 P.2d 651 (1939).

[9] N.Y. Sess. Laws 1945, ch. 118, §§ 1-3. The pioneering Ives-Quinn Bill was modeled in large part on the National Labor Relations Act. 49 Stat. 449 (1935), as amended, 29 U.S.C. §§ 151-68 (1958). Many of the New York State Commission Against Discrimination's administrative procedures can be traced to parallel powers granted to the NLRB. The idea of commission enforcement of a nondiscrimination policy derived from the Federal Committee on Fair Employment Practice, established by President Roosevelt in 1941 to eliminate tension caused by discrimination in the national war effort. Congress refused to extend the life of the FEPC at the termination of World War II.

[10] It should be noted that the election of an administrative remedy does not always bar a plaintiff from bringing a civil action, although many states do provide that the election of one remedy bars others. See Note, *The Right to Equal Treatment: Administrative Enforcement of Antidiscrimination Legislation*, 74 HARV. L. REV. 526, 573-74 (1961) [hereafter cited as *Equal Treatment*].

[11] Letter opinion of the Kansas Attorney General, November 23, 1960.

[12] Kan. Sess. Laws 1961, ch. 248, §§ 1-13.

[13] Kan. Sess. Laws 1963, ch. 279, §§ 1-9. The businesses covered were hotels, motels, cabin camps, and restaurants.

[14] Kan. Sess. Laws 1965, ch. 323, §§ 1-11. The public accommodations coverage of the act, newly defined in 1965, combines two different philosophies of statutory draftsmanship: it uses both an "umbrella clause" and a specific enumeration. Such combinations have often raised the question whether the detailed listing really is exclusive, rendering the broad clause nugatory under the principle of *expressio unius est exclusio alterius*. Some civil rights statutes have been restricted in this way. See GREENBERG, RACE RELATIONS AND AMERICAN LAW 103-05 (1959). A careful reading of the Kansas act makes it clear, however, that its umbrella clause is not restricted by the enumeration. Section 2(h) defines "public accommodation" as "any person, as defined herein, who caters or offers his goods, facilities, and accommodations to the public." That is the umbrella clause. Then the next subsection, (i), defines "unlawful discriminatory practice" as

any discrimination against persons in a hotel, motel, cabin camp, restaurant or trailer court *and* the segregation against persons *in a place of public accommodations* covered by this act by reason of their race, religion, color, national origin, or ancestry. The term "unlawful discriminatory practice" *also* means any discrimination against persons in a bar, tavern, barbershop, beauty parlor, theater, skating rink, bowling alley, billiard parlor, amusement park, recreation park, swimming pool, lake, gymnasium, mortuary, cemetery which is open to the public or on any public transportation facility. (Emphasis supplied.)

State statutes setting up civil rights commissions have freely borrowed from each other and show traceable similarities in coverage and method of operation, but there are many crucial differences. This article will explore provisions in the Kansas Act Against Discrimination that deal with commission procedure, particularly those that relate to the commission's effectiveness in carrying out the stated purposes of the act: "to eliminate and prevent discrimination in all employment relations and to eliminate and prevent discrimination, segregation, or separation in all places of public accommodations covered by this act."[15] The Kansas commission and its powers will be measured against the enforcing tools given antidiscrimination commissions in the twenty-four other states that have such commissions.[16]

At the outset, it should be made clear that we apply the term "effective" to a commission which makes a wide and systematic attack on discrimination in the areas of its jurisdiction. Some may fear that vigorous enforcement of antidiscrimination laws raises a danger of serious infringement on personal freedom or that such enforcement may harm or interfere with small businesses or the growth of large industries. It should be recognized, however, that the legislature considered "the practice or policy of discrimination against individuals in employment relations or in relation to free and public accommodations" a matter of greater concern to the state, "since such discrimination threatens not only the rights and privileges of the inhabitants of the state of Kansas but menaces the institutions and foundations of a free democratic state."[17] In passing an enforceable act against discrimination, the legislature made a choice between property rights and civil rights; an effective commission may be said to be one which best implements that choice.

While the tendency in Kansas has been to strengthen the antidiscrimination commission with each session of the legislature, a number of weakening provisions were inserted in the Kansas Act Against Discrimination in 1965. Pre-

---

Thus, the unlawful practices consist of discrimination in hotels, motels, etc., *and* in a public accommodation as broadly defined, and *also*—the key word—in the long list of enumerated facilities. The legislature probably intended to make sure that the enumerated facilities would be included within the general concept of public accommodations. Discrimination is prohibited, therefore, in all businesses that could reasonably be described as offering "goods, facilities, and accommodations to the public."

The public accommodations coverage may actually be broader than it appears upon a first reading because of the word "cater." "Cater," used in the umbrella clause, is an intransitive verb, and therefore cannot be related to "goods, facilities, and accommodations." As a matter of grammar, the sentence should be read as though written, "Any person . . . who *caters to the public* or offers his goods, facilities, and accommodations to the public" is covered by the act. Since "cater" is broadly defined as "to supply what is required or desired," a literal reading of the language will lead to coverage that is even more comprehensive than may have been intended.

[15] Kan. Sess. Laws 1965, ch. 323, § 1(a).

[16] The following states provide for administrative enforcement of their antidiscrimination laws: Alaska, California, Colorado, Connecticut, Delaware, Illinois, Indiana, Kansas, Maryland, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New Mexico, New York, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, Utah, Washington, and Wisconsin.

This study will not dwell upon the substantive jurisdiction of the various state laws; in general, substantive jurisdiction extends to racial, religious, or ethnic discrimination in public accommodations, employment, education, or housing. Some states prohibit discrimination on the basis of age and sex as well, although Kansas does not. In Kansas, not all employment is covered; only employers having four or more employees are subject to the act. Kan. Sess. Laws 1965, ch. 323, § 2(b). In both public accommodations and employment, nonprofit fraternal or social associations are exempted from the strictures of the act. Kan. Sess. Laws 1965, ch. 323, §§ 2(b), (h).

[17] Kan. Sess. Laws 1965, ch. 323, § 1(a).

dictably, opponents of civil rights charged that the commission was hungry for power, and warned against adding new weapons to its arsenal. Where civil rights proponents did succeed in persuading the legislature to supply new tools to the commission, some peculiar restrictions were nevertheless imposed. It is important both for the present and the future to understand where the act and the commission stand now.

Before examining the Kansas act in detail, it will be helpful to describe the general *modus operandi* of the Kansas commission. The broad procedural outlines described below are similar in all states with antidiscrimination commissions.

The commission enters a case when a formal complaint is filed with it alleging an act of discrimination covered by the Kansas act.[18] A member of the commission is assigned as investigating commissioner. The Executive Director, head of the commission's paid staff,[19] appoints a field representative to investigate the allegations of the complaint. This representative, working under the supervision of the Executive Director, reports his findings to the investigating commissioner, who then makes a finding of probable cause or no probable cause. If no probable cause is found, the respondent is so notified in writing. If probable cause is found, the commission seeks through conference and conciliation to have the respondent agree to a satisfactory adjustment of the situation. The parties to a conciliation effort are normally the respondent, the Executive Director, and the investigating commissioner; sometimes the field representative is present, and sometimes counsel for any of the principal parties. If persuasion succeeds, the commission draws up a conciliation agreement, which the respondent signs.

If conciliation efforts fail, the case is scheduled for a hearing before a panel of three commissioners.[20] In Kansas this hearing is public. At the hearing, evidence may be presented by the respondent, the aggrieved person, and the commission's staff. What transpired during conciliation is confidential and may not be introduced into evidence. After considering the evidence presented, the hearing commissioners enter a decision, finding discrimination or no discrimination. If the finding is one of discrimination, state statutes vary as to the orders that may be issued by the commissions. All of them allow, as a mini-

---

[18] Although this article deals only with commission procedures in cases where complaints of unlawful discrimination are formally filed, the Kansas Commission on Civil Rights has important other functions as well: to endeavor to eliminate prejudice among ethnic groups, to further good will among them, and to prepare educational programs for the state's public schools that will emphasize the incompatibility of racial prejudice with American principles of fair play, Kan. Sess. Laws 1965, ch. 323, § 4(9); to study discrimination in all fields, to foster and coordinate programs of good will in cooperation with advisory agencies and voluntary groups, § 4(10); to issue publications and publish the results of its studies, § 4(12); to render an annual report to the governor and state legislature of its activities and recommendations, § 4(13).

[19] The professional staff consists of an Executive Director, an Educational Director, two field representatives, a secretary, and a stenographer.

[20] Up to this point in the proceedings, the commission as a whole has not been involved in the case. Only the Investigating Commissioner has reviewed the evidence beforehand, and by statute in Kansas he may not participate in the hearing except as a witness, nor does he take part in deliberations. Kan. Sess. Laws 1965, ch. 323, § 5. Most other states make similar provision for division of function within the administrative agency. Such separation of the fact-gathering from the fact-finding process has long been accepted as standard practice in administrative law.

mum, cease and desist orders. Either side may then appeal the commission's findings to a court of law, and appeals from that court's rulings may be taken to the highest court of the state.

In exploring in detail the procedural elements of the Kansas act that have the most direct bearing on the effectiveness of the commission, we have selected the following questions as most significant to a study of the commission's strength:[21]

A. Who can file complaints?
B. When must the respondent be notified that a complaint has been filed?
C. What is the statute of limitations on filing complaints?
D. What evidence-gathering power does the commission have?
E. What interlocutory relief is available before a hearing and final orders?
F. What can the commission require in conciliation agreements and in final orders after hearing?
G. How are conciliation agreements and final orders enforced?
H. What legal assistance is available to the commission?
I.  What restrictions are placed on evidence at the hearing?
J.  How broad is the reviewing power of the court over the decisions of the commission?

## A. *Initiation of commission action: who can file a complaint?*

"Aggrieved persons" are entitled to file complaints in all of the states that have antidiscrimination agencies.[22] Kansas permits only one other person, the attorney general, to invoke commission action.[23]

Other states variously allow filing by the commissioner of labor,[24] the commissioner of education,[25] the antidiscrimination agency itself,[26] and civil rights organizations.[27] No state goes so far as to permit "any public or private agency" to file a complaint, although with the increasing proliferation of municipal

---

[21] In limiting the scope of our discussion to procedures relating to effectiveness, we have used a "without which" kind of test; a procedural issue is discussed if it involves a power without which the commission might be hampered in promoting compliance with the act. Necessarily this excludes discussion of such procedural matters as election of remedy, immunity of witnesses, power of complainant to withdraw his complaint, and so on. Most of these noncontroversial procedural problems are discussed in *Equal Treatment*.

[22] Just who may be considered "aggrieved" is not immediately self-explanatory. A person only incidentally harmed by discrimination, such as a nondiscriminatory barber who alleges harm to his trade because of frequent referrals of Negroes by competitors, may not be entitled to file complaints. See N.Y. STATE COMM'N AGAINST DISCRIMINATION, 1959 ANN. REP. 76. It can be argued that someone working on a test case for CORE, NAACP, or a similar group ought not to be permitted to file complaints in cases where the person discriminated against does not stand ready to accept the job or house he allegedly sought even if offered to him. On the other hand, such a person will be aggrieved in the sense that the denial of employment or accommodations based on race does make him experience discrimination personally and directly. Many commissions do accept complaints from persons "aggrieved" only in the sense described above. Some, however, have discouraged them as "trap" cases. See, *e.g.*, Interview With Administrator, Civil Rights Division, Oregon Bureau of Labor, Aug. 9, 1960, cited in *Equal Treatment* 529.

[23] Kan. Sess. Laws, 1965, ch. 323, § 5. New York, Massachusetts, Pennsylvania, New Jersey, Colorado, California, New Mexico, Missouri, and Oregon also permit the attorney general to file complaints.
The Kansas act provides in the same section that "any employer whose employees, or some of whom, refuse or threaten to refuse to cooperate with the provisions of this act, may file with the commission a verified complaint asking for assistance by conciliation or other remedial action." This is a standard provision found in all the state statutes proscribing discrimination in employment.

[24] New York, New Jersey, and New Mexico.

[25] New Jersey.

[26] Massachusetts, Ohio, Rhode Island, Pennsylvania, Washington, Connecticut, Colorado, Missouri, Oklahoma, and Minnesota.

[27] Rhode Island and Ohio.

human relations commissions and federal government agencies concerned with discrimination, it might well be desirable to allow such agencies to file complaints with the appropriate state agency when a known instance of discrimination falls outside the limited jurisdiction of a particular commission or government division.

The range of persons or organizations entitled to invoke commission action is important to an effective attack on discrimination. Although our civil legal system depends upon the energy of potential plaintiffs to start the wheels of justice rolling, less reliance can be placed on the class of persons that antidiscrimination laws are designed to protect. Often minority groups are ignorant of the remedies they might invoke by seeking commission assistance, or skeptical about the sincerity of the wish of a middle-class government to right their wrongs. They may fear retaliation by employers or others if they seek the commission's help. In Kansas the reluctance of "aggrieved persons" to seek legal redress is illustrated by an example cited in 1960 by the commission. The major industry in one Kansas town at that time hired Negroes as janitors only. Because members of the families of potential complainants were employed by this company, fear of reprisal effectively barred the filing of formal complaints.[28] Yet the commission, knowing of the situation, might have been able to mediate if it had had the power to initiate action on its own motion.

People of Latin-American descent are even more reluctant to file complaints than colored persons, at least in states where they are heavily concentrated. Since 1961, when the Kansas Act Against Discrimination became administratively enforceable, only six complaints have been filed by Mexican-Americans, as opposed to 1400 complaints filed by persons of color.[29] These figures do not demonstrate that there is little discrimination against Mexican-Americans;[30] submissiveness and apathy probably provide a better explanation. If potential complainants from this class were convinced that available remedies were worth the trouble of going through the procedures that the act provides, their alienation from the state's social and economic life might be substantially reduced.

Giving the attorney general power to bring complaints, as Kansas does, has not proved effective. In this state the attorney general has acted as formal complainant in only one case.[31] After acting as complainant in this case, the attorney general made clear his intention to stay out of all but the most clear-cut cases in the future, and rendered an opinion

[28] Interview with Executive Secretary, Kansas Anti-Discrimination Commission, in Topeka, Kan., July 27, 1960, cited in *Equal Treatment* 531.
[29] KAN. COMM'N ON CIVIL RIGHTS, 1964 REPORT OF PROGRESS 17.
[30] The testimony of Pete Esquivel, chairman of the American GI Forum of Kansas, at hearings on housing discrimination conducted by the Kansas Legislative Council in 1963 indicates that there is only token integration of Mexican-Americans in the state. Memorandum, Research Department, Kansas Legislative Council, Re: Proposal No. 11- Discrimination- Real Property· Transcript of October 10 Hearing 17-19 .(1963).
[31] In the Matter of Board of Educ., No. 96-63 (KCCR 1963), *appeal docketed sub nom.* Ferguson v. Board of Educ., No. 20477B, Dist. Ct. Wyandotte County, Div. 4, April 28, 1965.

That the Attorney General should initiate complaints before the Kansas Commission on Civil Rights only if three requirements are met. These are:

1. The matters complained of must be of a general nature affecting a substantial number of individuals.
2. The persons directly affected or aggrieved by the alleged discrimination must demonstrate that they have a compelling reason for not filing a complaint before the Commission in their own behalf.
3. Sufficient primary facts, and not merely inferences or conclusions, should be furnished to this office to lead the Attorney General to conscientiously believe that there probably exists an unlawful employment practice.[32]

These requirements are understandable. Considering the large number of statutory duties that rest on the attorney general's small staff, he might well feel that only matters "of a general nature affecting a substantial number of individuals" merit the attention of his attorneys. This, of course, is the main reason why it is wrong to rely on his office for the protection of individual rights. The statute provides a remedy for *any* person discriminated against by reason of race, religion, color, or national origin, and whether the case is of a general nature or affects a substantial number of individuals is utterly irrelevant as a criterion of enforcement.

The opinion's requirement of "primary facts" that evidence a clear violation is understandable in light of both the workload of the attorney general's staff and the political nature of his office. Nevertheless, it is inherent in the nature of discrimination that, at the initial complaint stage, suspicions and inferences often form the basis of a charge. The antidiscrimination law is not criminal, and the precautions surrounding the invocation of criminal prosecution do not apply to it. Although the commission's powers of informal investigation are not entirely clear,[33] in general, the filing of a complaint should precede specific fact-gathering by commission personnel. Not until the commission's wheels have thus been set in motion, and a proper investigation conducted, can anyone "conscientiously believe that there probably exists an unlawful . . . practice."

Several states, aware of the timidity of minority groups and the pressures exerted on elected officials, have given their civil rights commissions the power to initiate complaints.[34] This enables the commission to take a more systematic approach to the elimination of discrimination in the areas entrusted to it, instead of relying on haphazard individual protests. Of course, in such states the commission still relies primarily upon information relayed to it by interested persons, but the attitudes of directly aggrieved persons toward publicity

---

[32] Letter opinion of the Kansas Attorney General dated August 26, 1963.

[33] The Kansas act does empower the commission "to study the problem of discrimination in all or specific fields or instances of discrimination." Kan. Sess. Laws 1965, ch. 323, § 4(10). But this broad language could hardly justify intensive investigation of an isolated instance of discrimination in view of the complaint procedures outlined in § 5. Yet a number of commissions which do not have statutory power to initiate their own complaints have devised procedures to get around this limitation, and many commissions do infer authorization to investigate from enumeration of broad study powers like the Kansas provision quoted. See *Equal Treatment* 530. Such practices seem questionable. Even though action taken under these provisions cannot lead to enforceable decrees, the effect may be to regulate the behavior of the establishment investigated since respondents are not always informed whether investigations are formal or informal.

[34] See note 26 *supra*.

and the possibility of retaliation cease to be important factors. The commission's familiarity with the state's problems and the expertise that it gains in the course of its work are thus put to the best use.[35]

The reasons for granting filing power to commissions also apply to giving that power to civil rights groups. Rhode Island permits complaints to be filed by "an organization chartered for the purpose of combating discrimination or racism, or of safeguarding civil liberties, or of promoting full, free, or equal employment opportunities. . . ."[36] Such statutory authorization seems particularly desirable since civil rights groups have wide experience in recognizing discrimination when it occurs, weeding out baseless complaints, advising complainants, following up adjusted cases, and providing counsel for the protection of individual rights.[37] It is arguable that it is even better for private organizations to have filing power than for the commissions themselves. Certainly, the more private interest groups are accorded a role in policing the antidiscrimination law, the more detached and impartial the commission will appear to the public at large.

It is not entirely clear that civil rights groups could not file complaints under the present Kansas law. On its face the filing provision seems weak, specifically naming only aggrieved persons and the attorney general. But a civil rights group might seek to file a complaint invoking the broad definition of "person" in Kan. Sess. Laws 1965, ch. 323, § 2(a): "The term 'person' includes one or more individuals, partnerships, associations, organizations, corporations. . . ." No judicial precedent in Kansas extends this definition to a civil rights group, but under a similar definition of "person" in the New York antidiscrimination law, the American Jewish Congress was held to come within the reasonable scope of a "person" authorized to file a complaint.[38] Possibly, then, the Kansas provision on filing could be held to be stronger than it appears on its face.

## B. *Notice to the respondent of the complaint.*

Prior to 1965, the Kansas act provided for notice to the respondent in the following manner: if the investigating commissioner found no probable cause after investigating a complaint, he would so inform the respondent within ten days from that finding. If he found probable cause, he would attempt to conciliate, and if conciliation failed, notice of public hearing and a copy of the complaint

---

[35] It should be noted, however, that giving commissions the power of initiative does not ensure the exercise of that power. In a 1961 survey of antidiscrimination commission practices it was revealed that only a few commissions have made extensive use of their power to initiate complaints.

This difference of approach reflects basic divergences in the commissions' own conceptions of their roles. For those to whom the antidiscrimination commission is a quasi-judicial agency established to adjudicate disputes between aggrieved complainants and respondents, in the manner of a court of law, the self-instituted complaint is an extraordinary weapon, to be used only in extreme cases (footnote omitted). If, however, the commission is regarded as an independent force created to combat discrimination affirmatively, it should make more frequent use of its initiatory powers to formulate a coherent program. *Equal Treatment* 531.

[36] R. I. GEN. LAWS ANN. § 28-5-17 (1956). Ohio similarly allows "organized groups of persons" to file complaints. OHIO REV. CODE ANN. §§ 4112.01(A); 4112.05(B) (Baldwin 1964).

[37] See Comment, *Private Attorneys-General: Group Action in the Fight for Civil Liberties,* 58 YALE L.J. 574 (1949).

[38] American Jewish Congress v. Carter, 19 Misc. 2d 205, 23 Misc. 2d 446, 190 N.Y.S.2d 218 (Sp. T. 1959), *modified on other grounds* 10 App. Div. 2d 722, 199 N.Y.S.2d 157 (1960), *aff'd* 9 N.Y.2d 223, 173 N.E.2d 788, 213 N.Y.S.2d 60 (1961).

would be sent at least ten days before the hearing.[39]  Normally, the field representative conducting the investigation in an employment case would inform the respondent that a complaint had been filed as soon as the complainant's background had been checked.  In any case, the commission could not attempt conciliation with the respondent without informing him that a complaint had been filed, so that conciliation served as notice in the case of a finding of probable cause.  In the course of either investigation or conciliation, then, the respondent learned of the complaint.  But the law did not require notice to the respondent until the investigation was over.

The legislature amended the act in 1965 to provide that notice of the complaint must be given within seventy-two hours after a complaint is filed.[40]  At first glance, this provision may seem reasonable and consistent with fundamental due process notions that are reflected in the ordinary court practice of sending copies of all papers filed to opposing parties.  The appearance, however, is misleading; it arises from the confusion of investigatory activity with the hearing process.  This confusion may stem from the different contexts in which the word "complaint" is used.  The initial complaint to the commission is analogous to a citizen's complaint of a crime to the police, rather than a lawyer's filing a complaint in court at the beginning of the trial process.  The requirement that notice be given the respondent at this point, then, is analogous to requiring that notice be immediately given to an alleged criminal before the police can conduct an investigation.

Only two other states require that notice be sent to the respondent of all complaints, and none has a time period as short as seventy-two hours.[41]  Most of the states follow the practice Kansas followed until 1965, requiring a copy of the complaint to be sent to the respondent only after conciliation failure.  Eight states do make provision for sending complaints at an earlier stage "if in the opinion of the investigating official circumstances so warrant,"[42] but only Kansas, Illinois, and Utah require that this be done.

The effect of the amendment will almost certainly be to hamper the commission in its work.  For example, in certain kinds of cases, discriminatory practices are embodied in instructions given to employees, such as waitresses in restaurants or interviewing personnel in the employment field.  Notice here before an investigation would make it virtually impossible for the commission's staff to gather direct evidence of the practices in question.[43]  A violating em-

[39] Kan. Sess. Laws 1961, ch. 248, § 6.
[40] Kan. Sess. Laws 1965, ch. 323, § 5.
[41] UTAH CODE ANN. § 34-17-7(4) (Supp. 1965) (5 days); ILL. ANN. STAT. ch. 48, § 858(a) (Smith-Hurd Supp. 1964) ("promptly").
[42] The language quoted is from COLO. REV. STAT. ANN. § 80-21-7(5) (1963).  New York, Massachusetts, Ohio, Rhode Island, California, and New Mexico have similar provisions.  Michigan's provision is somewhat ambiguous: "the commission shall have the power to issue and cause to be served upon such respondent a complaint stating the charges."  MICH. STAT. ANN. § 17.458(7)(d) ('960).  "Shall have the power" probably does not mean "must."
[43] It may seem unfair that the commission should depend on concealing its mission during the fact-gathering process in certain types of cases, but these are areas where discrimination is generally very difficult to prove.  See Note, *An American Legal Dilemma—Proof of Discrimination,* 17 U. CHI. L. REV. 107 (1949).  To take away the power of surprise is to strip the commission of one of its best investigating tools.

ployer or manager will have an opportunity to destroy or conceal records as well as to coach his key subordinates in the proper posture to adopt before the commission's staff.

Another harmful effect of the notice requirement is that it will cause needless worry for persons complained against where the complaint is insubstantial or groundless. One of the important functions of the commission's trained staff is to screen out baseless complaints before they go any farther. The ultimate effect of having to give notice before the staff can study the complaint and confer with the complainant will be annoyance to many innocent respondents, and opposition to the law itself.

Building opposition to the law may have been in the minds of some who sponsored the amendment. Others probably went along with it under a mistaken application of concepts of fair play. Whatever the reasoning of its sponsors, the amendment will fetter the commission in its fact-gathering function and will not generate for it much good will. The time at which notice should be given to the respondent should not date from the original complaint, but from the point at which the investigating commissioner decides that there is probable cause, which marks the end of the initial investigation. Preserving constitutional rights before and during a hearing or trial is important; but notice that the investigator is on his way is not a constitutional right.

## C. *The statute of limitations on filing a complaint.*

The 1965 legislature reduced the time for filing complaints from six months to ninety days after the occurrence of an alleged discriminatory act.[44] This puts Kansas in the minority of states having less than a six months' period. Only one state, Utah, has an even shorter limitations period of thirty days;[45] California, at the other extreme, allows a full year with an additional ninety days if the facts are not discovered until after that. The California provision reads,

> No complaint may be filed after the expiration of one year from the date upon which the alleged unlawful employment practice or refusal to co-operate occurred; except that this period may be extended for not to exceed 90 days following the expiration of that year, if a person allegedly aggrieved by an unlawful employment practice first obtained knowledge of the facts of the alleged unlawful employment practice after the expiration of one year from the date of their occurrence.[46]

California's statute illustrates one attempt by a state legislature to deal with some of the difficult legal issues that can arise concerning the time at which the statutory period starts to run. Suppose a person applies for a job, and the employer decides not to hire him because of his race. If the employer notifies the person of his rejection ninety-one days after the application was filed, it seems clear that the period only starts running with the notice of rejection, and the applicant still may file a complaint up to ninety days after receiving the rejection. But what if the employer simply throws the application away, and

never notifies the applicant? It would be manifestly unfair to the applicant to hold that the period starts running when the application is actually rejected, since he has no way of knowing of the rejection until a significant period has elapsed—which may in some cases be as long as ninety days. On the other hand, it seems contrary to the spirit of the statute to allow the limitation to be tolled indefinitely because no explicit rejection was sent.[47] Even more difficult are the cases where the employer has rejected a specific application for unlawful reasons, but has held off notifying the applicant because of the possibility that he might accept a more menial position. What about the case where the unlawful practice consists of failure to promote an employee because of race? Should the statute be tolled indefinitely on the theory that the employer can rectify his action and promote the employee at any time?

These last problems raise squarely the question of "continuing discrimination," that is, whether a negative posture, a continuing refusal to act, can be an "act of discrimination" within the meaning of the statute such that the statutory limitations period will not expire. A New Jersey case, *Levitt & Sons, Inc. v. Division Against Discrimination*,[48] sheds some light on the problem. Complainants had been refused housing by the respondent developers because of their race, and had filed complaints within the statutory (ninety-day) period against respondent corporations; after the period had expired the complainants sought to add the developers individually as respondents. Their theory was that since the developers were continuously refusing to sell properties in the same development to other Negroes, unlawful discrimination continued down to the filing of the amended complaints. The New Jersey Appellate Division rejected this argument, indicating that in such a case a specific act such as rejecting an offer to buy a house would start the statute running, but that "patterns" of discrimination continuing thereafter would not be considered.

The decision seems proper. Where some specific act must be alleged to justify a complaint, it is reasonable to conclude that such an act starts the statute running and it is not tolled by acts which may discriminate against others but which bear no direct relation to the person complaining. The facts in this case nicely illustrate, however, the notice problems which a short limitations period can intensify. Suppose that in this case the complainants had not filed a complaint against the respondent corporations at all because they did not know that their refusal to sell to them was based on race. Ninety-one days later they realize that the developers had violated the law because Negroes were systematically

---

[47] In International Bhd. of Elec. Workers Local No. 35 v. Commission on Civil Rights, 140 Conn. 537, 102 A.2d 366 (1953), a Negro filed application for union membership on April 1, 1949 and did not file a discrimination complaint till July 1, 1950. The Connecticut Supreme Court of Errors held that the complaint was not barred by the six-month statute of limitations, although more than a year elapsed between the dates. "Inasmuch as there was no express rejection, the six months would not begin to run until the expiration of the period within which it could reasonably be expected that the plaintiff [respondent below] would have acted upon the application." *Id.* at ___, 102 A.2d at 370. Since in practice apprentices customarily waited a year before being admitted into this union, the court implies that it would have been a year and six months before the complaint could have been barred.

[48] 56 N.J. Super. 542, 153 A.2d 700 (Super. Ct. 1959), *aff'd*, 31 N.J. 514, 158 A.2d 177, *appeal dismissed*, 363 U.S. 418 (1960).

rejected during that period while white buyers were accepted. The court's reasoning would bar the original persons discriminated against from filing a complaint, even though unlawful discrimination took place previously and even though it has continued unabated. In the light of the notice difficulties posed by cases like this, and in our earlier examples of silent rejection and failure to promote, it seems that a generous limitations period is called for.

Clearly the new Kansas provision will foreclose redress for a certain number of potential complainants. Just as clearly, potential respondents will be aided by the shorter period. Justification for it arguably lies, as with all such statutes, in the general policy of "letting men's affairs come to rest." Such a policy has less application to the discrimination area than to others, however. The relief granted by this law is not punitive, but specific—ending particular discriminatory practices in order to open up segregated enterprises on a footing of equality. Where an employer or a restaurateur is pursuing an unlawful discriminatory business practice, society has no interest in letting his affairs come to rest. If he has seen the light and changed his policy since a discriminatory act took place, a case will not be pursued against him and a lengthy statute of limitations cannot hurt him.[49] If he has not changed his ways, then a short statute only makes it harder for the commission to take corrective action, and puts a premium on filing as soon as possible even in cases where a complainant is sincerely uncertain that a particular rebuff was based upon his race.

## D. The evidence-gathering power of the commission.

A 1965 amendment to the Kansas act gives the Kansas commission, for the first time, a possible means of obtaining subpoenas for the production of records and witnesses.[50] The new section on subpoenas provides that any member of the commission, the complainant, the attorney general, or the county attorney may apply to the district court judge of the district where the discrimination allegedly occurred, and "upon filing of an affidavit with the court setting forth facts which the judge shall find sufficient to constitute reasonable grounds for a belief that a violation of this act has occurred and that the person complained against has committed such violation" the judge may, "in his discretion," issue the subpoena. Kansas thus finally joins the large majority of states that afford subpoena powers to their antidiscrimination agencies.[51] Of these states, however, only Kansas and Michigan force the commission to rely upon a judge to obtain a subpoena; all the others except New Jersey give the power to the commission directly.[52] The more usual practice is to allow the commission itself to subpoena witnesses and records "relating to any matter under investigation

---

[49] If he has changed his policy he will have no objection to signing a conciliation agreement stating that he will comply with the law. When conciliation is successful, a case is closed.

[50] Kan. Sess. Laws 1965, ch. 323, § 4(5).

[51] Only three state statutes are silent as to whether or not their commissions can subpoena witnesses and records: Oregon, Delaware, and Alaska have no provision one way or the other. Presumably the Human Rights Commission in Oklahoma has no subpoena power since it can only "request the appearance of witnesses." Okla. Stat. tit. 74, § 953(f) (Supp. 1963). All the other states specifically grant the power.

[52] New Jersey gives its attorney general the power of subpoena. N.J. Rev. Stat. § 18:25-8(i) (Supp. 1964).

or in question before the commission,"[53] and eight states further provide that the commission may make rules as to the issuance of subpoenas by individual commissioners.

What is a simple matter in most states may turn out to be a headache for the Kansas Commission on Civil Rights. How useful the commission's somewhat truncated subpoena power will be will depend in part on the reactions of individual district judges to applications by the commission. The wording of the statute apparently would allow a hostile judge to refuse to issue a subpoena either by denying the existence of "reasonable grounds for a belief that a violation of this act has occurred," or simply in exercise of the "discretion" that is expressly granted. Since the refusal to issue a subpoena probably does not constitute a final order for purposes of judicial review,[54] there is likely to be no meaningful remedy for an abuse of discretion. Even if no judges are fundamentally opposed to the commission's work, certainly standards by which subpoenas are granted will vary from judge to judge so that the commission can never rely automatically on the issuance of a needed subpoena.

Perhaps a more serious weakness in the subpoena provision is the lack of any clear language concerning timing. In those statutes allowing subpoenas regarding "any matter under investigation or in question before the commission," it is clear that the subpoena can issue at the initial investigatory stage. The Kansas provision, however, is silent on this point. On the one hand it can be argued that the requirement of "reasonable grounds" means that there must be proof conforming closely to a showing of probable cause. In that case, the subpoena power would not be available for the first stages of an investigation, and the commission would have to use other means for unearthing evidence to show probable cause. On the other hand, a notarized complaint plausible on its face may be sufficient to demonstrate "reasonable grounds." A judge so holding would presumably grant a subpoena at the initial investigatory stage.

It can be argued that whatever the proper interpretation of the section, as a matter of policy the commission should not be given subpoena rights until the case has reached the adversary point. Its earlier use may seem to approach violation of the respondent's civil liberties. But it should be recognized that the use of subpoenas for investigation by federal agencies has been regularly upheld by the federal courts and by most states where the power is given to state agencies.[55] In defense of allowing subpoenas at the investigatory stage, the commission's findings are in practice kept confidential,[56] and it is hard to conceive of any detriment other than publicity to which an innocent respondent might object. In any case, the fear of "fishing expeditions" has much less basis with a commission that is limited to investigating one subject than with a general-purpose law enforcement agency.

---

[53] N.Y. EXECUTIVE LAW § 295(7).
[54] Cf., Curtis v. Interlake Realty, Inc., 62 Wash. 2d 928, 385 P.2d 37 (1963) (trial court's order to a witness to appear before antidiscrimination board and give testimony is not a "final judgment" within meaning of supreme court's rules respecting appeals).
[55] See 1 DAVIS, ADMINISTRATIVE LAW § 3.04 (1958).
[56] Interview with Executive Director, KCCR, in Topeka, Kan., July 22, 1965.

The Kansas act also permits the respondent to apply to the district court for a subpoena of documents or witnesses "pertinent to the proceeding." ("Proceeding" presumably means the hearing before the commission, since the paragraph immediately follows the provision on formal hearings.) Although only Illinois and Michigan have similar provisions, it is somewhat surprising that such language is not more widespread. It seems only fair to allow the respondent the same evidence-producing powers as the commission. Perhaps in practice most commissions exercise their subpoena powers for the benefit of a respondent who requests it.

One caveat seems pertinent, however, where the respondent uses his power of subpoena to elicit records of the commission itself. The order should extend only to specifically named records or reports, not to internal memoranda or working papers. In the field of civil court procedure, analogous discovery powers have rightly been limited so that a party's "work-product" cannot be taken against his will.[57] If the same rule were not applied to the commission, the successful preparation of a case would become almost impossible.

### E. Interlocutory relief.

One of the difficult problems in administering a civil rights law is preserving the status quo of a transaction so that a complainant can obtain the relief he seeks. This pertains mainly to the fields of employment and housing. It is difficult to set up a scheme that preserves an appropriate remedy for the complainant without working a hardship on the respondent in some cases. Groundless complaints are bound to be filed occasionally,[58] and there are some cases where the respondent is vindicated after a finding of probable cause.[59] Should a respondent have to keep a job or housing opportunity open until the dispute is settled?

Only two states go so far as to grant their commissions the power to apply for injunctive relief pending settlement of a discrimination case.[60] One of these, Oregon, does not grant the power directly, but it can probably be inferred from a provision in the statute that prohibits a respondent from taking any action that would defeat the purposes of the act or make employment, public accommodations, or real property unavailable.[61] In Massachusetts, after a determination of probable cause, a commissioner may file a petition in equity seeking appropriate injunctive relief, including restraints on selling or renting property

---

[57] Hickman v. Taylor, 329 U.S. 495 (1947).

[58] Over a three year period, from July 1, 1961, to June 30, 1964, out of a total number of 137 complaints filed with the Kansas Commission on Civil Rights charging unlawful discrimination in employment, no probable cause was found in 47 cases and no jurisdiction in 6 cases. Kan. Comm'n on Civil Rights, 1964 Report of Progress 12, Table I-C.

[59] The problem is not a serious one in terms of frequency, since a finding of probable cause is arrived at only after careful evaluation of the evidence by the commission's staff. In the history of the commission, vindication after a finding of probable cause has occurred only two or three times. Interview with Executive Director, KCCR, in Topeka, Kan., July 22, 1965.

[60] In most of the other states injunctive relief is not available until after a formal hearing, pending judicial review or enforcement of the commission's order by a court. Kan. Sess. Laws 1965, ch. 323, § 7, is a typical provision allowing the court "to grant such temporary relief or restraining order as it deems just and proper" when a petition has been filed requesting enforcement of a final order of the commission.

[61] Ore. Rev. Stat. § 659.055 (Supp. 1963).

pending final determination of a housing complaint. No injunction can be granted without a hearing preceded by three days' notice to the respondent.[62] It would be possible to argue that other commissions can also seek injunctions, since nothing in any of the statutes forbids it, but at least one court has foreclosed this method of maintaining the status quo in the absence of specific language authorizing it.[63]

Probably the lack of interlocutory relief causes no great injustice in the employment area. Broadly speaking, the employment situation is a fluid one, and even if a particular job opportunity has been foreclosed during conciliation or hearing proceedings, relief can usually be given to a successful complainant by an order that he be hired for the next similar job that opens up. In the housing field, however, lack of interlocutory relief can be more of a problem since many sellers or renters of property are not engaged in the business and are only dealing with the specific housing opening that the complainant seeks.

Although Kansas at present has no fair housing legislation, it seems pertinent to discuss the problems of interlocutory relief in this area since the Kansas commission has recommended a fair housing law for Kansas[64] and the legislative research council has been directed to draft such a law for consideration at the next legislative session.[65]

In a housing case, the issues are generally simple: the respondent is selling or renting property, the complainant offers to meet the respondent's price, and is refused. The complex problems that can arise in the employment field involving qualifications of the applicant or subtle patterns of discrimination seldom arise in housing. Where a complaint alleging housing discrimination has been filed, the merits can usually be determined without much delay. A respondent temporarily enjoined from disposing of property could be hurt, if innocent, in the unusual case where a unique opportunity to rent or sell appeared during mediation, later disappeared, and the complainant became uninterested in the property. But in the ordinary case the respondent, innocent or guilty, will have at least one buyer or renter on hand when proceedings are terminated—the original complainant himself.

Although the two states providing for interlocutory relief apparently do not have provisions for compelling a complainant to go through with his side of the bargain, such a provision seems only fair if the respondent has been ordered not to act.[66] Perhaps an injunction bond should be required, in appropriate cases, or purchase money might be placed in escrow. At the very least, no temporary relief should be granted without an adversary hearing, at which the court should balance the possibilities of injury to complainant and respondent in deciding

---

[62] Mass. Gen. Laws Ann. ch. 151B, § 5 (Supp. 1964).
[63] Marshall v. Equi, No. 76678 Eq., Mass. Super. Ct., Suffolk County, March 25, 1960 (decided before the provision for interlocutory relief was added to the Massachusetts law).
[64] Kan. Comm'n on Civil Rights, 1964 Report of Progress 20.
[65] Kan. Sess. Laws 1965, ch. 324.
[66] This would mean, of course, that no interlocutory relief should be made available to a party to a test case of the kind discussed above, note 22 *supra.*

whether to issue an injunction. Security, if required, should be fashioned to the needs of the particular case as determined at the hearing.

A provision for interlocutory relief was the point of many attacks made on the housing bill proposed in Kansas in 1965.[67] A newspaper advertisement by one real estate board objected that the bill "proposed to hold in suspension real property transfers for an indefinite period upon a charge of discrimination even though such charge might later be determined untrue."[68] Unless reasonable protective clauses are included in a section authorizing injunctive relief, such objections are probably well-founded. Ideally, the following conditions should be required:

1. No injunction should issue until after a finding of probable cause.
2. No injunction should issue without an adversary hearing.
3. The commission should be required to expedite its investigation and conciliation proceedings so that "indefinite periods" do not drag on.
4. Respondents later determined innocent should either be empowered to compel the complainant to buy or rent the property in question, or else should be reimbursed under court order for damages sustained by delay.

F. *Contents of conciliation agreements and final orders.*

The conciliation process, which takes place after a finding of probable cause, is the main focus of the commission's activity. Of the many complaints processed by the commission since it gained enforcement powers in 1961, only two have had to go beyond the conciliation stage.[69] The range of terms that can be inserted in a conciliation agreement is important, since it determines the flexibility of the agreement as a mechanism of adjustment between the parties and others similarly situated.[70] Kansas empowers its commission "to include any term in a conciliation agreement as could be included in a final order under this act."[71] This provision, new in 1965, clears up the uncertainty that exists in other states concerning what can go into the agreement.[72] It clearly bars Kansas from following the doubtful Pennsylvania practice of allowing agreement provisions that could not have been required in a final order.[73] It seems fair to limit the

---

[67] Kan. S.B. 166 (1965). The pertinent provision read, "The commission shall have the following functions, powers and duties . . . . (8) To apply to the district court of the county where the housing accommodation or real property is located for interlocutory relief to prevent any such housing accommodation or real property, whether such housing accommodation or real property is constructed or to be constructed, from becoming unavailable during the processing of a formal complaint after a finding of probable cause by the investigating commissioner."

[68] Lawrence Daily Journal World, April 19, 1965, p. 5, col. 6.

[69] Notice of public hearing has been issued in more than two instances by the commission, but in every case except these two the disagreement has been resolved at the eleventh hour. In the Matter of Board of Educ., No. 96-63 (KCCR 1963), *appeal docketed sub nom.* Ferguson v. Board of Educ., No. 20477B, Dist. Ct. Wyandotte County, Div. 4, April 28, 1965 (alleged unlawful employment practices by the Board); In the Matter of Jake Brown's Barbecue Club, Inc., No. PA 12-64 (KCCR 1964), *appeal docketed,* No. 19951B, Dist. Ct. Wyandotte County, Div. 3, March 4, 1965 (alleged unlawful discriminatory practices).

[70] The problem of "others similarly situated" is discussed in text accompanying note 82 *infra.*

[71] Kan. Sess. Laws 1965, ch. 323, § 4(6).

[72] Only Oregon's statute clearly provides that the terms of a written conciliation agreement may include any or all such terms as could be included in a cease and desist order. ORE. REV. STAT. § 659.050(2) (Supp. 1963).

[73] See PA. FEPC LEGAL RULINGS 7 (1958).

commission thus; a respondent should not be penalized for being conciliatory by having to submit to terms that could not have been imposed finally if he had resisted mediation and proceeded to public hearing.

What may the Kansas commission require in a final order under the act? There are two passages in the statute relating to a final order's contents (thus governing conciliation terms as well). The first is in section 5:

> If, upon all the evidence in the hearing, the commission shall find a respondent has engaged in or is engaging in any unlawful employment practice or unlawful discriminatory practice as defined in this act, the commission shall state its findings of fact and shall issue and cause to be served on such respondent an order requiring such respondent to cease and desist from such unlawful employment practice or such unlawful discriminatory practice and to take such affirmative or other action, including the hiring, reinstatement with or without back pay, or upgrading of employees and the admission or restoration to membership in any respondent labor organizations; the admission to and full and equal enjoyment of the goods, facilities, and accommodations offered by any respondent place of public accommodation denied in violation of this act, as, in the judgment of the commission, will effectuate the purposes of this act, and including a requirement for report of the manner of compliance.[74]

Only Kansas and one other state limit the power of the commission to award back pay to situations involving reinstatement of employees fired on account of discrimination.[75] The back-pay phrase in the quoted paragraph is identical to language in the National Labor Relations Act naming back pay as a remedy for persons unlawfully fired for union activity.[76] In the labor field, it makes sense to direct back-pay relief to situations involving reinstatement of employees previously hired; employers seldom coerce or restrain persons not yet hired in the exercise of collective bargaining rights. In the racial discrimination field, however, an initial refusal to hire because of race is far more common than firing because of race. Recognizing this, although many states originally copied the NLRA language as did Kansas, most of them have rearranged the crucial commas to enable their commissions to award back pay for a discriminatory refusal to hire. New York's language is typical of most: the commission may take "affirmative action including (but not limited to) hiring, reinstatement or upgrading of employees, with or without back pay."[77]

The unusual limitation in the Kansas act constitutes a major weakness of the act. Although awards of back pay are seldom granted by other commissions,[78] the existence of the power encourages respondents in these states to avoid delaying tactics. In Kansas, the commission's experience has been that many employer-respondents deliberately draw out negotiations where they know that complainants are not in a position to play a waiting game.[79] The threat of having to pay a salary accruing since the date of an unlawful refusal to hire would

---

[74] Kan. Sess. Laws 1965, ch. 323, § 5.
[75] The other state is Missouri. Mo. REV. STAT. § 296.040(6) (Supp. 1961).
[76] 49 Stat. 453 (1935), as amended, 29 U.S.C. § 160(c) (1958).
[77] N.Y. EXECUTIVE LAW § 297(2).
[78] KAN. COMM'N ON CIVIL RIGHTS, 1964 REPORT OF PROGRESS 19.
[79] Interview with Executive Director, KCCR, in Topeka, Kan., July 22, 1965.

constitute a powerful incentive for these respondents to cooperate quickly. Like all powers, the award of back pay could be subject to abuse; but the law affords ample review and modification of commission orders by the courts. Moreover, the near-complete unanimity of other states in granting the power indicates that it has not caused serious problems.

The other elements in the quoted paragraph concerning remedial orders are much the same as provisions in other states. Some states specifically recognize the increasingly common problem of discriminatory practices by labor unions, and empower their commissions to order admission to guidance, apprenticeship, or on-the-job training programs.[80] Kansas' language directing its commission to take "such affirmative or other action . . . as, in the judgment of the commission, will effectuate the purposes of this act" is a standard provision which would seem to afford a wide range of flexibility in adjustment terms.

Kansas' second provision dealing with remedial orders is new, passed in 1965. Section 4(8) includes in the commission's functions, powers, and duties the power "to issue such final orders after a public hearing as may remedy any existing situation found to violate this act and prevent its recurrence." The significant addition is "prevent its recurrence," which implements language newly added to the declaration-of-policy section directing the commission to "eliminate and prevent discrimination" in all areas covered by the act.[81] Only two other states, Massachusetts and Oregon, grant the explicit power to issue orders that operate prospectively,[82] although some others may allow it by interpretation.[83] Prior to the inclusion of specific language in the Massachusetts law, that state's Supreme Judicial Court struck down a portion of an order that enjoined the respondent in a housing dispute from discriminating in future sales or rentals of property.[84] A four-to-three majority felt that without specific prospective language the law could not be interpreted to authorize redress for any situation except the immediate complainants.

The decision demonstrates the desirability of Kansas' specific language. Because discrimination is generally practiced continuously where it is practiced at all, it is of utmost importance that a commission be able to prevent its recurrence when a particular instance of discrimination has been proved.[85] If the only out-

---

[80] *E.g.*, N.Y. EXECUTIVE LAW § 297(2).

[81] Kan. Sess. Laws 1965, ch. 323, § 1(a).

[82] MASS. GEN. LAWS ANN. ch. 151B, § 5 (Supp. 1964); ORE. REV. STAT. § 659.010(2) (Supp. 1963).

[83] It is not unreasonable to infer that the standard provision empowering a commission to take "such affirmative or other action . . . as, in the judgment of the commission, will effectuate the purposes of th[e] act" authorizes a commission to take regulatory action affecting future practices of a respondent, without more explicit language. But at least one state supreme court has limited the application of such general language in holding that it cannot authorize a commission to order a guilty builder to construct new housing for a complainant. New Jersey Home Builders Ass'n v. Division on Civil Rights, 81 N.J. Super. 243, 195 A.2d 318 (Super. Ct. 1963). *But cf. In re* Rollercade Skating Rink, 89 Ohio L. Abs. 491 (Ohio Civil Rights Comm'n 1962).

[84] Massachusetts Comm'n Against Discrimination v. Colangelo, 344 Mass. 387, 182 N.E.2d 595 (1962). In this case the constitutionality of the Massachusetts fair housing law was sustained.

[85] Once a commission is empowered to "prevent recurrence" of discrimination, however, the problem of what its orders may contain is not automatically solved. A question facing the Kansas courts right now is whether or not the commission can order a public accommodation to abandon club membership devices where membership rules have been ignored for white customers but have been used to discriminate against minorities. In the Matter of Jake Brown's Barbecue Club, Inc., No. PA 12-64 (KCCR 1964), *appeal docketed*, No. 19951B, Dist. Ct. Wyandotte County, Div. 3, March 4, 1965. Orders for places of public

come of the arduous processes of investigation, conciliation, and hearing (where necessary) were the hiring or serving of a single complainant, the work of the commission would be futile indeed. Prospective regulatory power is a necessary adjunct of the power "to receive, investigate, and pass upon" particular complaints.

## G. *Enforcement of the commission's orders.*

Enforcement problems can arise at two different stages in the course of compliance proceedings: after a conciliation agreement has been reached and after final orders issued by the commission following a public hearing. Concerning conciliation agreements, it will be recalled that if the commission succeeds in obtaining a respondent's cooperation during mediation, the agreement reached may be reduced to writing. Ensuring that the respondent abides by the terms of the agreement could present a problem, however, in cases where apparent agreement really masks an intent not to comply. In the newly amended Kansas act, the problem of enforcing a conciliation agreement in a case like this has been anticipated: the commission may apply directly "to the district court of the county where the respondent resides or transacts business for enforcement of any conciliation agreement by seeking specific performance of such agreement."[86] This simple and forthright solution is unique among state statutes.[87] In all other states, if the respondent violates the agreement, the commission's only recourse is to reopen the case and set it for public hearing. This is an unwieldy procedure at best and has led some commissions to devise alternative means of enforcing conciliation agreements which may be of doubtful validity.[88]

One problem that could arise under Kansas' new section on enforcement of conciliation agreements is the traditional reluctance of courts to order specific performance of personal service contracts. In the employment area the question is directly posed, since often the relief suggested by the commission will be hiring the complainant-applicant. If a respondent signs such an agreement and later ignores it, the court entertaining the commission's application for enforcement may well be bothered by the personal service nature of the "contract" as well as by the fact that the agreement was signed under pressure,[89] without

accommodation to abandon membership procedures have been upheld, even where statutory language was less broad than the Kansas § 4(8). See *In re* Rollercade Skating Rink, 89 Ohio L. Abs. 491 (Ohio Civil Rights Comm'n 1962).

[86] Kan. Sess. Laws 1965, ch. 323, § 4(7).

[87] At first glance a provision in Oregon's statute seems to achieve the same effect, but not when read in connection with other sections of the law. ORE. REV. STAT. § 659.070 (Supp. 1963) directs that "any conciliation agreement or order" issued under § 659.060 "may be enforced by mandamus or injunction or by a suit in equity to compel specific performance," but § 659.060 deals with orders issued after formal hearing. Conciliation agreements are dealt with separately under § 659.050. It looks as though the drafters have called a final order after hearing a "conciliation agreement," which is not the way the term is ordinarily used.

[88] In New York, for example, the State Commission Against Discrimination has had the respondent agree as a term of the conciliation agreement that the agreement would be treated as an "order" for purposes of enforcement and review. N.Y. STATE COMM'N AGAINST DISCRIMINATION, 1959 ANN. REP. 90. Since an order presupposes a public hearing under the statute, the practice seems questionable.

[89] It must be recognized that the threat of going to public hearing can have decidedly coercive effects. It is not inconceivable that a respondent who has not in fact discriminated unlawfully will nevertheless sign and abide by a conciliation agreement rather than risk the publicity of a hearing. The pressure that can be exerted in this way may seem alarming, but if the respondent is in fact innocent no great harm can come

protection of a formal hearing. Nevertheless, the legislature's voice seems clear; specific performance is named as the remedy for the commission and a court ignoring the plain words of the statute would seem to be guilty of judicial legislation.

In contrast to the statute's simple directive for enforcing conciliation agreements, enforcement of final orders was left in a murky state by the legislature. Just as Kansas is unique in permitting the commission to apply on its own for enforcement of conciliation agreements, it is the only state which denies its commission an equivalent power to apply directly for enforcement of final orders.[90] Some states permit their commissions to apply for enforcement of final orders upon a simple showing that the respondent is subject to the commission's jurisdiction or resides or transacts business in the county where the court receiving the application is situated.[91] Some states give the attorney general a power of application parallel to that of the commission,[92] but in Kansas *only* the attorney general or a county attorney may apply:

> The attorney general or county attorney, at the request of the commission, *may* secure enforcement of any final order of the commission by the district court of the county where the unlawful . . . practice shall have occurred or where any person required in the order to cease and desist from an unlawful . . . discriminatory practice . . . resides . . . .[93]

The permissive language of the section seems to imply that the state's attorneys could refuse to secure enforcement if they so chose. If that is the correct interpretation, the section is not only inconsistent with the section on enforcing conciliation agreements, but seems anachronistic as well. If one of the main reasons for establishing a civil rights commission in the first place is the recognized reluctance of state attorneys to enforce civil rights laws vigorously, it seems unjustifiable to place prosecuting power back in their hands at the halfway point in compliance proceedings. Perhaps, viewing the statutory scheme as a whole, a court would conclude that this section was not intended to vest discretion in the state's elected officials but simply names them as agents through whose offices the commission should apply for enforcement. In that case, mandamus should lie as a remedy for the commission in a case where a state's attorney ignored the commission's request.

### H. *Rules of evidence at commission hearings.*

Kansas is not alone in providing that "the commission shall be bound by the rules of evidence prevailing in courts of law or equity, and only relevant

---

to him by signing an agreement not to discriminate against the complainant or others similarly situated by reason of race. At worst, he might choose to hire or serve one person who was genuinely unqualified or disorderly, in order to avoid a public hearing. This is a price that may occasionally be paid in exchange for the paramount position given to mediation in the statutory scheme. It should be recognized as such.

[90] In Maryland, the commission also works through the state's attorneys in securing enforcement. MD. ANN. CODE art. 49B, § 15(a)-(b) (1957). The statutory language is not permissive, however, as is that of Kansas.

[91] *E.g.*, UTAH CODE ANN. § 34-17-8(11) (Supp. 1965); MICH. STAT. ANN. § 17.458(8)(h) (1960).

[92] PA. STAT. ANN. tit. 43, § 960 (1964); CONN. GEN. STAT. ANN. § 31-128(a) (1960).

[93] Kan. Sess. Laws 1965, ch. 323, § 7. (Emphasis supplied.)

evidence of reasonable probative value shall be received,"[94] but the company of state commissions similarly restricted is scattered.[95] Most of the states either provide precisely the opposite, that their commissions shall *not* be bound by the rules of law and equity,[96] or make no provision at all,[97] and presumably follow normal administrative practice with relaxed rules of admissibility.

There are several reasons why Kansas' provision is unfortunate. In the first place, the rules of evidence may be construed, rightly or wrongly, to bar certain types of evidence that are crucially important to the determination of a controversy under the act. This is particularly likely to happen in the area of racial discrimination, where proof is intangible and elusive and may be derived more from words and deeds than from discrete, overt acts.[98] Yet a law-trained person passing on questions of admissibility[99] is likely to bar instinctively evidence of patterns and former practices that are validly probative of the fact of discrimination in a given instance and should be admitted.[100]

Furthermore, the commission, unlike the courts, exists to eliminate discrimination from broad areas of economic activity, not just to provide redress for individual injuries. It is true that its processes must be triggered by complaints, but the focus is on the general practices of the respondent as well as what he did at a particular time to a particular person. This concern with his continuing behavior is not a subterranean policy. Conciliation agreements and final orders may explicitly require that a respondent cease *all* unlawful discriminatory practices and report on the manner of compliance; future applicants as well as present complainants are thus protected by the act. But it is easy to lose sight of this broad policy in the atmosphere of a hearing that is deliberately modeled on traditional adversary procedures.

Even more important, where strict rules of evidence are observed, the lawyers on both sides spend much of their time arguing over admissibility questions rather than focusing on the more important questions to be determined at the hearing.[101] One of the most valuable innovations of administrative law was the

---

[94] Kan. Sess. Laws 1965, ch. 323, § 5.

[95] Only Oklahoma, Illinois, and Utah have similar restrictions on evidence that may be received.

[96] *E.g.*, N.Y. EXECUTIVE LAW § 297(2).

[97] Michigan, Washington, Wisconsin, Delaware, Alaska, Missouri, and Maryland have no explicit provision one way or the other.

[98] "One intent on violating the Law Against Discrimination cannot be expected to declare or announce his purpose. Far more likely is it that he will pursue his discriminatory practices in ways that are devious, by methods subtle and elusive—for we deal with an area in which 'subtleties of conduct . . . play no small part.'" Holland v. Edwards, 307 N.Y. 38, ...., 119 N.E.2d 581, 584 (1954).

[99] As of 1965, one member of the Kansas commission must be a lawyer. Kan. Sess. Laws 1965, ch. 323, § 3. Up to now, the chairman of the hearing panel had to be assisted by an outside attorney in ruling on procedural questions arising at a hearing.

[100] Statutes in Ohio, Rhode Island, and Michigan specifically permit the commissions to receive evidence of this kind. Ohio's provision is typical: the commission "shall, in ascertaining the practices followed by the respondent, take into account all evidence, statistical or otherwise, which may tend to prove the existence of a pre-determined pattern of employment or membership, provided that nothing contained in this section shall be construed to authorize or require any person to observe the proportion which persons of any race, color, religion, national origin, or ancestry bear to the total population or in accordance with any criterion other than the individual qualifications of the applicant." OHIO REV. CODE ANN. § 4112.05(E) (Baldwin 1964).

[101] See, *e.g.*, Brief for Respondent, pp. 4-9, In the Matter of Jake Brown's Barbecue Club, Inc., No. PA 12-64 (KCCR 1964) arguing that testimony of white witnesses served on past occasions was inadmissible under the Kansas Code of Civil Procedure, KAN. STAT. ANN. § 60-450 (1964) (evidence of habit or custom).

concept of hearings with informal evidentiary rules, whereby lawyers could cross-examine witnesses and keep the opposing evidence within reasonable bounds of relevancy, and trained laymen would concentrate on the ultimate facts of the situation before them. A commission becomes experienced in evaluating evidence in its field of particular expertise, and need not be sheltered from an occasional piece of hearsay or a witness' conclusion.

Thus, applying rules designed for juries has few precedents in administrative law and makes little sense in the complex area with which the Kansas Commission on Civil Rights deals.

### I. *Legal assistance for the commission.*

The commission shall employ such . . . full or part-time legal . . . assistance as shall be necessary to carry out the provisions of this act and fix the amount of their compensation: *Provided, however,* That the appointment and compensation of legal counsel shall be approved by the attorney general.[102]

With this fairly liberal provision for separate legal assistance, Kansas falls in a group of over half of the commission states. The other states either make no provision for counsel at all, or leave legal assistance entirely in the office of the attorney general.[103]

In practice the statute's generosity in providing for independent counsel has been largely illusory. The commission operates on a frugal budget,[104] and the legislature makes no regular appropriation for the employment of outside counsel. With only a few exceptions[105] the commission has had to rely on the attorney general's office for its legal work. It may seem that the attorney general's office is adequately suited to the task of advising and representing the commission, as it advises other state agencies. Experience has shown this not to be the case. For one thing, the work required of the commission's lawyer is quite different from the demands of other state agencies. Although the state has a theoretical interest in every case of racial discrimination covered by its laws, in discrimination cases the rights asserted are peculiarly those of individual complainants as well. The individual interest at stake may therefore make a discrimination case seem trivial and less worthy of the time of the attorney general's assistants than matters of concern to the more general public, such as work of the corporation commission or the motor vehicles department.[106] Furthermore, genuine conflicts of interest can arise. The respondent in a discrimination case could well be another state agency, and the attorney general would be faced

---

[102] Kan. Sess. Laws 1965, ch. 323, § 3.

[103] States having no provision for counsel: Oregon, Wisconsin, Illinois, Alaska, and Delaware. States using the attorney general's office: Ohio, Connecticut, Oklahoma, Missouri, and Maryland. States where independent counsel need not first be approved by the attorney general: New York, Massachusetts, Michigan, Washington, Colorado, Minnesota, California, Indiana, and Utah.

[104] The commission's budget for fiscal year 1965 was $57,449.00, representing a reduction of $2,936.00 from the previous year's budget. The commission was disturbed at the reduction in a year of civil rights unrest. KAN. COMM'N ON CIVIL RIGHTS, 1964 REPORT OF PROGRESS 3.

[105] In the Matter of Board of Educ., No. 96-63 (KCCR 1963), *appeal docketed,* No. 19951B, Dist. Ct. Wyandotte County, Div. 3, March 4, 1965; Folks v. Police Dept., No. 86-63 (KCCR 1963).

[106] See letter opinion of the Kansas Attorney General dated August 26, 1963, quoted in text accompanying note 32 *supra.*

with the duty of advising both parties to the litigation. Finally, the attorney general is subject to many political crosswinds, and many of the respondents with whom the commission deals can generate a good deal of wind.

Some of these problems have already arisen in two Kansas cases in which the commission had to rely on the attorney general's staff for counsel. Both cases concerned the assertion by public restaurants that their adoption of private club procedures and haphazard use of membership rules made them bona fide social associations exempt from the strictures of the Kansas Act Against Discrimination.[107] In one case, just at the time that private liquor interests were pushing a new private club bill in the legislature,[108] the attorney general's office attempted to cancel a public hearing the night before it was scheduled to take place. Since it was then too late to notify all parties of cancellation, the parties were induced to sign an agreement that did not meet the issues involved.[109] In a second instance, the assistant attorney general assigned to present the state's case on behalf of the commission at a public hearing telephoned on the morning of the hearing to say that he could not attend because his car had broken down. (The hearing proceeded without him because the complainant had his own co-counsel present, who took over presentation of the case literally on five minutes' notice.[110]) In the latter case, although the assistant attorney general's excuse was no doubt valid, one would expect the State of Kansas to have sufficient resources for transporting an assistant attorney general from Topeka to Kansas City even on short notice in a case that was deemed significant.

The private club issue is a delicate one in Kansas, to say the least, involving both racial discrimination in public accommodations and circumvention of the prohibition on selling liquor publicly.[111] One cannot expect the attorney general to ignore political pressures from various directions within the state. But that is precisely the point. The state antidiscrimination law cannot be effectively enforced by adhering to popularity polls. The commission's attorney should be undivided in his attention to the task. Moreover he should work consistently enough with the commission to gain familiarity with the Kansas law and case law from other states.[112] For these reasons, the commission would be better

---

[107] Kan. Sess. Laws 1965, ch. 323, § 2(h). "The word . . . 'public accommodations' shall . . . not include a nonprofit fraternal or social association or corporation."

[108] Kan. H.B. 838 (1963).

[109] Jackson v. Dearmore, Inc., No. PA 11-64 (KCCR 1964).

[110] In the Matter of Jake Brown's Barbecue Club, Inc., No. PA 12-64 (KCCR 1964), *appeal docketed*, No. 19951B, Dist. Ct. Wyandotte County, Div. 3, March 4, 1965. Kan. Sess. Laws 1965, ch. 323, § 5 permits a complainant to be represented at the hearing by private counsel. Eleven states authorize the complainant to appear by counsel, some giving the right absolutely and some vesting in the commission discretion to grant private representation. All states permit the respondent to be represented by counsel at the hearing. Two states, Ohio and Michigan, have provisions permitting any person with an interest in the subject matter of a hearing to intervene at the discretion of the commission. This could raise interesting problems concerning the definition of an interested person.

[111] See Comment, *Liquor Regulation, Racial Discrimination, and Private Clubs in Kansas*, 13 Kan. L. Rev. 135 (1964).

[112] Although Kansas has relatively few cases that have reached the supreme court in the civil rights field, and none arising under the present commission-enforced legislation, there has been extensive litigation in the states whose civil rights laws have been administratively enforceable for a longer time than those of Kansas. See generally Greenberg, Race Relations and American Law (1959).

served by the appointment of an outside attorney to its staff, at least part time,[113] with assurance from the legislature that adequate compensation will be provided.

J. *The reviewing power of the courts.*

The administrative agency was chosen as the method of enforcing the antidiscrimination law because, as discussed earlier, civil litigation and criminal prosecution proved ineffectual. The agency has numerous advantages over the court as the primary means of enforcement: its personnel, working full-time in the field, develop expertise, which is all-important in this complex and delicate area; the agency can move swiftly, without waiting for crowded court dockets to clear, as is often important if meaningful redress is to be given; the agency rather than the complainant bears the expense of fact-gathering, mediation, or contest; its procedures, developed against the background of the extensive American experience in administrative law, are designed to be fair to the parties involved and at the same time informal enough to gather necessary information that might be barred by technical rules of evidence. The very effectiveness of an agency in getting the job done, without the "win a few, lose a few" gamesmanship of the trial system, is what most disturbs those who would rather be free to discriminate.

Opponents of antidiscrimination legislation severely undercut the advantages of the administrative scheme in 1965 by giving the respondent the right to a trial de novo, with a jury if he demands it, to contest an order of the commission.[114] This may well be the most significant limitation yet imposed on the commission.

No thinking person would argue that a commission's action should be final and not appealable. Administrative agencies can act arbitrarily and abusively, just as private persons can. The reason for the traditional right of appeal from an agency's action is precisely to make sure that all parties were treated fairly and that the final action was reasonable in the light of the facts that were developed. A trial de novo, however, would redo the entire work of the commission; its purpose can only be to find the facts anew and arrive at independent conclusions. In short, ordinary appeal procedure in administrative law determines whether the agency acted reasonably, whereas a trial de novo redecides the question whether the respondent is guilty and if so what should be done about it. It is not surprising, given the purpose of administrative enforcement to begin with, that trials de novo are rare in the field of administrative law.

Allowing the respondent to retry the whole case in court effectively upsets the commission enforcement scheme. A respondent who knows he can demand a new trial at the end of the road obviously need not cooperate at earlier stages with the commission or its representatives. The new latitude for respondents

---

[113] At present, there is not enough legal work to be done to justify a full-time commission attorney. Interview with Executive Director, KCCR, in Topeka, Kan., July 22, 1965.

[114] Kan. Sess. Laws 1965, ch. 323, § 7.

will weaken the law by reducing the number of instances in which compliance can be achieved without resort to coercive process.

Other objections to the new provision can be made. Conducting a public hearing before the commission will be an expensive, time-consuming, and meaningless duplication of effort, if the issues are to be retried later by a jury. The delay involved in docketing the case for jury trial has a special importance for an aggrieved person in this area, since he is not ultimately rewarded by money damages[115] but rather seeks a job or service now. Moreover, complaining or supporting witnesses may be unavailable by the time a new trial can be had. Most important of all, perhaps, is the effective loss of the expertise of the commission and its personnel mentioned above. The commission, not the court, is the body best equipped for subtle evaluation of economic and social pressures, for mediation and compromise, for sensitive fashioning of orders. Whether intended or not, the institution of a right to trial de novo is a long step away from the original legislative judgment that these latter activities have an important place in implementing antidiscrimination legislation.

How the jury-trial-de-novo provision will operate in practice is by no means obvious, since neither the 1965 legislature nor its predecessors spoke in a clear voice. Previously the law had read, "the court shall hear the appeal with or without a jury."[116] It went on to say that "the review shall be heard on the record." What this meant, if the court elected to employ a jury, has never been clear. Experience under the provision offers no guide, since no court used a jury in deciding an appeal while this provision was law.[117] Normally one might expect that the function of the court would be to examine the record of the hearing, and with the help of arguments by counsel determine whether the commission acted within the range of its discretion. If that were the nature of the appeal, however, it would be difficult to see just what function the jury would perform.

The previous confusion was compounded by the 1965 amendment to the provision. Specific "trial de novo" language was inserted, so that the provision reads "The court shall hear the appeal by trial de novo with or without a jury in accordance with the provision of K.S.A. 60-238."[118] This would have clarified the situation, except that the language "the review shall be heard on the record" was retained. Thus the confusion is deeper now than it was before.

The problem for a court faced with this apparent contradiction will be to determine just what is meant by a trial de novo, in a way that reconciles the different provisions of the statute, carries out its purposes, and conforms to established conventions of administrative law. The court should bear in mind that the appeal is in no sense an appeal from a criminal proceeding, so that there is not the same reason for giving the jury the ultimate "dispensing power" that it

[115] As discussed above, he cannot even be awarded back pay later if a refusal to hire was based on race. See text accompanying note 76 *supra*.
[116] Kan. Sess. Laws 1963, ch. 279, § 6.
[117] Only two cases reached the public hearing stage and were appealed. See note 69 *supra*. Neither case has yet been decided.
[118] Kan. Sess. Laws 1965, ch. 323, § 7.

has in criminal cases with its inscrutable guilty or not-guilty verdict. Neither is it a civil proceeding for damages, where the jury is the primary decider of the measure of recovery. And, speaking broadly, juries have never been empowered to decide questions of "law" but are limited to answering some variation of the question "What happened?"; there is no reason to enlarge their traditional province of finding only "facts."

In light of these considerations we suggest that if a jury is demanded under the present provision, it should be limited to deciding disputed questions of fact on the basis of the record. This seems the most sensible way to reconcile the jury-trial-de-novo provision with the stricture that the review shall be heard on the record. If the jury's function is so limited, a special verdict should be employed to answer questions specifically framed. The kind of question posed under these circumstances should be "Did John Jones receive Robert Smith's employment application on or before February 1, 1965?," a fact question, not "Was John Jones guilty of unlawful discrimination?" which is a question of law.

This admittedly tortuous resolution of the conflicts posed by the 1965 amendment really raises a question concerning the usefulness of a jury at all. Even granting that the facts of the case are to be newly determined, a judge is better trained to decide questions on a reading of the record than a jury. Using a jury to decide fact questions in this way would simply result in delaying the final decision process without gaining either the advantages of a full jury trial or of the swifter adjustments the commission can effect. Considerations such as these led the Supreme Court of Michigan to void the whole section of the Michigan antidiscrimination law that called for trial de novo. Reading the act in its entirety, the court said that an appeal must be limited to examining the record before the commission for legal errors or arbitrary action, despite statutory provisions for trial de novo by jury, since these provisions were patently inconsistent with the general statutory scheme.[119]

Of the twenty-four states having antidiscrimination commissions, only six of them allow a trial de novo.[120] One of these, New Mexico, at least modifies its trial de novo provision to read that "the court in its discretion, may consider the matter, solely upon the transcript filed by the commission or may order a new trial upon the merits as if no trial had been had or may consider such portions of the transcript as it considers admissible . . . ."[121] This provision has the virtue of clarity, although it still seems unwise to make treatment of the record problem depend on the attitudes of the individual judge.

All the rest of the states limit appeals from their commissions' orders to determining whether the commission acted within the range of permissible discretion; the usual provision is that "the findings of the commission as to the

---

[119] Lesniak v. Fair Employment Practices Comm'n, 364 Mich. 495, 111 N.W.2d 790 (1961).
[120] MINN. STAT. § 363.08(3) (1961); ALASKA STAT. § 23.10.225(a)-(c) (1962); N.M. STAT. ANN. § 59-4-11(a)-(b) (1953); MO. REV. STAT. § 296.050(1) (Supp. 1961); MD. ANN. CODE art. 49B, § 15(b) (1957); UTAH CODE ANN. § 34-17-8(5) (1960).
[121] N.M. STAT. ANN. § 59-4-11(b) (1953).

facts shall be conclusive if supported by sufficient evidence on the record considered as a whole."[122] These states reflect normal practice regarding an appeal from an administrative decision: the appeal should determine the propriety of the agency's action, not what the court would have done had it been in the agency's place.

*A historical summary.*

The legislature has carefully limited the powers of Kansas' civil rights commission since its creation in 1953. The 1953 fair employment legislation establishing an antidiscrimination agency for the first time gave that agency no enforcing tools, so the job of the commission for its first nine years was largely educational.[123] While antidiscrimination commissions in seventeen other states at that time were equipped with the kind of enforcing machinery that has been described in previous sections, Kansas' law exhorted the commission to "receive, investigate and resolve complaints" without designating any means other than voluntary persuasion. As a result, the commission resolved no complaints by itself during this period. Forty-five formal complaints and sixty-three informal complaints were received between 1953 and 1959,[124] but the only cases which were satisfactorily closed were those in which outside pressure was brought to bear from federal committees because of the involvement of federal funds.[125]

In 1961, the legislature expanded the jurisdiction, staff, and powers of the commission. The important powers added were the power to hold public hearings upon failure of conciliation and the power to issue cease and desist orders with court enforcement and judicial review. No subpoena powers were given, but it is interesting to note that at that time the commission did not feel subpoena powers were necessary. In its 1961 annual report the commission commented that lack of such powers probably was not a handicap because "in any court enforcement proceedings the court itself would very likely subpoena records necessary to its determination of the facts of the matters."[126] This statement reveals the commission's inexperience at the date of that writing, for it seems then to have thought of court proceedings as the ultimate and most useful sanction. It had not yet run up against the problem of respondents refusing to cooperate in supplying needed information at the investigatory stage.[127]

Two years of administering the 1961 act  revealed several inadequacies in its compliance procedures. By 1964 the commission had had many discouraging

---

[122] N.Y. EXECUTIVE LAW § 298.
[123] The commission's educational program included the following efforts: speaking engagements to various civic and other groups throughout the state; lending films and filmstrips dealing with discrimination problems; publishing its bi-monthly newsletter, the *Reflector;* writing and distributing its annual report; sending copies of flyers on program aids and reprints of articles to interested groups; cooperating with civil rights groups in sponsoring the First Annual Conference on Civil Rights. KAN. COMM'N ON CIVIL RIGHTS, 1959 REPORT OF PROGRESS 11-13.
[124] *Id.* at 9.
[125] *Id.* at 11.
[126] KAN. COMM'N ON CIVIL RIGHTS, 1961 REPORT OF PROGRESS 5.
[127] "Table 1-B, 'Disposition of Formal Complaints Received, July 1, 1960, through June 30, 1961,' shows that in no cases were respondents unco-operative with the Commission's investigatory and conciliatory efforts." *Id.* at 12.

failures because of inability to compel the production of witnesses and records. In one case, the commission needed to look at an employment application in order to determine whether remarks with racial overtones had been jotted down by the interviewer.

> [The] employer actually read from a complainant's application all that was pertinent but withheld reading aloud the employment interviewer's remarks. When the Commission's representatives asked to examine the complete application, the employer stated the Commission could look at the application only if it was subpoenaed, knowing full well the Commission lacked power of subpoena. . . . This case remained open on the Commission's docket after months of time-consuming correspondence and repeat conferences between this employer and the Commission.[128]

Similar experiences during this period included sending a representative to a distant city to meet with a respondent, only to be told that no information could be supplied from the respondent's office there;[129] scheduling a meeting with an officer of a union alleged to have discriminated against a colored member, only to have the union officer walk out abruptly after listening to the field representative's first questions.[130] Several potential witnesses told the commission that unless they could be compelled to testify at a public hearing about discrimination to fellow employees, they felt they could not afford to appear voluntarily and risk losing favor with their employers.[131] Quite recently the commission encountered frustration in connection with investigation of a restaurant alleged to have discriminated against a Negro cab driver.[132] The commission's field representative had found upon investigation that although the respondent claimed to be operating a bona fide private club, membership rules were applied only against minorities and that white customers were regularly and carelessly admitted without having to purchase membership cards. A key factor in determining whether this was a bona fide club exempt from the strictures of the act[133] was the existence or non-existence of updated membership records. The commission could only ask to see the file of allegedly kept cards; permission was denied by the respondent. Without this obviously material evidence, the case had to be prepared and heard on the basis of testimonial evidence that was considerably harder to produce.

We have seen that in granting enforcement powers to the Kansas commission the legislature has consistently selected weak versions of the tools an effective commission needs. Thus, while aggrieved persons and the attorney general may file complaints, the commission does not have similar power, nor do civil rights groups.[134] No interlocutory relief is available to the commission to keep a job or housing opportunity open during compliance proceedings. Al-

---

[128] KAN. COMM'N ON CIVIL RIGHTS, 1964 REPORT OF PROGRESS 15.
[129] Ibid.
[130] Ibid.
[131] Ibid.
[132] In the Matter of Jake Brown's Barbecue Club, Inc., No. PA 12-64 (KCCR 1964), appeal docketed, No. 19951B, Dist. Ct. Wyandotte County, Div. 3, March 4, 1965.
[133] See note 107 supra.
[134] But see text accompanying note 38 supra.

though the commission can require back pay for employees fired because of race, no back pay can be assessed upon employers who have discriminated in hiring. Final orders are enforceable by the courts, but the commission must depend on the state's attorneys to initiate enforcement proceedings.[135] Since counsel for the commission must be approved by the attorney general, and since no regular appropriation for counsel is made, in practice the commission must rely upon the not overzealous staff of the attorney general for legal help. Strict rules of evidence govern the admissibility of evidence at hearings.

The foregoing provisions currently govern commission procedure. In addition, the legislature added some significant amendments affecting procedure in 1965. The commission now must notify a respondent that a complaint has been filed, and serve a copy of it within seventy-two hours after filing. The statute of limitations on filing complaints has been shortened from six months to ninety days. The commission can now apply for a subpoena through the district courts upon a showing of reasonable grounds for believing that a violation of the act has occurred; discretion whether to grant a subpoena, and at what stage in the proceedings, is vested in the individual district court judge. Conciliation agreements may now by express authorization contain any terms that final orders can, and may be specifically enforced upon direct application by the commission to a court. Remedial orders are expressly directed not only to eliminate specific instances of discrimination but to prevent their recurrence as well. A court reviewing an order of the commission must hear the case by trial de novo with a jury if demanded.

### CONCLUSION

The Kansas Act Against Discrimination, as we have shown, takes a cautious and reluctant approach to enforcing the state's policy against discrimination. This probably results from two main factors: ambiguous attitudes of the population toward segregation, expectable in a state midway between North and South, and antipathy toward social legislation, often wrapped in the banner of "property rights," characteristic of people who still maintain a strong identification with the rural way of life.[136] Apart from these essentially moral questions, however, the act should be recognized as having an important pragmatic goal: to forestall militant and disruptive tactics by minorities seeking equal treatment, and to maintain domestic peace by reassuring those minorities that such tactics are unnecessary. Yet as long as the legislation is no more than a minimal, grudging concession, reflecting only the precise balance of immediate pressure, it proves precisely the opposite—that minorities will have to fight for every inch they gain—and in this sense, the act is a failure. The 1965 legislature expanded the coverage of the act, but at the same time cut the already small budget of the

---

[135] Unless Kan. Sess. Laws 1965, ch. 323, § 7 is interpreted not to vest discretion in the state's attorneys.

[136] It is interesting to note that as of this date the states with no antidiscrimination commissions are concentrated in the South, historically committed to segregation as a way of life, and in the rural areas of northern New England, the Northern Plains, and the Rocky Mountains.

commission and passed a mixed bag of procedural changes that probably left it weaker than before.

State civil rights legislation raises another question that may be even more important today: the ability of the states to meet the governmental needs of the times. Partly because of popular dissatisfaction with the way the states have handled the problem, Congress has put the federal government in the business of enforcing equal treatment for minorities, in areas that largely overlap the coverage of acts like Kansas'. It is significant that the federal Civil Rights Act of 1964 expressly gives state agencies the first chance to handle a complaint satisfactorily, before the federal remedy may be sought, in both employment and public accommodations.[187] Whether Congress will continue to show such deference to state remedies will undoubtedly depend on the effectiveness of state commissions against discrimination. The "first chance" of the federal act may indeed be a last chance for states and local communities to handle this problem with their own sets of rules.

---

[187] §§ 204(c), 704(b)-(c), 78 Stat. 241.