

The Labor Market Impact of State-Level Anti-Discrimination Laws, 1940-1960

Author(s): William J. Collins

Source: *ILR Review*, Jan., 2003, Vol. 56, No. 2 (Jan., 2003), pp. 244-272

Published by: Sage Publications, Inc.

Stable URL: https://www.jstor.org/stable/3590937

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms of scholarship. For more information about JSTOR, please contact support@jstor.org.

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at https://about.jstor.org/terms



Exhibit #12C

 *Sage Publications, Inc.* is collaborating with JSTOR to digitize, preserve and extend access to *ILR Review*

# THE LABOR MARKET IMPACT OF STATE-LEVEL
# ANTI-DISCRIMINATION LAWS, 1940–1960

## WILLIAM J. COLLINS*

By the time Congress passed the 1964 Civil Rights Act, 98% of non-southern blacks (40% of all blacks) already resided in states with "fair employment" laws prohibiting labor market discrimination. Using census data from the Integrated Public Use Microdata Series, the author assesses the impact of fair employment legislation on black workers' relative income, unemployment, labor force participation, migration, and occupational and industrial distributions. In general, the fair employment laws adopted in the 1940s appear to have had larger effects than those adopted in the 1950s, and the laws had considerably smaller effects on the labor market outcomes of black men than on those of black women.

By the time the U.S. Congress passed the Civil Rights Act of 1964, approximately 98% of non-southern blacks (40% of all U.S. blacks) already resided in states with "fair employment" legislation, which prohibited employment discrimination on the basis of race, color, creed, and national origin. Understanding the labor market impact of these state-level laws is important for at least two reasons. First, prior to 1964, the state fair employment laws were arguably the most significant legislative achievements of the Civil Rights Movement, but economic analyses of the Civil Rights Movement's impact have been heavily weighted toward the study of federal legislation (for example, see Smith and Welch 1989; Donohue and Heckman 1991; Chay 1998). Thus, a more balanced and accurate description of the Civil Rights Movement's contribution to African-American economic progress, particularly through the promotion of anti-discrimination legislation, requires an assessment of the state laws' effects.

Second, some critics of current affirmative action programs have recommended pursuing "color blind" employment standards that sound quite similar in spirit and form to the fair employment standards (Thernstrom and Thernstrom 1997:540). The claim by Thernstrom and Thernstrom

*William J. Collins is Assistant Professor of Economics at Vanderbilt University and Faculty Research Fellow at the National Bureau of Economic Research. This work benefited from the suggestions of Jeremy Atack, Kenneth Chay, Leemore Dafny, Claudia Goldin, James Heckman, Thomas Lyons, Robert Margo, Charles Mullin, Jacob Vigdor, and seminar participants at the University of North Carolina, the University of California at Berkeley, the University of Michigan, and the NBER. Kathleen Albers and David Rivers provided excellent research assistance. Archivists at the Pennsylvania Historical and Museum Commission were also helpful. The author gratefully acknowledges research support from the Oak Ridge Associated Universities (Ralph E. Powe Award), National Science Foundation (SES 0095943), NBER (National Fellowship), and Harvard University's Du Bois Institute (Non-Resident Fellowship).

The data used in this study are publicly available.

*Industrial and Labor Relations Review,* Vol. 56, No. 2 (January 2003). © by Cornell University.
0019-7939/00/5602 $01.00

This content downloaded from
192.102.230.248 on Thu, 15 Oct 2020 08:23:47 UTC
All use subject to https://about.jstor.org/terms

Case 2:21-cv-00629-MTL    Document 1-6    Filed 04/12/21    Page 3 of 30

(1997:427, citing Belz 1991:40) that "it cannot be argued that color-blind policies had failed; they had not been tried" is at least partly incorrect. In fact, such policies had been pursued by state governments for years before affirmative action programs were implemented. Whether or not they "failed" is then an empirical question, the answer to which will partly depend on one's definition of failure. In any case, debates about the future of race-related policy ought to be informed about experience under alternative legal arrangements.

By the early 1960s, the state agencies charged with enforcing the fair employment laws had become targets of harsh criticism from civil rights groups that claimed that the laws were not effectively deterring discriminatory practices. This conviction helped underpin not only the continuing drive for federal anti-discrimination legislation, but also the drive to strengthen enforcement powers, to widen the scope of discrimination's definition, and, ultimately, to pursue "affirmative action" rather than just "fair employment" policies.

But were the state fair employment laws truly ineffective? Few studies have offered econometric estimates of their impact. Using aggregate state-level census data, Landes (1968) found a modest positive impact on the wages of nonwhite men relative to whites, but he also detected a modest positive impact on the relative unemployment rate. Using similar data but a different econometric technique, discussed below, Heckman (1976) measured a larger wage effect but did not explore other labor market outcomes.

This paper extends the previous work in a number of ways and provides a richer account of when, where, for whom, and how much these laws mattered.[1] First, the empirical investigation is based on individual-level census data rather than on state-level averages. This allows control for a variety of individual characteristics (age, education, metropolitan residence, and so on) that are strongly correlated with labor market outcomes but only roughly accounted for in studies depending on aggregate data. Second, the paper employs a difference-in-difference-in-difference framework within which "experimental" and "control" states can be more deliberately chosen to identify a fair employment effect than in earlier work. Third, the paper assesses a variety of labor market outcomes, including income, employment status, labor force participation, occupational and industrial distribution, and migration. Finally, unlike most other studies of the effects of civil rights policy, this paper examines labor market outcomes for both men and women.

## A Brief History of State Fair Employment Laws

By 1964, 22 non-southern states had adopted fair employment laws that were enforced by government administrative agencies and backed by state courts. New York was the first, passing a fair employment statute in 1945, and was followed in quick succession by New Jersey (1945), Massachusetts (1946), Connecticut (1947), Oregon (1949), Rhode Island (1949), New Mexico (1949), and Washington (1949).[2] These laws have deep historical roots. In fact, the seed for the idea that the government should not discriminate in employment is embedded in many state constitutions that ban religious tests for public officials. Over time, this principle expanded

---

[1] After writing this paper, I learned of simultaneous work undertaken by Neumark and Stock (2001) that is similar in focus. The papers' experimental designs are somewhat different, providing some opportunities for cross-validation of results, which are noted later in the paper.

[2] Subsequently, Michigan (1955), Minnesota (1955), Pennsylvania (1955), Wisconsin (1957), Colorado (1957), California (1959), Ohio (1959), Illinois (1961), Kansas (1961), Missouri (1961), Hawaii (1963), and Indiana (1963) adopted fair employment laws before the 1964 Civil Rights Act (Landes 1968). Several of the remaining states passed laws after 1964.

This content downloaded from
192.102.230.248 on Thu, 15 Oct 2020 08:23:47 UTC
All use subject to https://about.jstor.org/terms

to cover other kinds of government employees and other forms of discrimination, including racial discrimination (for details, see Bonfield 1967). The fair employment legislation of the post-1940 period, however, took a sizable step beyond earlier curbs on discrimination. The laws applied broadly to private employment, even when there was no direct connection to government funds, and independent agencies with the power to issue cease-and-desist orders were charged with the laws' enforcement. Thus, the scope of coverage and the method of enforcement of anti-discrimination policies changed distinctly in this period.

Although several states adopted fair employment legislation before the federal government did, the most important precursor to the state anti-discrimination efforts operated at the federal level during World War II (Ruchames 1953; Reed 1991). In 1941, under pressure from A. Philip Randolph's March on Washington Movement, Franklin Roosevelt issued an executive order declaring that "there shall be no discrimination in the employment of workers in defense industries or government because of race, creed, color, or national origin" and established the Fair Employment Practice Committee (FEPC) to field and resolve complaints of discrimination. The federal anti-discrimination measures were never passed into law during the war, however, and afterwards, the FEPC was disbanded.

For the next two decades, congressional bills prohibiting discrimination in employment were frequently detained in committee. On the few occasions when the bills made it to the floor for debate, filibusters preempted their passage in the Senate. When the 1964 Civil Rights Act finally did pass, it was only after the Senate mustered a two-thirds majority vote for cloture on the southern filibuster.[3]

While stalled at the federal level, the Civil Rights Movement's legislative agenda moved forward in the form of state-level anti-discrimination initiatives (Lockard 1968; Collins forthcoming). The details of the fair employment laws' provisions varied somewhat across states, but the prohibitions and methods of enforcement were, for the most part, quite similar because they emulated New York's law. The "standard package" of enforcement powers wielded by the state fair employment agencies included the power to receive and investigate complaints of discrimination, to eliminate any unlawful discriminatory practices by conference and persuasion, and, if necessary, to issue cease-and-desist orders to non-compliant firms and unions (Norgren and Hill 1964:94–98).[4]

Typically, in response to a discrimination complaint, a representative of the fair employment agency would contact the accused establishment to collect information about both the alleged act of discrimination and the establishment's general employment policies. On the basis of the investigator's report, a fair employment commissioner would decide whether there was sufficient evidence of discrimination to press forward. If so, the commissioner would meet with a firm or union representative to seek "conciliation"—essentially, a formal agreement to discontinue discriminatory practices, to reverse the act of dis-

---

[3]Beginning with proposed anti-lynching legislation in 1938 and ending with the Civil Rights Act of 1964, eleven consecutive efforts failed to secure cloture on Senate filibusters holding up civil rights–related legislation (*Congressional Quarterly Almanac* 1964:368).

---

[4]It should be noted that in some ways the reach and strength of the state agencies exceeded that of the Equal Employment Opportunity Commission (EEOC) as established by Title VII of the 1964 Civil Rights Act. In general, the state laws covered a broader class of employers than the federal law did, including smaller employers and those that were not engaged in interstate commerce. Furthermore, the state agencies could issue cease-and-desist orders, but the EEOC could not (Bonfield 1967:1082–88). Some state agencies were given authority to launch their own investigations, even if a formal complaint had not been filed. Lockard (1968:78) argued that this power was rarely exercised, but the New York agency appears to have initiated a number of independent investigations (New York State Commission against Discrimination 1956).

This content downloaded from
192.102.230.248 on Thu, 15 Oct 2020 08:23:47 UTC
All use subject to https://about.jstor.org/terms

Case 2:21-cv-00629-MTL   Document 1-6   Filed 04/12/21   Page 5 of 30

crimination against the person who complained, and to submit to subsequent reviews. To this point in the process, the charge of discrimination and the findings of the fair employment agency would not be publicized, and relatively few cases went beyond this stage. If, however, conciliation could not be achieved, the agency could order a public hearing before a panel of fair employment commissioners. If "probable cause" of discrimination was upheld at the hearing, then a cease-and-desist order, backed by state courts, would be issued (Norgren and Hill 1964:102–13).

Thus, the state fair employment agencies had two levers to pull when faced with opposition. First, they could attempt to publicly embarrass the firm, union, or employment agency. Second, they could resort to their cease-and-desist power. Of course, the rarity of such directives does not imply that their threat was without effect. Essentially, both these enforcement tools could increase the cost of discrimination for employers. Importantly, apart from such enforcement mechanisms, the fair employment laws might also have lowered the perceived cost of integration. For example, the laws might have facilitated integration by giving employers an excuse to hire blacks despite the wishes of white employees or local employment norms.[5] Furthermore, the agencies could draw on their accumulated experience to suggest how workplace integration could be accomplished without risking a disruption of work (New York State Commission against Discrimination 1948:10; Cartwright 1948:310; Lockard 1968:88). Finally, fair employment agencies often undertook broadly targeted "educational" campaigns to encourage workplace integration by engaging the public, challenging racial stereotypes, and invoking the rhetoric of fairness and democracy.

## The Nature of Discrimination and the Impact of State Fair Employment Laws

Discrimination may exist in a number of different forms simultaneously, some of which may be more amenable than others to correction by fair employment legislation.[6] In a basic Becker (1957) model of *employer* discrimination, black workers obtain employment by offering their services at a lower wage rate than equally productive whites in order to compensate the employer for the psychic costs presumed to accompany blacks' employment. Unless or until non-discriminatory employers drive discriminatory ones out of the market, the labor market equilibrium entails a wage gap between equally productive black and white workers. If blacks and whites have a similar distribution of reservation wages, the wage gap may also imply a gap in employment rates. Therefore, in this context, an effectively enforced fair employment law barring discrimination in hiring, promotion, and wages would tend to diminish the observed wage gap as well as any existing gap in employment rates.

Although employer groups (for example, state chambers of commerce) were among the most vocal and organized opponents of state fair employment laws (Kesselman 1948; Lockard 1968), it does not necessarily follow that this model is the most accurate representation of labor market discrimination in the 1940s and 1950s. When explaining their opposition to, or non-compliance with, fair employment standards, employers sometimes expressed concern about how the white employees, customers, or community would react to racial integration or to the promotion of blacks into previously all-white occupations.[7]

---

[5]In discussing the impact of the 1964 Civil Rights Act on racial employment patterns in the South, Donohue and Heckman argued that "in certain ways the South was ripe for change. There is evidence that some Southern employers were eager to employ blacks if given the proper excuse" (1991:1639). Perhaps the same was true of some northern employers prior to the passage of state fair employment laws.

[6]See Cain (1986) for a survey of the extensive literature on the economics of discrimination.

[7]In 1952, Pennsylvania's Governor's Commission on Industrial Race Relations surveyed 1,229 firms (it is unclear how they were selected). Ninety percent of

This content downloaded from
192.102.230.248 on Thu, 15 Oct 2020 08:23:47 UTC
All use subject to https://about.jstor.org/terms

If *employees,* rather than employers, are the repositories of discriminatory attitudes in a Becker model with competitive input and product markets, then racial segregation within or between workplaces results, but not a wage gap. In this context, fair employment legislation might force integration, but there would be no detectable impact on relative wages. However, if there are wage premiums, perhaps associated with unions, in a particular set of occupations, firms, or industries that happen to employ whites disproportionately, then a racial wage gap would exist for otherwise observationally similar workers.[8] By forcing integration, an effective fair employment law would tend to diminish the racial wage gap in this scenario.

Unlike the Becker models, models of statistical discrimination do not begin by assuming that some group has a taste for discrimination; rather, discrimination follows naturally from imperfect information about individual workers' productivity. For example, Lundberg and Startz (1983) demonstrated that when information for one group is less reliable than information for another group, optimizing firms will construct different wage offer schedules for the different groups. Optimizing workers, in turn, respond to these offer curves when making human capital investments. In general, workers from the group for which there is less reliable information will be found to receive lower wage offers even in analyses that control for observed human capital levels. Requiring firms to maintain the same wage offer schedule for both groups would then narrow the wage gap in two ways: by eliminating gaps between workers with similar human capital levels in the short run, and by encouraging convergence in human capital levels across groups over the long run.

Finally, racial differences in human capital levels, occupational attainment, industrial distributions, and income might persist and be reinforced through a variety of feedback mechanisms, path-dependencies, network effects, and social norms (see Myrdal 1944; Arrow 1973; Wright 1987; Whatley 1990; Loury 1998). If so, then even in a race-neutral labor market, the erosion of economic disparities derived from past discrimination could be a slow process. In this context, although fair employment laws might diminish the frequency of overt acts of discrimination, they might not be expected to narrow racial gaps in labor market outcomes quickly. Consequently, groups or policy-makers seeking a rapid narrowing of racial gaps would argue for stronger intervention than is provided by fair employment standards. Indeed, arguments along these lines unfolded in political and judicial discourses during the 1960s as policy drifted away from the original fair employment standards embodied in the state laws and in Title VII of the 1964 Civil Rights Act (Belz 1991; Epstein 1992; Moreno 1997).

It is possible, however, that if the adoption of anti-discrimination legislation contributes to a rapid shift in firms' employment policies, bolsters complementary civil rights activity, or alters social norms regarding discrimination, the fair employment effect could manifest itself quickly. This seems to have been the case in the South after the 1964 Civil Rights Act (Donohue and Heckman 1991). Moreover, the fair employment effect could be far larger than suggested by, for example, the number of firms investigated by enforcement agencies.

---

the firms were found to practice some form of racial or religious discrimination, with the frequency of discriminatory practices increasing with occupational skill level. As to why they discriminated, by far the most frequent responses were "tradition" and "company policy," followed by "alleged union restrictions." Many fewer firms cited "alleged employee reaction" or "alleged customer reaction" (Governor's Commission 1953).

[8]The relationship between unions and African-American economic progress in the 1940s and 1950s was a complicated one. On one hand, unions (especially CIO) helped promote fair employment legislation, but on the other hand unions (especially AFL) had long histories of racial exclusion and were often the most resistant targets of the state fair employment agencies. See Northrup (1944), Ashenfelter (1972), and Collins (forthcoming).

This content downloaded from
192.102.230.248 on Thu, 15 Oct 2020 08:23:47 UTC
All use subject to https://about.jstor.org/terms

Case 2:21-cv-00629-MTL   Document 1-6   Filed 04/12/21   Page 7 of 30

## Measuring the Fair Employment Effect

In 1964, Herbert Hill, the labor secretary of the NAACP, alleged that the state fair employment agencies acted with "timidity and a general reluctance to broadly and rapidly enforce antidiscrimination statutes" and that ultimately the "state FEPC laws have failed" (1964:68, 23).[9] However, several studies have argued to the contrary. Bonfield (1967:1076) admitted that the laws were not "panaceas," but asserted that "there is little doubt that they were responsible for some substantial employment gains by minority group members during this period and for the eradication of significant amounts of discrimination by employers, labor organizations, and employment agencies." The New York State Commission against Discrimination reported that follow-up surveys demonstrated that 85% of its investigations in 1951 led to "definite improvement" in minority employment patterns (1952:7). Liggett (1969) found evidence of a positive correlation between blacks' occupational upgrading in the 1950s and the presence of fair employment agencies. Norgren and Hill (1964:114–30) cited both the number of cases settled by the committees and positive changes in the occupational and industrial distributions of black workers in fair employment states. As Lockard (1968:94) pointed out, however, Norgren and Hill's comparisons are rough, and they fall short of a convincing measure of the policy's impact.[10]

Landes (1968) offered the first regression-based estimates of the fair employ-ment laws' impact. With each state serving as an observation, he ran a cross-section regression of nonwhite/white average weekly wages in 1959 on a fair employment law dummy variable and some pertinent state characteristics. This revealed a positive, though weak, correlation between fair employment laws and nonwhites' relative income.[11] Recognizing that the examination of a single year's cross-section is a dubious route to the identification of a policy effect, Landes then examined the change in nonwhite/white male annual income between 1949 and 1959, and again he found a modest, positive correlation with the presence of fair employment laws. He also examined the change in relative unemployment rates for men between 1939 and 1959 and found that over the 1950s, blacks fared worse (compared to whites) in fair employment states than in non–fair employment states.

Stigler (1973) and Heckman (1976) pointed out that the presence of a fair employment law in 1959 ought not be viewed as an exogenous state characteristic, especially in cross-section estimation. Heckman went on to use the Landes paper to motivate the development of an econometric approach to dealing with such endogeneity. Then, he estimated by maximum likelihood a two-equation system in which the first equation describes favorable "sentiment" toward blacks; this sentiment, in turn, determines the presence or absence of a fair employment law. The second equation is similar to the cross-section estimated by Landes for nonwhite/white male weekly wages in 1959, but Heckman's approach accounts for correlation between the error terms of the two

---

[9]Hill's argument is based on three varieties of evidence: data showing that blacks' earnings and employment levels still lagged behind those of whites by wide margins even in states with fair employment laws; evidence that the state commissions dismissed a substantial portion of discrimination complaints for lack of evidence; and several supporting anecdotes.

[10]Lockard went on to make comparisons of blacks' occupational improvement between 1950 and 1960 across 20 non-southern cities. He reported that "they by no means support the thesis that the existence of FEP is a decisive force in determining Negro employment opportunities" (1968:95).

[11]This approach yields a coefficient on the fair employment dummy of about 0.03 with a standard error of about 0.02 (Landes 1968:516). Using annual earnings or income as the dependent variable delivers smaller coefficients (results are available from the author upon request). Landes also undertook similar analyses of occupational status and explored alternative measures of fair employment enforcement.

This content downloaded from
192.102.230.248 on Thu, 15 Oct 2020 08:23:47 UTC
All use subject to https://about.jstor.org/terms

equations. This led to an estimate of the laws' effect that is more than double the size of that from Landes's 1959 cross-section (Heckman 1976:256–64).

**Empirical Strategy**

This paper's approach to estimating the fair employment effect differs from Landes (1968) and Heckman (1976) in both its empirical strategy and its data. I employ a difference-in-difference-in-difference (DDD) regression framework and individual-level census data from the Integrated Public Use Microdata Series (IPUMS) (Ruggles and Sobek 1997).[12] Essentially, the idea is to use three dimensions of comparison to establish a clean measure of the policy's effect. The framework compares native-born black and white outcomes (one "difference") in states with and without fair employment laws (a second "difference") over time (the third "difference"). What emerges is an estimate of the difference between the change in the racial outcome gap in states that adopted laws and those that did not, controlling for each worker's characteristics.

Each of the DDD regressions pools data from two census cross-sections (1940 and 1950, 1950 and 1960, or 1940 and 1960) and takes the following general form:

$$(1) \quad Y_{ijt} = \alpha + \beta_1 X_{ijt} + \beta_2 \text{BLACK}_{ijt} + \\ \beta_3 \text{FAIREMPL}_j + \beta_4 \text{YEAR}_t + \\ \beta_5 (\text{BLACK}_{ijt} \times \text{FAIREMPL}_j) + \\ \beta_6 (\text{BLACK}_{ijt} \times \text{YEAR}_t) + \beta_7 (\text{FAIREMPL}_j \times \text{YEAR}_t) \\ + \beta_8 (\text{BLACK}_{ijt} \times \text{FAIREMPL}_j \times \text{YEAR}_t).$$

$Y$ is a labor market outcome variable; $i$ indexes individuals, $j$ indexes the two groups of states (those with and those without fair employment laws), and $t$ indexes the two census years; $X$ is a vector of personal characteristics (a quartic in age, a quadratic in years of education, and indica-

tors for marital status and metropolitan residence); BLACK is a dummy variable equal to one for blacks; FAIREMPL is a dummy variable equal to one for states that adopted a fair employment law between the first and second census dates; and YEAR is a dummy variable equal to one for the later census year in the comparison.

I measure the fair employment effect on a variety of labor market outcomes, including annual income, unemployment, labor force participation, occupational status, and industrial distribution. Unlike previous studies of fair employment, this study reports separate estimates for men and women (ages 20–59). Also, in case young workers are more strongly affected by such legislation than older workers are (perhaps because they are more mobile between industries and occupations), I provide separate estimates for young men and women (ages 20–35). The personal characteristics' coefficients are constrained to remain the same over time. In light of the change in the income distribution over these years, particularly between 1940 and 1950, such a constraint may be undesirable (Goldin and Margo 1992). Later in the paper, I note how the income regression results change when the $\beta_1$ coefficients are allowed to vary over time.

Following Gruber (1994), $\beta_2$ reflects time-invariant and state-invariant differences between blacks and whites; $\beta_3$ reflects time-invariant and race-invariant differences between fair employment states and non–fair employment states; $\beta_4$ captures race-invariant and state-invariant changes over time; $\beta_5$ captures time-invariant differences between blacks and whites in fair employment states relative to non–fair employment states;[13] $\beta_6$ reflects state-invariant changes in blacks' labor market outcomes relative to whites'; and $\beta_7$ reflects race-invariant changes over time in the fair em-

[12]See Besley and Case (2000) and Meyer (1995) for discussions of this approach. See Card (1992) and Gruber (1994) for applications to minimum wages and maternity benefits, respectively.

[13]I have also run each regression for the 20–59-year-old samples with state and state-year effects, rather than state group and state group–year effects. In general, the coefficient of interest and its standard error change only slightly.

This content downloaded from
192.102.230.248 on Thu, 15 Oct 2020 08:23:47 UTC
All use subject to https://about.jstor.org/terms

ployment states relative to non-fair employment states. The coefficient of particular interest ($\beta_8$) is on the triple interaction of BLACK $\times$ FAIREMPL $\times$ YEAR and measures the change in blacks' outcomes relative to whites' outcomes in fair employment states relative to non–fair employment states.

To interpret $\beta_8$ as a clean measure of the fair employment policy effect, one must assume that there were not unobserved shocks or trends that differentially affected blacks relative to whites in fair employment states relative to non–fair employment states. This assumption seems most likely to hold when the groups of states being compared are geographically proximate and industrially similar and therefore subject to common shocks and trends. Therefore, when feasible, I assemble the comparison groups accordingly, and I return to these issues in discussing the results. One must also assume that there were not offsetting migration responses to the passage of fair employment legislation. In perfectly integrated labor markets, an improvement in employment opportunities in one place will provoke an arbitraging migration flow. If so, then $\beta_8$ will not detect a fair employment effect. I examine the data for migration responses later in the paper.

The first two sets of DDD estimates (1940–50 and 1950–60) focus on the Northeast and Midwest. For the 1940s, I use New York, New Jersey, Connecticut, and Massachusetts as the fair employment states. All of these states adopted fair employment laws between 1945 and 1947. The control states are Pennsylvania, Ohio, and Michigan, all of which adopted fair employment laws after 1950. The initial 1940 characteristics suggest that this is a reasonable collection of states for comparison. Blacks comprised 3.9% and 5.0% of the sample population in the fair employment and non–fair employment states, respectively. Unemployed workers comprised 10.8% (fair employment) and 9.9% (non–fair employment) of the sample's state-groups' labor forces. Manufacturing workers comprised 31.4% (fair employment) and 34.9% (non–fair employment) of the sample's state-groups' employed workers.

Of course, at a finer level of industrial detail, the state-groups may have been less similar, and therefore unobserved industry-specific trends could influence the results if blacks and whites were distributed differently across industries within state-groups. For example, if a particular industry was concentrated in the fair employment state-group, happened to employ a disproportionately high number of blacks, and happened to have unusually strong wage growth, then black workers in fair employment states will appear to have fared remarkably well even if the anti-discrimination law had nothing to do with it.

To evaluate this possibility by isolating the importance of different racial distributions across detailed industries, I calculated three-digit industry-specific log wage changes for white workers (separately by sex), and then formed weighted averages of those changes according to each race category's "initial" (1940) industrial distribution in the fair employment and non–fair employment states.[14] The results suggest that the comparison groups are reasonably good matches: the weighted average for black men in fair employment states is 0.78 and in non–fair employment states is 0.79; for white men the figures are 0.77 and 0.78, respectively. For black women in both fair employment and non–fair employment states, the weighted average is 0.78; for white women the figures are 0.75 and 0.76, respectively.

Nonetheless, by its nature, the DDD approach remains vulnerable to unobserved trends that influence labor market outcomes of blacks and whites in different ways in different state-groups. Given the relatively small number of states involved in the 1940–50 and 1950–60 comparisons, another worthwhile check on the empirical framework is provided by dropping one state at a time from the samples. When the results of

---

[14]I calculated the average nominal wage changes and industrial distributions using the same sample of individuals as in the wage regressions described below.

This content downloaded from
192.102.230.248 on Thu, 15 Oct 2020 08:23:47 UTC
All use subject to https://about.jstor.org/terms

that exercise are potentially illuminating, they are noted below.

For the 1950s, Pennsylvania, Michigan, and Minnesota, all of which adopted laws in 1955, are the fair employment states, and this group is compared with Illinois, Indiana, and Iowa, none of which adopted laws before 1960.[15] In 1950, blacks comprised 6.1% of the sample's population in both fair employment and non–fair employment states. Unemployed workers comprised 4.1% (fair employment) and 2.5% (non–fair employment) of the state-groups' labor forces. Manufacturing workers comprised 36.0% (fair employment) and 32.0% (non–fair employment) of the state-groups' employed workers. When I perform the same three-digit industry-specific wage-growth exercise described above, the results again suggest that the comparison groups are reasonably well matched. The weighted average for black men in fair employment states is 0.54 and in non–fair employment states is 0.53; for white men, the figures are also 0.54 and 0.53, respectively. The average for black women in fair employment states is 0.48 and in non–fair employment states is 0.47; for white women, the figures are 0.45 and 0.46, respectively. However, I will discuss at some length the potential importance of Michigan's automobile industry in driving some unusual results within the 1950s framework.

For the full 1940 to 1960 period, the DDD estimates are derived from a larger and more heterogeneous sample of non-southern states. Ordinarily, a broader sample would be helpful for purposes of measurement by reducing the influence of idiosyncratic events, but in this case the net benefits are unclear because the non-fair-employment states differ systematically (geographically, industrially, racially, politically) from the fair employment states.

This tends to strain the DDD assumption that there are no unobserved, confounding trends or shocks.[16] Consequently, throughout the paper, I emphasize the estimates derived from the comparison groups for 1940–50 and 1950–60 separately, though I provide the full 1940–60 estimates for the sake of comparison. Summary statistics for each comparison are reported in Appendix Tables A1–A3.

The quality of the estimates derived from the DDD frameworks depends on the exogeneity of the timing of fair employment's implementation with respect to changes in the relative labor market outcomes of blacks and whites. It is not difficult to imagine, however, that the laws were endogenous in one way or another. For example, perhaps states passed the laws in response to a relative decline in the economic fortunes of African Americans, thereby confounding the interpretation of $\beta_8$ as a measure of the fair employment policy impact. In general, dealing with an endogeneity-of-law problem requires some understanding of the factors that determine the timing of a law's passage. In the case of fair employment laws, Collins (forthcoming) estimated duration models to measure how a variety of economic, demographic, and political variables influenced the likelihood of adoption. Controlling for the level of white unemployment in 1950, a higher black unemployment rate does not appear to have hastened the adoption of fair employment policy. Moreover, historical accounts of the political campaigns for fair employment laws do not suggest that changes in the economic well-being of blacks relative to whites played a role in determining the timing of adoption (Cartwright 1948; Goldstein 1950; Bonfield 1967; Lockard 1968; Gray 1970).

---

[15]I considered including Ohio in the non–fair employment group, but it adopted a law in 1959 and so the timing is a problem. A review of preliminary regressions suggests that the results are not strongly affected by Ohio's inclusion.

[16]There are only 18 states in the 1940–60 DDD estimates. The coverage of the metro status variable in the IPUMS microdata requires dropping several non-southern states. I also dropped states that adopted laws in the late 1950s, because it was unclear where they should be grouped. See the notes to Table 1 for details.

This content downloaded from
192.102.230.248 on Thu, 15 Oct 2020 08:23:47 UTC
All use subject to https://about.jstor.org/terms

Another plausible, but less easily tested, confounding hypothesis is that the states that passed fair employment laws were subject to larger declines in discriminatory attitudes over time than other states, and that these unobserved changes made their own contribution, separate from the legislation, toward relative improvements in black labor market outcomes. Thus, the estimates reported below may tend to have a positive bias because they reflect both the effect of the law *per se* on outcomes and the effect of weakening, but unobserved, discriminatory attitudes. This hypothesis, however, may have several conceptual weaknesses.

First, although one might hope that a democratic system would effectively link popular support with legislative outcomes, it is abundantly clear that this link is neither direct nor especially strong, given the committee structure of legislative bodies, the dynamics of interest-group competition, the potential for log-rolling across legislative issues, and so on. One reason state laws often serve as useful "quasi-experiments" is that changes in law may be abrupt compared to changes in the underlying factors that influence a state's political economy (Meyer 1995).

Second, even supposing that popular and legislative support for a particular proposal are very tightly connected, it does not follow that the *change* in support in a state that adopts the legislation is different from the *change* in support in a state that does not. The states might have started with different levels of support, experienced the same change in support, and therefore ended with different levels of support and different legislative outcomes.[17]

Third, supposing that differing times of adoption really do reflect differential changes in popular support, it does not necessarily follow that such changes have

an influence on labor market outcomes that is independent of their influence on the legislation's passage.

Finally, even if the hypothesized bias exists, it may actually reflect the influence on popular opinion of the local campaign for fair employment legislation. Thus, it may be a legitimate part of a broadly construed fair employment effect, one that includes both the effect of the law and an independent effect from the campaign.

Nevertheless, because there is no fully satisfactory way to construct a measure of change in discriminatory attitudes, the hypothesis cannot be completely and empirically refuted.[18] Therefore, the potential bias the hypothesis suggests should be kept in mind when interpreting the following results.

## Annual Income

To maintain a comparable sample and set of variables over time, I use log annual wage and salary income for workers who were 20 to 59 years old, were not in school, worked at least 40 weeks in the relevant year, had earnings that were at least half of the level implied by the minimum wage for a full-time worker, and were employed, but not self-employed, at the time of the census.[19] I focus on wage and salary income for

---

[17]Along these lines, Hyman and Sheatsley (1964) reported that the change in support for school integration increased by nearly the same amount in the South (from 2% to 34%) as in the North (from 40% to 73%) between 1942 and 1963.

[18]Of course, using the change in the wage gap between blacks and whites to gauge changes in discriminatory attitudes is not helpful in this paper's context. Gallup Poll questions on employment discrimination that span this period are inconsistently worded, and the results are not reported at the state level (Gallup 1972:528, 748, 1083). I attempted to gauge changes in support by using roll-call voting records in the House of Representatives for the six states that enter the 1950–60 DDD framework. A comparison of the proportion of votes favoring consideration of a fair employment bill in 1950 with votes favoring the Civil Rights Act of 1964 revealed no evidence that the change in sentiment was larger in the states that passed fair employment legislation (Rosenthal and Poole 1992).

[19]Removing the low-income cutoff tends to raise the estimated fair employment effect. For men in the 1940s, the coefficient rises from 0.050 to 0.063; for women, it rises from 0.122 to 0.144. For men in the 1950s, the coefficient rises from 0.001 to 0.016; for women, it rises from 0.006 to 0.025.

This content downloaded from
192.102.230.248 on Thu, 15 Oct 2020 08:23:47 UTC
All use subject to https://about.jstor.org/terms

254        INDUSTRIAL AND LABOR RELATIONS REVIEW

*Table 1.* Estimates of Fair Employment Laws' Effect on Annual Income.

| Group | 1<br>1939–1949 | 2<br>1949–1959 | 3<br>1939–1959 |
|---|---|---|---|
| Men, 20–59 | 0.0496*<br>(1.80)<br>[75,438] | 0.0008<br>(0.03)<br>[69,013] | –0.0051<br>(0.27)<br>[187,851] |
| Men, 20–35 | 0.0698*<br>(1.79)<br>[37,437] | –0.0764*<br>(1.88)<br>[28,214] | –0.0429<br>(1.51)<br>[82,108] |
| Women, 20–59 | 0.1217***<br>(2.96)<br>[29,813] | 0.0063<br>(0.12)<br>[25,925] | 0.0185<br>(0.67)<br>[73,179] |
| Women, 20–35 | 0.1232**<br>(2.37)<br>[18,782] | 0.0132<br>(0.19)<br>[10,144] | 0.0085<br>(0.22)<br>[34,370] |
| Non–Fair Employment States<br>Fair Employment States | MI, OH, PA<br>CT, MA, NJ, NY | IA, IL, IN<br>MI, MN, PA | Non-South w/o law<br>All w/ law in 1955 |

*Notes:* The dependent variable is log annual wage and salary income for those who worked at least 40 weeks in the relevant year, were not self-employed but were employed at the time of the census, and were not in school. Each coefficient in the table is taken from a separate regression. The DDD coefficients are from ordinary least squares regressions, which include the set of characteristics and interactions described in the text. T-statistics based on robust standard errors are in parentheses. Top-coded income is multiplied by 1.4. Samples exclude those earning less than half of the minimum wage on a full-time basis (in 1940 the cutoff is $250; in 1950, $400; in 1960, $1000). The number of underlying observations is in brackets. Observations are weighted by the IPUMS person weights in 1940 and 1960 and the IPUMS sample line weights for 1950. In column (3), the same set of states are included for both 1940 and 1960; maintaining this comparability required discarding some states' observations for 1940 because the metro area variable is unavailable for some states (including Rhode Island and New Mexico, which had FE laws). The "experimental group" in column (3) includes Connecticut, Massachusetts, Michigan, Minnesota, New Jersey, New York, Oregon, Pennsylvania, and Washington. The "control group" includes Idaho, Illinois, Indiana, Iowa, Kansas, Missouri, Nebraska, Vermont, and Wyoming. Ohio, California, Wisconsin, and Colorado are excluded from column (3) because they adopted laws in the late 1950s. Hawaii and Alaska are excluded throughout.

*Sources:* Census micro-data are from Ruggles and Sobek (IPUMS 1997).

*Statistically significant at the .10 level; **at the .05 level; ***at the .01 level.

non-self-employed workers because total income is not available in the 1940 census and because the laws pertain to employment relationships. These sample restrictions obviously exclude the unemployed, those tenuously attached to the labor force, the self-employed, and those out of the labor force altogether. Later in the paper, when estimating the laws' effects on employment and labor force participation, I will use a much less restricted sample.

Column (1) of Table 1 reports DDD estimates for laws adopted in the 1940s, where New York, New Jersey, Massachusetts, and Connecticut are grouped together and designated the "experimental" states (FairEmpl = 1), and Pennsylvania, Ohio, and Michigan are the "control" states

(FairEmpl = 0). The regression equations are similar in form to the one described above, and the personal characteristics (X) include age (quartic), years of education (quadratic), metropolitan residence, and marital status. The coefficient of interest (reported in Table 1) is for the triple interaction of the race, fair employment, and 1949 dummies (Black × FairEmpl × 1949). It should be noted that the federal FEPC operated in all these states during World War II, and so distinguishing a separate state fair employment effect might be difficult. Nevertheless, the results in column (1) are fairly supportive of the notion that state fair employment laws had a positive impact on the relative income of black workers in the 1940s. Though not strongly

This content downloaded from
192.102.230.248 on Thu, 15 Oct 2020 08:23:47 UTC
All use subject to https://about.jstor.org/terms

statistically significant, the estimate for all men suggests a 5% improvement associated with fair employment laws, and that for young men suggests a 7% improvement. In general, the positive impact for men remains when any one of the states is dropped from the analysis, but the point estimate increases when Michigan is dropped (to 9%) and declines somewhat when Pennsylvania is dropped (to 2%).

The estimated impact on the relative income of black women is especially strong, at approximately 12%.[20] This strong positive coefficient remains when any one of the states is dropped from the analysis. In the fair employment states in 1940, the black-white gap in average log income was 0.48 for men and 0.50 for women (see Appendix Table A1), and so the estimated fair employment impact is non-trivial relative to the size of the initial gaps.[21] The impact appears even more impressive relative to the total change in the income gaps between 1940 and 1950. The racial gap narrowed by 0.14 for men and 0.24 for women in the fair employment states. Interacting the $X$-characteristics with the year dummy, thereby allowing the $\beta_1$ coefficients to change over time, leads to slightly lower estimates of the fair employment effect: the coefficient for men falls to 0.042 (t-stat = 1.53), and for women it falls to 0.100 (t-stat = 2.45).

Column (2) of Table 1 presents DDD estimates of the effect of state laws adopted in the 1950s. In this case, I designate the three states that adopted laws in 1955 (Pennsylvania, Michigan, and Minnesota) as the "experimental" states and three states that did not adopt laws before 1960 (Illinois, Indiana, and Iowa) as the "control" states. For the laws adopted in the 1950s, there is no support for the hypothesis that the laws made a substantial contribution to the improvement of black workers' relative income.[22] In fact, young black men in the fair employment states appear to have fared worse relative to their white counterparts than did young black men in the non–fair employment states over the course of the decade. This odd result deserves further investigation. Even if fair employment laws did not help black workers, it is difficult to imagine how the laws could have hurt them.

Looking at the data state by state, the outstanding characteristic of young black men in Michigan was their concentration in the auto industry: in 1950, 43% were employed producing motor vehicles, a degree of industrial concentration that was extraordinary in comparison with the pattern for young white men in Michigan and also with the pattern for young black men in other states.[23] Although the 1950s are widely viewed as a prosperous time for the American auto industry, Sugrue (1996) argued that from the perspective of young black Detroiters, it was a decade of increasing dislocation. Automakers moved production out of the central city, automated jobs held disproportionately by unskilled blacks, and hired relatively few new workers. Ultimately, "The combination of discrimination and deindustrialization weighed most heavily on the job opportunities of young African American men" (Sugrue 1996:147). Returning to the income regressions, dropping Michigan from the sample causes the coefficient of inter-

---

[20]For the most part, these results are not driven by broad changes in the industrial distribution of black workers. Adding indicator variables for manufacturing and personal service industries to the income regressions slightly lowers the estimated fair employment impact for black women (from 12.2% to 8.6%) and slightly raises the estimated impact for men (from 5.0% to 5.6%).

[21]With a substantially different regression setup spanning the 1940–60 period, Neumark and Stock (2001, Table 8, Col. 4) also found larger income effects for black women (relative to white men) than for black men.

[22]Adding $X$-year interactions has little effect on the coefficients reported in Table 1, column (2).

[23]About 27% of young white men in Michigan were employed in the auto industry in 1950. Such high degrees of industrial concentration were not even approached outside Michigan. For example, in Pennsylvania the largest industrial concentration for young workers was in the steel industry, with a share of 8% of young black men and 9% of young white men.

This content downloaded from
192.102.230.248 on Thu, 15 Oct 2020 08:23:47 UTC
All use subject to https://about.jstor.org/terms

est for young men to move toward zero and become statistically insignificant (−0.023, t-stat = 0.47); the coefficient of interest for all men (20–59) becomes more positive (0.039, t-stat = 1.22).

This is precisely the sort of industry-specific shock with a disproportionate impact on blacks relative to whites in a fair employment state that can confound the DDD approach. It is also the kind of event one would hope to detect with the combination of detailed industrial distributions by race and industry-specific income changes, as examined above. In this case, however, the observed income gains in the auto industry were in line with those of other industries, perhaps reflecting rigidities in a highly unionized industry, and certainly reinforcing the point that unobserved trends may complicate the interpretation of DDD estimates.

Column (3) presents a DDD estimate covering the full 20-year period for a broader sample of states than in columns (1) and (2).[24] Workers residing in non-southern states that had adopted fair employment laws before 1957 are assigned to the experimental group. Those residing in non-southern states that did not adopt the laws by 1960 are assigned to the control group. Those residing in states that adopted the laws between 1957 and 1960 are excluded because it is not clear that the laws would have had time to affect outcomes (Wisconsin, Colorado, California, and Ohio). As with the estimates for the 1950s, the coefficient estimates for the full 20-year period detect virtually no evidence of a positive fair employment effect on African Americans' relative income, a result that is not sensitive to Michigan's inclusion or exclusion.

## Unemployment and Labor Force Participation

Table 2 examines the impact of fair employment laws on the likelihood of unemployment (panel A) and labor force participation (panel B) using DDD specifications of probit models. Column (1) reports the DDD coefficients for the 1940s.[25] For both men and women, there appears to have been no effect on the relative likelihood of unemployment or labor force participation. Thus, the income gains for *employed* black workers recorded for the 1940s in Table 1 were not offset by losses in employment, nor were they driven by withdrawal from the labor force by other workers. That is, during the 1940s, the fair employment laws did not induce a tradeoff between blacks' relative income and relative employment.[26]

Again, the story that emerges for black men in the new fair employment states of the 1950s is not as positive as that for the 1940s. Column (2) of panel A suggests a substantial positive effect on black male unemployment, though there is no adverse labor force participation effect in panel B.[27] This adverse association of fair employment laws with black men's likelihood of unemployment depends heavily on Michigan's inclusion in the sample, and as discussed above, Michigan's auto industry may be the source of a confounding influence. The coefficient for all men declines to 0.015 (z-stat = 1.48) and that for young

---

[24]Because of limitations on the metropolitan status variable in 1960, some states are entirely and automatically dropped from the regressions in that year (generally, states with small metropolitan populations). I have trimmed the 1940 sample accordingly so that the same states are included in 1940 and 1960. See the notes to Table 1 for details.

[25]The probit coefficients are calculated by switching the triple-interaction dummy from zero to one with all other variables (including dummies) at their mean values. When the results for the 20–59 age group are statistically significant, I note an alternative estimate obtained by two steps: first, using the probit coefficients to predict eight probabilities for every observation, corresponding to the eight race-year-state groups; then, taking differences (DDD) across the eight categories and reporting the average DDD.

[26]Neumark and Stock (2001, Table 7, Col. 4) also reported no relative employment effect over the 1940–60 period.

[27]Following footnote 25, the DDD probit coefficients suggest a 0.05 increase in the relative probability of being unemployed.

This content downloaded from
192.102.230.248 on Thu, 15 Oct 2020 08:23:47 UTC
All use subject to https://about.jstor.org/terms

*Table 2.* Estimates of Fair Employment Laws' Effect
on Unemployment and Labor Force Participation.

| Group | 1<br>1940–1950 | 2<br>1950–1960 | 3<br>1940–1960 |
|---|---|---|---|
| **Panel A:  Unemployment** | | | |
| Men, 20–59 | 0.0078<br>(0.67)<br>[129,008] | 0.0433***<br>(3.74)<br>[98,732] | 0.0077<br>(1.13)<br>[298,109] |
| Men, 20–35 | 0.0073<br>(0.37)<br>[65,706] | 0.0615***<br>(3.18)<br>[39,870] | 0.0237*<br>(1.87)<br>[132,614] |
| Women, 20–59 | 0.0149<br>(0.98)<br>[50,506] | 0.0015<br>(0.12)<br>[44,983] | –0.0006<br>(0.07)<br>[126,486] |
| Women, 20–35 | 0.0089<br>(0.41)<br>[31,810] | –0.0065<br>(0.39)<br>[17,766] | –0.0134<br>(1.01)<br>[60,384] |
| **Panel B:  Labor Force Participation** | | | |
| Men, 20–59 | –0.0123<br>(1.31)<br>[136,269] | –0.0017<br>(0.19)<br>[104,509] | –0.0044<br>(0.85)<br>[314,645] |
| Men, 20–35 | –0.0129<br>(1.07)<br>[68,686] | –0.0049<br>(0.40)<br>[41,887] | –0.0082<br>(1.20)<br>[138,542] |
| Women, 20–59 | 0.0231<br>(0.86)<br>[144,287] | 0.0930***<br>(3.04)<br>[114,705] | 0.0364**<br>(2.09)<br>[335,890] |
| Women, 20–35 | 0.0026<br>(0.06)<br>[75,039] | 0.1084**<br>(2.40)<br>[48,420] | 0.0563**<br>(2.09)<br>[153,037] |
| Non–Fair Employment States<br>Fair Employment States | MI, OH, PA<br>CT, MA, NJ, NY | IA, IL, IN<br>MI, MN, PA | Non-South w/o law<br>All w/ law in 1955 |

*Notes:*  The DDD coefficients are from probit regressions and expressed in dF/dx terms as described in footnote 25.  Z-statistics based on robust standard errors are in parentheses.  The regressions control for the characteristics and interactions described in the text.  The number of underlying observations is in brackets.  Observations are weighted by the IPUMS person weights in 1940 and 1960 and the IPUMS sample line weights for 1950.  See Table 1's notes for a list of states included in column (3).

*Sources:*  Census micro-data are from Ruggles and Sobek (IPUMS 1997).

*Statistically significant at the .10 level; **at the .05 level; ***at the .01 level.

men declines to 0.018 (z-stat = 1.12) when Michigan is excluded.  Column (3) does not show evidence of a statistically significant impact on unemployment or labor force participation for all men between 1940 and 1960.  In terms of unemployment, young black men tended to fare relatively poorly in fair employment states, but again, the difference is negligible when Michigan is excluded (0.011; z-stat = 0.90).

The story for black women in the 1950s is apparently quite different from that for men.  There is no hint of an adverse effect on black women's unemployment, and in fact, there appears to have been a positive impact on labor force participation.[28]  This positive and statistically significant result for labor force participation remains when

---

[28]Following footnote 25, the DDD probit coefficients suggest a 0.08 increase in the relative probability of being in the labor force.

This content downloaded from
192.102.230.248 on Thu, 15 Oct 2020 08:23:47 UTC
All use subject to https://about.jstor.org/terms

any state is excluded. The unemployment coefficient is somewhat sensitive to the exclusion of Illinois, becoming stronger (more positive) when only Indiana and Iowa are left in the non–fair employment comparison group. Combined with Table 1's estimates, these results indicate that the relative expansion of black women's labor force participation and employment in the fair employment states of the 1950s did not come at the expense of lower relative earnings. Over the full 20-year period, and with the broadest possible sample of states (column 3), the results for black women are not quite as strong as in column (2), but they tell a similar story: a positive fair employment effect on labor force participation with no offsetting decline in income (Table 1) or increase in unemployment.

## Discussion of Income and Employment Results

In light of the results so far, was Herbert Hill's criticism of the fair employment approach on target? The evidence is decidedly mixed. Contrary to Hill's argument, the laws appear to have had a non-trivial impact on the racial income gap during the 1940s, especially for women. In line with Hill's contention, however, black workers did not fare especially well in the fair employment states studied in the 1950s, even when Michigan is excluded from the analysis.

The differing results from the 1940s and 1950s comparisons could be related to a number of factors. Two compelling, and to some extent testable, hypotheses concern changes in the tightness of labor markets over time and differences in the strength of enforcement efforts across the fair employment states. A third, more empirically elusive, hypothesis suggests that the nature of discrimination, or the existing mix of types of discrimination (discussed above; see the "Nature of Discrimination" section), changed over time in ways that rendered the fair employment approach less effective.

Starting with the business cycle concerns: if the wartime boom had substantially dif-

ferent amplitudes across the fair employment and non–fair employment states during the 1940s, and if blacks gained disproportionately from it, and if those gains persisted through reconversion, then the apparent relative gains by blacks in the 1940s could reflect the differing booms across state-groups, rather than the impact of state fair employment laws. Similarly, differential business cycle conditions across the state-groups in the 1950s could be influencing the 1950s DDD exercise.

At first blush, and focusing on the endpoints of each decade, the premise of business cycle conditions that were substantially uneven across state-groups seems unlikely. The unemployment rate for white men, a reasonable barometer of business cycle conditions, fell by six percentage points in both the fair employment and the non–fair employment states during the 1940s (Table A1). Likewise, during the 1950s, the unemployment rate for white men rose by 1.5 percentage points in the fair employment states and by 1.4 percentage points in the non–fair employment states (Table A2).

Returning to the wartime experience, war contract data provide a more direct perspective on the boom's amplitude across state-groups. The cumulative value of war contracts (through June 1944) was approximately $1,850 per person in the fair employment states and $2,110 per person in the non–fair employment states.[29] Thus, the implied difference in the wartime boom across the two groups of states is relatively small, and it would appear to work to the advantage of the non–fair employment states in the 1940s DDD calculation.

It is possible, however, that African Americans in the fair employment states benefited from more frequent federal FEPC intervention during the war, and that the 1940s DDD estimates capture some of that

---

[29]War contract data are from the War Production Board (1944, Table 2). Population figures are from the U.S. Bureau of the Census (1975, Series A195–209).

This content downloaded from
192.102.230.248 on Thu, 15 Oct 2020 08:23:47 UTC
All use subject to https://about.jstor.org/terms

Case 2:21-cv-00629-MTL Document 1-6 Filed 04/12/21 Page 17 of 30

wartime anti-discrimination effort. Accurately interpreting caseload data is notoriously difficult, and so the following figures should be viewed as suggestive evidence, rather than proof positive, of differing degrees of federal intervention. From July 1, 1943, to June 30, 1944, 1.2 cases were docketed per thousand blacks in the fair employment states, compared to 0.8 cases in the non–fair employment states.[30] Largely on the basis of such caseload data's correlation with changing black/white employment ratios, Collins (2001) argued that the federal fair employment effort did improve blacks' employment opportunities in war-related industries outside the South.

A related, but distinct, hypothesis is that the 1940s and 1950s DDD estimates are indeed accurate characterizations of the state laws' impact, and that the differences reflect the higher effectiveness of anti-discrimination laws in relatively tight labor markets. In other words, given the decline in unemployment rates over the 1940s and the rise in unemployment rates over the 1950s, perhaps the relatively large fair employment effects in the 1940s reflect complementary business cycle conditions. Although it is certainly plausible that anti-discrimination laws have larger effects when labor demand is high, it should be kept in mind that the state fair employment laws were implemented *after* the war, and therefore were in effect during the period of reconversion (as unemployment was rising).[31]

An alternative hypothesis for the differing fair employment effects across decades is that the agencies' enforcement efforts varied across fair employment states, even when the form of the legislation itself looked very similar. Given the relatively high esteem in which the fair employment literature holds the New York State commission, this hypothesis seems entirely plausible. By 1964, the New York Commission was the largest, most experienced, and best funded of the state commissions (Lockard 1968:86; Norgren and Hill 1964:100). Even so, the agencies in the fair employment states used in the 1950s DDD exercises were not altogether starved for resources. In 1959, Pennsylvania and Michigan had the largest fair employment budgets after New York (Landes 1966, Table 4). But of course, funding does not translate directly into activity, let alone proficiency.

The existing caseload data do provide a direct measure of the agencies' levels of activity, but their connection to the laws' impact may be tenuous (for example, if firms conform to the law before being prodded by the enforcement agency). It is worth noting that between 1956 and 1963, Pennsylvania's agency "satisfactorily adjusted" 0.106 cases per thousand African Americans per year (on average). From the mid-1940s to 1963, New York and New Jersey satisfactorily adjusted, respectively, 0.061 and 0.066 cases per thousand blacks per year, though New York's figure doubles when "adjustments" are counted in cases where the original complaint was not upheld (that is, when discriminatory practices were revealed and corrected even though the original, specific complaint could not be proven).[32]

---

[30]The federal FEPC docketed most of its cases during the 1943–44 period for which state-level caseload data are available from the agency's microfilmed records (John Davis files; see Friend 1970). The state-level data do not report the proportion of complaints coming from blacks relative to other groups, but the FEPC's *First Report* indicates that Jews filed about 16% of the complaints in New York, a much larger proportion than elsewhere (Appendix E, Table 2C). Thus, the caseload gap would be narrowed somewhat by subtracting cases submitted by non–African Americans.

[31]New York State did have a "Committee on Discrimination in Employment" that attempted to discourage discrimination during the war (Reed 1991:31, 209, 211). Ideally, one could pursue some cross-

validation of the 1940s results on the basis of mid-decade income and employment figures, by race, state, and industry. In particular, comparisons across state-groups for the postwar 1940s may be preferable to comparisons across the full decade. Unfortunately, as far I know, the data required for such comparisons are not available.

[32]Calculations are made using the caseload data and 1960 population figures reported by Lockard (1968:91, 86). Comparable data are not reported for

This content downloaded from
192.102.230.248 on Thu, 15 Oct 2020 08:23:47 UTC
All use subject to https://about.jstor.org/terms

Three points should be taken from the state agencies' caseload data. First, it would be difficult to argue on the basis of the existing caseload data that the lack of impact in the 1950s (compared to the 1940s) was due to a relative lack of enforcement effort. Second, for the laws to have had a substantial impact on African-American labor market outcomes, either the enforcement efforts must have had spillovers (that is, more than a single black worker must have been made better off from each "adjusted" case), or a substantial number of firms and unions must have voluntarily complied with the laws, or both. Third, and related to the last point, if the employment discrimination remaining in place in the mid-1950s was more difficult to eliminate than that which existed in the 1940s, perhaps because the most overt or easily corrected discriminatory practices eroded first, then similar institutions and enforcement efforts might have had different effects at different points in time. Further research on such issues, perhaps at the firm level or in the form of detailed case studies of the fair employment agencies, would be helpful but lies beyond the scope of this paper.

The differing results for black men and women that emerge from the DDD estimates are also worthy of further consideration. Gender discrimination was not covered in the original fair employment laws, and so it is not as though black women were doubly protected and therefore doubly benefited by the laws. A number of alternative hypotheses suggest themselves. If white employers or employees had attitudes toward black women that were less discriminatory than their attitudes toward black men, then a given dose of fair employment enforcement effort might have improved black women's relative position more than men's. Along these same lines, if union obstacles to black employment gains were more prevalent for "men's work" than for "women's work," we might expect black women to have gained ground faster than black men. Finally, given the initial prevalence of black women in domestic service jobs, their occupational and industrial movement might have been associated with relatively large income gains compared to occupational and industrial movement for black men (Cunningham and Zalokar 1992).

By 1990, employed black women were substantially less segregated from white women (by industry/occupation/establishment/job) than black men were from white men. This has clear implications for the magnitude of the racial wage gap among women relative to that among men (Bayard et al. 1999). The next section examines the potential connection between fair employment legislation and the occupational and industrial redistribution of workers.

## Occupational and Industrial Redistribution

Aside from their link to higher incomes, the occupational and industrial redistributions of workers during this period are interesting in their own right. To a large extent, the campaigns for fair employment legislation and the activities of the state agencies were geared toward moving black workers into occupations and industries that had long-standing barriers to their entry. Thus, in a sense, a more direct view of the fair employment impact is gained by studying the occupational and industrial reallocation than by studying income and employment levels. Furthermore, these movements might have economically important effects that are not quickly reflected in income or unemployment differentials. For example, the redistribution could lead to improvements in non-pecuniary job characteristics, to the extension of networks both up the occupational hierarchy and across the industrial spectrum, and to a wider range of job choices that has value whether or not it leads to higher average income.

Massachusetts and Michigan. Minnesota (0.193) and Connecticut (0.308) have higher figures, but these have a small impact on the weighted average within the state-groups.

This content downloaded from
192.102.230.248 on Thu, 15 Oct 2020 08:23:47 UTC
All use subject to https://about.jstor.org/terms

## Occupational Status

Table 3 investigates changes in occupational status from three vantage points. In panel A, I use the natural log of the IPUMS's OccScore variable as a simple index of each individual's occupational status. The OccScore measure is based on the median income earned in 1950 by all workers within each three-digit occupational category. In panel B, I estimate the fair employment effect on the likelihood of employed workers being craftsmen or operatives. The movement of black workers into the semi-skilled or skilled operative and craftsman categories was an important aspect of African-American economic progress between 1940 and 1960 (Maloney 1994; Margo 1995; Collins 2000). The regressions in panel B shed light on whether or not this redistribution was promoted by state-level anti-discrimination laws. Finally, in panel C, I estimate the policy effect on the likelihood of workers holding clerical occupations. The movement of black workers out of blue-collar and into white-collar work is important not only because income gains might accompany such moves, but also because white-collar work generally has fewer disamenities than blue-collar work. Furthermore, a relative expansion of white-collar opportunities for black workers in fair employment states might signal an effective campaign against long-standing social norms that excluded blacks from such occupations (Governor's Commission 1953; Whatley 1990; Sundstrom 1994). Of course, occupational and industrial redistributions often go hand in hand, and so the paper's next section examines the industrial side of the story.

The most striking results from panel A of Table 3 are the large relative gains in occupational status by black women working in fair employment states in the 1940s, the 1950s, and over the full 1940–60 period.[33]

In general, these gains are larger than those found for actual income, which likely reflects movement out of occupational categories in which black women made up a large proportion of the workers (for example, household service) into occupational categories in which the OccScore value is more influenced by men's earnings (for example, operatives).[34] In comparison with the results for women, the estimated fair employment effects for men in columns (1) and (2) of panel A are less impressive, even when we take account of the fact that the initial gap in occupational status was smaller for men than for women. With the broader sample of states covering the full 1940–60 period (column 3), however, the coefficient does suggest a substantial degree of relative improvement for both men and women.

Panel B reports estimates of the policy effect on the likelihood of employment as an operative or a craftsman. In the 1940s (column 1), the effect for men is positive, but small and statistically weak. When Michigan is dropped from the sample, however, the coefficients increase in magnitude and statistical significance (all men: 0.081, z-stat = 2.34; young men: 0.096, z-stat = 1.86). The estimated effect for women is very strong, a finding that will also be reflected in the next section's study of the probability of manufacturing employment.[35] This strong result for women persists when any state is dropped from the regressions.

The results for the 1950s (column 2, panel B) faintly echo those for the 1940s. There is no evidence of a positive fair employment impact on black men's employment in the operative and craftsman cat-

---

[33]The results for women in the 1940s remain when any state is dropped from the regressions. The results for the 1950s are dampened when Illinois is excluded, but then dropping Illinois requires identification from a relatively small number of remaining black women in non-FE states.

[34]The difference between the income and the OccScore results is not explained by excluding those who worked less than 40 weeks, were self-employed, or earned less than one-half of the implied minimum annual earnings from the OccScore regressions (to make the sample more similar to that used for the income regressions).

[35]Following footnote 25, for both the manufacturing and operative regressions, the DDD probit coefficients suggest a 0.14 increase in the relative probability of holding such a job.

This content downloaded from
192.102.230.248 on Thu, 15 Oct 2020 08:23:47 UTC
All use subject to https://about.jstor.org/terms

*Table 3.* Estimates of Fair Employment Laws' Effect on Occupational Distribution.

| Group | 1<br>1940–1950 | 2<br>1950–1960 | 3<br>1940–1960 |
|---|---|---|---|
| **Panel A:  Occupational Status** | | | |
| Men, 20–59 | 0.0245<br>(1.22)<br>[116,170] | −0.0137<br>(0.71)<br>[90,765] | 0.0687***<br>(5.25)<br>[269,163] |
| Men, 20–35 | 0.0290<br>(1.02)<br>[57,599] | −0.0418<br>(1.49)<br>[36,334] | 0.0789***<br>(3.93)<br>[117,272] |
| Women, 20–59 | 0.2297***<br>(5.11)<br>[46,217] | 0.0784<br>(1.54)<br>[40,963] | 0.1023***<br>(3.48)<br>[113,635] |
| Women, 20–35 | 0.3057***<br>(5.05)<br>[28,716] | 0.1408**<br>(2.11)<br>[16,046] | 0.1462***<br>(3.64)<br>[53,691] |
| **Panel B:  Operatives and Craftsmen** | | | |
| Men, 20–59 | 0.0229<br>(0.73)<br>[116,823] | −0.0084<br>(0.25)<br>[94,022] | 0.0996***<br>(4.83)<br>[276,886] |
| Men, 20–35 | 0.0521<br>(1.12)<br>[57,983] | −0.0286<br>(0.56)<br>[37,684] | 0.0788**<br>(2.52)<br>[120,571] |
| Women, 20–59 | 0.2314***<br>(5.49)<br>[46,560] | 0.0692*<br>(1.85)<br>[42,807] | 0.0788***<br>(3.52)<br>[118,190] |
| Women, 20–35 | 0.2792***<br>(4.61)<br>[28,939] | 0.1000*<br>(1.87)<br>[16,754] | 0.1025***<br>(3.02)<br>[55,508] |
| **Panel C:  Clerical Workers** | | | |
| Men, 20–59 | 0.0094<br>(0.47)<br>[116,823] | −0.0082<br>(0.50)<br>[94,022] | −0.0169<br>(1.52)<br>[276,886] |
| Men, 20–35 | 0.0523<br>(1.49)<br>[57,983] | −0.0311<br>(1.46)<br>[37,684] | −0.0107<br>(0.56)<br>[120,571] |
| Women, 20–59 | −0.0098<br>(0.16)<br>[46,560] | 0.0374<br>(0.57)<br>[42,807] | 0.0781*<br>(1.75)<br>[118,190] |
| Women, 20–35 | 0.0597<br>(0.69)<br>[28,939] | 0.0553<br>(0.57)<br>[16,754] | 0.1121*<br>(1.86)<br>[55,508] |
| Non–Fair Employment States | MI, OH, PA | IA, IL, IN | Non-South w/o law |
| Fair Employment States | CT, MA, NJ, NY | MI, MN, PA | All w/ law in 1955 |

*Notes:* In Panel A, the natural log of the IPUMS OccScore variable is the dependent variable, and the DDD coefficients are from ordinary least squares regressions.  T-statistics based on robust standard errors are in parentheses.  In Panel B and Panel C, the DDD coefficients are from probit regressions and expressed in dF/dx terms as described in footnote 25.  Z-statistics based on robust standard errors are in parentheses.  The regressions include the set of controls and interactions described in the text.  The number of underlying observations is in brackets.  Observations are weighted by the IPUMS person weights in 1940 and 1960 and the IPUMS sample line weights for 1950.  See Table 1's notes for a list of states included in column (3).
*Sources:* Census micro-data are from Ruggles and Sobek (IPUMS 1997).
*Statistically significant at the .10 level; **at the .05 level; ***at the .01 level.

This content downloaded from
192.102.230.248 on Thu, 15 Oct 2020 08:23:47 UTC
All use subject to https://about.jstor.org/terms

egories, though again the coefficient for men does increase when Michigan is discarded (all men: 0.065, z-stat = 1.59; young men: 0.052, z-stat = 0.84). Also, there is again stronger support for a positive effect on black women's employment in these occupational categories. The 1940–60 results of column (3) suggest a positive impact for both men and women.

Although much of the fair employment literature, including this paper, focuses on access to blue-collar occupations, it is evident that discrimination in white-collar jobs was very common at mid-century. A study by Pennsylvania's Governor's Commission on Industrial Race Relations (1953) found that 88% of 1,137 firms providing information discriminated against racial or religious minorities in "office occupations" (compared to 37% in unskilled occupations).[36] The role of state-level fair employment laws in facilitating movement into such occupations is explored in panel C. There is statistically weak evidence of a fair employment effect for employed young women in the 1940s and 1950s, though somewhat stronger support emerges from the 1940–60 regressions in column (3). For young men in the 1940s, there is some evidence of a positive fair employment impact, but in the 1950s and in column (3) there is no sound evidence.

**Industrial Distribution**

To a large extent, the hiring of blacks for manufacturing jobs before the 1940s came during World War I or as replacement workers when whites went on strike (Whatley 1990, 1993). Historically, manufacturing jobs were viewed as "good" jobs (relative to the alternatives) by black workers, but it is not known whether the state-level fair employment laws eased blacks' entry into the sector. Panel A of Table 4 reports a strong

positive effect on women's likelihood of manufacturing employment in all three columns, especially for the 1940s, when black female manufacturing workers as a proportion of all employed black women jumped from 7% to 27% in the fair employment states compared to an increase from 10% to 15% in the non–fair employment states. In the 1940s, there were large increases in black women's manufacturing employment in all four of the fair employment states, and the strong positive coefficient remains in evidence when any state is excluded from the regression. Further investigation reveals that the expansion of black women's employment in the apparel industry in fair employment states was the single largest contributor to the rising proportion of employed black women in manufacturing. Excluding apparel workers from the regressions, however, does not undermine the strong and statistically significant coefficients: for all women the coefficient declines to 0.19, but for young women it remains at 0.32.

The vast majority of women in manufacturing industries were classified as operatives, and so the results in Table 4 are closely connected to those for female operatives in the previous table. The estimated effect for men is very small in the 1940s, slightly stronger but statistically insignificant in the 1950s, and stronger yet in the full 1940–60 DDD framework.[37] On the whole, there is a good deal of evidence consistent with the hypothesis that state-level anti-discrimination laws facilitated the movement of black workers, especially women, into manufacturing jobs.[38]

---

[36]Surveys conducted in five cities in 1940 by the Women's Bureau of the Department of Labor found that about 50% of firms had policies against hiring black clerical workers (Goldin 1990:147).

[37]Following footnote 25, the DDD probit coefficients suggest an increase in the relative probability of working as an operative of 0.09 (men) and 0.06 (women), and an increase in the relative probability of working in manufacturing of 0.07 (men) and 0.08 (women).

[38]Along these lines, an industrial breakdown of caseload data for New York State from 1945–61 indicates that about 34% of employer-targeted complaints (and cases resolved) pertained to manufacturing, by far the single largest category (Higbee 1966:364, 372).

This content downloaded from
192.102.230.248 on Thu, 15 Oct 2020 08:23:47 UTC
All use subject to https://about.jstor.org/terms

INDUSTRIAL AND LABOR RELATIONS REVIEW

*Table 4.* Estimates of Fair Employment Laws' Effect on Industrial Distribution.

| Group | 1<br>1940–1950 | 2<br>1950–1960 | 3<br>1940–1960 |
|---|---|---|---|
| **Panel A:  Manufacturing** | | | |
| Men, 20–59 | 0.0064<br>(0.21)<br>[116,823] | 0.0493<br>(1.54)<br>[94,022] | 0.0894***<br>(4.59)<br>[276,886] |
| Men, 20–35 | 0.0293<br>(0.65)<br>[57,983] | 0.0555<br>(1.14)<br>[37,684] | 0.0907***<br>(2.97)<br>[120,571] |
| Women, 20–59 | 0.2739***<br>(5.61)<br>[46,560] | 0.0904**<br>(1.96)<br>[42,807] | 0.1572***<br>(5.05)<br>[118,190] |
| Women, 20–35 | 0.3158***<br>(4.67)<br>[28,939] | 0.1837***<br>(2.65)<br>[16,754] | 0.2382***<br>(4.97)<br>[55,508] |
| **Panel B:  Personal Service** | | | |
| Men, 20–59 | 0.0116<br>(1.58)<br>[116,823] | 0.0088<br>(1.23)<br>[94,022] | 0.0042<br>(1.08)<br>[276,886] |
| Men, 20–35 | 0.0078<br>(0.74)<br>[57,983] | 0.0060<br>(0.59)<br>[37,684] | 0.0072<br>(1.17)<br>[120,571] |
| Women, 20–59 | −0.0610***<br>(4.51)<br>[46,560] | −0.0113<br>(0.71)<br>[42,807] | −0.0193*<br>(1.85)<br>[118,190] |
| Women, 20–35 | −0.0604***<br>(3.89)<br>[28,939] | −0.0296<br>(1.82)<br>[16,754] | −0.0259*<br>(1.85)<br>[55,508] |
| **Panel C:  Government** | | | |
| Men, 20–59 | −0.0013<br>(0.11)<br>[116,823] | −0.0034<br>(0.29)<br>[94,022] | −0.0215***<br>(3.48)<br>[276,886] |
| Men, 20–35 | −0.0033<br>(0.23)<br>[57,983] | −0.0079<br>(0.58)<br>[37,684] | −0.0188**<br>(2.37)<br>[120,571] |
| Women, 20–59 | −0.0084<br>(0.70)<br>[46,560] | −0.0112<br>(0.90)<br>[42,807] | −0.0061<br>(0.62)<br>[118,190] |
| Women, 20–34 | −0.0047<br>(0.33)<br>[28,939] | 0.0073<br>(0.39)<br>[16,754] | −0.0074<br>(0.68)<br>[55,508] |
| Non–Fair Employment States | MI, OH, PA | IA, IL, IN | Non-South w/o law |
| Fair Employment States | CT, MA, NJ, NY | MI, MN, PA | All w/ law in 1955 |

*Notes:* The DDD coefficients are from probit regressions and expressed in $dF/dx$ terms as described in footnote 25.  Z-statistics based on robust standard errors are in parentheses.  The number of underlying observations is in brackets.  The regressions include the set of controls and interactions described in the text. Observations are weighted by the IPUMS person weights in 1940 and 1960 and the IPUMS sample line weights for 1950.  See Table 1's notes for a list of states included in column (3).  Personal service industries include service in private households, hotels, laundries, and so on.

*Sources:* Census micro-data are from Ruggles and Sobek (IPUMS 1997).

*Statistically significant at the .10 level; **at the .05 level; ***at the .01 level.

This content downloaded from
192.102.230.248 on Thu, 15 Oct 2020 08:23:47 UTC
All use subject to https://about.jstor.org/terms

The rapid decline in the proportion of black female employment in personal service is among the most remarkable features of labor market reallocation in the post-1940 period. Sundstrom noted that between 1940 and 1980, black female domestic servants as a proportion of all black female workers fell from 58% to 6% (2000:1). The high proportion of black women in such jobs in 1940 was certainly not a southern peculiarity: in the states selected here for comparison in the 1940s DDD regressions, over 70% of employed black women worked in personal service industries (in 1940), primarily in household service. Did fair employment laws accelerate the decline of blacks' employment in personal service industries? For women in the 1940s there is evidence consistent with a substantial fair employment effect, but the evidence is weaker in columns (2) and (3), and there is no such evidence for men's employment in service.[39]

Finally, panel C reports estimates of the policy effect on (non-military) government employment, a sector that experienced a substantial increase in its proportion of African-American workers after 1940. *A priori*, the effect of fair employment legislation on blacks' employment in government is ambiguous. On one hand, one might expect the government to follow fair employment policies more strictly than the private sector, thereby drawing a relatively high proportion of blacks into government employment. On the other hand, effective fair employment legislation might have opened better-paying opportunities for blacks outside of government, and anti-discrimination policy covering government employment sometimes preceded the passage of fair employment laws (Bonfield 1967). In panel C of Table 4, the estimated effects on black women's likelihood of government employment are small and usually negative. For men, the estimated effects are small and negative in both the 1940s

and 1950s DDD frameworks, but somewhat stronger (and negative) in the 1940–60 estimates. In any case, the state-level fair employment laws do not appear to have crowded blacks into government employment; if anything, the opposite occurred.

## Migration

To this point, the empirical approach has treated each state-group as a separate labor market and attempted to identify a fair employment effect by making comparisons across those labor markets. Clearly, however, African Americans were very geographically mobile between 1940 and 1960, the two greatest decades of the Great Migration. To the extent that migration patterns are sensitive to differences in economic opportunities, mobile labor may dissipate differences across locations, confounding the DDD identification strategy. However, the states that passed fair employment laws did not experience relatively large increases in their black populations. In fact, the fair employment groups of states had slightly smaller increases in their black/white population ratios than the non–fair employment states in both the 1940s and 1950s. Thus, it seems unlikely that the potential labor demand–side impact of fair employment laws was offset by a relatively strong migration response to improved opportunities in fair employment states.

More formally, using the familiar DDD framework, panel A of Table 5 shows that a black's relative probability of being an interstate migrant (that is, resident in a state other than one's state of birth) is not positively and statistically significantly associated with the presence of fair employment laws. Panel A's approach, however, takes no account of when people moved, and so an alternative, and perhaps preferable, route is explored in panel B of Table 5. I assembled a panel of state-level data for each census period from 1900 to 1960, covering all the important destinations for black migrants. I then regressed the net black immigration rate (net black in-migration expressed relative to the state's total population) for each state-decade observa-

---

[39]Following footnote 25, the DDD probit coefficient suggests a 0.17 decline in the relative probability of working in personal service.

This content downloaded from
192.102.230.248 on Thu, 15 Oct 2020 08:23:47 UTC
All use subject to https://about.jstor.org/terms

tion on a series of state and period fixed effects, plus a dummy variable equal to 1 for state-decade observations with fair employment laws in place. The state fixed effects should account for time-invariant state characteristics (such as distance from the South, and persistent differences in industrial structure and transportation networks). The time fixed effects should account for state-invariant time-series influences (such as declining transportation costs and macroeconomic demand shocks). The fair employment dummy variable then reflects any change in the black migration rate that coincides with the enactment of fair employment laws.

The regressions underlying the first two columns of panel B include only the industrial states of the Northeast and the Midwest, the most important destinations for black migrants throughout the period. The last two columns' samples are expanded to include several states that received substantial inflows of black migrants in the 1940s and 1950s. In short, whether or not the migration rate is specified in logs, and whether the analysis uses the "industrial sample" or the "broader sample," there is no strong evidence that the fair employment laws elicited a substantial migration response from African Americans.

## Conclusion

State-level fair employment laws were among the earliest legislative achievements of the Civil Rights Movement, and by the time the Civil Rights Act of 1964 was passed, nearly all African-American workers outside the South were already covered by such legislation. The symbolic and political importance of these laws is reasonably clear: for the first time, state governments attempted to protect minority workers from discriminatory employment practices in the private sector. The economic importance of the laws, however, has long been in dispute, though it has been 25 years since economists last weighed the evidence. The dearth of economic inquiry into these laws is unfortunate, because an accurate understanding of their labor market impact could provide a better understanding of the Civil

Rights Movement's contributions to black economic progress and could be informative for current discussions of affirmative action policy.

This paper takes a new approach to the measurement of the fair employment policy impact and offers a broader view of labor market outcomes than previous studies. The earliest fair employment laws, which were adopted in the 1940s, appear to have improved the relative income of black workers. They certainly did not eliminate the racial income gap between otherwise observationally similar workers, but the income gains associated with fair employment were not trivial. Moreover, the positive relative income effect was not offset by worsening relative unemployment or labor force participation rates in the 1940s.

The laws adopted during the 1950s, however, appear to have had a less positive impact than those in the 1940s even though, in general, the laws and enforcement agencies were similar in form. Existing evidence on the caseload volume does not demonstrate that the state agencies created in the 1950s were much less active than their predecessors, though more detailed research on the agencies' operations might provide additional insight on this issue. It is possible that the agencies operating in the 1940s were more proficient than those formed later, that the relatively strong 1940s results partly reflect the wartime federal FEPC's efforts, and that by the mid-1950s, the remaining forms of employment discrimination were more difficult to dissolve than those in place in the 1940s. In any case, by the time the Civil Rights Act passed in 1964, the perception among activists that the fair employment approach was ineffective had firm roots in the disappointing experience under the previous decade's new fair employment laws, particularly with respect to men's outcomes. Given this point of view, a view that focuses on labor market outcomes, the drive for and continuing commitment to more aggressive labor market intervention is not surprising.

Importantly, from a variety of perspectives, black women appear to have benefited more from the laws than did black

This content downloaded from
192.102.230.248 on Thu, 15 Oct 2020 08:23:47 UTC
All use subject to https://about.jstor.org/terms

*Table 5.* Migration Response to Fair Employment Laws.

### Panel A: Probits for Out-of-State Birth (DDD Estimates)

| Group | 1940–1950 | 1950–1960 | 1940–1960 |
|---|---|---|---|
| Men, 20–59 | –0.0294 | 0.0090 | –0.0356** |
| | (1.32) | (0.33) | (2.35) |
| | [135,846] | [101,909] | [308,785] |
| Men, 20–35 | –0.0234 | –0.0138 | –0.0183 |
| | (0.82) | (0.40) | (0.89) |
| | [68,483] | [40,879] | [136,234] |
| Women, 20–59 | 0.0323 | 0.0179 | –0.0515*** |
| | (1.42) | (0.68) | (3.57) |
| | [143,848] | [112,171] | [329,926] |
| Women, 20–35 | 0.0055 | –0.0267 | –0.0170 |
| | (0.20) | (0.83) | (0.86) |
| | [74,827] | [47,365] | [150,613] |

### Panel B: OLS for State-Level Black Migration Rates, 1900–1960

| | Industrial Sample: In Migration Rate | Industrial Sample: Migration Rate | Broader Sample: In Migration Rate | Broader Sample: Migration Rate |
|---|---|---|---|---|
| Fair Employment Coefficient | –0.0983 | –3.4160 | 0.0913 | –2.4570 |
| | (0.42) | (1.30) | (0.38) | (0.84) |
| States | 10 | 10 | 17 | 17 |
| Observations | 60 | 60 | 96 | 102 |
| Mean of Dependent Var. | 10.04 | 1.86 | 9.18 | 1.67 |

*Notes:* In Panel A, the reported coefficients are DDD estimates from probits for having a state of birth different from the current state of residence. The coefficients are expressed in dF/dx terms (evaluated at sample means)—that is, the estimated fair employment effect on the probability of being an inter-state migrant. Regressions include the set of characteristics and controls described in the text. Z-statistics based on robust standard errors are in parentheses. Observations are weighted by the IPUMS person weights in 1940 and 1960 and the IPUMS sample line weights for 1950. The number of underlying observations is in brackets. In Panel B are estimates of the fair employment coefficient from OLS regressions of the black migration rate on a complete set of time and state indicator variables and a fair employment indicator (equal to one when a law is in place before the end of the decade). T-statistics are in parentheses. The "Industrial Sample" corresponds to the industrial Northeast and Midwest: Connecticut, Indiana, Illinois, Massachusetts, Michigan, New Jersey, New York, Pennsylvania, Ohio, and Wisconsin. The "Broader Sample" adds Arizona, California, Colorado, Minnesota, New Mexico, Oregon, and Washington. In the broad sample, the net migration rate is sometimes zero, implying the log of the rate is undefined. Trimming the last column's sample to match the previous column's (from 102 to 96 observations) does not affect the qualitative results.

*Sources:* For Panel A, census micro-data are from Ruggles and Sobek (IPUMS 1997). For Panel B, migration and population data for 1900–1950 are from Eldridge and Thomas (1964), and for 1950–1960 are from U.S. Department of Commerce (1975).

*Statistically significant at the .10 level; **at the .05 level; ***at the .01 level.

men. This is an intriguing result given the eventual collapse of the racial wage gap among women even as the gap among men persisted (Bayard et al. 1999). In the 1940–60 period, black women's advance was manifested most clearly in the rising proportion of black women working as manufacturing operatives and the sharply declining proportion working as domestic servants. In moving beyond the findings reported in this paper, long-run comparisons of black women's labor market experiences with black men's experiences may shed considerable light on how the contours of labor market discrimination have been reshaped over time.

This content downloaded from
192.102.230.248 on Thu, 15 Oct 2020 08:23:47 UTC
All use subject to https://about.jstor.org/terms

INDUSTRIAL AND LABOR RELATIONS REVIEW

**Appendix Table A1**
**Summary Statistics for 1940–1950 Estimates**

| Variable/Year | Black Men F.E. Mean | Black Men Non-F.E. Mean | White Men F.E. Mean | White Men Non-F.E. Mean | Black Women F.E. Mean | Black Women Non-F.E. Mean | White Women F.E. Mean | White Women Non-F.E. Mean |
|---|---|---|---|---|---|---|---|---|
| **Log Income** | | | | | | | | |
| 1940 | 6.815 (0.431) | 6.814 (0.428) | 7.292 (0.549) | 7.217 (0.535) | 6.361 (0.388) | 6.275 (0.364) | 6.857 (0.499) | 6.702 (0.492) |
| 1950 | 7.739 (0.348) | 7.789 (0.376) | 8.079 (0.459) | 8.065 (0.429) | 7.387 (0.396) | 7.235 (0.462) | 7.647 (0.407) | 7.553 (0.429) |
| **Unemployed** | | | | | | | | |
| 1940 | 0.189 | 0.195 | 0.110 | 0.099 | 0.132 | 0.194 | 0.094 | 0.078 |
| 1950 | 0.110 | 0.099 | 0.046 | 0.040 | 0.080 | 0.090 | 0.039 | 0.026 |
| **Labor Force Participant** | | | | | | | | |
| 1940 | 0.898 | 0.902 | 0.950 | 0.953 | 0.535 | 0.396 | 0.387 | 0.292 |
| 1950 | 0.859 | 0.884 | 0.945 | 0.945 | 0.513 | 0.384 | 0.383 | 0.326 |
| **Log OccScore** | | | | | | | | |
| 1940 | 2.973 (0.332) | 3.015 (0.302) | 3.270 (0.343) | 3.206 (0.346) | 2.149 (0.615) | 2.262 (0.620) | 3.029 (0.318) | 2.975 (0.376) |
| 1950 | 3.060 (0.396) | 3.102 (0.347) | 3.330 (0.374) | 3.285 (0.396) | 2.587 (0.564) | 2.483 (0.608) | 3.104 (0.409) | 3.056 (0.462) |
| **Craftsmen and Operatives** | | | | | | | | |
| 1940 | 0.257 | 0.276 | 0.386 | 0.433 | 0.128 | 0.167 | 0.256 | 0.252 |
| 1950 | 0.418 | 0.455 | 0.427 | 0.512 | 0.341 | 0.209 | 0.254 | 0.263 |
| **Clerical** | | | | | | | | |
| 1940 | 0.051 | 0.025 | 0.123 | 0.086 | 0.024 | 0.020 | 0.334 | 0.256 |
| 1950 | 0.088 | 0.045 | 0.094 | 0.074 | 0.064 | 0.068 | 0.386 | 0.319 |
| **Manufacturing** | | | | | | | | |
| 1940 | 0.141 | 0.278 | 0.315 | 0.363 | 0.069 | 0.101 | 0.321 | 0.297 |
| 1950 | 0.268 | 0.458 | 0.343 | 0.411 | 0.267 | 0.148 | 0.347 | 0.340 |
| **Personal Service** | | | | | | | | |
| 1940 | 0.148 | 0.100 | 0.032 | 0.020 | 0.782 | 0.684 | 0.125 | 0.160 |
| 1950 | 0.105 | 0.057 | 0.023 | 0.018 | 0.467 | 0.509 | 0.060 | 0.074 |
| **Government** | | | | | | | | |
| 1940 | 0.050 | 0.028 | 0.056 | 0.037 | 0.016 | 0.018 | 0.034 | 0.035 |
| 1950 | 0.065 | 0.040 | 0.062 | 0.042 | 0.037 | 0.053 | 0.039 | 0.036 |
| **Inter-State Migrant** | | | | | | | | |
| 1940 | 0.792 | 0.810 | 0.220 | 0.210 | 0.819 | 0.797 | 0.225 | 0.198 |
| 1950 | 0.759 | 0.812 | 0.223 | 0.216 | 0.804 | 0.774 | 0.223 | 0.220 |

*Notes:* "F.E." = Fair Employment. Standard deviations are in parentheses for variables that are not dummies.
*Source:* IPUMS (Ruggles and Sobek 1997).

This content downloaded from
192.102.230.248 on Thu, 15 Oct 2020 08:23:47 UTC
All use subject to https://about.jstor.org/terms

STATE-LEVEL ANTI-DISCRIMINATION LAWS, 1940–1960          269

**Appendix Table A2**
**Summary Statistics for 1950–1960 Estimates**

| Variable/Year | Black Men | | White Men | | Black Women | | White Women | |
|---|---|---|---|---|---|---|---|---|
| | F.E. Mean | Non-F.E. Mean | F.E. Mean | Non-F.E. Mean | F.E. Mean | Non-F.E. Mean | F.E. Mean | Non-F.E. Mean |
| **Log Income** | | | | | | | | |
| 1950 | 7.812 (0.369) | 7.814 (0.348) | 8.046 (0.442) | 8.069 (0.466) | 7.239 (0.475) | 7.372 (0.444) | 7.544 (0.435) | 7.601 (0.436) |
| 1960 | 8.299 (0.368) | 8.324 (0.371) | 8.606 (0.437) | 8.640 (0.437) | 7.795 (0.438) | 7.903 (0.402) | 8.031 (0.419) | 8.067 (0.423) |
| **Unemployed** | | | | | | | | |
| 1950 | 0.104 | 0.112 | 0.042 | 0.018 | 0.086 | 0.106 | 0.026 | 0.023 |
| 1960 | 0.136 | 0.085 | 0.057 | 0.032 | 0.114 | 0.123 | 0.052 | 0.039 |
| **Labor Force Participant** | | | | | | | | |
| 1950 | 0.876 | 0.885 | 0.941 | 0.951 | 0.359 | 0.439 | 0.327 | 0.333 |
| 1960 | 0.869 | 0.874 | 0.950 | 0.955 | 0.474 | 0.477 | 0.394 | 0.419 |
| **Log OccScore** | | | | | | | | |
| 1950 | 3.112 (0.295) | 3.084 (0.286) | 3.255 (0.378) | 3.232 (0.410) | 2.493 (0.628) | 2.682 (0.563) | 3.034 (0.405) | 3.026 (0.442) |
| 1960 | 3.117 (0.288) | 3.129 (0.284) | 3.331 (0.315) | 3.318 (0.339) | 2.638 (0.566) | 2.763 (0.546) | 3.053 (0.359) | 3.072 (0.362) |
| **Craftsmen and Operatives** | | | | | | | | |
| 1950 | 0.486 | 0.394 | 0.488 | 0.421 | 0.256 | 0.328 | 0.247 | 0.223 |
| 1960 | 0.444 | 0.394 | 0.476 | 0.450 | 0.205 | 0.225 | 0.203 | 0.185 |
| **Clerical** | | | | | | | | |
| 1950 | 0.047 | 0.066 | 0.072 | 0.074 | 0.063 | 0.095 | 0.315 | 0.332 |
| 1960 | 0.062 | 0.096 | 0.072 | 0.073 | 0.125 | 0.143 | 0.320 | 0.364 |
| **Manufacturing** | | | | | | | | |
| 1950 | 0.462 | 0.445 | 0.374 | 0.319 | 0.184 | 0.272 | 0.310 | 0.298 |
| 1960 | 0.411 | 0.359 | 0.428 | 0.384 | 0.156 | 0.182 | 0.280 | 0.277 |
| **Personal Service** | | | | | | | | |
| 1950 | 0.050 | 0.064 | 0.019 | 0.017 | 0.519 | 0.393 | 0.079 | 0.084 |
| 1960 | 0.046 | 0.045 | 0.015 | 0.015 | 0.336 | 0.263 | 0.066 | 0.065 |
| **Government** | | | | | | | | |
| 1950 | 0.034 | 0.048 | 0.040 | 0.040 | 0.041 | 0.036 | 0.035 | 0.034 |
| 1960 | 0.065 | 0.083 | 0.046 | 0.038 | 0.070 | 0.071 | 0.039 | 0.032 |
| **Inter-State Migrant** | | | | | | | | |
| 1950 | 0.822 | 0.826 | 0.202 | 0.255 | 0.788 | 0.833 | 0.199 | 0.257 |
| 1960 | 0.737 | 0.767 | 0.199 | 0.280 | 0.713 | 0.770 | 0.205 | 0.285 |

*Notes:* See notes to Table A1.

This content downloaded from
192.102.230.248 on Thu, 15 Oct 2020 08:23:47 UTC
All use subject to https://about.jstor.org/terms

**Appendix Table A3**
**Summary Statistics for 1940–1960 Estimates**

| Variable/Year | Black Men | | White Men | | Black Women | | White Women | |
|---|---|---|---|---|---|---|---|---|
| | F.E. Mean | Non-F.E. Mean | F.E. Mean | Non-F.E. Mean | F.E. Mean | Non-F.E. Mean | F.E. Mean | Non-F.E. Mean |
| Log Income | | | | | | | | |
| 1940 | 6.823 (0.431) | 6.726 (0.463) | 7.251 (0.550) | 7.124 (0.599) | 6.328 (0.385) | 6.266 (0.453) | 6.803 (0.503) | 6.673 (0.498) |
| 1960 | 8.272 (0.372) | 8.301 (0.381) | 8.630 (0.444) | 8.616 (0.439) | 7.858 (0.410) | 7.839 (0.428) | 8.087 (0.420) | 8.042 (0.421) |
| Unemployed | | | | | | | | |
| 1940 | 0.199 | 0.159 | 0.107 | 0.070 | 0.157 | 0.170 | 0.089 | 0.059 |
| 1960 | 0.106 | 0.085 | 0.044 | 0.033 | 0.090 | 0.115 | 0.051 | 0.038 |
| Labor Force Participants | | | | | | | | |
| 1940 | 0.901 | 0.887 | 0.951 | 0.949 | 0.472 | 0.396 | 0.340 | 0.275 |
| 1960 | 0.872 | 0.874 | 0.952 | 0.955 | 0.524 | 0.483 | 0.414 | 0.421 |
| Log OccScore | | | | | | | | |
| 1940 | 2.992 (0.375) | 2.974 (0.374) | 3.219 (0.407) | 3.102 (0.476) | 2.200 (0.585) | 2.330 (0.622) | 3.001 (0.440) | 2.960 (0.489) |
| 1960 | 3.115 (0.300) | 3.118 (0.284) | 3.351 (0.321) | 3.323 (0.341) | 2.661 (0.582) | 2.711 (0.558) | 3.082 (0.341) | 3.068 (0.366) |
| Craftsmen and Operatives | | | | | | | | |
| 1940 | 0.272 | 0.232 | 0.394 | 0.319 | 0.150 | 0.166 | 0.245 | 0.190 |
| 1960 | 0.420 | 0.376 | 0.435 | 0.441 | 0.223 | 0.199 | 0.188 | 0.174 |
| Clerical | | | | | | | | |
| 1940 | 0.037 | 0.028 | 0.102 | 0.075 | 0.024 | 0.036 | 0.299 | 0.281 |
| 1960 | 0.079 | 0.094 | 0.080 | 0.073 | 0.131 | 0.128 | 0.361 | 0.363 |
| Manufacturing | | | | | | | | |
| 1940 | 0.216 | 0.207 | 0.316 | 0.213 | 0.083 | 0.104 | 0.295 | 0.219 |
| 1960 | 0.341 | 0.336 | 0.383 | 0.354 | 0.189 | 0.155 | 0.277 | 0.253 |
| Personal Service | | | | | | | | |
| 1940 | 0.124 | 0.117 | 0.026 | 0.021 | 0.742 | 0.656 | 0.142 | 0.177 |
| 1960 | 0.052 | 0.048 | 0.017 | 0.016 | 0.331 | 0.287 | 0.056 | 0.070 |
| Government | | | | | | | | |
| 1940 | 0.041 | 0.033 | 0.047 | 0.037 | 0.015 | 0.018 | 0.035 | 0.035 |
| 1960 | 0.064 | 0.088 | 0.056 | 0.043 | 0.053 | 0.063 | 0.039 | 0.036 |
| Inter-State Migrant | | | | | | | | |
| 1940 | 0.809 | 0.760 | 0.242 | 0.273 | 0.814 | 0.770 | 0.238 | 0.274 |
| 1960 | 0.727 | 0.736 | 0.245 | 0.308 | 0.717 | 0.738 | 0.254 | 0.312 |

*Notes:* See notes to Table A1.

This content downloaded from
192.102.230.248 on Thu, 15 Oct 2020 08:23:47 UTC
All use subject to https://about.jstor.org/terms

Case 2:21-cv-00629-MTL   Document 1-6   Filed 04/12/21   Page 29 of 30

## REFERENCES

Arrow, Kenneth. 1973. "The Theory of Discrimination." In Orley Ashenfelter and Albert Rees, eds., *Discrimination in Labor Markets.* Princeton, N.J.: Princeton University Press, pp. 3–33.

Ashenfelter, Orley. 1972. "Racial Discrimination and Trade Unionism." *Journal of Political Economy,* Vol. 80, No. 3, pp. 435–64.

Bayard, Kimberly, Judith Hellerstein, David Neumark, and Kenneth Troske. 1999. "Why Are Racial and Ethnic Wage Gaps Larger for Men Than for Women?" Cambridge, Mass.: NBER Working Paper 6997.

Becker, Gary S. 1957. *The Economics of Discrimination.* Chicago: University of Chicago Press.

Belz, Herman. 1991. *Equality Transformed: A Quarter-Century of Affirmative Action.* New Brunswick, N.J.: Transaction.

Besley, Timothy, and Anne Case. 2000. "Unnatural Experiments? Estimating the Incidence of Endogenous Policies." *Economic Journal,* Vol. 110, No. 467, pp. F672–94.

Bonfield, Arthur Earl. 1967. "The Origin and Development of American Fair Employment Legislation." *Iowa Law Review,* Vol. 52, No. 6, pp. 1043–92.

Cain, Glen G. 1986. "The Economic Analysis of Labor Market Discrimination: A Survey." In Orley Ashenfelter and Richard Layard, eds., *Handbook of Labor Economics,* Vol. 1. New York: Elsevier, pp. 693–785.

Card, David. 1992. "Do Minimum Wages Reduce Employment? A Case Study of California, 1987–89." *Industrial and Labor Relations Review,* Vol. 46, No. 1, pp. 38–54.

Cartwright, Marguerite. 1948. *Legislation against Discrimination in Employment in New York State.* Diss., New York University.

Chay, Kenneth Y. 1998. "The Impact of Federal Civil Rights Policy on Black Economic Progress: Evidence from the Equal Opportunity Act of 1972." *Industrial and Labor Relations Review,* Vol. 51, No. 4, pp. 608–32.

Collins, William J. 2000. "African-American Economic Mobility in the 1940s: A Portrait from the Palmer Survey." *Journal of Economic History,* Vol. 60, No. 3, pp. 756–81.

——. 2001. "Race, Roosevelt, and Wartime Production: Fair Employment in World War II Labor Markets." *American Economic Review,* Vol. 91, No. 1, pp. 272–86.

——. Forthcoming. "The Political Economy of State-Level Fair Employment Legislation." *Explorations in Economic History.*

*Congressional Quarterly Almanac 1964.* Washington, D.C.: Congressional Quarterly News Features.

Cunningham, James, and Nadja Zalokar. 1992. "The Economic Progress of Black Women, 1940–1980: Occupational Distribution and Relative Wages." *Industrial and Labor Relations Review,* Vol. 45, No. 3, pp. 540–55.

Donohue, John H., and James Heckman. 1991. "Continuous versus Episodic Change: The Impact of Civil Rights Policy on the Economic Status of Blacks." *Journal of Economic Literature,* Vol. 29, No. 4, pp. 1603–43.

Eldridge, Hope T., and Dorothy Swaine Thomas. 1964. *Population Redistribution and Economic Growth, United States, 1870–1950, Volume III: Demographic Analyses and Interrelations.* Philadelphia: American Philosophical Society.

Epstein, Richard A. 1992. *Forbidden Grounds: The Case against Employment Discrimination Laws.* Cambridge, Mass.: Harvard University Press.

Fair Employment Practice Committee. 1945. *First Report.* Washington, D.C.: GPO.

Friend, Bruce I. 1970. *Guide to the Microfilm Record of Selected Documents of the Committee on Fair Employment Practice in the Custody of the National Archives.* Glen Rock, N.J.: Microfilming Corporation of America.

Gallup, George H. 1972. *The Gallup Poll: Public Opinion, 1935–1971,* Vol. 1. New York: Random House.

Goldin, Claudia. 1990. *Understanding the Gender Gap: An Economic History of American Women.* New York: Oxford University Press.

Goldin, Claudia, and Robert A. Margo. 1992. "The Great Compression: The U.S. Wage Structure at Mid-Century." *Quarterly Journal of Economics,* Vol. 107, No. 1, pp. 1–34.

Goldstein, Bernard. 1950. *The Dynamics of State Campaigns for Fair Employment Practices Legislation.* Chicago: Committee of Education, Training, and Research in Race Relations of the University of Chicago.

Governor's Commission on Industrial Race Relations. 1953. "Employment Practices in Pennsylvania." Harrisburg: Commonwealth of Pennsylvania.

Gray, Gibson Hendrix. 1970. *The Lobbying Game: A Study of the 1953 Campaign of the State Council for a Pennsylvania Fair Employment Practice Commission.* Tyler, Tex.: published by author.

Gruber, Jonathan. 1994. "The Incidence of Mandated Maternity Benefits." *American Economic Review,* Vol. 84, No. 3, pp. 622–41.

Heckman, James J. 1976. "Simultaneous Equation Models with Continuous and Discrete Endogenous Variables and Structural Shifts." In Stephen M. Goldfeld and Richard E. Quandt, eds., *Studies in Non-Linear Estimation.* Cambridge, Mass.: Ballinger, pp. 235–72.

Higbee, Jay Anders. 1966. *Development and Administration of the New York State Law against Discrimination.* University, Ala.: University of Alabama Press.

Hill, Herbert. 1964. "Twenty Years of State Fair Employment Practice Commissions: A Critical Analysis with Recommendations." *Buffalo Law Review,* Vol. 14, No. 1, pp. 22–69.

Hyman, Herbert H., and Paul B. Sheatsley. 1964. "Attitudes toward Desegregation." *Scientific American,* Vol. 211, No. 1, pp. 16–23.

Kesselman, Louis Coleridge. 1948. *The Social Politics of FEPC: A Study in Reform Pressure Movements.* Chapel Hill: University of North Carolina Press.

Landes, William M. 1966. *The Effect of State Fair*

This content downloaded from
192.102.230.248 on Thu, 15 Oct 2020 08:23:47 UTC
All use subject to https://about.jstor.org/terms

272 INDUSTRIAL AND LABOR RELATIONS REVIEW

*Employment Legislation on the Economic Position of Non-white Men.* Diss., Columbia University.

____. 1968. "The Economics of Fair Employment Laws." *Journal of Political Economy,* Vol. 76, No. 4, pp. 507–52.

Liggett, Malcolm H. 1969. "The Efficacy of State Fair Employment Practices Commissions." *Industrial and Labor Relations Review,* Vol. 22, No. 4, pp. 559–67.

Lockard, Duane. 1968. *Toward Equal Opportunity.* New York: Macmillan.

Loury, Glenn C. 1998. "Discrimination in the Post-Civil Rights Era: Beyond Market Interactions." *Journal of Economic Perspectives,* Vol. 12, No. 2, pp. 117–26.

Lundberg, Shelly J., and Richard Startz. 1983. "Private Discrimination and Social Intervention in Competitive Labor Markets." *American Economic Review,* Vol. 73, No. 3, pp. 340–47.

Maloney, Thomas N. 1994. "Wage Compression and Wage Inequality between Black and White Males in the United States, 1940–1960." *Journal of Economic History,* Vol. 54, No. 2, pp. 358–81.

Margo, Robert A. 1995. "Explaining Black-White Wage Convergence, 1940–1950." *Industrial and Labor Relations Review,* Vol. 48, No. 3, pp. 470–81.

Meyer, Bruce D. 1995. "Natural and Quasi-Experiments in Economics." *Journal of Business and Economic Statistics,* Vol. 13, No. 2, pp. 151–62.

Moreno, Paul D. 1997. *From Direct Action to Affirmative Action: Fair Employment Law and Policy in America, 1933–1972.* Baton Rouge: Louisiana State University Press.

Myrdal, Gunnar. 1944. *An American Dilemma: The Negro Problem and Modern Democracy.* New York: Harper & Brothers.

National Council of Churches of Christ. 1956. *Survey of Churches and Church Membership in the United States.* New York.

Neumark, David, and Wendy A. Stock. 2001. "The Effects of Race and Sex Discrimination Laws." Cambridge, Mass.: NBER Working Paper 8215.

New York State Commission against Discrimination. 1948. *Annual Report 1947.* Albany, N.Y.

____. 1952. *Report of Progress 1951.* Albany, N.Y.

____. 1956. *Annual Report 1955.* Albany, N.Y.

Norgren, Paul H., and Samuel E. Hill. 1964. *Toward Fair Employment.* New York: Columbia University Press.

Northrup, Herbert R. 1944. *Organized Labor and the Negro.* New York: Harper & Brothers.

Ranney, Austin. 1965. "Parties in State Politics." In Herbert Jacob and Kenneth N. Vines, eds., *Politics in the American States.* Boston: Little, Brown, pp. 61–99.

Reed, Merl. 1991. *Seedtime for the Modern Civil Rights Movement: The President's Committee on Fair Employment Practice, 1941–1946.* Baton Rouge: Louisiana State University Press.

Rosenthal, Howard L., and Keith T. Poole. 1992. *United States Congressional Roll Call Voting Records, 1789–1987: Reformatted Data* (computer file). Ann Arbor, Mich.: Inter-University Consortium for Political and Social Research.

Ruchames, Louis. 1953. *Race, Jobs, and Politics: The Story of the FEPC.* New York: Columbia University Press.

Ruggles, Steven, et al. 1997. *Integrated Public Use Microdata Series.* Minneapolis: Historical Census Projects, University of Minnesota.

Smith, James P., and Finis R. Welch. 1989. "Black Economic Progress after Myrdal." *Journal of Economic Literature,* Vol. 27, No. 2, pp. 519–64.

Stigler, George. 1973. "The Sources of Economic Legislation—1: Fair Employment Legislation." Unpublished paper, University of Chicago.

Sugrue, Thomas J. 1996. *The Origins of the Urban Crisis: Race and Inequality in Postwar Detroit.* Princeton, N.J.: Princeton University Press.

Sundstrom, William A. 1994. "The Color Line: Racial Norms and Discrimination in Urban Labor Markets, 1910–1950." *Journal of Economic History,* Vol. 54, No. 2, pp. 382–96.

____. 2000. "From Servants to Secretaries: The Occupations of African-American Women, 1940–1980." Unpublished paper, Santa Clara University.

Thernstrom, Stephan, and Abigail Thernstrom. 1997. *America in Black and White: One Nation, Indivisible.* New York: Simon & Schuster.

United States Bureau of the Census. 1975. *Historical Statistics of the United States, Colonial Times to 1970, Bicentennial Edition.* Washington, D.C.: GPO.

War Production Board. 1944. *Summary of War Supply Contracts by Industrial Area.* Washington, D.C.

Whatley, Warren C. 1990. "Getting a Foot in the Door: 'Learning,' State Dependence, and the Racial Integration of Firms." *Journal of Economic History,* Vol. 50, No. 1, pp. 43–66.

____. 1993. "African-American Strikebreaking from the Civil War to the New Deal." *Social Science History,* Vol. 17, No. 4, pp. 525–58.

Wright, Gavin. 1987. "Postbellum Southern Labor Markets." In Peter Kilby, ed., *Quantity and Quiddity: Essays in U.S. Economic History.* Middletown, Conn.: Wesleyan University Press, pp. 98–134.

This content downloaded from
192.102.230.248 on Thu, 15 Oct 2020 08:23:47 UTC
All use subject to https://about.jstor.org/terms