# Buffalo Law Review

Volume 14
Number 1 *Toward Equal Opportunity in Employment: The Role of State and Local Government—Proceedings of the Conference in Memory of Honorable Philip Halpern, April 24, 25, 1964*

Article 7

10-1-1964

## Twenty Years of State Fair Employment Practice Commissions: A Critical Analysis with Recommendations

Herbert Hill
*New School for Social Research*



Follow this and additional works at: https://digitalcommons.law.buffalo.edu/buffalolawreview

 Part of the Administrative Law Commons, and the Labor and Employment Law Commons

**Recommended Citation**

Herbert Hill, *Twenty Years of State Fair Employment Practice Commissions: A Critical Analysis with Recommendations*, 14 Buff. L. Rev. 22 (1964).
Available at: https://digitalcommons.law.buffalo.edu/buffalolawreview/vol14/iss1/7

This Leading Article is brought to you for free and open access by the Law Journals at Digital Commons @ University at Buffalo School of Law. It has been accepted for inclusion in Buffalo Law Review by an authorized editor of Digital Commons @ University at Buffalo School of Law. For more information, please contact lawscholar@buffalo.edu.

# TWENTY YEARS OF STATE FAIR EMPLOYMENT PRACTICE COMMISSIONS: A CRITICAL ANALYSIS WITH RECOMMENDATIONS

Herbert Hill[*]

## I. Introduction

Beginning with the 1940's, civil rights advocates in many states actively campaigned for the creation of state fair employment practice commissions. Stimulated by the dramatic successes of the federal FEPC created by President Roosevelt's Executive Order 8802 in 1941, proponents of fair employment practice laws hoped that rigorous application of the legal power of state civil rights commissions would alleviate the very serious problem of job discrimination, and help open the path to Negro participation in many occupations and industries. Perhaps some advocates of state fair employment practice laws were aware that if employment reached the crisis proportions of a general depression then even the most stringent laws would be ineffective. But it was hoped that the increased hiring of Negroes during periods of full employment and their entrance into stable skilled jobs with union membership would help create a broader occupational distribution that would render the Negro worker less vulnerable to large-scale unemployment.[1]

This concept appeared to be plausible when presented during the period of wartime and postwar industrial expansion. But the analysis did not envision the sharp decrease in Negro employment which was to occur after the wartime demand for labor had subsided. The very serious impact of automation and other technological innovations in many industries was not anticipated. Nor was the intransigence of employers and labor unions in refusing to significantly alter the status of Negro workers realistically evaluated.

Now after almost two decades of experience with state fair employment practice laws, it is possible and indeed necessary to make an assessment of their efficacy. During the period of general affluence and overall prosperity which led to the description of America in the 1950's as "the affluent society," Negro workers experienced the equivalent of a general economic depression.

The period of 1948-1952 was a time of full employment for the nation; the national unemployment rate during this period was about 2½ per cent. In 1950-51 the aggregate demand for goods and services reached a high point for the entire country, but the rate of unemployment among Negro wage-earners was already rapidly increasing. Since 1951, the gap between the average income of Negro and White wage-earners has been growing consistently greater.[2]

---

* National Labor Secretary, NAACP and member of the faculty of the New School for Social Research, New York City.

1. Ruchames, Race, Jobs, & Politics 194-95 (1953).
2. See U.S. Dep't of Labor, Manpower Report of the President and a Report on Manpower Requirements, Resources, Utilization, and Training 106 (1964).

Changes in law and public policy have involved a very small number of Negroes and resulted only in marginal or token integration into some few industries. The occupational pattern of Negro labor has not been changed in states with FEPC laws. "Statutory remedies that rely on individual complaints by aggrieved parties are slow," commented Harold Baron of the Chicago Urban League, "and permit many subtle subterfuges on the part of the discriminators. Relatively few individuals receive better jobs or housing under the protection of these measures, and the basic pattern of second-class status remains unchanged."[3]

Given the significant developments in the American economy during the last twenty years together with the current status of the Negro wage-earner in states with FEPC laws we must conclude on the basis of the evidence that state FEPC laws have failed. They have failed because their potential was in fact never realized. The time has now come to insist upon a fundamentally new approach in the operation of state fair employment practices law that operates with new standards and enforcement procedures. For the Negro wage-earner the limited and inadequate state FEP commissions are no substitute for broad federal actions to eliminate the deeply entrenched patterns of employment discrimination. If this is not done very soon even the limited gains of the past will be destroyed and the entire Negro community will be in a permanent condition of crisis. Negro wage-earners in vast numbers will either be the working poor or the hard core of the permanently unemployed.

Surely there is great significance in the fact that during the spring and summer of 1963 and again in 1964, the largest and most dramatic public demonstrations against job discrimination occurred in states with FEPC laws as in New York, in Pennsylvania, in California and elsewhere and that the rates of Negro unemployment in several states with fair employment laws are among the highest to be found in the nation.

Herman Miller, Special Assistant, Bureau of the Census, in his book *Rich Man, Poor Man,* states that in the past decade in most states: ". . . there was a widening of the gap between the incomes of whites and Negroes and in some cases it was fairly substantial. In Michigan for example, the ratio of average Negro income to white income dropped from 87 percent in 1949 to 76 percent in 1959."[4]

Several basic propositions will be advanced in this paper. One is that the status of Negro labor in northern states covered by fair employment practice laws has not changed in any basic sense for the past twenty years, and is now further deteriorating. The second is that state FEP enactments have proved unable to cope with the problem of changing the Negro occupational pattern and that FEP commissions do not provide a solution to structural unemployment

---

3. Baron, *Negro Unemployment—A Case Study*, 3 New University Thought 42 (1963).
4. Miller, Rich Man, Poor Man 88 (1964).

problems. Thirdly, that certain industries with expanding job opportunities are beyond the reach of FEP statutes and that a virtual immunity from anti-discrimination laws has been achieved by many important labor unions where Negro exclusion has been traditional and where there is rigid control of hiring by the union.[5] Further, that with some very few exceptions, most state FEP commissions have been administered by timid political appointees, many with little or no professional competence and with an appalling lack of sensitivity to the realities of the Negro workers' life in the racial ghettos of the urban north.

If state antidiscrimination commissions are to become effective and their purpose realized then certain basic changes in the operation of the commissions must be made. These include:

1. *Greater Use of Mandatory Powers*

   The general reluctance to apply statutory enforcement powers must immediately come to an end. In areas where they could function in a positive manner, state commissions most often reject the law enforcement approach. This is because administrators do not regard state FEP commissions as law enforcement agencies and the history of virtually every state agency will indicate that the use of mandatory powers is very rare. This is a basic weakness in the operation of all state FEP commissions.[6]

2. *Affirmative Action Based Upon Pattern Centered Approaches Instead of the Individual Complaint Procedure*

   State commissions have become complaint taking bureaus that very slowly and laboriously—for as long as one or two years or more—attempt to "conciliate" an individual complaint that may or may not result in new employment for one person and do not change the racial employment pattern of a company or an industry. We know that only a very small fraction of all individuals who are the victims of discrimination file complaints and therefore commissions must initiate affirmative action based upon the overall pattern of employment discriminations. The recent decision of the New York State Commission against Local 28 of the Sheet Metal Workers Union[7] comes at least 10 years too late. Had the rigid pattern of overt discrimination in the construction trades in New York and elsewhere been directly attacked a decade ago the status of Negro workers in this important industry would today be very different.

3. *Drastic Reduction in the Number of Rejected Complaints*

   A major characteristic of commission operations is the very high percentage of rejected complaints. Among virtually all state commissions the number of rejected cases is approximately 50 percent.[8]

---

5. Hill, *Racism Within Organized Labor: A Report of Five Years of the AFL-CIO, 1955-1960*, 30 The Journal of Negro Education 109-18 (1961).
6. See *infra* Part V of this study.
7. Lefkowitz v. Farrell, C-9287-63 (N.Y. State Comm'n for Human Rights, 1964).
8. See *infra* Part V of this study.

Taken by itself, it is difficult to say that this figure is necessarily too high. However, as indicated by the discussion below and by other papers presented at this Conference, the record of the state commissions has generally been characterized by a lack of aggressive vigor and by a timid reluctance to root out discriminatory practices in powerful unions and companies. This clear timidity, plus the absence of any indications as to the standard of "probable cause" that is actually applied to these complaints, leads to the inevitable conclusion that these standards are much too rigid, that the number of rejected complaints is much too high. Inevitably, aggrieved persons are discouraged from filing valid complaints. There is clearly a need for revised standards of judgment and the public has a right to know what those standards are.

4. *Public Disclosure of Basis for Settlements*

State commissions must begin to reveal in precise terms what constitutes an "adjusted complaint," and what is meant by a "settlement." From a study of commission reports it is impossible to determine the relation between problem and settlement. In most cases the public does not know what was allegedly "settled." I also recommend that the official reports of the state commissions contain more precise and extensive information and that the atmosphere of secrecy that surrounds FEPC operations be once and for all removed.

5. *Expanded Availability of Commission Facilities*

State commissions have a responsibility to establish an easier access to agency procedures for members of minority groups. In most cases, even after 18 years, where and how to file a complaint remains a mystery for those who suffer the worst discrimination. The burden to eliminate this problem rests upon the various commissions.

Typical of state commissions with very poor records of achievement due to inadequate operations are the Wisconsin and Michigan Commissions, although many other agencies such as the Ohio, Washington and Pennsylvania Commissions might also be cited. The Wisconsin fair employment practices law went into operation on July 25, 1945; thus, the Wisconsin FEP agency was one of the very first state commissions. Revealing indeed are the biennial reports from Wisconsin. In 1956-1958, the Commission received 70 complaints, during 1958-1960, 146 complaints were processed, and in the two year period of 1960-1962, the Commission received 116 complaints which were disposed of as follows: probable cause found in 52, no probable cause in 48, other questionable practices 2, withdrawn 1. Officials of the Wisconsin Commission attributed the "increase" in their case load to the new jurisdictions of age and sex discrimination given the agency.

Michigan is a state with a large Negro population. Detroit alone has over 500,000 Negroes with a very high rate of Negro unemployment. Michigan has had a state fair employment practice law since 1955. In 1963, the Michigan

Commission received only 280 complaints, in 1962, 303 complaints and in 1961, 250 complaints. The Michigan Commission also has jurisdiction in matters relating to discrimination because of age and sex. Surely there is a connection between a commission's effectiveness and the number of complaints received. Negro workers do not voluntarily file complaints when such actions are believed to bring little or no results. Other state commissions with very small case loads are New Jersey, Minnesota, Oregon and Connecticut, among others.[9]

The state of Pennsylvania has had a fair employment law since 1955 and Philadelphia has had a municipal FEP commission since 1948. After all these years there remains intact a widespread pattern of Negro exclusion from the major building trades craft unions in Philadelphia and elsewhere in Pennsylvania; thus Negro workers are denied jobs in the most important construction projects in the state. The Philadelphia Tribune in its issue of February 12, 1962 stated that: "Philadelphia labor unions have fostered a pattern of racial discrimination that is unsurpassed even in the Deep South."

## II. THE ECONOMIC STATUS OF THE NEGRO

Perhaps the most exhaustive study of the current economic status of Negroes in the United States has been made by Herman Miller of the Bureau of the Census.[10] This report was presented before hearings of the Subcommittee on Employment and Manpower of the Committee on Labor and Public Welfare of the United States Senate. Miller began his study by stating what he believed should be obvious, that "the Negro still ranks among the poorest of the poor and that his economic status relative to whites has not improved for nearly 20 years."[11] Miller disputed the "general impression that the relative economic position of the Negro—particularly with respect to employment opportunities—has improved in recent years."[12]

It is valid to state that for the country as a whole Negroes have raised their occupational levels in the past 22 years at a faster rate than whites. But to make this statement and deduce progress from it is to use the data in a misleading manner. The improvement in the occupational status of the Negro since 1940 is due only to movement from the rural south to urban industrial areas, "rather than to any major improvement in job opportunities," concludes Miller.[13] Negroes who once were highly concentrated in sharecropping and agricultural labor have moved up to urban service jobs or to unskilled and semi-skilled factory work and some few have moved into white-collar employment. But there has been a parallel upgrading of jobs held by whites.

9. *Ibid.*
10. *Hearings on S. 773, S. 1210, S. 1211 and S. 1937 Before the Subcommittee on Employment and Manpower of the Senate Committee on Labor and Public Welfare*, 88th Cong., 1st Sess. 321-88 (1963). (Hereinafter cited as *Senate Hearings.*)
11. *Id.* at 321.
12. *Id.* at 322.
13. *Ibid.*

*TWENTY YEARS OF STATE FEPC*

The real question to ask, Miller states, "is whether the relative upward move-ment has been faster for nonwhites than for whites."[14] The past three census reports show that "although the occupational status of nonwhites relative to whites has improved for the country as a whole, in most States the nonwhite male now has about the same occupational distribution relative to the whites that he had in 1940 and 1950."[15] The results show that there were few signifi-cant changes "in the occupational distribution of nonwhite males relative to whites during the past 20 years."[16]

Moreover, during the past decade there has been no change in income differentials between whites and Negroes:

> In 1947, the median wage or salary income for nonwhite workers was 54 percent of that received by the whites. In 1962, the ratio was almost identical (55 percent). Prior to 1957 there was a substantial reduction in the earnings gap between whites and nonwhites. In view of the stability of the earnings gap during the postwar period, how-ever, the reduction during the war years cannot be viewed as part of a continuing process, but rather as a phenomenon closely related to war-induced shortages of unskilled labor and government regulations . . . designed generally to raise the incomes of lower paid workers, and to an economy operating at full tilt.[17]

### Concentration in Low Paid Occupations

Even when Negro men are educated and employed in a trade or profession, their earnings are substantially lower than those of whites.[18] More important, however, is the concentration of Negro labor "in low-paid occupations such as laborers and service workers."[19] A Negro man who has not gone beyond the eighth grade has little chance of being anything other than a laborer, porter or factory hand; 8 out of every 10 Negro men with 8 years of schooling worked as laborers, service workers, or in other unskilled jobs—compared with only 3 out of 10 whites with the same amount of schooling!

When Negro college graduates work in professional occupations they do so in almost the same proportion as white college graduates. But unlike the white graduate, they are concentrated in the lower paid professions. Moreover, the earnings of Negroes in these lower paid professions were considerably lower than whites. While 20 per cent of white college graduates were engineers, only 8 per cent of Negro college graduates in professional employment were in this profession. Fourteen per cent of white male college graduates in pro-fessional employment were lawyers or accountants, but only 6 per cent of nonwhites. And the average earnings of Negro doctors were half that received by white doctors.

---

14. *Ibid.*
15. *Ibid.*
16. *Ibid.*
17. *Id.* at 323.
18. See Tables 3–8, *Senate Hearings* 324–28.
19. *Id.* at 324.

*BUFFALO LAW REVIEW*

When Negroes do the same kind of work as whites, they are paid substantially less. Miller showed that study of the lifetime earnings of white and nonwhite men by years of school completed, reveal that "the relative earnings gap between whites and nonwhites increases with educational attainment."[20]

The lifetime earnings of nonwhite elementary school graduates is about 64 percent of the white total. Among college graduates nonwhites have only 47 percent of the white total. The fact of the matter is that the average nonwhite with 4 years of college can expect to earn less over a lifetime than the white who did not go beyond the eighth grade.[21]

In the north, the Negro with 4 years of college can expect lifetime earnings of $209,000—while the white elementary school graduate can total a lifetime earning of $198,000. In the south, where earnings are lower, the Negro college graduate can expect to earn $154,000, while the white who completed only the eighth grade can expect to earn about 8 per cent more—$167,000.

Education is clearly related to earning power, but the gains of education are not equally distributed between whites and Negroes. The average high school graduate earns more than men who quit school after the eighth grade. But the returns are far greater for whites. In most occupations, Negro men earn less than whites with the same amount of schooling. Miller notes that among "carpenters, bricklayers, factory workers, almost any occupation you turn to—there is a very substantial difference between white and nonwhite earnings."[22]

Miller's data revealed, to sum up the evidence, that improvement has resulted only because many more Negroes now live in the north in 1963 than twenty years ago. "It would be incorrect to infer from this fact," Miller pointed out, "that job opportunities in the North have improved relatively faster for Negroes than for whites."[23] Job opportunities in New York for example, "have not changed for about 20 years, according to census data."[24] The data shows that in both occupation and wages, there "has been no improvement in the economic status of Negroes relative to whites since the end of World War II."[25]

Miller concludes "that the Negro has a dual handicap. He works at far lower paid jobs than the whites and even when he works at the same kind of job he is payed far less. As a result the figures show that the Negro college graduate makes less than the white who has had only 8 years of elementary school."[26]

*Concentration in Lower Income Brackets*

Miller's presentation was strikingly confirmed in a recent study made by Dr. Vivian W. Henderson, professor of economics and business administration

---

20.  *Id.* at 325.
21.  *Ibid.*
22.  *Senate Hearings* 379.
23.  *Id.* at 375.
24.  *Ibid.*
25.  *Id.* at 377.
26.  *Id.* at 380.

at Fisk University.[27] The issue is not whether Negroes have made any progress, but whether it has been rapid enough to enable the Negro to adjust to an economy whose rate of change is cumulative and intense and undergoing revolutionary changes in the mode of production.[28]

The truth is, as Professor Henderson points out, that "Negroes are on a treadmill and time is in reality 'running out' on them as a group, in their pursuit of parity with whites. The group has to run exceptionally fast in order to stand still."[29]

While the proportion of Negro families with incomes between $4,000 and $6,000 tripled between 1945 and 1961, 60 per cent of Negro families maintained an income of less than $4,000 annually, compared with 28 per cent of white families. Moreover, white families were abandoning the lower income bracket at a faster rate than Negro families. Conversely, Negro families reached the higher brackets at a much slower rate than white families.

Seventy-five per cent of Negro families have incomes lower than $5,981, the medium income for white families. In 1960, the wage and salary income of Negro males was only three-fifths of that earned by white males—the same proportion as existed in 1955. Dr. Henderson states:

> Two characteristics stand out. On the one hand, relative growth in wage and salary income of Negroes since 1940 has been greater than that of whites; on the other hand, the absolute, or dollar difference, has widened considerably.
>
> White males have stretched the "dollar gap" between their earnings and that of Negroes over three times since 1939. White families similarly have increased the differential between their employment income and that of Negro families.
>
> People spend and save dollars. It is this dollar difference that counts. Pronouncements regarding economic progress which are confined to acceleration concepts and percentage change obscure the real predicament—Negroes are losing ground rapidly in gaining dollar parity with whites. The "dollar gap" trend . . . means very simply that earnings are increasing for whites at a faster pace than for Negroes.[30]

The number of Negroes employed in better paying semi-skilled and white collar jobs has increased. Yet this fact is not a basis for an optimistic view of the Negro employment pattern. The rate of improvement has not closed the large differential between the Negro and white, and "in dollars and cents the position of Negroes has deteriorated."[31] Negroes have not overcome their marginal position in the work force. Negroes continue to be confined to the lowest occupational categories.

Henderson states that: "Whites are acquiring the highest paying jobs in

---

27. Henderson, The Economic Status of Negroes: In the Nation and in the South (1963). (Document published by Southern Regional Council, Atlanta.)
28. *Id.* at 9.
29. *Id.* at 11.
30. *Id.* at 13.
31. *Ibid.*

*BUFFALO LAW REVIEW*

the higher occupational classifications. The benefits of general economic expansion and technology, therefore, have only 'trickled down' to the Negroes, putting more of them into wage and salary jobs. These benefits automatically produced high acceleration in the income change, but were restricted tightly to lower occupational classifications."[32] Despite the growth in income among Negroes, their relative position has become worse. More than twice as many Negroes as whites are in the lower income brackets, and the differential continues to widen. "Accordingly," states Henderson, "it is still difficult for Negroes to purchase health, education, and the amenities of life on the same level as other members of the population."[33]

### Adverse Effect of Changes in Labor Market Requirements

The nature of the profound changes in technology and manpower requirements suggest that Negroes can no longer depend upon national economic expansion to generate improvements in employment opportunity. Technology has changed in a most fundamental sense the kind of manpower needed by the American economy. The need for unskilled labor has drastically declined—while highly skilled labor in a variety of crafts finds more employment. The very slow pace of manpower change and development among Negroes means that the colored worker is in an unfavorable position in relation to the requirements of the labor market. Between 1947 and 1961, the number of employees in mining, manufacturing, contract construction and agriculture decreased, while the number in wholesaling, insurance and service industries increased. "Noteworthy," warns Dr. Henderson, "is the fact that the industries with a declining rate of employment are the industries which have absorbed Negroes."[34] The source of Negro "improvement" in the past has been the movement out of agriculture and into mining, manufacturing and construction where unskilled and semi-skilled jobs as laborers and operatives were once plentiful. "These are the industries which since 1957 have had either declining employment or relatively little growth. Excluding government, the areas of growth in employment are not the areas in which Negroes have traditionally found employment."[35]

At the same time, there has been a shift from plant to office in manufacturing industries. Between 1950 and 1961, the number of persons employed in manufacturing increased by over 1 million while the number of production workers declined by almost one-half million. "This means that increases in manufacturing employment were in nonplant and nonproduction jobs, a shift . . . to office work and white collar jobs, areas of employment which have never absorbed many Negroes."[36] Automation means there will be a further sharp decline in the need for semi-skilled and unskilled workers. "It will, therefore,

32. *Ibid.*
33. *Id.* at 25.
34. *Id.* at 16.
35. *Ibid.*
36. *Ibid.*

become increasingly difficult for Negroes to attain higher or retain previous levels of employment in those occupations and industries which they had penetrated during the 1940's and 1950's."[37]

Data analyzed by Harold Baron confirms that the Negro is especially vulnerable to technological displacement and long term unemployment. The rate of Negro unemployment is more than twice that of white, and in heavily industrialized areas the differential is significantly larger.

Baron writing of Chicago, states that:

> From 1947 to 1957, long-term unemployment (fifteen weeks to six months) remained about 10 percent of total unemployment; very long-term unemployment (six months or over) varied in the neighborhood of 8 percent of the total. From 1957 to 1962, long-term unemployment rose by 100 percent and very long-term unemployment by almost 150 percent. While nonwhites comprise 20 percent of the unemployed, they comprise 26 percent of the long-term unemployed and 28 percent of the very long-term unemployed; and these proportions have been increasing in recent years."[38]

In 1960-1961 in Chicago, where 813,000 Negroes constitute 23 per cent of the population, there were 320,000 Negroes in the city's labor force—20 per cent of the total labor force—but Negroes made up 43 per cent of Chicago's unemployed. The Negro unemployment rate was 11.5 per cent, or to put it simply, one out of every nine Negroes was out of a job. The white unemployed comprised only 3.5 per cent of the labor force, showing that Negro unemployment is four times as great as white unemployment. If one adds to this figure those who would be in the labor market if they thought they could obtain a job, Baron adds a total of 12,000 "discouraged" Negro workers and concludes that Negro workers in Chicago are more than half the unemployed in the city. He writes:

> Using a social definition of unemployment which includes the discouraged workers, we arrive at an adjusted 1960 unemployment rate for nonwhite males of 16 percent. When the estimate is made on the basis of data for the metropolitan area, the figure rises to 17 percent. A further adjustment for the racial differential in part-time employment would add about 1 percent to the above figures. This is hardly prosperity for the Negro community, with over one out of every six men who could be working out of a job![39]

In contrast, the white worker is relatively untouched by unemployment in Chicago. During 1960-1961, white males between the ages of 25 and 44 had an unemployment rate only of 2.2 per cent—minimal unemployment. In the Chicago Negro ghetto, as elsewhere, unemployment has become a way of life. In 31 all-Negro census tracts, the unemployment rate is over 15 per cent, while only 3 white tracts have a ratio that high. Negro unemployment in Chicago

---

37. *Ibid.*
38. Baron, *op. cit. supra* note 3, at 43.
39. *Id.* at 45.

has not changed for the better since 1950, and the concentration among Negroes has remained constant. Labor force projections indicate that there will be 450,000 more workers in Chicago's metropolitan area in 1970 than there were in 1960. One-third of these will be Negroes. Yet the trend of employment potentiality indicates that only 150,000 new positions will be created by 1970. The future indicates only the prospect of increasing long-term unemployment for the Negro wage earner.

The entire Negro community throughout the United States is today faced with a crisis of unemployment. What for the white worker has been a mild or temporary recession has become for the Negro worker a major depression. Negroes now constitute a very large part of the hard-core permanently unemployed group in American society.

As a result of automation and other technological changes in the economy, unskilled and semi-skilled job occupations are disappearing at the rate of 40,000 a week or two million a year. It is in these job classifications that there has been a disproportionate concentration and displacement of Negro workers. The economic well being of the entire Negro community is directly and adversely affected by the generations of enforced overconcentration of Negro wage earners in the unskilled and marginal sectors of the industrial economy. A continuation of this pattern will cause even greater crisis in the years to come unless fundamental and rapid changes take place in the occupational characteristics and mobility of Negro labor in the United States. Negroes may be slowly winning the broad legal and social struggles for full citizenship rights but are currently losing their battle for economic equality and job opportunity. "In 1963 there were more than 22 million nonwhites in the United States, most of whom were Negroes. Nonwhites comprised 11.7 per cent of the population, 11 per cent of the labor force, and 21 per cent of the unemployed. These stark figures serve to dramatize the disadvantaged status of Negro workers, for their disproportionately high rate of unemployment is essentially the climax of all the discriminatory forces shaping the lives of Negroes. . . ."[40] To quote the New York Times, "Unemployment of these proportions were it general, would be a national catastrophe."

### III. The Operational Approach of State Antidiscrimination Commissions

Twenty-five states now have fair employment practices commissions in operation. Their domain covers 41 per cent of the Negro population in the United States. Provisions in state fair employment practice laws make it unlawful to refuse to hire, employ, bar, discharge or promote individuals because of race, creed, color or national origin. The provisions cover labor unions and employment agencies as well as employers. The commissions have the

---

40.  U.S. Dep't of Labor, Manpower Report of the President and a Report on Manpower Requirements, Resources, Utilization, and Training 95 (1964).

power to receive, investigate and pass upon complaints which allege the existence of unlawful racial practices. They are empowered to hold hearings and compel attendance, secure enforcement of subpoena and production of records, and to gain and enforce such power through the state courts.

The enforceable state statutes have the following provisions in common according to Konvitz and Leskes:

> they declare discrimination in public and private employment on racial, religious, or ethnic grounds to be illegal; they authorize a state administrative agency to receive and investigate complaints; they empower the agency to eliminate, by persuasion and mediation, any discrimination found to exist; if unsuccessful in such efforts, the agency is authorized to proceed by public hearings, findings of fact and law, and cease and desist orders, which are enforceable by court decree; judicial review is available to a person claiming to be aggrieved by an agency ruling; and finally, the state agency is responsible for an educational program intended to reduce and eliminate discrimination and prejudice."[41]

On the face of it, the powers enumerated above seem to indicate that FEPC is a worthwhile mechanism for eliminating job discrimination. Early studies of the state FEP commissions, however, reveal that from their very inception, they were ineffectual agents of social change. Berger's study of the New York State Commission Against Discrimination,[42] the first state FEP agency (it became effective on July 1, 1945) revealed that in its first 18 months the Commission found insufficient evidence to uphold 57 per cent of the complaints filed. In 1947, SCAD found no evidence of discriminatory practice in 62 per cent of cases filed, in 1948 in 72 per cent, in 1949 in 63 per cent and in 1950 in 68 per cent. "The Commission itself," Berger wrote, "does not present the data in precisely this way and has not commented on the large proportion of complaints (65 percent) in which it found insufficient evidence to support the specific charge of discrimination, and the small proportion of cases (25 percent) in which it did sustain the complainants's claim."[43]

Berger pointed out that SCAD's disposition of complaint cases was not likely to encourage other workers to file complaints. Regardless of whether or not SCAD was able to rule in any other way than against the 65 per cent of complainants who charged discrimination, "when two out of three complainants find their charges not sustained . . . it is probable that few workers come away from an experience with SCAD in a mood to recommend the same procedure to their friends among minority groups."[44]

Moreover, the length of time it takes to settle a case is a discouraging factor to potential complainants. To the end of 1947, the average time required to dispose of a case was three months. Berger states that, "This is

41. Konvitz and Leskes, A Century of Civil Rights 203 (1961).
42. Hereinafter cited as SCAD.
43. Berger, Equality by Statute 128-29 (1952).
44. *Id.* at 135.

obviously too long a period to be effective for a worker who has experienced discrimination, since it is not likely that he can afford to remain unemployed for more than a few weeks while his complaint is being handled. If many weeks go by and the Commission has not yet come to a decision, the worker [who has experienced discrimination] probably has to get another job. When he does, the chances are he is no longer interested in the one where he experienced the discrimination."[45] SCAD's first chairman told a United States Senate subcommittee that less than 243 persons had actually obtained jobs as a result of filing complaints with the Commission between 1945 and 1947.[46] "Such a record," Berger notes, "is not one to encourage the filing of complaints."[47]

Berger is critical of three months as being "too long a period" for the disposition of a complaint, but recently in New York state important cases have been filed which have taken a year or two or more to resolve.

On September 27, 1962, Harold Mitchell, a member of the NAACP branch in Spring Valley, New York, filed a complaint against Local 373 of the AFL-CIO Plumbers Union in Rockland county with the State Commission for Human Rights (previously SCAD). The union, he alleged, had forced him out of a job he had held for more than 10 years with the R&S Plumbers and Mechanical Systems Company, after the Plumbers Union had entered into a collective bargaining agreement with his employer, and they refused to admit him into membership. Mr. Mitchell also charged that the union was "lily white" in its membership and had never admitted a Negro into the Union-controlled apprenticeship program. On February 21, 1964, the New York State Commission handed down an order requiring re-employment of Mr. Mitchell, payment of some back wages and admittance into the union.[48] *Seventeen months after the filing of the complaint, the Commission issued its determination.* (The significance of this important decision will be discussed below.)

On April 4, 1961, a complaint was filed against Local 10 of the International Ladies Garment Workers Union with the New York State Commission for Human Rights. On May 18, 1963, *25 months later in the case of Ernest Holmes, a Negro worker,*[49] the ILGWU entered into a stipulation upon which the complaint was finally withdrawn. In the agreement obtained by the Commission the union agreed to admit Holmes into the Cutter's local of the ILGWU, to assist him in seeking employment and in gaining training experience as an apprentice cutter.

This is precisely what the State Commission had ordered the ILGWU to do a year before when a finding of "probable cause" was issued by the investigating commissioner. I quote from *The New York Times,* July 2, 1962, in a report headlined "Union Told to Get Job For A Negro":

---

45. *Ibid.*
46. *Id.* at 136.
47. *Ibid.*
48. Mitchell v. R & S Plumbers & Mechanical Systems, Inc., C-9092-62 (N.Y. State Comm'n for Human Rights, 1964).
49. Holmes v. Falikman, C-7580-61 (N.Y. State Comm'n for Human Rights, 1963).

A garment cutters' union has been ordered by the State Commission for Human Rights to arrange for employment of a Negro at union rates commensurate with his skill and to admit the Negro into union membership if his work is satisfactory.

The *Times* story also states "With regard to the union, the decision found that 'the evidence raises serious doubt as to its good faith to comply with the State Law Against Discrimination in the matter of this complaint; and that there was "probable cause" to credit the allegations of the complaint.' "

On September 14, 1962, Rupert Ruiz, Investigating Commissioner, New York State Commission for Human Rights, in a letter to Emil Schlesinger, Attorney for Local 10, stated that the Commission had "repeatedly requested and for a period of eight months tried to obtain data pertinent to a resolution of the charges of discrimination against Amalgamated Ladies Garment Cutters Union—Local 10. These efforts were unsuccessful. The failure of representatives of that local to cooperate in the investigation despite their promises to do so, left me no alternative but to find 'probable cause to credit the allegations of the complaint.' " However, eight more months were to elapse before the Commission finally acted to secure enforcement of the law.

It is of some significance to note that this was not the first encounter by the ILGWU with the New York state antidiscrimination agency. In 1946, an action was brought by a Negro member of Local 22 who was barred from higher paying jobs controlled by Local 89, an Italian local.[50] After the Commission called the union's attention to relevant portions of the state antidiscrimination law and informed the ILGWU that the existence of nationality locals was a violation of the statute, a conference was held on January 22, 1947, at the offices of the State Commission Against Discrimination in New York City. Frederick Umhey, Executive Secretary of the ILGWU represented the union and Commissioner Caroline K. Simon, the State Commission. The ILGWU entered into an agreement with the Commission that it would not bar Negroes, Spanish-speaking or other persons from membership in the all-Italian locals. Today, eighteen years later, not a single Negro or Spanish-speaking person holds membership in the two Italian locals which have control of some of the highest paying jobs in the industry and no action has been taken to comply with the state law forbidding such practices. These cases are important because the garment industry is the major manufacturing industry in New York City and of great importance in the economy of the entire state.[51]

In its early years, SCAD relied on the technique of conference, conciliation and education as the basic approach in ending employment discrimination. The

50. Hunter v. Sullivan Dress Shop, C-1439-46 (N.Y. State Comm'n Against Discrimination 1947).
51. For a documentation of the status of nonwhite workers in the ladies garment industry in New York City and in the ILGWU see Herbert Hill, Testimony Before the House Committee on Education and Labor, 88th Cong., 1st Sess. 1569-72 (1963); see also Hill, *The ILGWU, Fact and Fiction*, 2 New Politics 7-27 (1962).

Commission anticipated danger in utilizing the threat of punitive measures, and therefore sought only voluntary compliance. The Commission resisted the demands of those who sought pressure to enforce compliance and frequently claimed that the alternative to its timid approach was to administer the law in an atmosphere of hostility and conflict. It presented an either/or alternative of conciliation or conflict, disregarding that a possible middle path between conciliation and harshness could be achieved. The Commission was extremely reluctant to enter into public hearings or to issue cease and desist orders because of the fear that employer and labor union opposition would then increase resistance to SCAD's conciliatory efforts. By the end of 1950, SCAD had only twice invoked its powers beyond the conciliation stage.[52] In its early years, SCAD handled complaints which were very few in number compared to the established pattern of employment discrimination. This evidently suited the overly cautious administrators of the Commission, who were apparently concerned that frequent processing of many cases would produce hostility. Thus, Berger concluded, SCAD carried a very small caseload and took too long to settle complaints.[53]

Louis Ruchames of Smith College reached similar conclusions. Absence of the issuance of cease and desist orders was described by Ruchames as "symptomatic of a weakness in the commission's policy." SCAD gained the reputation of being willing to settle for less than full compliance with the law. Employers would be likely to continue discriminatory practices if they knew that doing so did not involve any penalty or other difficulty, but merely entailed a promise to obey the law in the future or at worse suffer the adjustment of an individual compliant. "This has created in the minds of many of New York's citizens the impression that it is possible to evade the law and that the filing of a complaint with the Commission will not necessarily bring satisfaction to the complainant."[54]

In 1951, SCAD declared that settlement of cases involving discrimination in hiring did not entail compulsory hiring of the complainant at once or at the next available opportunity. SCAD felt even less impelled to demand partial or complete back pay from an employer who was found guilty of discriminatory practices. Its main function seemed to be the promotion of an "educational message" rather than the satisfactory settlement of complaints based upon enforcement of the law. That weakness was aggravated by the small number of complaints which the agency found to be valid. Either many complaints filed with the commission are weak—an assertion that can only be questioned because the existence of widespread discriminatory employment patterns is sustained by ample data—or the standards of adequate evidence required by the Commission are too severe and unrealistic. "In either case," commented Ruch-

---

52. Berger, *op. cit. supra* note 43, at 117.
53. *Id.* at 127, 133.
54. Ruchames, Race, Jobs, & Politics 173 (1953).

ames, "its rejection of two thirds or almost three fourths of all complaints is hardly calculated to increase its stature in the eyes of the average worker."[55]

SCAD's policies contributed to the impression that it accomplished little, that its scrutiny is easily evaded, and that individuals filing complaints are not likely to emerge with any gain. The result is that only a small number of complaints are filed each year, "far smaller than prevailing discriminatory practice would seem to call forth."[56] In 1949 there were 315 verified complaints, 257 in 1950 and 243 in 1951. It is the number of complaints filed and the extent and rapidity of enforcement that determines the law's effectiveness. "As a result of the current small number of complaints being received," Ruchames concluded, ". . . and the fact that they do not reflect existing discriminatory practices, the commission's efforts must ultimately prove inadequate."[57]

## IV. FEPC Administrators Speak

Information given by FEPC administrators and others involved in the operation of state commissions indicates that the criticisms advanced by Berger and Ruchames more than a decade ago remain quite valid. Mr. Walter H. Wheeler, Jr., Chairman of the Board of the Pitney Bowes Company of Stamford, unintentionally demonstrated one of the major causes of the ineffectiveness of the state FEPC. Mr. Wheeler's Company, a medium-size office equipment manufacturing concern, cooperated fully with the Connecticut State FEP Commission after it was created in 1947 and has publicly supported the concept of FEP legislation. The Connecticut Commission has the power to initiate complaints, order public hearings, issue cease and desist orders and petition courts for enforcement of its orders if it becomes necessary. Yet, as Wheeler testified before the Senate Hearings on Equal Employment Opportunity in 1963, "the Commission has had to order hearings in only three instances in 16 years."[58] According to the Commission's Reports, 1,137 complaints had been processed in 16 years and 48 per cent of these were found to be valid. All of these were adjusted by conciliation. Forty-four per cent were dismissed for insufficient evidence, and the remaining 8 per cent had been withdrawn.

The Connecticut FEPC "has used its 'big stick' scarcely at all," Wheeler commented, but the knowledge that it does exist has "undoubtedly helped obtain employment for many victims of prejudice." Wheeler acknowledged that the Commission does not pretend to control all employment discrimination, but that its activities are "educational weapons" and are backed by legal compulsion when no other course is open. Wheeler felt the Commission was effective because employers experienced "little or nothing in the way of new personnel

---

55. *Id.* at 175.
56. *Ibid.*
57. *Ibid.* Significant changes in the operation of the N.Y. State Commission, together with important recent decisions, are noted below.
58. *Senate Hearings* 210. Mr. Wheeler's statement may be found on pp. 208-11. Other testimony referred to in this section was presented at the same Senate hearings.

problems because of the law, and that none of the dreadful happenings predicted to take place by opponents of FEP had occurred."

Wheeler's conclusions sustain Ruchames' observation that the very high percentage of complaints rejected by state commissions was responsible for the minimal opposition to such laws. Ruchames states that in 1948 New York's SCAD had reported that its efforts proved "beyond the preadventure of a doubt that such a law can be administered without confusion, recrimination . . . and without threat to the stability and order of business enterprise." It is evident that state commissions are much too concerned with avoiding hostility from businessmen, too careful to refrain from interfering with the stability of manufacturing enterprise or union power, and insufficiently concerned with the welfare of the Negro job seeker.

Wheeler, by saying that "no dramatic upheaval has followed the enactment of FEP legislation in Connecticut," has testified to the fact that the Commission has really succeeded in changing little or nothing. Applications for new employment by Negroes have not increased substantially nor "has [the businessman] been forced to spend the best part of his time in court as an alternative to hiring every minority group member who presents himself for employment . . . He is not hounded unjustly, as evidenced by the fact that discrimination actually has been found in about half the cases investigated." This, however, is exactly the fact which reveals how little the Commission has accomplished. Although under the statute the Connecticut Commission is empowered to initiate complaints and in 1953 the Supreme Court of Connecticut sustained the Commission's authority to issue enforceable cease and desist orders, the Commission has consistently refrained from using these powers.[59]

Moreover, the data cited earlier by Herman Miller show that the occupational status of Negroes in Connecticut has not changed appreciably since 1940.

The testimony of Mr. Wheeler reveals the inadequacy of FEPC to deal with the broad patterns of employment discrimination as stated by an employer who advocates the creation of these Commissions. In fact, Mr. Wheeler cites with approval the fact that "no employer need maintain any sort of percentage or ratio of minority group employees within his organization." But what is the criteria used to determine compliance with the state antidiscrimination law? This is not indicated. Thus, an employer may often feel his company is abiding by a nondiscriminatory policy if the Commission's poster is exhibited and one or two Negroes are employed. Actually, Mr. Wheeler has inadvertently focused on the real problem—the fact that FEPC in Connecticut and elsewhere is not meant to change the Negro occupational pattern by widespread and fundamental changes in racial employment practices.

Edward Howden, Executive Officer of the California Fair Employment

---

59. Int'l Brotherhood of Electrical Workers v. Comm'n on Civil Rights, 140 Conn. 537, 102 A.2d 366 (1953). In this case the Supreme Court of Errors of Connecticut protected the job rights of Negro workers by sustaining a cease and desist order against the IBEW.

Practice Commission revealed other limitations inherent in state FEP commissions during his testimony at the Senate Hearings. The compliance program which stems from receipt of miscellaneous individual complaints is a piecemeal, "wholly inadequate method of operation," he stated. There is no correlation between the existence of restrictive practices and the filing of complaints, Howden admitted; and an FEP agency is often "obliged to close its eye to practices which flout the law."[60]

Howden was pleased that his own Commission was entitled to undertake and initiate investigations—but his own testimony showed a dependence on what he termed an "atmosphere of confidence and good will, with full protection of the rights of all parties."[61] Howden denied any "punitive" aim to FEPC, and noted that in only "a handful of cases" was it necessary to move beyond conciliation and persuasion to the evidently forceful procedure of a "formal public hearing." Mr. Howden seemed more concerned with attainment of a proper educational environment than with the full use of commission powers to gain new jobs for Negro workers. Rather than operate as a policing and enforcing agency as Mr. Howden put it, FEPC is a service institution, "assisting those who provide employment and those previously denied equal access to jobs to find each other." But the evidence proves that the two parties have not met, and that the responsibility for law enforcement should not depend upon the Negro complainant. It is no wonder that FEPC is inadequate to eliminate broad patterns of job discrimination, since the California Commission undertook corrective action in only one-third of the cases submitted to it. It is perhaps well for Mr. Howden to talk of the educational process which "flows freely" as a by-product of handling a case, but the process has meant little if anything for the Negro worker in California.[62]

The General Counsel of the New York State Commission, Henry Spitz, asserted in his testimony at the Senate hearings, that job discrimination, while still existing in New York, was being eliminated due to administrative application of the state anti-discrimination law's educational and regulatory procedures. Yet Spitz's testimony revealed that the New York Commission has a very limited record of achievement, although by contrast with other state FEP agencies, it appears far better than most. From July 1, 1945, when the Commission went into effect, through December 31, 1962—7,725 verified complaints were filed alleging discrimination in employment. Of these, 4,198 were dismissed by the Commission for lack of jurisdiction or lack of probable cause. In 1,620 cases, no cause was found as to the specific complaint, but other discriminatory practices or patterns were found and adjusted. Throughout these years only four complaints were not adjusted by conciliation and proceeded to public hearings and eventually to the issuance of cease and desist orders. Twenty-

---

60. *Senate Hearings* 231. Mr. Howden's statement may be found on pp. 227-33.
61. *Id.* at 228.
62. *Id.* at 228-29.

seven complaints ordered for public hearings were settled before the hearing date.[63]

The record of the New York State Commission fully sustains the criticisms of the early studies. The Commission evidently takes great pride in refraining from a vigorous and broad application of powers which the Commission is legally entitled to use. Its reluctance to hold public hearings and issue frequent cease and desist orders, instead of being regarded as a sign of weakness is viewed as a positive standard which supposedly justifies enactment of more FEP statutes. Spitz made clear that the Commission's preference was to resolve cases "through conference, conciliation and persuasion" although it has the power, after public hearings, to issue cease and desist orders which are enforceable through the courts. The status of Negro wage-earners in New York clearly requires a more dynamic and vigorous approach.

In Missouri, where an FEP Commission has existed only since 1961, attempts to cope with the deep and traditional pattern of employment discrimination are rather pathetic. Milton Litvak, Vice-Chairman of Missouri's Commission on Human Rights, acknowledged in his Senate testimony that "a general pattern of discrimination against Negroes"[64] exists in Missouri. This is true in public and private employment, is a common practice in labor unions, employment agencies, offices and public agencies of Missouri itself. As of July 23, 1963, the Commission had received only 45 complaints. Six were adjusted by conciliation, 11 were dismissed for no probable cause, 2 for insufficient evidence, 3 were withdrawn by the complainant, and 4 were judged to be out of the Commission's jurisdiction. Nineteen were still under investigation. Litvak frankly stated that although the Commission had "a three pronged program of education, research, and enforcement, the 'primary task' was 'education.'"

The record proves that the individual complaint approach is totally inadequate and is incapable of dealing with the fact that "the great mass of Negro workers remains in the lowest levels of employment," that few are employed in public agencies and that most Negroes occupy "unskilled or menial positions, with little jobs open and available to the general labor force." Public conferences, discussions of "human relations" and the seeking of "voluntary action between employers and labor unions" as a basis for ending the deeply entrenched pattern of job discrimination are ineffectual.

Mr. Litvak revealed that the Missouri Commission held "the general power to foster mutual understanding, eliminate discrimination, and the power to make studies and research." As a result of this power it undertook a study of civil rights in Missouri. The Commission found that 390,853 Negroes lived in Missouri out of a total population of 4 million—comprising almost 10 per cent of the population. Ninety per cent of the Negro population was found in

---

63. *Id.* at 234. Mr. Spitz's statement may be found on pp. 233-35.
64. *Id.* at 236-43.

the St. Louis-Kansas City and southeastern Missouri area. The Commission disclosed that "there was discrimination against Negroes in the entire State of Missouri in all areas and particularly employment." Mr. Litvak states that his Commission has enforcement powers under the law but he repeatedly emphasizes education and persuasion although the record indicates that they are of little value. Litvak says "I want to stress that we still consider our primary task to be education." In his testimony before the Senate Committee, Mr. Litvak produced sufficient evidence to prove that the approach of the Missouri FEPC is basically irrelevant to the problem of ending widespread job discrimination. Its basic program is education and complaint taking—a process which is extremely limited in bringing gains to the Negro community. It is no wonder that Negroes are resorting to militant mass protest in St. Louis and are increasingly engaging in public demonstrations elsewhere in Missouri, instead of filing complaints with a Commission that regards its "primary task to be education."

The truth was bluntly stated by Mr. Litvak in an exchange with Senator Joseph S. Clark of Pennsylvania. What FEPC has created, according to Litvak was "a climate or atmosphere of the idea of equal job opportunity." This did not mean, however, that Negroes would be readily hired by industry. "I would not say statistically that we have made any substantial progress," Litvak admitted, "but nonetheless we feel like we are creating this atmosphere of acceptance. . . ."[85]

This atmosphere was allegedly created in part we are told by the appointment of biracial committees to discuss public accommodation problems. Negroes, however, do not care whether FEPC administrators detect some vague atmosphere of acceptance when FEPC has not resulted in new, tangible jobs. The white liberal may have his conscience eased by talk of an atmosphere of equality, but the unemployed Negro prefers reality to psychological wish-fulfillment.

A major point to consider in the study of state antidiscrimination commissions is what the definition of "satisfactorily adjusted" really means. Data produced by the Minnesota State Commission Against Discrimination reveal that adjustment of individual complaints, often involving acquiescence in the hiring of the solitary Negro complainant, is taken as proof that the company which previously refused to hire Negroes has now eliminated its racist practices. In one case a Negro woman who applied for the position of an electrical assembler had not been hired although she had the necessary qualifications. The Minnesota State Commission's investigation found that the particular company never employed a Negro on production work and feared that the applicant would not be accepted by fellow employees. After conferring with the Commission the company agreed to offer the complainant the next position open. She was then

---

65. *Id.* at 268.

hired, and because she turned out to be a "very satisfactory employee," the commission closed the case as "satisfactorily adjusted."

According to the record, no effort was made, to determine if a total pattern of employment discrimination continued to exist. Because the company avoided difficulty by hiring the one Negro complainant this does not provide evidence that this un-named company has ended its discriminatory employment policy throughout its various operations. In fact, the granting of a "satisfactorily adjusted" determination in this case could possibly be interpreted by the company that it can continue its discriminatory policy by merely agreeing to take one or two Negro workers into a limited part of their operation. The pressure was immediately removed, because the company engaged the one complainant. This practice repeated many times over during the years is responsible for the fact that the Minnesota Commission has failed to change the occupational status of Negro workers in that state.

In yet another case, a Negro man was refused referral by an employment agency. The agency referred the man to the company and mentioned that the job applicant was a Negro. The company maintained that they did have a non-discriminatory employment policy, but feared that if a Negro were hired for this particular job there would be "trouble." The Commission found the agency to have violated the law by stating the applicant's race, and found the employer to have practiced discrimination as the applicant was not hired because he was a Negro. The Commission told the employer that since the applicant was qualified it should offer him the next available job. In the meantime, the Negro applicant had taken another job. The Commission then had the company publicly state its nondiscriminatory hiring policy, and closed the case as "satisfactorily adjusted." One wonders in what manner this solution constitutes "satisfactorily adjusted." By the Commission's own testimony, the company previously announced a nondiscriminatory policy but still refused to hire Negroes. The company was cleared by the Commission merely on the strength of the company's statement that it did not discriminate; it was not requested to hire any Negro employees.

The Commission's administrators did not concede that their efforts were relatively meaningless. James C. McDonald, director of Minnesota's SCAD, testified before the Senate hearings that it was not true that evidence existed that FEPC has been ineffective.[66] McDonald claimed that FEPC had "been of major importance." He did not present evidence to sustain his conviction. Rather, he attributed lack of knowledge of the beneficial results of FEPC to the fact that "commissions must work on cases quietly and without public knowledge."

But the Negro community and Negro civil rights organizations increasingly believe that in order to open up the job market, publicity must be given to the activities of corporations and unions which refuse to admit Negroes, and that

---

66. Mr. McDonald's statement may be found on pp. 244-252 of the *Senate Hearings.*

sharp public exposure of racist practices is essential in eliminating such policies. The practice of commission chairmen in holding quiet, secret meetings with employers and unions indicates their desire not to offend, which is apparently greater than their desire to take the most effective means possible to eradicate discriminatory hiring practices. How much more effective it would be if public hearings were held, the case laid out before the public, and pressure exerted on recalcitrant employers or unions by all interested parties. Such a publicly oriented policy would accomplish more toward ending discriminatory patterns than the friendly little discussions that often go on interminably and bring little or no tangible benefits to Negroes.

Most revealing of the actual effect of FEP legislation was the statement submitted by Governor Endicott Peabody of Massachusetts to the Senate Committee on Labor and Public Welfare.[67] By 1963, Massachusetts had a fair employment practice commission in existence for 17 years. Like the other commissions, the Massachusetts Commission Against Discrimination had not processed many complaints—only 2,819 since its inception. Only one of these had proceeded beyond the conciliation stage! The law had eliminated what Governor Peabody had called "outward signs of discrimination, "—such signs saying that Negroes need not apply. Personnel offices now had to display "at least outward courtesy" toward Negroes. Above all, the law allowed those who administered the FEP commission to undertake "effective education of employers and employees." The Governor attributed this to the enforcement provisions in the Act, which made the law effective.

Yet the Governor admitted that "*the law has not achieved the broad equality in economic status for Negroes which its supporters once envisioned.*" (Emphasis added.) This criticism is perhaps the most devastating and accurate made by any state official concerned with an FEP commission's operations. And this is the result of a law which has "teeth" in it! In Massachusetts, the Governor stated, the Negro is still twice as likely to be unemployed as the white. "In Metropolitan Boston he earns 50 percent less than the average white, and even after attending college, he earns no more than the median income earned by a white person with 3 years of high school."[68]

The Governor indicated that it is hard for FEPC commissions to judge whether or not discrimination has occurred. A head count could be taken in lower ranks of employment in large companies, but when other types of jobs and professional positions were in question, such methods could not be used. Where hiring and promotional decision is accorded on a subjective basis, it is doubly hard to prove discriminatory intent. The FEP agency finds it has to judge whether the Negro applicant is qualified for the job, and whether or not he was dismissed because of race. The result is that "it is harder to be certain that the law has been broken." The law, Governor Peabody admitted, once considered a

67. *Senate Hearings* 281-83.
68. *Id.* at 282.

"potent remedy," had "lost some of its curative power." And many types of employment discrimination were not even reached by law.

Governor Peabody noted that elimination of open hostility to Negroes has resulted in the substitution of covert and subtle forms of discrimination—not in conversion to a real nondiscriminatory hiring policy. The astute Governor understands that "neutrality is not enough and that we must do more." It is unfortunate that the Governor does not question the operating procedures of those who administer the Massachusetts antidiscrimination law.

## V. The Record of State Fair Employment Practice Commissions

By making a close examination of the records of various state fair employment practices commissions, it is possible to evaluate more fully the consequences of their past operations and to indicate the need for new policies by federal and state agencies in the future.

### California

In 1959, the California state legislature enacted a fair employment practice act. From September 18, 1959, the date the new law was put into effect through December 30, 1960, 565 complaints were received. Eighty-nine per cent of these cited alleged discrimination because of race. Out of these 511 cases, 502 or 87 per cent involved discrimination against Negroes. Fifty-seven per cent of the 502 involved refusal to hire, 24 per cent dismissal from employment, 8 per cent involved refusal to upgrade, 14 per cent the withholding of employment agency referral, and 35 per cent involved union discrimination. Sixty-seven per cent of the cases charged private employers, 24 per cent cited public employers, 18 per cent, agencies, and 26 per cent named labor unions.

In 287 of the cases, or 86 per cent, the Commission was able to make a determination as to whether or not discrimination had occurred. Forty-five cases, or 14 per cent, were dismissed because of lack of jurisdiction or failure of the complainant to proceed. Only 96 cases, or 33.5 per cent of complaints filed were found to be valid and were corrected by conference and conciliation. One hundred and ninety-one cases, or 67 per cent of those filed, were dismissed because of insufficient evidence.

Of the 96 cases in which the Commission found discriminatory practice, 29 cases or 30 per cent were settled by offers of immediate hiring of the complainant. But 64 per cent involved agreements that the respondent would comply with the state law and would issue a merit employment policy and also declare an intent to cease discriminatory practices. It is quite evident that the mere issuance of a nondiscriminatory statement does not assure equal opportunity for Negroes. Twelve cases in fact were adjusted by a commitment to consider hiring or promoting the complainant at the first opportunity. Why a firm commitment was not demanded in the specific case before the Commission is not explained.

44

Records of the Commission further reveal the limited nature of FEP settlements. In one case, a Negro saleman in an automobile agency was finally granted the opportunity to sell on the floor and thereby earn higher commissions. The Commission noted that the salesman was re-instated, given equal floor time, and his performance was evaluated after 90 days. It was found he had the third best sales record on the floor. The Commission concludes that equal opportunity led to rising sales and thereby showed the company that they too would profit by a nondiscriminatory policy. One asks whether the Negro salesman would have the right to make a low sales record on some weeks, and if he had, whether he then would have been dismissed. The Commission acknowledges that a city-wide check found that only six Negro salesmen were allowed to sell cars on the floor. No effort was made to provide the same right for other Negro salesmen in other automobile agencies. (During March 1964, 102 persons were arrested in the course of mass demonstrations organized by the local branch of the NAACP, at the General Motor Showrooms in San Francisco. On April 11, 226 persons again were arrested during demonstrations at auto showrooms.)

In another case, a young Negro was rejected after trying to file a job application with gas stations of a large oil company. The Commission learned that the company's standing policy was to accept applications from all potential employees. The firm's 36 stations in the area had 180 attendants, but not one was Negro. The FEP Commission persuaded the company to accept the complainant's application, evaluate it, and hire the respondent if he were qualified. "His qualifications were better than average," it noted, "and he got the job." This is what the Negro community today regards as token integration—the granting of one job to a highly qualified Negro, and is not acceptable as such, but is regarded by the California FEPC as proof of successful adjustment—although the Commission itself admits that the company has no other Negro employees. That such token standards are accepted as progress further indicates that the traditional approach of FEPC is obsolete and that the statute is not enforced in a manner that would make possible the fullest gains for nonwhite workers under the law.[69]

The rather anxious desire to appease business concerns that are guilty of discriminatory employment practices rather than to use all available powers to open new job opportunities for Negroes is attested to by the attitude of Commission executives. John Anson Ford, California FEP Commission Chairman, emphasized that its work is accomplished mainly by conference, conciliation, education and persuasion. "We have never yet had to invoke the enforcement power provided by the law," he commented. Ford, in a press release aimed at gathering support for FEP emphasized that "our sincere attempt to find the facts is shown by the number of cases—well over half—which have been closed

---

69. 1959-1960 Cal. F.E.P.C. Ann. Rep. 9-10, 19-27, 31-34.

on the basis of 'insufficient evidence' or 'no evidence' of discrimination."[70] The fact that the Commission has ruled against defendants in only approximately half the cases filed is not a record of which to be proud, especially when it is admitted that the entire number of complaints filed does not adequately indicate the serious extent of racial discrimination. Even if one claims that the Commission could not have ruled in any other manner in these cases, the decisions are geared to gain the confidence of the business and trade union community and the scorn of the Negro worker.

The Commission has chosen to answer conservative critics by claiming that FEPC action will not really alter the status quo. This tactic succeeds in placating the business interests that originally opposed FEPC, but it also reveals the actual character of FEPC to the Negro worker and his community. Thus there should be no cause to wonder at increasing Negro disillusionment with antidiscrimination commissions and the frequent recourse to direct mass action.

By 1961-1962, in California, 1,321 employment cases had been completed and closed by the Commission. One hundred and eighteen cases were dismissed for being outside the Commission's jurisdiction, and 414 were corrected after discriminatory practices were found. Seven hundred and eighty-seven cases however were closed for insufficient evidence or no evidence of discrimination. Three public hearings were held for respondents who did not make what the Commission accepted as a satisfactory settlement. But the courts set aside Commission orders in two cases and the third was pending at the end of the year.[71]

The FEP Commission in California takes it as a strong point that public disclosure of the identity of a respondent is prohibited on the assumption that this protects the accused against implications of guilt and might impair settlement efforts during the conciliation process. I believe that disclosure would facilitate reaching the goal of eliminating discrimination if this were the sole purpose of the Commission. The public would be able to exert pressure upon discriminatory company and union practices and also to judge whether the FEP Commission was an effective agent of social change.

Events occurring in March and April of 1964 reveal that extra-legal militant action for jobs has been more successful in attacking overt employment discrimination in some areas than the years of FEPC operations in California. On March 6 and 7, 1964, 1000 demonstrators picketed the Sheraton-Palace Hotel in San Francisco, and demanded that the hotel honor its avowed equal opportunity policy and hire 15 to 20 per cent of its total staff from the Negro and Mexican population in the area. At first representatives of the Hotel Employers' Association refused to negotiate with "irresponsible" groups and claimed that their hotels had always had an "equal opportunity" policy. But when 135

70.  Cal. Dep't of Industrial Relations, Div. of Fair Employment Practices, *News from FEPC* (April 29, 1962).
71.  Cal. Dep't of Industrial Relations, 1961-1962 Employment Relations Agency Biennial Rep., *Fair Employment Practices* 15-16.

persons staged a sit-in during the midst of the evening hours and when the demonstrators let it be known that the mass demonstrations would continue, the Hotel Employers agreed to the demands of the civil rights organizations.

A two-year agreement was signed in which the civil rights groups pledged to halt demonstrations, and the hotels agreed to refrain from pressing charges against those arrested, and further they agreed to hire the same percentage of Negroes as demanded before July 20th of the same year.[72]

The two-day demonstrations forced the hotels, which previously denied the existence of discriminatory employment practices to change the previous standard of judgment, by recognizing that the small percentage of Negroes they had hired in the past was not sufficient proof that they actually had a nondiscriminatory policy. The method used by the FEP Commission—that of judging intent and evaluating individual complaints—was also proven to be useless in changing the discriminatory practices of the Hotel Employers' Association. The standards used by the FEPC Commission in fact were virtually the same as those employed by the Hotel Association. Negroes in California will increasingly engage in mass action and participation in the militant Negro civil rights movement to effect significant change in the racial situation—with or without FEPC.  .

### Massachusetts

The record of the Massachusetts Commission Against Discrimination is a dismal one especially since the Massachusetts Commission is one of the oldest in years of operation and is given extensive powers under the statute, powers which it uses only very rarely. Thus, like many other state FEP commissions, it can not be regarded as a law enforcement agency. The Massachusetts Commission has been in existence since 1946 and has the authority to initiate investigations and to invoke its compliance procedures without the filing of complaints by aggrieved persons in instances where "trouble is manifest and can be traced to race." Conciliation and conferences are used in these investigations, but in 15 years, only 5 cases were brought to the stage of public hearing from the Massachusetts FEP docket. From November 10, 1946 to December 31, 1961, 2,149 complaints were initiated and received. Of these, 722 were dismissed for lack of probable cause, 76 for lack of jurisdiction, and 101 were withdrawn by complainants. The Commission found evidence of discriminatory practices in 1,186 cases, and closed them as satisfactorily adjusted. The Commission initiated 864 cases; 847 of these were closed after conciliation.[73]

Although the Commission found probable cause of discrimination in 1,186 cases, the reasons why Governor Peabody found that the Commission did not eliminate employment discrimination is quite clear after an examination of some typical cases which were "settled."

In an employment case, a Negro just recently discharged from the Air

72. The New York Times, March 8, 1964 § 1, p. 53.
73. 16 Mass. Comm'n Against Discrimination Ann. Rep. 35 (1961).

Force applied for a position as an IBM tabulator operator. Although he had been trained to operate the 407 tabulator and had successfully completed seven courses of study in IBM machine operation, he was not hired. The company claimed that it did not hire him because he did not have enough experience, but then decided that he would qualify for another lessor position and hired him.[74] No information was gathered as to how many Negroes are employed by the company, or what is the occupational distribution of nonwhites, nor is such information used as a basis of determining discriminatory intent. The employment of the individual Negro complainant by the company in a position lower than that for which he applied and had been trained, evidently provided enough justification for the state FEP Commission to close the case. In my opinion this is not adequate.

In another case, a complainant declared that she had not been hired because she was Negro. The Commission found that the company employed 75 people and that only one employee was colored. It was determined that three white women had been hired two days after the Negro complainant applied for the job. Hence the Commission asked the company to hire the Negro applicant, and "the complainant was given the next vacancy as a means of conciliating the matter."[75] By agreeing to hire the Negro complainant, after having been caught in a clear example of discriminatory racial practices, the company avoided the shame of exposure in a public hearing and the possibility of facing a court enforcement order. The Commission, however, made no effort to inquire how many other Negro applicants may have applied for a job and been refused. It made no recommendation that the company basically alter its racial employment practices nor did it determine that the hiring of two Negroes did not constitute compliance with the state anti-discrimination law. Because the data show that unemployment is much higher for the Negro than for the white worker in Massachusetts, the possibility exists that other Negroes might have applied and been turned down by the same company. It is also possible that many Negro applicants felt a sense of futility in filing a formal complaint with the Massachusetts Commission. Yet the Commission made no attempt to have the company publicly pledge to hire all qualified Negro applicants in the future—and to affirmatively seek and train Negroes in an effort to remedy and compensate for its previous record of discriminatory racial practices.

In yet another case, the Commission revealed that some investigations took longer than one year, a period quite long, so that a worker in need of employment is not able to wait for the verdict of the Commission. A Negro applicant had been interviewed by a company and was advised by the personnel department to try and find employment elsewhere. After applying two more times for a job, the Negro complainant charged the company with unlawful discrimination because of race. Investigation by the MCAD revealed that the company's em-

---

74.  15 Mass. Comm'n Against Discrimination Ann. Rep. 4-5 (1959-1960).
75.  17 Mass. Comm'n Against Discrimination Ann. Rep. 5 (1962).

ployees were "numbered in the hundreds" and that although "there were colored persons living in the same community and surrounding areas, none was employed." The particular Negro applicant had applied for a production job, a category in which the yearly turnover amounted to 6 per cent. Two hundred applications for production positions were on file with the company, but the personnel director said that few Negroes applied for employment. Investigation of the company's files revealed that the Negro applicant's card was distinctly marked to separate it from the others, and was dated three months after the actual date of application.

Two months after the Negro applicant first applied, when the MCAD began investigation, 130 persons were hired. Ninety-two of these were new employees. The company adamantly denied that the Negro applicant had been discriminated against because of her race. Yet the MCAD noted that its file showed that "no Negroes were employed despite information" and that "a few had applied." MCAD had the company give another test and interview to the applicant, upon completion of which her application was put into the active file. In the meantime, the Negro complainant took another job and notified the MCAD that she was no longer interested in working for the respondent company. In this case, where the MCAD took into consideration the fact that many other Negroes were unemployed in the nearby area and that some *had* applied for jobs, the Commission evidently dropped the case upon receipt of the information that the particular complainant had taken another job. The fact that a most clear discriminatory pattern existed throughout this company's operations did not lead the MCAD to take the necessary action obviously indicated by all the available evidence.[76]

### New Jersey

Other state commissions reveal a similar potential of unused powers. New Jersey's Division Against Discrimination reports that "monumental" tasks still have to be accomplished. In the period from July, 1957 to June 30, 1958, the New Jersey Commission investigated 123 employment cases. Out of this number only 53 cases were adjusted and declared to be based upon valid complaints. Fifty-nine per cent of cases registered were dismissed.[77]

In one case, Puerto Rican workers complained of discriminatory working conditions and charged their union with failing to give them proper protection and representation. Fifty-five per cent of the workers in the shop were Puerto Ricans. The union responded by accusing the Puerto Rican workers of holding anti-union attitudes. The Commission settled the grievance by arranging conferences between the Puerto Rican workers, the union leadership and employer representatives. The union agreed to promote better communication with the workers and to print material in both English and Spanish. The Puerto Rican

---

76. 11 Mass. Comm'n Against Discrimination Ann. Rep. 8-9 (1955-1956).
77. 1957-1958 N.J. Dep't of Education, Div. Against Discrimination Ann. Rep. 12-13.

leaders agreed "to place greater emphasis on the understanding and acceptance of responsibility to the union."[78]

The manner in which the case is described in the Commission's *Annual Report* for 1958 supports a rather idyllic view of how the Commission restores harmony and prevents tension from erupting. Yet, the report shows only that Puerto Rican workers, angry at their union's refusal to represent their interest, were forced to stop their protest and accept the judgment of the union leadership. No evidence is presented to enable the reader to learn the nature and accuracy of the Puerto Rican workers' charge against the union and no reasons are offered as to why the workers should accept the position of the union's leadership and stop their protest. Especially suspect is the involvement of the employers in a case where workers protest the collusion of the union with the employer against the workers' interests.

Like other state commissions, New Jersey's takes pride in the fact that the majority of cases are resolved in a "satisfactory" manner without resort to holding formal hearings and that the law enjoins the commission to use conference, conciliation and persuasion before resorting to legal sanctions. Yet from July 1, 1950 through June 30, 1953, out of 201 employment complaints which were investigated, 110 were dismissed for no probable cause, 9 others were dismissed for other reasons, and only 82 were judged to be valid and then adjusted. Over 54.7 per cent of complaints filed were found to be invalid.[79]

Other cases brought before the New Jersey Commission indicate the Commission's inability to deal with problems arising from the low occupational status of the Negro worker. A group of Negro workers complained about a company's discriminatory discharge policy. The men were dismissed in accordance with union seniority agreements and in the light of production requirements. But in this plant, only the Negro workers, who constituted less than 20 per cent of all employees, were dismissed. This occurred because there was in effect a plant-wide system of segregation in which Negro workers were restricted to certain menial and unskilled jobs. Segregation was thus declared by the Commission to be discriminatory in intent and result, and the company had to give evidence that it would abandon such practices and rehire the Negro workers "whose skills permitted employment in other processes."[80] In this case, Negro workers were actually displaced because of technological innovation. But their vulnerability as a group to job loss was a direct result of racial discrimination, *i.e.*, they were segregated in all-Negro job classifications and limited to menial and unskilled occupations. Thus a disproportionate displacement of Negroes occurred as a result of their disproportionate concentration in unskilled jobs with no promotion rights. The State Commission was unable to cope with the "legal" explanation invoked to justify the mass dismissal of the Negro workers. Increasingly, Negro workers are experiencing large scale dismissals especially in the mass

78. *Id.* at 14.
79. 1951-1953 N.J. Dep't of Education, Div. Against Discrimination Biennial Rep. 4.
80. *Ibid.*

production industries as a result of automation and other technological change; state FEP commissions are impotent to deal with this very serious problem.

### Minnesota

Another state commission which shows a poor record is the Minnesota Commission. This body has been in existence since 1955, but in seven years of operation it has handled only 205 cases through 1962. Of these, 136 dealt with employment discrimination. Out of the total of 205 cases, 81 were dismissed for no probable cause, 9 for lack of jurisdiction, 3 were withdrawn by the complainants, 4 were dismissed for insufficient evidence and only 32 were judged to be valid and then adjusted. If conciliation is found to be unsuccessful in Minnesota, the Commission may ask the Governor to appoint a three member hearing body from a 12 man Board of Review. This Board may then hold a public hearing, and determine whether an unfair discriminatory practice does exist. If it finds this is the case, the Board may then issue a cease and desist order. This absurd and unwieldy procedure is clearly unsuited to meaningful action against recalcitrant companies and labor unions and certainly explains the very small number of complaints filed with the Commission.[81]

However, even when cases are brought before the Minnesota agency, there is evidence to show a general reluctance on the part of the Commission to take affirmative action. In one case, a Negro woman had applied for the position of airline stewardess and had been rejected. The Commission took four years to complete the investigation, at which time they recommended that the case be held over pending further investigation.

In another case, a Negro man was not hired as a salesman by a department store in a small Minnesota community. The local manager informed the Commission that he believed company policy forbade the hiring of Negroes. The company stated that this interpretation was not correct and proceeded to inform all local managers of the company's nondiscriminatory hiring policy. This affirmation of a nondiscriminatory policy was evidently enough to settle the case, although the firm had still not hired a Negro. No investigation was made to determine how many Negroes, if any, were employed in the future with this firm.[82]

The Minnesota Commission stated that it is aware that the pattern of complaints filed does not indicate the actual pattern of discrimination. Actually most people seek employment where they know that they have a chance to be hired. Firms which do not have Negro employees may seldom get an application from one. The FEP commission may be the least likely agency to receive complaints based upon attempts to gain jobs in these firms. "Thus, the Commission is least likely to receive complaints against the very firms, industries, unions and employment agencies which may be most discriminatory in their employment

---

81. 7 Minn. Comm'n Against Discrimination Ann. Rep. 1-9 (1962).
82. *Id.* at 4-5.

practices."[83] Minnesota proposes an "educational" program as an answer. But we already know that this approach has become quite meaningless and that much more than education is necessary.

Minnesota, in fact, seems to rely to such a great degree on so-called "education and persuasion" to resolve complaints that requests for Review Board hearings are seldom made. In 1956, one case was not "settled" during the process described as "education and persuasion" and a hearing was requested. But this action "was not taken until after the Commission had tried unsuccessfully for fourteen months to secure a satisfactory adjustment of the complaint through the process of conference and conciliation."[84]

In another complaint, a Negro truck driver who weighed over 220 pounds was informed that he could not be employed because he was overweight. The management presented evidence to show that it was concerned about the over-all weight of men and produce on its trucks. However, the Commission was not persuaded that overweight was the real disqualifying factor, because white drivers working for the company in some cases also weighed over 200 pounds. The Commission asked that the applicant be given another test. The applicant, having obtained another job during the protracted negotiations between the Commission and the company, failed to appear. Because the company agreed to affirm a nondiscriminatory policy—although they had not hired a Negro for 6 or 7 years—the "Commission made a finding of no discrimination," and the company was asked to put the policy into practice by employing Negro drivers when the opportunity presented itself in the future. The Commission's standards, so vague and indefinite, point to the conclusion that much more is needed to clear a company, which does not hire Negroes, of the charge of discrimination than a mere promise to hire Negroes sometime in an indefinite future when and if there are job vacancies and if Negroes apply. The Commission's judgment in this case was really absurd as the Commission saw fit to accept a mere statement of alleged nondiscriminatory policy, although the company obviously employed no Negroes. Nor did the Commission take action to provide for compliance with the state law in the future.[85]

### *New York State—The Test of FEPC*

The experience of the New York State Commission Against Discrimination, later re-named the State Commission for Human Rights, is most important to evaluate. New York was the first state to enact an FEPC law. Beginning in 1945, its Commission has had the largest staff and highest budget of all state FEP commissions. Unlike some other commissions, the New York agency does investigate discriminatory *employment patterns* and attempts to correct them.

---

83. 4 Minn. F.E.P.C. Ann. Rep. 9 (1959).
84. 2 Minn. F.E.P.C. Ann. Rep. 10 (1957).
85. 3 Minn. F.E.P.C. Ann. Rep. 7-8 (1958).

The Commission is empowered to investigate discriminatory patterns even if no individual complaint is filed. If discriminatory patterns are found to exist and the accusation is accompanied by reasonable factual support, the Commission may authorize the start of an informal investigation and may seek to remedy the discriminatory pattern through education, conciliation and persuasion. Although the Commission may not call a formal hearing in these cases, the State Industrial Commissioner or the State Attorney General may file a formal complaint with the Commission against the respondent.

In 1962, the New York State Commission received 1,171 complaints; 740 verified complaints from the previous year had not been settled, making a total of 1,911 cases under consideration. This figure represented the greatest number of complaints filed with the Commission in its 17 year history. Of these, 611 or 52.2 per cent pertained to employment. This amounted to a drop from 660 filed in 1961, a drop of 7.4 per cent. Sixty-six and two-tenths per cent of the employment complaints were based on discrimination because of race. Refusal to hire was alleged in 235 complaints (38.5 per cent of the employment complaints.) One hundred and fifty-four concerned dismissal from employment, 113 conditions and privileges of employment and 48 concerned the withholding of employment agency referral. The remaining charged refusal of union membership and other forms of labor union discrimination and pre-employment inquiries.[86]

Of the 1392 complaints closed in 1962, probable cause was found to sustain charges of discrimination in 340, or 24.4 per cent of cases filed. Another 111 cases, or 8 per cent disclosed other unlawful practice which was adjusted. Thus, in 32.4 per cent of cases closed some discriminatory practices were found and adjusted. This means, however, that in nearly 70 per cent of cases filed by complainants, no evidence of discrimination was found. The percentage of cases rejected remains close to the amount which Berger studied in 1950. In that year, Berger noted that SCAD had ruled against 65 per cent of the cases filed. It is interesting to note that in 1962 the percentage of rejected cases is very close to what it was in 1950; thus the pattern of Commission rulings does not give the Negro worker confidence in the ability of FEPC to eradicate job discrimination, that is to help solve his employment problem. Probable cause was found to sustain the allegations in only 12.3 per cent of the employment complaints, 40 per cent of public accommodation complaints, and 45.1 per cent of housing complaints.

The Commission is authorized to make informal investigations of potential discriminatory situations. Since 1945, 1,463 of these were conducted. Three hundred and six were conducted in 1962 alone; 301 of these dealt with employment discrimination.[87]

New York's FEPC record reveals that more complaints were filed with

86. 1962 N.Y. State Comm'n for Human Rights Ann. Rep. 2–4. (Mimeo ed.)
87. *Id.* at 4–5.

the Commission as the years moved on. From 1945 through 1949, 1,583 employment complaints were filed. Two hundred and fifty-six were filed in 1950, 321 in 1955, 650 in 1957, 794 in 1959 and 611 in 1962.[88] Of the 611 employment cases filed in 1962, 405 (or 66.2 per cent) alleged discrimination on grounds of race. For 1945 through 1962, a total of 5,244 employment complaints alleging racial discrimination were filed. Thus, discrimination based on color was charged in 67.9 per cent of the employment cases brought before the New York Commission during this seventeen year period.[89]

Out of the 611 filed in 1962, 235 cases concerned refusal to employ, 154 alleged dismissal from employment, 113 cited conditions of employment, 48 agency referral and 46 concerned trade unions. Out of the 7,725 employment complaints filed from 1945 through 1962, 3,365 concerned refusal to employ, 1,732 dismissal, 1,054 conditions of employment, 493 employment agencies and 743 involved labor union discrimination.[90]

What was the disposition of the employment cases for the year 1962 and for the period from 1945 to 1962? The record is clearly revealed in the statistics presented by the Commission itself:

COMPLAINTS CLOSED BY TYPES OF CLOSING[91]

| Closing | Employment Cases 1962 | 1945-1962 |
|---|---|---|
| 1. Probable cause—specific complaint sustained | | |
|   a. Adjusted after conference and conciliation | 103 | 1,405 |
|   b. Ordered for hearing or consent order issued | 1 | 64 |
| 2. No probable cause found as to specific complaint but other discriminatory practices or policies found and adjusted | 96 | 1,620 |
| 3. No probable cause found—specific complaint dismissed and no other discriminatory practices or policies found | 588 | 3,811 |
| 4. Withdrawn by complainant | 19 | 171 |
| 5. Lack of jurisdiction—specific complaint dismissed | 36 | 387 |
| Total | 843 | 7,458 |

Translated into percentage distribution figures, the Commission's analysis of closings shows that for category two above, no probable cause was found as to the discrimination charged by the complainant in 11.4 per cent of 1962 employment cases and in 21.7 per cent of 1945 to 1962 employment cases. No discrimination *of any kind* (category three above) was found in 69.7 per cent of 1962 cases and in 51.1 per cent of 1945 to 1962 employment cases. In generalized terms, therefore, the Commission found no probable cause to credit the specific discrimination alleged in the complaint in 81.1 per cent of employment cases in 1962 and in 72.8 per cent of employment cases from 1945

88.  *Id.* at 10, Table 2.
89.  *Id.* at 12, Table 4.
90.  *Id.* at 13, Table 5.
91.  *Id.* at 14, Table 6.

to 1962. The over-all record substantiates the fact that the same pattern exists as that studied by Morroe Berger five years after the New York Commission came into existence; the large percentages of cases invalidated still does not tend to create confidence in the Commission among Negro workers, and that given the enormity of the problems of the very large Negro community in New York state, the actual number of complaints received by the New York Commission is very small indeed.

New York's Commission—despite the fact that it rejects half of the complaints which are filed with it—is the only Commission with a substantial annual budget and a fairly adequate staff. Its 1960 budget was $950,000 and the Commission had a working staff of 80 people. California, a state that had two-thirds as large a Negro population, had a Commission budget of only $203,000 and a staff of 15. Pennsylvania, a state with a sixteenth as many Negroes had a budget of $100,000 for its FEPC commission and a staff of 3. Yet even the large budget and staff for New York's agency is not sufficient to cope with the very serious problems of racial and other forms of discrimination. Hence it is obvious that the other state commissions would be extremely understaffed and ill-equipped to function properly. The other commissions are forced to limit their activity to processing complaints. Only the New York Commission has a budget that is large enough to enable it to conduct activity on a pattern-centered compliance basis.

During its eighteen years of existence, New York's FEPC concluded agreements with over 2,000 separate firms. This is but a small fraction of companies which have six or more employees—but they do account for business operations in which the Commission found proof of discriminatory practices. If all the firms revised their previous discriminatory policy, the result would have to be some general improvement in employment opportunity. The Commission's post-settlement investigations reveal that many of the firms did hire an increased number of Negro employees after settlements took place, as a direct consequence of revised employment policies. Therefore New York's Commission did demand and secure some significant enforcement of the law, a step which other state FEP settlements did not entail. In 1951, for example, SCAD had studied 334 cases for follow-up review. In 85 per cent of cases investigated it found that there was "a definite improvement in the employment pattern as compared with the conditions which existed at the time the original complaints against them were filed. These changes were reflected in substantial increases in the number of members of different racial . . . groups employed in professional, technical, skilled, semiskilled and unskilled job categories."[92]

But this very improvement delineates the actual inability of the Commission to make meaningful changes in the total pattern of employment discrimination. By the very nature of the process used by the Commission—investigation of the employment pattern of respondent firms—the Commission can influence only a

92. 1951 N.Y. State Comm'n Against Discrimination Ann. Rep. 7-8.

small minority of business firms operating in the state. The change in employment patterns achieved by later investigation of agreements is certainly to be commended—but unfortunately it touches only a small minority of New York's manufacturing and other industries. Thus, as Herman Miller pointed out, the occupational status of Negroes in the 1960's in New York remains close to the levels reached in 1940.

In 1958, some relative progress in specific industries for Negro "white collar" employees can be noted. The Commission made an analysis of reviews of Negro employment in several important industries—banking, insurance companies and department stores. These institutions traditionally excluded Negroes from all but menial jobs. Comparison of the findings of their follow-up investigations with the original employment pattern revealed that originally Negroes held only menial jobs in these firms. In the middle 1950's, however, 7 banks which had been respondent firms had more than 100 Negroes in white collar positions, and 2 of the banks had 300 Negroes in each. The progress appears to be great, however, because for a Negro, any job above a menial position is regarded as a significant change in occupational status.

Of 20 insurance companies investigated by the Commission, 8 firms showed that they had no Negro employment; 1 showed that Negroes were employed but that no general increase in Negro employment had been registered. Ten firms had no Negro employees at the time of the analysis. The largest firm studied had no Negro employees in 1945, at the time of the original investigation. By 1956, it had employed 750 Negroes in many different positions, and 200 Puerto Ricans. Similarly, few retail stores had Negroes employed in any but menial jobs in 1945 and most had no Negro employees at all. By the 1950's, Negroes comprised approximately 10 per cent of the work force of New York department stores. However, these gains for Negro middle class white collar workers are more than offset by losses in employment opportunity for Negro industrial workers especially in mass production manufacturing. Although increases in Negro employment have taken place, they appear to be significant only in contrast to the complete exclusion which was the standard 20 years ago. In the communication industry in New York state, Negroes may now comprise 5 per cent of the total work force, compared to only 2 per cent in the 1940's, but the percentage of change does not signify a great increase in the actual number of Negroes whose occupational status has changed. A few Negroes have been employed, but the demand for jobs is much higher than the number of Negroes who are working at them or who are qualified for such positions. As automation begins to eliminate many of the jobs in these industries, the ability of Negroes to gain entrance becomes even more difficult. Racial bias in the allocation of jobs has changed slightly, and this change reflects the positive aspects of New York's FEPC. But it also reveals the inability of FEPC as an institution to cope with the over-all pattern of job discrimination. Even when FEPC has worked most effectively compared to other states—and it has worked most effectively in

New York—it is simply unable to fundamentally alter the Negro employment pattern.

New York's FEPC commission has tried to avoid the defects inherent in the other state FEPC agencies. It has tried to do more than rectify the situation of an individual complainant. One Negro man charged that he had received no referrals for a job as a front elevator operator in an East Side luxury apartment. The Commission failed to find evidence to support the contention that he was not employed because of his color. Nevertheless, it investigated to determine whether a combination of geographic area factors and the specific category of employment acted to discriminate against Negroes. It found that no Negroes had ever been employed as front elevator operators in the expensive East Side apartment buildings. The Commission then had the specifications for jobs in the area changed. It would no longer be acceptable for employers to ask for "East Side apartment house experience" or "comparable experience" as a prerequisite for employment. Because Negroes never held the job, this type of qualification automatically excluded them. The Commission emphasized that such "localized prior experience is certainly not the only way to acquire the necessary training."[93] This ruling does not insure Negro employment as front elevator operators, but it certainly sets the basis for ending their absolute exclusion.

Nevertheless, the Commission's efforts to affect the employment pattern are not always successful. In 1953, 228 respondent firms were involved in complaints which were closed that year. One hundred and seventy-nine companies were first complaint cases; 49 had previously been investigated in connection with other complaints. Checking on the latter group is a method of examining whether changes had taken place in employment patterns and of testing how effective earlier conciliation agreements were. Of these 49 firms, 13 were found to be no longer practicing any discrimination. Fifteen were found to have nondiscriminatory employment policies currently, although in previous years they did not. Fourteen companies were found still to be engaged in discriminatory practices, indicating that "the earlier conciliation agreements had not been completely effective."[94] Adjustments made with these 14 companies were proved to have been based upon meaningless agreements, for the employers did not end their discriminatory pattern of employment. Promises are not always kept, and satisfactory adjustment does not mean that respondent firms will always act upon the agreements they sign. The remaining 7 firms were found to have a discriminatory policy which had not been disclosed during earlier investigations. This result shows that companies may often avoid scrutiny of their policies, despite an FEPC investigation.

New York's Commission tries to prevent lack of compliance by undertaking a review of complaints six months after they have been closed. In 1953, 103 reviews were made. Field representatives visited respondents, made inquiries

---

93. 1961 N.Y. State Comm'n Against Discrimination Ann. Rep. 60.
94. 1953 N.Y. State Comm'n Against Discrimination Ann. Rep. 15.

about employment practices, policies and patterns as well as general compliance with the terms of the conciliation agreement. The Commission found that in one Long Island defense plant there was a steady increase in Negro employees. At the time of the original investigation the plant had 900 employees and no Negro workers. At the first review, it employed 1,600 persons and 19 Negroes. At the second review, it employed 1,800 employees and 32 Negroes. A large bakery employed 1,000 people, but used Negro sales people only in Negro neighborhoods. At the first review, the Commission found that Negroes sold goods in 9 shops where they had not been previously employed. A Fifth Avenue department store had 2,900 employees. Of the 135 Negroes employed, only 1 was in sales work. At the first review, the store was using 18 Negro salespeople.[95] The Commission thus notes an increase in the use of Negro workers—but it cannot do anything about the small percentage which this increase comprises. This kind of limited increase against the background of Negro unemployment and underemployment does not effect a change in the Negro's occupational status, and is of benefit only to the few who are fortunate enough to have been chosen for the token advance. It is necessary to observe that this kind of progress might have been very important as symbolic achievement 20 years ago, but today given the reality of Negro life in the north, it can be regarded only as token compliance with the law at best.

New York's Commission has indicated a serious effort to attempt a review of its cases and to secure compliance. This has amounted to an increase in the number of Negroes employed by industries in which investigations have been made. But in all the categories cited, only a very small percentage of Negroes has benefited. There has been no general increase that would match the increased percentage of Negroes in the population and give them equality in employment on the same terms as that enjoyed by whites. Moreover, most Negro migrants are unskilled, having been accustomed to life and work in rural areas. No significant training programs involving large numbers of workers have been initiated to make them eligible for clerical, professional and skilled craft jobs in which employment opportunities are available.

In one case, the Commission received the complaint of a Negro welder that he had not been referred for employment by a local craft union because he was Negro. This local union controlled all hiring for welding operations on the St. Lawrence Seaway construction project. The local had 800 members, all of whom were white. Negroes were denied the opportunity to work because in practice the union was the exclusive hiring agent and refused to refer Negroes for work. After the Commission acted, the complainant and two other Negroes were sent out for work by the Union. "These men represented the first Negroes in this job category to be employed on the seaway."

In this case, SCAD made no effort to establish the permanent right of Negroes to belong to a union which rigidly controlled the hiring hall operation

---

95. *Id.* at 16-17.

and to make certain that all qualified Negroes seeking jobs in the future would be referred for employment by the union. Thus they achieved the goal of getting a job for the complainant, but did not initiate action to change the over-all pattern of discrimination by craft unions which control the hiring process and which exclude Negroes from membership.[96]

### VI. Technological Change, Training Programs and Labor Union Racial Practices

The 1948 Annual Report of the New York State Commission notes that "the extent of integration depends not only on the absence of a discriminatory hiring and employment policy, but also on the number of people in the discriminated group possessing the requisite skills who are available for employment as well as the state of a given industry and the condition of the labor market."[97] This is much more true in 1964 than it was in 1948. Increasingly, the central issue of fair employment practices involves the availability of new training opportunities for nonwhite wage earners.

The American economy is characterized by a great paradox in the area of manpower utilization, for in the midst of a serious rise in unemployment, many jobs are going begging because of a lack of skilled workers. Even in an area of critical unemployment such as Detroit during 1961-1962, and in other industrial communities where there has been a very high rate of unemployment, industry has been unable to find an adequate supply of skilled workers in a variety of crafts. There is every indication that this pattern will continue.

For every 100 skilled workers that the nation had in 1955, it will need 122 in 1965 and 145 in 1975; yet all of the available data clearly indicate that the nation's training programs are not even turning out enough new craftsmen to replace those who retire. It is now clear that in the next decade, the entire American economy will be faced with a crisis because of the lack of skilled manpower.

A major factor contributing to the irrational, wasteful and socially harmful operation of the nation's apprenticeship, vocational and other training programs is the color discrimination and racial exclusion which characterize training programs in major sectors of the economy in the north as well as the south. For many occupations the only way a worker can be recognized as qualified for employment is to successfully complete apprenticeship or other established training programs.

Studies such as that made by the New York State Commission Against Discrimination,[98] as well as by the National Association for the Advancement

---

96. For a discussion of trade union racial practices see Hill, *Labor Unions and the Negro*, 28 Commentary 479-88 (Dec. 1959) and Hill, *Has Organized Labor Failed the Negro Worker*, 11 The Negro Digest 41 (May 1962).
97. 1948 N.Y. State Comm'n Against Discrimination Ann. Rep. 11.
98. N.Y. State Comm'n Against Discrimination, Apprentices, Skilled Craftsmen and the Negro: An Analysis (1960).

of Colored People, clearly indicate that no significant advances have been made by Negroes in those craft union apprenticeship training programs which have historically excluded nonwhites. An examination of available data makes evident that less than one per cent of the apprentices in the building and construction industry throughout the United States are Negro. In the ten year period, 1950-1960, in the state of New York, Negro participation in building trades apprenticeship programs increased from 1.5 per cent to 2 per cent.[99]

Open access to plumbing and pipe fitting apprenticeship controlled by the Plumbers Union is a very rare experience for young Negroes in the north as well as the south. Similarly, Negro youth are completely excluded from apprenticeship programs controlled by the Sheet Metal Workers Union, the International Brotherhood of Electrical Workers, the Lathers and Plasterers Union, the Ornamental and Structural Iron Workers Union and from other important craft unions operating in the construction industry.

Almost equally exclusive are the printing trades unions. In a survey made by the National Association for the Advancement of Colored People of the seven major New York City newspapers in 1962, we find that with the exclusion of building services and maintenance personnel, less than one per cent of those employed on the major New York newspapers are Negro. Virtually, all of the Negroes employed on these newspapers are in the "white collar" jurisdiction of the New York Newspaper Guild.

We estimate that less than one-half of one per cent of those currently employed in the newspaper crafts outside of the Guild's jurisdiction are Negroes. This includes printing pressmen, compositors, photo-engravers, stereotypers, paper handlers, mailers and delivery drivers. As far as apprenticeship training for these crafts is concerned, we have been unable to detect a single instance where Negroes have been recently admitted into a training program in the newspaper crafts in the City of New York or in other major cities in the United States.

In the study entitled *Made in New York: Case Studies in Metropolitan Manufacturing,* published by Harvard University in 1959, we are told that "Negro and Puerto Rican women who are on the lower rungs of the city's economic ladder, have become important in the New York garment industry, but they work mainly in the more established branches and with few exceptions . . . they do not become highly skilled tailor system workers on dresses or 'cloaks.' As a result a shortage of skilled sewing machine operators is developing."[100]

In most of these programs the role of the labor union is decisive because the trade union usually determines who is admitted into the training program and therefore, who is admitted into the union membership. Labor unions also exercise control over apprenticeship programs through hiring hall procedures in

---

99. Hill, The Negro Wage Earner and Apprenticeship Training Programs (1959).
100. Made in New York: Case Studies in Metropolitan Manufacturing 95 (Hall ed. 1959).

*de facto* closed shop situations. In these circumstances, craft unions have the power either to promote or prevent the admission of individuals or of an entire class of persons.

By means of a variety of formal and informal controls, craft unions are frequently the decisive factor in the recruitment process in many apprenticeship programs and often directly prevent Negro youth from becoming skilled craft workers via the established route of apprenticeship.

A careful analysis of most apprenticeship training programs currently operating in many skilled craft occupations will clearly indicate the utter lack of a system of objective standard criteria for admission into apprenticeship training. At the present time there is no objective basis for determining admissions. Persons are admitted or not admitted because of nepotism and caprices of certain union officials acting in collusion with management.

On the level of the small shop and local union, the tradition of racial discrimination has now become deeply institutionalized. A form of caste psychology impels many workers to regard their own positions as "white man's jobs," to which no Negro should aspire. These workers, and often their union leaders, regard jobs in their industries as a kind of private privilege, to be accorded and denied by them as they see fit. Often Negroes are not alone in being barred from such unions which have much of the character of the medieval guild, but Negroes as a group suffer the most from these practices. On the local level, the tradition which sustains discrimination is to be found among skilled workers in heavy industry as well as in the craft occupations and in the north almost as commonly as in the south.

FEP commissions clearly have the authority to function in this decisive area but with very few exceptions they have not invoked their powers against discriminatory apprenticeship training programs and against skilled craft labor unions directly responsible for maintaining a rigid pattern of Negro exclusion.

If Negroes do not possess the skills required by modern technology, fair employment practice commissions cannot help them. They can only ask that those few Negroes who do have skills be treated equally. If a given industry is in decline or experiencing a depressed condition, FEPC cannot help to gain an increase in the rate of Negro employment. It can only call for equal opportunity, and this becomes a meaningless abstraction.

Recent decisions of the Pennsylvania State Commission and the New York Commission indicate that mass demonstrations and other forms of organized public pressure from the Negro civil rights movement have influenced some state commissions to invoke their authority against institutions that previously enjoyed a virtual immunity from fair employment practice laws. Equally significant is the nature of the findings and the substance of commission orders in these few recent cases which represent a significant departure from the limitations of past practice.

Dramatic public exposure of anti-Negro practices can create an atmosphere

61

which is conducive to effective action by state FEP agencies. As in the San Francisco hotel case which was previously discussed, eradication of discriminatory practices and action by the California Commission came only after the intensification of independent mass action by civil rights organizations.

Early in May of 1963, mass demonstrations stopped construction of an $18,000,000, twenty-one story municipal service building in Philadelphia. On May 27, 1963, NAACP members began mass picketing at the construction site of a school in the Negro district of Philadelphia, because building trades unions affiliated with the AFL-CIO refused to admit skilled Negroes as members, and thus denied them access to employment controlled by the unions. In June and July of 1963, construction in Harlem and elsewhere in New York City was stopped because of the refusal of labor unions to admit Negroes into craft occupations. During the summer months, Negro civil rights groups conducted mass demonstrations to dramatize the pattern of Negro exclusion from training programs and jobs in the building and construction trades in many cities across the country.

After years of avoiding conflict with the politically powerful building trades unions, the Pennsylvania State Commission, beginning on July 9, 1963, held public hearings involving six major unions and finally issued a series of orders against these unions that had long engaged in anti-Negro practices. On February 24, 1964, the New York State Commission for Human Rights made its first important step forward in prohibiting employment discrimination by building trades unions. On that date it found Local 373 of the Plumbers Union of Spring Valley, New York guilty of maintaining a pattern of anti-Negro practices. The significance of the Harold Mitchell case against the Plumbers Union is in the nature of the Commission's decision. After finding that the membership of Local 373 was composed exclusively of Caucasians and that it maintained a policy of excluding Negroes from membership, the New York Commission directed the union to place Mitchell at the head of its work referral list, giving him priority on the job referral list, whether or not he joined the union. It further directed that Mitchell be allowed to take the journeyman entrance examination and that the examination be graded fairly. It also directed the union to treat all apprenticeship applicants equally and to disregard race. The local was ordered to submit an affidavit outlining the manner in which it was complying with the order. The plumbing company in question was ordered to send Mitchell a letter offering to rehire him at full union wages and to restore all seniority rights that would have accrued had he been continuously employed since his date of dismissal. The company also was ordered to give him three hundred dollars in back pay for partial loss of wages following illegal dismissal.[101]

The decision in the Mitchell case represents a fundamental departure by

---

101. Mitchell v. R & S Plumbers & Mechanical Systems, Inc., C-9092-62 (N.Y. State Comm'n for Human Rights, 1964).

the New York Commission from the traditional limited settlements which in the past only benefited the individual complainant. The Commission for the first time touched upon the power of those craft unions, which control the hiring process and deliberately exclude Negroes from skilled craft occupations. Although the New York Commission had been in existence for 18 years, it was not until the Negro mass movement began an intensive public attack on union discrimination in the building trades that the Commission acted to reach the source of the union's power, *i.e.,* exclusive control of assignment to jobs.

The provisions of the state antidiscrimination law are such that they empower the Commission to deal with union discrimination. The law makes it illegal for unions to deny or withhold membership from any qualified person because of race. This is a serious difficulty for colored people nationally and New York State has one of the most rigid patterns of overt discrimination against Negroes in the building trades industry. This pattern of discrimination was extensively studied for the New York State Advisory Committee to the United States Commission on Civil Rights by Dr. Donald F. Shaughnessy of Columbia University.[102]

Some critics have called the attempt to gain admission for Negroes into the construction trades ill-advised, because allegedly there is not enough work for those already in the industry. What good is a call for Negro participation, so the argument goes, when whites as well as Negroes are in danger of losing their jobs?

The logic is good, but it does not apply to the construction industry. Dr. Shaughnessy's report, as well as other studies revealed that there is a huge backlog of work that will take decades for the construction industry to complete. Exclusion of Negroes from participation in this industry is *not* a reflection of economic stagnation. Building construction is not an industry in which there are fewer jobs for both Negroes and whites. The construction industry represents a segment of the economy which is not declining. General contractors and the employers associations believe that there is a severe shortage of both residential and nonresidential construction in New York and elsewhere. New York, with twice the population of Chicago, has over four times the need for office space. Data indicate that the construction demand is growing.

Dr. Shaughnessy has pointed out that the fear of unemployment by construction workers must be set aside due to reliable estimates of forthcoming construction activity. New construction is scheduled to increase by 57 per cent between 1960 and 1964, and double between 1970 and 1975, according to Commerce Department estimates. The volume of construction and new repairs is also expected to grow. Thus the skilled manpower necessary in 1970 will be 35 per cent above the present labor supply.

The *Wall Street Journal,* April 10, 1964, in a front page story states

---

102. Shaughnessy, A Survey of Discrimination in the Building Trades Industry, New York City (April 1963). Dr. Shaughnessy's study was the basis for the Report of the New York Advisory Committee to the U.S. Commission on Civil Rights (August 1963).

"Booming construction activity will provide strong support this year for the nation's economy." The report concludes by noting that ". . . the general contractors who build highways, housing, office structures, and utility facilities generally agree they will have record volume." Although the industry is expanding, Negro workers have not been able to enter into the construction industry. This occurs because, as Shaughnessy notes, "the economic characteristics of the industry have created a condition wherein the decision making power is concentrated in the local union."

It is the economic structure of the building industry which concentrates in the local unions the power to decide who obtains employment and who gets admitted to the craft. The men who are engaged in construction work are recruited from labor pools controlled exclusively by the various unions in the craft jurisdictions of building trades. The union is the sole employment agency and the men who appear on the jobs are those whom the union has referred to the job site. Because the volume of operation of individual contractors and subcontractors in the industry is too small to allow them to employ steadily a large number of skilled workers in a given area, contractors must depend upon a pool of available craftsmen in each trade. Contractors are thus completely dependent upon local unions for their labor supply. This factor further increases the power of local craft unions to control the employment process.

The worker, in turn, is dependent upon the union for his source of job security. Since he works on many different jobs for a variety of contractors, his sole sense of loyalty is to the union which dispatches him to various jobs. His attachment is to the source which gives him his job security, in this case, the specific building trades union to which he belongs. The economic characteristics of this industry provide fertile soil in which racial discrimination can and does flourish.

Rather than admit Negro members, the unions frequently encourage the use of out-of-town labor. Based upon direct interviews, Shaughnessy found that commuters travel as much as 120 miles per day from Connecticut and elsewhere to find steady employment in New York, when the available local union membership supply is exhausted. But local sources of skilled Negro manpower are deliberately ignored. During the spring and summer of 1963 there were approximately 1200 plumbers with "travelling cards" from other cities working in New York City.

Thus the New York State Advisory Committee of the United States Commission on Civil Rights stated in its 1963 report that ". . . the building trades unions continue to maintain an effective shortage of labor. One way that shortage is preserved in the face of continuing high demand is the use of commuters like those from Bridgeport who represent an auxiliary source of manpower that can be cut off at any time." Out-of-town construction workers commute over 100 miles daily to jobs in New York City while local Negroes and Puerto Ricans are denied employment and entry to union controlled jobs and apprenticeship programs.

Apprenticeship programs provide from one-half to two-thirds of all the skilled workers who are needed to replace older craftsmen and to meet new needs of industry. The unions, however, have the power to fix the number of apprentices. Thus, they deliberately maintain an effective shortage of the skilled labor supply on the theory that this enhances their power at the bargaining table. Twenty-two vocational high schools exist in New York City. Five of these teach skills used in the building trades. But qualified Negro graduates are limited to low-paying non-union jobs, or are forced to leave the trade entirely. Negro youth taught a skilled craft at public expense, find that they are deprived of the opportunity to practice it. Parenthetically it should be noted that this contributes to the high rate of Negro school drop-outs, drop-outs that are an expression of a sense of futility and alienation among Negro youth in relation to job opportunities.

Yet as Shaughnessy puts it, the "swollen myth" exists that discrimination in training and employment has been effectively prevented by law in New York City. Section 296 of Article 15 of the Executive Law of New York State is most clear. The law prohibits discrimination by employers in hiring, compensation, employment privileges, working conditions and discharges, prohibits union discrimination in membership and bars discrimination by unions in admission to apprenticeship training, on the job training, and in other vocational training programs.

However, the state FEPC cannot act until a complaint has been filed by an aggrieved party, and only after a public hearing in which the respondent is found to be guilty. The Commission has the power to establish and maintain an office, meet and function at any place within the state, appoint attorneys and amend and rescind rules, receive, investigate and pass upon complaints, hold hearings, and act upon the results. "It has, in fact, every conceivable power such a commission might need except the power to initiate investigations." But as Dr. Shaughnessy put it, the New York Commission "has been singularly ineffective in preventing or eliminating discrimination in apprenticeship programs in the building trades industry."

In 1948, SCAD had ordered the New York Sheet Metal Workers Union to desist from "executing and/or maintaining constitution or by-law provisions which exclude Negroes." Yet seventeen years later no progress had been made in that area although the "Caucasian only" clause was removed from the union's constitution, apparently for public relations purposes only.

In December of 1963, the New York City Commission on Human Rights investigated the problem, and found "a pattern of exclusion in a substantial portion of the building and construction industry which effectively bars non-whites from participating in this area of the city's economic life."

A major factor in perpetuating Negro exclusion is the union's use of father-son clauses and preferences for relatives, plus the need to be recommended by a group of *union* members. When the right to become an apprentice is limited to

65

sons and relatives of members, Negroes are automatically excluded since none have ever belonged to these unions. Union members may view this provision as a source of job security and claim that they are not discriminating against Negroes, but only against people who are not related to members. Yet the logic of the arrangement is to exclude, on a systematic basis, all Negroes as a class. The situation is analogous to the exclusion of Negroes from the all-white southern primaries in the 1920's. According to defenders of the "white primary," it was not anti-Negro, it merely allowed only those citizens whose grandfathers had voted to take part in primaries. But in effect the rule prevented all Negroes as a group from voting. Only when the courts ruled that the "white primaries" were unconstitutional and in fact were a device meant to bar Negroes, did the exclusion of Negroes from voting in primary elections come to an end in southern states.

The analogy suggests that what is needed is a new definition, a new standard by state FEP commissions. It is necessary to recognize that father-son clauses and preference to relatives is *prima facie* evidence of a discriminatory position; that, in effect, their use as a basis of admittance to apprentice programs is as anti-Negro as the more overt discriminatory clauses which used to be in many union constitutions until the law forced them to be removed. The same standard should be applied to the more common sponsorship clauses. When union practice requires that a youth be sponsored by two members of five years good standing, a Negro almost never can obtain such sponsorship.

On March 4, 1964, the Commission ruled that Local 28 of the Sheet Metal Workers Union had "automatically excluded" Negroes over the entire 78 years of the unions' existence. This was held to be a violation of New York State Law Against Discrimination. The Commission announced that it would issue an order for the union to "cease and desist" from such discriminatory practices and would demand affirmative action to guarantee an end to job discrimination.[103]

The decision was called "revolutionary" by the Commission's chairman, George H. Fowler, because "it takes into account a historical pattern of exclusion and not merely a specific complaint." Thus the Commission ruled against the union as an institution functioning within a given racial situation and with a history, and not on the basis of the "validity" of an individual complaint. The decision was based on public hearings against the union conducted by three commissioners. They had been called to investigate charges against Local 28 of the Sheet Metal Workers Union filed by the Civil Rights Bureau of the State Attorney General's office. The Bureau, which has been quite effective in this area, charged that the union and a contractors committee responsible for selecting apprentices had systematically discriminated against Negroes. The contractors committee had refused apprenticeship to a qualified Negro applicant. The State Commission charged that Local 28's admission program bore "a remarkable resemblance to the medieval guilds" by maintaining a father-son

---

103. Lefkowitz v. Farrell, C-9287-63 (N.Y. State Comm'n for Human Rights, 1964).

admission standard. The Commission noted that in a provision of its International Union constitution, which was deleted in 1946, the union declared that "no Negro could ever become a full member."

Observers agree, as The New York Times put it, that the ruling by the Commission was "a key harvest of the seeds planted by the massive civil rights protests at construction sites here last year. Local 28 has been a prime target of the rights groups."[104] What the decision demonstrates is that despite years of a state FEPC law and a previous ruling against Local 28, discrimination in the building trades continued unabated. Voluntary union programs, investigations, exposure, education, interminable negotiations and conciliation brought no results to Negroes. The historic pattern was retained and the union leadership, supported by the Building Trades Council of the AFL-CIO bitterly defended its anti-Negro practices. The state antidiscrimination law was not enforced and for the Negro job seeker in the building trades, for all practical purposes, it just did not exist in New York City and state. Therefore, civil rights demonstrations took place in a state with the oldest and strongest FEP Commission in the nation. Another factor is the litigation initiated by the NAACP currently pending in the New York State Supreme Court against Local 28 and eight other building unions and against the city and state of New York.

What the ruling also indicates is that if FEPC is to work, it must change the entire basis of its function. No longer can FEPC serve merely as a complaint taking agency or remain content to settle cases on an individual level, often agreeing to token settlements. It must be able to rule against respondents on the basis of a broad pattern of racial practices even when the respondent avows a nondiscriminatory policy in some vague future. It must take into account what Mr. Fowler called the "historical pattern of exclusion" and not only individual complaints. And then, it must take affirmative actions to assure that the pattern is really ended. Later, on March 23, the State Commission announced that it had given Local 28 sixty days to discard the old apprentice list of some 900 names of white persons and that it had ordered the Local to "cease and desist" from excluding Negroes from membership and to abandon the practice of requiring that an applicant be sponsored by a union member. The order is, in effect, a significant breakthrough for Negro workers and can have far reaching consequences. What is now necessary, as Roy Wilkins, Executive Secretary of the NAACP, requested, is that Governor Rockefeller and Mayor Wagner take immediate steps to order the cancellation of any contracts for public construction in which the hiring of apprentices and journeymen is controlled by Local 28 and other AFL-CIO craft unions guilty of similar practices. The state and city governments must abide by the State Commission's ruling by cancelling all contracts, and refusing to enter into new ones, in which hiring is controlled by unions that engage in discriminatory racial practices. The State Commission's ruling, Mr. Wilkins stated, in his letters of March 6, 1964 to Governor Rocke-

---

104. The New York Times, March 5, 1964.

feller and Mayor Wagner, has now "removed whatever justification existed, and we contend that there was none, for failure of city and state officials to cancel such contracts." Moreover, authorization of new contracts should be withheld until a realistic policy of nondiscrimination has been effected. Wilkins also called for "the institution of foolproof practices and procedures to insure the policing and affirmative enforcement by the city and state of their policies of nondiscrimination in employment." Unfortunately, in his reply to Roy Wilkins, Governor Rockefeller stated that it has been his "consistent policy . . . to encourage voluntary compliance with the laws against discrimination." In declining to act immediately, the Governor stated, the union would be given a "reasonable time within which to comply." The Governor also noted that ". . . Local 28 is still entitled to test the recent opinion of the Commission in the Courts." Mayor Wagner did not reply to the request of the NAACP Executive Secretary.

State FEP commissions could function more effectively if in addition to the development of new criteria, other law enforcement agencies worked in close conjunction with them. In New York, the state Attorney General, Louis J. Lefkowitz, has proposed an amendment to the state antidiscrimination law, making it illegal under an apprentice program, registered with the state, to select persons, "on any other basis than their qualifications as determined by objective criteria which permit review." The proposal was enacted into law in March 1964[105] over the vigorous opposition of the state AFL-CIO Council and the bitter objections of the Building Trades Unions. Now that new standards are established, and the FEP Commission performs the review, the means by which discriminatory practices can be legally ended is at hand.

The decision of the New York State Commission for Human Rights in the Sheet Metal Workers Union case holds great importance insofar as it influences FEPC operations throughout the nation. The decision, if its implications are carried to their logical conclusion, clearly indicates that state FEP commissions need not be obsolescent. State commissions however must qualitatively change their operational assumptions by using a new public standard based upon the realities of the social situation. Individual complaint settlements must now become a secondary function of the commission and for the first time, FEP commissions should demand that employers and labor unions change their entire institutional pattern in relation to Negroes and other nonwhite citizens.

Negro militancy in the north has created a new set of conditions for state FEP commissions. Now they must proceed boldly to the attack upon discriminatory patterns in entire industries and crafts, with new standards of evidence and new concepts of permanent affirmative compliance and above all, a far greater use of mandatory measures including the frequent issuance of cease and desist orders and court enforcement of commission rulings.

If state FEP commissions continue instead to operate with timidity and a general reluctance to broadly and rapidly enforce antidiscrimination statutes

---

105.  L. 1964, ch. 948. The New York Times, March 21, 1964.

then they are obsolete, for the rising Negro mass movement will proceed to the attack in its own way. What state antidiscrimination commissions do within the next months and years and how rapidly they go about doing it will determine in large measure the nature of the racial confrontation in the northern states. This is now especially important as it becomes clearer each passing day that the next great crisis in American race relations will be in the north.

69