# HEARING ON THE FUTURE DIRECTION OF THE EEOC

## HEARING

BEFORE THE

SUBCOMMITTEE ON EMPLOYER-EMPLOYEE RELATIONS

OF THE

COMMITTEE ON EDUCATION AND

THE WORKFORCE

HOUSE OF REPRESENTATIVES

ONE HUNDRED FIFTH CONGRESS

SECOND SESSION

HEARING HELD IN WASHINGTON, DC, MARCH 3, 1998

### Serial No. 105-78



Exhibit #14

Printed for the use of the Committee on Education

and the Workforce

---

Table of Contents *

opening statement of the honorable harris fawell, chairman,

subcommittee on Employer-employee relations, committee on education and the workforce, u.s. house of representatives *

opening statement of the honorable Donald Payne, Ranking member, subcommittee on Employer-employee relations, committee on education and the workforce, u.s. house of representatives *

STATEMENT OF the HONorable NEWT GINGRICH, SPEAKER OF THE HOUSE OF REPRESENTATIVES *

For this reason, if no other, the role of the EEOC to ensure that racism, sexism, and bigotry are not a basis for employment decisions is as critical as it has ever been. To the extent the Agency does not succeed, the promise of equal opportunity without regard to race, color, creed, or sex will be as hollow tomorrow as it was many, many years ago when I was born.

Again, Mr. Chairman, this is an excellent opportunity to have a constructive discussion about the future direction of EEOC. I look forward to our hearing and the testimony of the witnesses on this very important issue. The Agency has a vital role in protecting and preserving civil rights laws because they are integral to preserving the rights of all Americans. Thank you.

Chairman **Fawell**. And I thank the gentleman for his statement.

[The statement of Mr. Payne follows:]

written statement of the honorable donald payne, ranking member, subcommittee on Employer-employee relations, committee on education and the workforce, u.s. house of representatives - see appendix b

Chairman **Fawell**. As indicated, our first panel is one man, and one very important man, the Speaker Newt Gingrich.

We very much appreciate your coming to this hearing, Mr. Speaker, and expressing the concerns that you have in regard to the enforcement of civil rights, and all the various acts under the EEOC. We are happy that you have a deep concern and interest. And we are more than willing to listen to whatever comments and thoughts that you may have that will enable our subsequent panel to have even a better discussion about the concerns that we all have about this extremely important area.

The chair does now recognize the Speaker.

### STATEMENT OF the HONorable NEWT GINGRICH, SPEAKER OF THE HOUSE OF REPRESENTATIVES

Speaker **Gingrich**. Thank you, Chairman Fawell, and Mr. Payne and members of the committee. I think that this is a very important hearing on the future direction of the Equal Employment Opportunity Commission.

You know, in addition to demeaning the human condition, discrimination is profoundly un-American. It is contrary to the principle first inscribed in the Declaration of Independence, "All men are created equal, endowed by their Creator with the inalienable right of life, liberty, and the pursuit of happiness." These are the words that precede the founding of the United States. Thus, to treat someone else differently due to race, color or gender is an offense against not merely the individual, not merely the State, but, in fact, our Creator.

Yes, it took America time to completely live up to these first principles. We are humans, yet fortunate to be blessed with the best continuing experiment in self-government the world has ever seen. We have progressed and continue to do so. Yet we must work to guarantee that discrimination can never be tolerated.

It is vital that the EEOC, the Nation's leading civil rights enforcement agency, function in a fair, efficient and professional manner. If the Commission can demonstrate that it can do this, we will support additional funding for it. Support for increased funding will be contingent on its being properly targeted to helping actual victims of discrimination and not to litigating cases that seek to break new legal ground. The typical case of discrimination may seem mundane to EEOC lawyers, but it is vitally important to the individual victim.

Until the 65,000-case backlog is reduced and those real Americans receive justice, the EEOC should not be trying to create new cases through initiatives such as testers. Unfortunately, this committee heard testimony last October from individual victims of discrimination, civil rights lawyers, and small businessmen that the EEOC gives the investigation of individual charges of discrimination low priority in terms of staffing and resources, while litigation, especially high-profile cases, has more than ample staffing and funding. This is a shocking situation.

While every office should be allowed certain latitude in assessing its Commission priorities, continually putting individuals on the back burner sends a horrific signal. Indeed, it could be said that the EEOC is in effect discriminating against individuals who happen to be only a single victim. That attitude, intentional or not, cannot be justified. For the individual awaiting resolution, justice delayed is justice denied. It must change if the EEOC is to be entrusted with the budget increase.

The average number of cases investigated and completed per investigator is 28.2, and the average case load of pending cases is 70 cases per investigator. By sharp contrast, the average litigation case load per attorney in the district offices is 1.4 cases, a workload which calls into question the very meaning of the word. This allocation of resources leads to questions about EEOC priorities. Lawyers must become more involved in the supervision of the intake and investigation process and less focused on litigation.

Thus, any new money for EEOC must go to addressing the 65,000-case backlog through such avenues as improvements in the investigative process and increased alternative dispute resolution. It should not go to initiatives that create new cases where no individual has alleged discrimination, such as employment testers or Commissioner's charges.

While the backlog is down from the record 1995 level of 103,000 cases, justice delayed is still unacceptable. At the same time, we must ensure that any backlog reduction by the EEOC does not result in a sacrificing of fairness. There should be no case dumping. Should these concerns be addressed, we will support the President's increased funding request, 15 percent of $37 million, for the Commission.

Is every Commissioner's charge frivolous and unworthy of support? Of course not. But again, there are many obvious individuals out there who have suffered apparent discrimination. Why go out seeking discrimination haphazardly when it can be said that it is sitting on your doorstep. Increased funding should be given in return for reform such as: one, improvements to investigative and intake processes, including greater supervision of the process; two, a significant reduction to the backlog of cases and the length of time for case processing; three, appropriate allocation of resources between intake, investigation and litigation; four, clarification of the criteria for litigation by the EEOC; five, expanded use of alternative dispute resolution; and six, an agreement by the EEOC not to use its scarce resources for employment testers.

The use of employment testers, frankly, undermines the credibility of the EEOC. The Government should not sanction applicants' misrepresentation of their credentials to perspective employers. The use of testers not only causes innocent businesses to waste resources interviewing candidates not interested in actual employment, but also puts a Government agency in the business of entrapment. It assumes guilt where there has been no indication of discriminatory behavior.

In addition, there are serious concerns of fairness; for example, whether using testers would be a fair test since not even identical twins are exactly alike, and testers may be overly motivated to find discrimination.

Finally, the courts are also divided as to whether the whole concept of employment testers are even lawful. The D.C. Circuit Court of Appeals ruled that employment testers lacked standing to bring claims of discrimination. For these reasons, the use of testers must be seriously reviewed.

I am committed to working with you to ensure that the EEOC is a fair, and efficient and effective enforcer of the Nation's civil rights laws. We want to make sure that it has adequate funds to carry out its mission. We will support additional funding this year provided the resources go to ensuring that actual victims of discrimination receive more timely justice and the reforms outlined here are initiated.

Let me just close by saying, I believe it is vital that every American know that their Federal Government stands with them against discrimination. I think it is vital that we be prepared in an effective, enforceable way to provide prompt response and a true opportunity for justice in a timely manner to any American who has been a victim of discrimination.

Chairman **Fawell**. Well, I thank you very much. I think your statement was very, very fine.

[The statement of Speaker Gingrich follows:]

written statement of the honorable newt gingrich, speaker of the house of representatives - see appendix c

Chairman **Fawell**. I've noted that as we prepared for this hearing, having read all of the testimony and looking forward to discussing the matter with our second panel, that everyone does seem to be very strong in the support of the increase, and everyone has targets in regard to what the money ought to be used.

Now, there is some variation in regard to the targets, but I notice that the main emphasis is that we should zero in on alternative dispute resolution, the charge and processing, the intake and the investigation, and also in regard to technology, which Mr. Igasaki has made reference.

So it is good to know that we, I think, start with a good, positive feeling here that the EEOC is probably more important than ever because of recent Supreme Court decisions, and if anything is more important than the idea that when discrimination does occur, that there is going to be strict and fast and efficient movement. I think in this area we can make a lot of improvements, as I think Mr. Igasaki would be the first to say so. And I am very much, by the way, encouraged by everything I have heard about this man. I think he is very realistically taking a look at what we have and recognizes that there are inefficiencies, and this is what we are going to be able to discuss today.

So at this time I will recognize the Ranking Democrat of this committee, Mr. Payne, for any questions of the Speaker that he may have.

Mr. **Payne**. Thank you very much.

I would just like to just ask the Speaker about your statement on seeking discrimination haphazardly when you have it on your own doorstep. I take it to mean that you, and what I hear the Chairman saying, is that you agree to funding the increase based on certain criteria, one of which is not seeking new cases with testers.

I don't know specifically how it works, but I would imagine that your characterization of testers being used haphazardly isn't accurate, I suppose that testers are probably used when there is some pattern, and I don't know whether that is considered haphazard. And I just wondered if you could elaborate a little bit more on the fact that you feel, and I, too, feel that the backlogs can certainly be brought down and, hopefully, finally eliminated. But by the same token, I don't understand the disapproval of attempting to move forward to seek proof of additional new discrimination.

So if you want to elaborate on that a bit.

Speaker **Gingrich**. Sure. Let me make a couple of points. First of all, I believe that, as a matter of justice, we owe it to those who have filed a complaint to receive timely attention from their government. Otherwise the promise that their government will defend them against discrimination ceases to be relevant.



*U.S. Equal Employment Opportunity Commission*

Exhibit #15

Meeting of July 18, 2012 – Public Input into the Development of EEOC's Strategic Enforcement Plan

# Written Testimony of Former Chair Gilbert Casellas, OMNITRU

Who is more deserving of protection from discrimination on the job? Some might argue in favor of African Americans, who were the objects of the most offensive, legally sanctioned racial oppression of any group in our country's history. The civil rights movement and resulting legislation were a reaction to the segregation imposed on African Americans during the one hundred years after the end of slavery. Others might argue on behalf of women, who represent half the population but, nevertheless, receive less than three-quarters the pay of their male counterparts. Women remain second-class citizens even though they gained the right to vote decades ago. Still others might advocate for Hispanics or Asians, the fastest growing segments of the population, who often are discriminated against because of their race, color, accent, surname, national origin, or all of the above. In the increasingly multinational, multicultural America, it is suggested that these minorities better represent what this country will look like in the twenty-first century. By sheer number, the forty-five to fifty million individuals with disabilities are the last of the truly second-class citizens, others might argue, because of the many deep-seated myths, fears, prejudices, and stereotypes that persist about them. In terms of both their group size and their political and economic clout, older workers, whose numbers grow exponentially with the aging of the baby boomers, are arguably more "advantaged" and somewhat less deserving. There are also white men, who view themselves as innocent victims and losers in the "preference" game and who will soon become the new minority. Finally, there are religious minorities whose causes can engender passionate zeal on the part of their advocates.

In a constitutional democracy, the question of who is more deserving of legal protection is an offensive one. The answer to such a question can be found in the law and should be plain: each member of the listed groups, as well as all other Americans, is covered by our workplace civil rights statutes. The prohibition against race discrimination, though intended to protect blacks, protects members of every race-black, white, and other. Men and women are equally protected from sex-based discrimination. The Civil Rights Act of 1964, the Equal Pay Act, the Age Discrimination in Employment Act (ADEA), and the Americans with Disabilities Act (ADA) represent the recognition that prejudice in all manifestations is antithetical to basic American values. Nonetheless, the question exists because, rather than the law, it is the politicians, pundits, and even the protected groups who, by design or default, increasingly seek to define who is more deserving. Whether because of open hostility legitimized by ideologues, compassion-fatigue from a calloused public, self-centeredness inherent in interest-group advocacy, or insufficient resources devoted to it by a less generous Congress, civil rights law enforcement is becoming more of a zero-sum game: one group's gain becomes another group's loss.

For over three years, I served as Chairman of the U.S. Equal Employment Opportunity Commission, the federal agency principally responsible for enforcing laws against workplace discrimination. I began my service in October 1994, nearly two years into the Clinton Administration and five weeks before the Congressional elections that wrested control of the House from the Democratic Party for the first time in forty years. To say that it was a period of unprecedented challenge and innovation may not be much of an overstatement. This era certainly brought into focus once again questions of how American society views discrimination and civil rights law enforcement; who are "appropriate" victims; what are "worthy" causes and "acceptable" issues; and how we enforce the law in a period of limited resources, lowered expectations of the role of government, and greater militancy by business and politically conservative groups.

The politicization of civil rights is nothing new. The very structure and jurisdiction of the EEOC resulted from political compromise in order to secure passage of the Civil Rights Act of 1964. So preposterous was the notion that discrimination against women should be illegal that the inclusion of sex as a protected class was part of a cynical and ultimately unsuccessful political strategy by opponents of the civil rights bill to defeat the entire bill. Notwithstanding this history, the politicization of the past three years seems to have taken on new and more dangerous dimensions as manifested by the so-called Republican Revolution, the Contract with America, the angry-white-male phenomenon, anti-immigrant hysteria, and anti-affirmative action legislative initiatives. All contributed to a backlash against civil rights law enforcement, and all occurred during the three years that I served as Chairman of the EEOC.

Similarly, the increased fractionalization of the American public along racial, ethnic, or other interest-group lines made serving as an ecumenical Chairman very difficult. Advocacy groups exerted constant pressure to right the wrongs of the previous twelve years of Republican administrations by prioritizing their constituency's problems over those of others. As a result, a single week in the life of the Chairman could involve individual meetings with various civil rights advocates who ignored the very real fiscal constraints facing the Commission and who nonetheless, advocated for a greater focus on their respective issues. These groups and issues could include black federal employees, women in non-traditional industries, women of color in corporate America, Hispanic women in the agricultural sector, Asians Americans and corporate glass ceilings, individuals with physical disabilities competing with those with mental disabilities, and on and on in virtually every combination. Convincing each group that the Commission existed to serve everyone was less difficult than convincing ourselves that we could accomplish this goal. However, congressional parsimony during the dozen or more years before I

arrived made that noble cause virtually unattainable as a practical matter. Convincing the American public that civil rights was an "American" issue, and not exclusively an African-American, Hispanic-American, or Asian-American issue, was also made difficult by the political noise generated by an empowered conservative movement that sought to polarize the American public with the so-called wedge issues of racial quotas and preferences.

The debate over deserving groups, worthy causes, and appropriate issues also involves the perennial question of the Commission's role and function. The Commission was formed by Title VII of the Civil Rights Act of 1964, which prohibits employment discrimination based on race, color, national origin, sex, and religion. Its founding mandate was to receive and investigate charges of employment discrimination and, when warranted, to attempt to "conciliate" disputes. While alternative dispute resolution (ADR) is now in greater use, the practice has existed in Title VII since the statute's inception. The statute provides that the Commission, after finding reasonable cause to believe that discrimination has occurred, must engage in a process of conciliation. Essentially, this process should involve attempting to resolve the dispute, to end the offending practice, and to provide relief to the charging party. During its first seven years, the Commission's only enforcement authority was this power of persuasion. If conciliation failed, the EEOC had no ability to enforce its findings through litigation. Although modeled in part after the National Labor Relations Board, the Commission also lacked that Agency's cease and desist authority. Therefore, at the time of its creation, the Commission was an agency designed to "process cases," issue rules and policy guidance, collect statistics, offer technical assistance, and obtain justice through the power of persuasion, all without power to enforce its findings or rules.

It was this view of the EEOC as a conveyor belt that has brought about, over the years, significant debate about whether its true mission should be processing cases or identifying and eliminating discrimination. During the past three years, some members of the current congressional majority have viewed the Commission as a case-processing agency. This view would have the Agency focus exclusively on the cases of individual claimants involving disparate treatment and eschew class and pattern and practice cases, investigations initiated by individual Commissioners, known as Commissioner charges, and the use of statistical proof in appropriate cases, despite long-standing court precedent authorizing such evidence. This support for an individual-claimant focus was not limited to members of Congress, though they tended to hold to the more unyielding view. Some workers' rights advocates also believed that "customer service" at intake and the investigation and conciliation of individual cases should take precedence. They pointed out that many of the individual claimants are without counsel, are unlikely to obtain private counsel, or are unable or unwilling to engage in lengthy and expensive litigation as part of a large group. As examples, advocates pointed persuasively to cases of sexual harassment or religious accommodation where the individual claimant simply sought an end to the offensive behavior and a return to work unencumbered by the harassment. The need to "make law" or to "send a message" was surrendered to the practical needs to earn a living and avoid a reputation as a troublemaker.

The mission of the EEOC has also revolved around the issue of how efficiently the Commission performs its work, and this was true during my term as well. Thus, the concern over a large pending caseload sometimes incorrectly called a backlog [FN1]-is also not a new one. Backlogs-more incoming charges than the Agency is resolving-have been emblematic of the EEOC. From the outset, there was a great swell of those wanting access to the rights afforded by Title VII. It had been forecast originally that the Commission would receive approximately 2,000 charges in its first year. In fact, the Agency received nearly 9,000 complaints. To meet the demand of those filing discrimination complaints, the EEOC opened field offices throughout the country. By 1971, the Agency had seven regional and twenty-seven district offices processing discrimination charges. This growing nationwide access to the Agency resulted in a significant backlog of charges. To address its burgeoning workload, the Commission transferred greater authority to the field. District Directors were allowed to begin conciliation soon after a charge was filed, rather than having to wait until an investigation determined that discrimination had actually occurred and that the Commission concurred. In certain instances, District Directors were given the prerogative to make the final cause determination, which led to questions of Commission oversight, quality control, and consistent application of the law. Those questions continue to be raised today.

Prior to 1972, when the EEOC was granted authority to seek court enforcement of its findings, the Commission was still able to make a significant contribution to the early development of Title VII decisional law. The Agency did so by using amicus briefs in private lawsuits to influence crucial court decisions defining discrimination and outlining appropriate relief. Other creative strategies were also employed. During the term of EEOC Chairman William H. Brown, the Commission obtained one of its largest back-pay settlements ever. The Commission had intervened successfully in a Federal Communications Commission (FCC) proceeding involving AT&T, arguing that a rate increase should not be given to a company that had discriminatory employment policies. Approximately fifty million dollars was awarded, primarily to female employees.

In 1972, Congress granted the EEOC the power to litigate. The Agency then added five regional litigation centers to its regional and district offices. From these litigation centers, the Agency brought not only large class actions challenging entrenched policies but also individual suits seeking specific relief for an aggrieved party. The Agency defeated involuntary furloughs for pregnant employees, restrictive recruiting policies designed to exclude racial minorities, and airline rules limiting flight attendant positions to women. The EEOC was no longer a toothless tiger, and employers became more willing to settle claims of discrimination in order to stay out of court.

One might argue that the Commission became the victim of its own success. Between 1975 and 1977, the number of charges awaiting Agency action more than doubled from 53,000 to 130,000. In 1978, the burgeoning workload caused newly appointed Chairwoman Eleanor Holmes Norton to close the regional offices and litigation centers. Norton also consolidated enforcement resources in the district offices so that investigators and litigators could work together more effectively. In another effort to reduce the backlog, the Commission implemented a new policy known as the "rapid charge process." This approach encouraged quick settlement of charges by bringing complainants and employers together for fact-finding conferences before the initiation of an investigation.

A 1978 executive branch reorganization added enforcement of the ADEA and the coordination of federal agency EEO programs to the Commission's responsibilities. These additional obligations, though funded, increased the Agency's workload considerably, thereby exacerbating an already unmanageable caseload. By 1979, the Agency had twenty-two district offices with full enforcement units and twenty-seven smaller area and local offices reporting to them. Also during this time, the Agency began to actively pursue opportunities to litigate charges of discrimination. Under its new "Early Litigation Identification" program, investigators and litigators formally combined to select, at the outset of the administrative process, charges with the best potential to promote the Agency's mission through litigation. All of these efforts, buttressed by an ample budget and a supportive Congress and White House, reduced the backlog to fewer than 40,000 charges. Success, however, did not come without criticism.

A General Accounting Office Report issued in 1982 found that the Agency's rapid charge processing and early settlement procedures resulted in remedies that understated the gravity of charges with merit and overinflated the validity of those with little or no merit. In response to the report, the Commission, under its new Chairman, Clarence Thomas, moved to an enforcement policy requiring full investigation of all charges. By 1985, all cases where cause was found, but conciliation failed, were litigated on a first-come, first-served basis. This approach did not permit the maximizing of resources through selective, targeted enforcement. Cases in which investigations revealed a pattern and practice or other evidence of entrenched or widespread discrimination were no longer given priority, simply taking their place in line with all other charges. Consequently, fewer and fewer of these cases were conciliated or litigated. Whether by coincidence or as a result of these policy changes, the number of charges filed with the Agency began to drop. Charges received dipped quickly from 69,000 in 1986 to 59,411 in 1989. During this time, the Agency's commitment to civil rights leadership began to be questioned publicly. Chairman Thomas's many confrontations with Congress revealed that the congressional oversight committee was skeptical of his personal commitment to the Agency's mission, especially due to his earlier public disavowal of affirmative action. Ironically, the Democratic-controlled Congress, which should have been predisposed to supporting the Agency, questioned the Chairman's commitment to the Agency's mission, his conveyor-belt case processing approach, and his abandonment of attacks on broad-based discriminatory employment patterns and practices. As a result, the Agency's funding was relatively flat during the Thomas years.

The slump in case receipts was reversed in no time with the passage of the Americans with Disabilities Act (ADA) and the Civil Rights Act of 1991. The employment provisions of the ADA became effective in 1992, expanding once again the Agency's already broad mandate. As a result, the number of charges filed with the Agency grew rapidly after 1991, peaking in 1994 when 91,000 charges were filed. In addition, in 1992, a substantial increase in sexual harassment charges followed the similar allegations made by Professor Anita Hill during the Senate confirmation hearing for former EEOC Chairman and Supreme Court nominee Clarence Thomas. Four years later, sexual harassment charges filed with the EEOC and state and local fair employment practice agencies had increased by 150 percent. The Agency's expanded mandate and a failure by Congress to provide adequate funding combined to recreate a substantial backlog.

Thus, when I was sworn in as Chairman of the EEOC on October 3, 1994, I walked into an agency with a backlog of nearly 100,000 private-sector cases, compared to 42,000 four years earlier; a litigation docket composed principally of individual cases with very few class or pattern and practice cases; gross underfunding for several years resulting in a smaller, inadequately trained staff and antiquated computer technology; a dearth of rule-making and policy pronouncements on important issues under the civil rights statutes enforced by the Commission; and a Commission which held few public meetings, conducted little outreach, and was viewed as inaccessible to the public-especially to members of historically underserved groups, such as national origin and language minorities.

While some of the contours of these problems could have been foreseen in decisions made a decade earlier, their magnitude had not been. For example, because of inadequate funding through much of the 1980s and early 1990s (with the exception of a one-time appropriation for the ADA), the average active caseload of an EEOC investigator had grown to 123 cases when I assumed the Chair. In 1990, by contrast, each investigator averaged 51 cases. My predecessor, Chairman Evan Kemp, who resigned in April of 1993, left the Commission with an acting Chair who justifiably saw his role only as a caretaker pending President Clinton's selection of a permanent Chairman. As a result, the Commission did not exercise its responsibility of facilitating voluntary compliance with the law through the issuance of policy guidance, especially on basic and important issues under the ADA, such as how to define a disability. Without such guidance, the Commission could not credibly argue to the new, more skeptical Congress that it was doing all it could to encourage voluntary compliance by business, a constituency which the new majority in Congress believed was already overregulated and overburdened by government.

Public meetings of the Commission fell to three per year under the last permanent Chairman. Public access to and interaction with the Chairman and Commissioners was rare. This was significant to civil rights organizations that had already begun to question the Commission's relevance and the Clinton Administration's commitment to civil rights in light of the delayed naming of an EEOC Chair and the slow filling of other vacancies on the Commission. It was therefore important to "open" the Commission to the various communities, particularly to traditionally underserved groups, such as national origin and language minorities.

The new congressional majority's antigovernment, anti-Washington sentiment was veiled in some respects by a focus on government efficiency. The argument, in short, was that Congress supported strong enforcement of our civil rights laws, but wished to assure American taxpayers that their money was being spent wisely by efficiently run, streamlined agencies. On this score, the EEOC was a large target. In addition to its bulging caseload, the Commission had very serious operational problems. First, there were the problems with its own work force. The EEOC's internal labor-management situation, historically ineffective, was at its worst. The EEOC had no employee appraisal system because it had been invalidated by a labor arbitrator; there were a large number of employee grievances pending against the Agency; the Agency had proportionately more internal EEO complaints filed against it by its own employees than any other federal government

agency; there was no collective bargaining agreement in effect; and the Agency was the defendant in several high exposure cases brought by the labor union, the National Council of EEOC Locals of the American Federation of Government Employees (AFGE), involving overtime compensation and other workplace issues. These were hardly hallmarks of a model employer, much less the agency responsible for overseeing important aspects of the American workplace. No agencywide employee training had been conducted since 1992, the year the ADA's employment provisions became effective. In terms of technology, the computer system was antiquated, overburdened, and redundant. Because of years of flat funding, the Agency could not take advantage of technological advances that were evident in most government and commercial offices. The few employees with computers were using equipment so outdated that repair service for them was no longer available. On the information superhighway, the EEOC was "roadkill." These operational problems were generally not known and would have been potentially embarrassing to the Clinton Administration, which as part of its National Performance Review in 1993 pledged to reinvent government. Those reinvention efforts were well underway at the time I assumed the Chairmanship, and the second phase, known as REGO II, was about to commence. The EEOC made little progress on the first phase in 1993 and 1994 as it awaited the appointment of its new leadership.

If the above problems were not enough, I began the new fiscal year in October 1994 with a budget shortfall that would have required a twenty-five percent cut from every budget item, excluding personnel and overhead, because Congress had appropriated eleven million dollars less than President Clinton had requested. Thus, the Commission was being squeezed by several competing forces: a smaller and poorly trained staff with inadequate resources to handle the mushrooming caseload resulting from the new statutes; higher expectations and greater demands; a more militant congressional majority, which legitimized attacks on all government agencies and on civil rights (especially affirmative action); and an impatient, frustrated, and empowered business community, provided with little guidance on a complex new statute and with little appetite for long delays with investigations or the expense of litigation.

In searching for an approach to remedy these seemingly intractable problems, my first step was to depoliticize, as best one could, the discussion about and search for solutions. For the first time in the Agency's thirty-year history, I involved, in unprecedented ways, the other Commissioners to help find solutions to the Agency's many problems. Through the use of Commissioner-led task forces, I was able to tap into the perspectives of the other four members of this bipartisan Commission. These task forces followed my charge to seek out and consult broadly with the many stakeholders of the EEOC. As a result, we were able to accomplish a number of objectives at once. We reinvented government initiatives; we satisfied our many diverse constituents, who spanned the political and ideological spectrum, by opening the Commission and hearing their concerns; we engaged our Republican colleagues on the Commission; and we came up with a plan that many stakeholders could support, thus neutralizing a Congress bent on downsizing government.

Based on the recommendations of these task forces, the Commission rescinded Agency policies that had been adopted in the 1980s, which contributed to our administrative bottleneck. The bipartisan Commission adopted virtually every one of those policies by a unanimous vote. This helped to neutralize any further political opposition from congressional oversight committee members on the Republican side of the aisle. I also reinstituted regular public meetings of the Commission, and devoted several meetings to hearing from representatives of advocacy and other interest groups. We implemented new charge-handling procedures that permit prioritization and better management of incoming and pending charges, encourage settlement at every stage of the process, and allow for a greater exchange of information between the parties. We adopted national and local enforcement plans to guide us in performing our enforcement responsibilities through the strategic use of our limited resources. Most significantly, we authorized the unprecedented use of voluntary, mediation-based alternative dispute resolution to enhance our system of charge processing and to bring about a more cost-effective, fair, and timely method of resolving certain employment discrimination disputes. This marked the first time that a federal law enforcement agency had adopted alternative dispute resolution as part of its enforcement efforts.

These changes were successful. In fiscal year 1997, the EEOC resolved a record-breaking 106,000 charges of discrimination, exceeding the prior year's total by over 20,000. Its pending caseload, which had reached 112,000 in 1995, had dropped to 64,000 by the time of my departure. At least when measured by benefits obtained, this reduction in the number of pending cases did not compromise the rights of claimants. Since October 1994, the EEOC obtained through settlements, conciliations, and litigation nearly three-quarters of a billion dollars in monetary relief for claimants. Most significantly, approximately seventy-five percent of those benefits were obtained absent litigation, without clogging our already overburdened courts, and without incurring legal fees. EEOC policy decisions also kept pace with our program changes. For example, to facilitate compliance with the ADA, the Agency issued long-sought guidances addressing the definition of "disability," the differences between disability-related and service-related retirement plans, and pre-employment disability-related questions and medical examinations. There were policy and enforcement guidances on other issues as well.

With respect to operational issues, we were so successful in such a short period of time that we received a "Hammer of Reinvention" award for our labor-management partnership initiatives. The introduction of much-needed computer technology, including an EEOC web site and local area networks, and the expansion of employee training and development programs increased staff morale, which contributed to record-breaking case resolution, policy pronouncements, and litigation successes.

In short, for the first time in years, the Commission is respected for its enforcement activities, credited for its outreach, applauded for its efforts encouraging voluntary compliance, and praised for its internal reforms. The notorious backlog has been virtually eliminated. The Commission's litigation is more strategic and selective. For example, in the second year of my term, the Commission filed half the number of lawsuits as in the previous year, but obtained twice the monetary relief. A delicate balance was struck: increased outreach, technical assistance, and practical policy guidance to educate and to encourage voluntary compliance; a streamlined case management system, including mediation as a method of alternative dispute resolution; and selective use of litigation. The issue of balance is significant and historical. There persists within the

Commission an institutional conflict: whether to engage in strong, deterrent law enforcement through investigation and litigation or to provide technical assistance and other preventive tools to employers. Moreover, as a corollary, there is within the Commission lingering skepticism towards mediation, a feeling that ADR is antithetical to strong enforcement.

It remains my view that an either/or approach is foolish. First, it is important that the EEOC continue, and if possible increase, its efforts to encourage voluntary compliance, especially through technical assistance. The demand from employers is so great that hundreds of employer representatives were turned away last year from over-subscribed EEOC-sponsored technical assistance program seminars. Second, it is equally important that the EEOC expand its mediation program. Although ADR, in the form of conciliation, was established at Title VII's passage, it occurred at the end of an often lengthy and sometimes contentious investigative process. The mediation program, which we implemented in 1996, commences at the earliest stages of the investigative process, before positions have irrevocably diverged. Further, it relieves the EEOC's administrative enforcement system, the courts, and employees and employers of the burden of a system over which they have minimal control. Congressional critics of the EEOC strongly assert that ADR can eliminate the case backlog and should replace litigation. However, ADR is not a panacea and it will not solve all workplace problems. It will not and should not replace the Commission's other important enforcement tools, including, as a last resort, selective and strategic litigation. Nevertheless, used properly and offered voluntarily, it can resolve a significant number of the cases filed each year with the Commission.

Revising priorities, procedures, and policies are all important steps in bringing the Agency's burgeoning workload under control. However, none of these measures can overcome the fundamental problem-too few resources for an increasing number of complaints. Until Congress provides the EEOC with adequate funding, its investigators will continue to be responsible for too many cases, and the Agency will continue to struggle to meet basic needs in the areas of training, technology, and litigation support, all of which have a negative impact on optimum enforcement of the law.

Finally, the Agency should continue to stand firm against those who would force the EEOC to choose its particular pet issues or, as is increasingly the case, not to pursue certain issues, cases, methods, or practices. All Americans are protected by the civil rights statutes, and civil rights is not a "black issue" or a "minority issue" or a "women's issue." Indeed, it comes as a surprise to many to learn that fifty percent of individuals who file charges with the EEOC are white. Notwithstanding this fundamental fact of equitable enforcement, the most disconcerting development over the past three years has been the willingness of Congress to seek to influence EEOC enforcement by challenging, among other things, certain Commission actions, including intervention in certain high-profile cases; use of Commissioner charges; increased use of class and pattern-and-practice suits; issuance of policy and enforcement guidances on, for example, mandatory predispute arbitration agreements and mental disability under the ADA; large-scale litigation on glass ceilings or employee downsizing; and challenges to violations of longstanding precedents on the use of bona fide occupational qualification and customer preference to justify gender or national origin discrimination. Each one of the above issues or activities generated complaints, correspondence, and calls from legislators who sought in some way to explain how they supported strong enforcement, but not on issue du jour, which they argued was never contemplated by the law. Drafts of some congressional conference committee reports and appropriation language restricted the types of cases litigated (e.g., class and systemic cases), as legal services for the poor had been in the 1980s, or the EEOC methods employed to initiate investigations (e.g., Commissioner charges, which are provided for by statute). Other EEOC enforcement activities resulted in editorials, articles, and even letter writing campaigns asking whether the Commission had overstepped its jurisdiction, lost its institutional mind, or should be closed to allow the private bar to enforce the civil rights laws. One newspaper columnist, without a hint of irony, quite seriously suggested that the EEOC conduct public opinion polls before commencing certain investigations or lawsuits.

The high stakes business of politics, with so many special interests heavily invested in the process, seeks to turn the EEOC's pursuit of remedies for victims of discrimination into a zero-sum game. More and more, pundits and politicians disapprove of and scorn the Agency for doing its job, as evidenced by attempts to ridicule the Commission for offering employers guidance in the applicability of the ADA to individuals with mental disabilities, a group clearly covered by the statute; criticizing the finding that a class of African-American employees at Texaco had been denied promotions (before the appearance of a secretly recorded tape of personnel meetings); or the bold attempt of Mitsubishi Motor Manufacturing Company of America to intimidate the Commission from pursuing, on a classwide basis, a sexual harassment suit on behalf of hundreds of its female employees.

If this kind of outside pressure does not eventually force a hierarchy among equals, a shortage of resources may well compel the Agency to choose who remains seated at the table of equal opportunity. The framers of our workplace civil rights laws certainly never intended for the Commission to engage in rob-Peter-to-pay-Paul-tactics. However, this is what will result if lawmakers do not prioritize civil rights enforcement and if funding for the Agency remains stagnant. The EEOC projects that, without increased funding, its private sector backlog will once again increase to nearly 100,000 charges in two years.

Employment demographics show that workplace equality for women and minorities remains illusive. They also show that the profile of who the Agency will serve is changing dramatically. When founded over thirty years ago, the EEOC's primary focus was redressing deeply rooted racism that resulted in widespread workplace discrimination against blacks. While race continues to be the most frequently cited form of discrimination by those filing charges with the Commission, racial issues in America are far more complicated and dynamic than at any time since 1965. The nation's ethnic profile is changing so rapidly that, in the next few years, it is projected that Hispanics will outnumber African Americans. Asians are now the country's fastest-growing minority. By the middle of the next century, virtually half of all Americans will be black, Hispanic, Asian, and American Indian. For the first time, whites will be in the minority and a two-tone, black and white America will be a thing of the past. Our future work force will be composed of more women, more of what we today term "minorities," more older people, and more immigrants. Underscoring the new racial complexity are the increasing number of multiracial

Americans. In 1990, there were nearly two million children under eighteen whom the census classified as of a different race than one or both of their parents, and many in the growing groups of multiracial Americans pushed for a distinct category on the census forms.

How do we, in the face of public skepticism and weariness during a period of financial constraint, continue to promote equal opportunity in employment for everyone protected by the law? How do we recognize and protect the rights of emerging minorities, while maintaining the promise the Agency has long held for African Americans? How do we overcome the deep-seated myths and prejudices against individuals with disabilities? These will be among the EEOC's major challenges in the twenty-first century. Over the past three years, we have put the EEOC house in order with a balanced and reasoned law enforcement program that combines prevention, ADR, efficient case management, and strong enforcement. The ultimate question is whether America's public leaders will commit the resources necessary to enforce the law and actualize for so many the promise of equal opportunity, or whether civil rights law enforcement agencies, such as the EEOC, will be forced to ration justice.